**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION**

| | | |
|---|---|---|
| LISA TORREY, KATHRYN KOCUREK, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF J. DAVID KOCUREK, PH.D; LANA BARNES, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF AL BARNES; AMY HANNEKEN, JANE POWELL, CAROL FISCH, CHRISTOPHER VALERIO, STEVEN WARD, RANDY SYKES, BRIENNA REED, ROSETTA FULLER, ADRIANA MONTEIRO MOREIRA, JESSICA MCKINNIE, KRISTINE WOODARD, GAIL MEADS, DR. MICHAEL FUNDENBERGER, GAYLE CLARKE, ALLISON LYNN CARUANA, CHLOE LOHMEYER, MAX SHINDLER, TAWNYA DAWN SMITH, INDIVIDUALLY AND AS NEXT FRIEND OF MONET PITRE; MIKE PEACHER, INDIVIDUALLY AND AS NEXT FRIEND OF ASHLEIGH PREACHER; AND ALARIE BOWERMAN, INDIVIDUALLY AND AS NEXT FRIEND OF ELISA, EMORY AND ANAIS BOWERMAN; | § § § § § § § § § § § § § § § § § § § § | CIVIL ACTION NO.  5:17-CV-00190-RWS |
| Plaintiffs, | § § § | |
| v. | § § § | |
| INFECTIOUS DISEASES SOCIETY OF AMERICA, BLUE CROSS AND BLUE SHIELD ASSOCIATION, AETNA INC., ANTHEM INC, BLUE CROSS AND BLUE SHIELD OF TEXAS, CIGNA CORPORATION, KAISER PERMANENTE, INC., UNITED HEALTHCARE SERVICES, INC., UNITED HEALTHCARE GROUP INCORPORATED, DR. GARY P. WORMSER, DR. RAYMOND J. DATTWYLER, DR. EUGENE SHAPIRO, DR. JOHN J. HALPERIN, DR. ROBERT B. NADELMAN, DR. LEONARD SIGAL, DR. ALLEN STEERE, | § § § § § § § § § § § § § § § | |
| Defendants. | § § § | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Before the Court are Defendants Anthem, Inc., Blue Cross and Blue Shield of Texas, Aetna, Inc., Cigna Health and Life Insurance Company (sued as Cigna Corporation), Kaiser Foundation Health Plan, Inc. (sued as Kaiser Permanente, Inc.), United Healthcare Services, Inc., Unitedhealth Group Inc. and Blue Cross and Blue Shield Association's (collectively, "Insurance Defendants") Motion to Dismiss (Docket No. 37), Blue Cross and Blue Shield Association's Individual Motion to Dismiss (Docket No. 38), and Defendants Infectious Diseases Society of America ("IDSA"), Dr. Gary P. Wormser, Dr. Raymond J. Dattwyler, Dr. Eugene Shapiro, Dr. John H. Halperin, Dr. Robert B. Nadelman, Dr. Leonard Sigal, and Dr. Allen Steere's (collectively, "Doctors" or "IDSA Panelists") Motion to Dismiss (Docket No. 40).  Briefing in this matter has completed, and the Court held a hearing on these motions on May 22, 2018 (Docket No. 89).

## BACKGROUND

Plaintiffs filed the instant action on November 10, 2017, alleging that the Insurance Defendants, IDSA and IDSA Panelists have engaged in a decades-long conspiracy and scheme to deny the existence of chronic Lyme disease and to prevent treatment of chronic Lyme disease. The following facts come from Plaintiffs' Complaint (Docket No. 1).  The Court accepts all well-pleaded facts as true and views them in the light most favorable to the Plaintiffs.

Lyme disease is the most common tick-borne infection and the fastest growing infectious disease in North America.  Compl. ¶ 44.  The CDC estimates that 300,000 Americans are infected with Lyme disease each year.  *Id*.  Left untreated for a prolonged period of time, Lyme disease may spread to the joints, heart and nervous system, cause debilitating symptoms, such as crippling muscle and joint pain, disabling fatigue, arthritis, neurological disorders, cardiac disorders, and lead to a painful and agonizing death.  *Id*.

Plaintiffs allege that doctors have known for a long time that while many patients who contract Lyme disease may be cured with short-term antibiotics, a large number of patients, up to 40 percent, do not respond to short-term antibiotic treatment.  *Id*. ¶ 45.  These patients require long-term antibiotic treatment for many months until the symptoms are resolved.  *Id*.  Though Insurance Defendants initially provided coverage for long-term antibiotic treatment of Lyme disease, the health insurance industry made a concerted effort in the 1990s to deny coverage for Lyme disease because treatment was too expensive.  *Id*. ¶¶ 47, 48.  The Insurance Defendants enlisted the help of doctors who were researching Lyme disease—the IDSA Panelists—and paid them large fees to develop arbitrary guidelines for testing Lyme disease.  *Id*. ¶ 48.  Once these guidelines were established, the Insurance Defendants could, and did, deny coverage for patients who did not meet the new stringent Lyme disease testing protocols.  *Id*. ¶ 49.  With the help of the IDSA Panelists, the Insurance Defendants decided that long-term antibiotic treatment was not necessary and that all Lyme disease patients could be cured in less than a month.  *Id*. ¶ 50.  By August of 1992, the Insurance Defendants had imposed an intravenous antibiotic limit of 28 days.  *Id*.

By the mid-1990s, the Insurance Defendants began paying large consulting and expert fees to the IDSA Panelists who helped them develop the treatment guidelines to review and deny insurance coverage claims.  *Id*.  ¶¶ 54–59.

Lyme Disease Guidelines

In 2000, the IDSA published its first guidelines for treating Lyme disease, similar to the guidelines imposed by the Insurance Defendants, and written mostly by the same Lyme disease researchers paid by the Insurance Defendants.  *Id*. ¶ 60.  Plaintiffs allege that doctors who actually treated Lyme disease were not invited to join the panel or were removed from the panel if they

disagreed with the guidelines. *Id.* ¶¶ 61–63.  Between 1997 and 2000, more than 50 physicians in New York, New Jersey, Connecticut, Michigan, Oregon, Rhode Island and Texas were investigated, disciplined or had their licenses removed for speaking out against the IDSA guidelines. *Id.* ¶ 65.  Many of these doctors were reported to their medical boards by the Insurance Defendants via correspondence by mail from their offices to the medical boards in these states.  *Id.* These communications caused doctors who would normally treat Lyme disease patients to refuse treatment.  *Id.*  These physicians used their own money to defend themselves in these state board proceedings, and some lost their licenses, some were not allowed to treat Lyme disease patients and one of these physicians eventually committed suicide.  *Id.* ¶ 67.

For example, Dr. Joseph Burrascano, Jr., an internationally known infectious disease specialist, testified at a hearing before the Senate Committee on Labor & Human Resources that a "core group of university-based Lyme disease researchers and physicians . . . promote this so called 'post Lyme syndrome' as a form of arthritis . . . [and] [s]ome of them are known to have received large consulting fees from insurance companies to advise the companies to curtail coverage for any additional therapy beyond the arbitrary 30-day course." *Id.* ¶ 68.  Two months after Dr. Burrascano gave this testimony, the New York Office of Professional Medical Conduct ("OPMC") began an intensive seven-year investigation against him.  *Id.* ¶ 69.  He was eventually cleared of any wrongdoing relating to his treatment of Lyme disease but spent more than $1 million on attorneys' fees defending himself.  *Id.* ¶ 69.

In 2006, the Insurance Defendants paid the IDSA Panelists to form more restrictive guidelines.  *Id.* ¶ 70.  These new guidelines "promoted the idea that Lyme is a simple, rare illness that is easy to avoid, difficult to acquire, simple to diagnose, and easily treated and cured with 28 days of antibiotics."  *Id.* ¶ 74.  This time, the IDSA invited input from Dr. Leonard Sigal who was

paid $560 an hour by the Insurance Defendants to review the guidelines before they were finalized. *Id.* ¶¶ 71, 72.  Though Dr. Sigal is not referenced in the 2000 IDSA guidelines, he is referenced six times in the 2006 IDSA guidelines; one of these references is to an article written by Dr. Sigal in which he claims that "[c]hronic Lyme disease is a common clinical diagnosis in some geographic areas and is based on thinking that is at odds with scientifically validated findings." *Id.* ¶ 71.  Plaintiffs allege that, again, the members on the panel had no actual expertise in the testing or treatment of Lyme disease and that any physician who received an income of more than $10,000 per year from treating Lyme disease was excluded from the panel.  *Id.* ¶ 73.

<u>Insurance Defendants Report Doctors Who Treat Chronic Lyme Disease</u>

Plaintiffs allege that in addition to denying the existence and, therefore, the treatment of chronic Lyme disease, the Insurance Defendants and IDSA Panelists report doctors who treat chronic Lyme disease to medical boards in an attempt to strip them of their medical licenses.  *Id.* ¶ 79.  Plaintiffs allege that the IDSA Panelists are then paid by the Insurance Defendants to testify against these doctors in front of the medical boards, which has resulted in patients struggling to even find doctors who are willing to treat chronic Lyme disease.  *Id.*

Plaintiffs specifically identify three doctors who have been reported for treating chronic Lyme disease.  Dr. Joseph G. Jemsek began treating patients with long-term antibiotic treatment when he learned about the growing number of Lyme disease patients who were not being treated properly.  *Id.* ¶¶ 82, 83.  He submitted these patients' claims to Defendants Blue Cross and Blue Shield Association, Anthem, Inc., and Blue Cross and Blue Shield of Texas (collectively, "Blue Cross Defendants").  *Id.* ¶ 83.  In 2003, the Blue Cross Defendants began examining Dr. Jemsek's claims and learned of his use of long-term antibiotic therapy for treating chronic Lyme disease. *Id.* ¶ 84.  The Blue Cross Defendants, relying on the IDSA guidelines, defined all courses of

antibiotics lasting longer than 28 days to be "medically unnecessary" for treating Lyme disease. *Id*. Instead of informing Dr. Jemsek that they used this specific policy to deny his patients' claims, the Blue Cross Defendants sent correspondence to Dr. Jemsek's patients, informing them that Dr. Jemsek's use of long-term antibiotics did not meet the "medical necessity" standard. *Id*. In 2005, the Blue Cross Defendants stopped paying Dr. Jemsek's patients' claims and then worked with some of those patients and the North Carolina Medical Board to put Dr. Jemsek out of business and to strip him of his medical license. *Id*. ¶ 85. Plaintiffs allege that Dr. Jemsek learned that Janelle R. Rhyne, a member of the North Carolina Medical Board, was, at the same time, a paid consultant to the Blue Cross Defendants. *Id*. The North Carolina Medical Board recommended charging Dr. Jemsek with professional misconduct for improperly diagnosing Lyme disease and using long-term antibiotics to treat chronic Lyme disease. *Id*. ¶ 86. After these charges were announced, the Blue Cross Defendants used this recommendation to place a hold on all claims submitted by Dr. Jemsek and his clinic. *Id*. The Blue Cross Defendants then sued Dr. Jemsek for up to $100 million for treating Blue Cross-insured patients, putting Dr. Jemsek out of business in North Carolina and forcing his practice into bankruptcy. *Id*. ¶ 87.

Plaintiffs also allege that Dr. Kenneth B. Liegner has been forced to defend himself in front of the New York State Department of Health for treating patients with chronic Lyme disease and, similarly, that Dr. Charles Ray Jones has expended over $1 million in defending against the Connecticut State Medical Board. *Id*. ¶¶ 88, 89. Plaintiffs allege that Pat Smith, the President of Lyme Disease Association, Inc., has testified in front of the New York State Assembly that "almost 60 percent of doctors who treat chronic Lyme disease in New York State have faced OPMC scrutiny the past year," and that "OPMC reps said that 'some of our best tips come from insurance companies.' " *Id*. ¶ 80. Plaintiffs allege that the practice of reporting doctors who treat chronic

Lyme disease is part of a current and ongoing conspiracy by the Insurance Defendants, the IDSA and the IDSA Panelists to prevent patients with chronic Lyme disease, including Plaintiffs, from receiving treatment that could cure them. *Id.* ¶ 91.

Connecticut Attorney General's Investigation

Shortly after the 2006 IDSA guidelines were released, the Attorney General of the State of Connecticut, Richard Blumenthal (now Senator Blumenthal) served the IDSA with a Civil Investigative Demand because he was concerned that the 2006 IDSA guidelines violated laws by restraining "doctor and patient choices for treatment of the disease" and preventing physicians' clinical judgment. *Id.* ¶ 92. Blumenthal inquired into whether the IDSA ignored any studies supporting long-term antibiotic treatment, if there were any conflicts of interests and whether insurance companies might use these new guidelines to deny payment for Lyme treatment. *Id.* ¶ 93. Blumenthal also claimed that some members of the IDSA panel who wrote the guidelines consulted for insurance companies which could lead to unfair guidelines in respect to chronic Lyme disease. *Id.* On April 30, 2008, the IDSA reached a settlement with Blumenthal but not before he found that several of the most powerful IDSA panelists had undisclosed financial interests in insurance companies, including consulting arrangements with them. *Id.* ¶ 94.

RICO Allegations

Plaintiffs allege that IDSA and the Insurance Defendants are corporations and thus are persons pursuant to Section 1961(3) of the Racketeer Influence and Corrupt Organizations Act ("RICO"). *Id.* ¶ 98. Plaintiffs claim that the IDSA, Insurance Defendants and IDSA Panelists constitute an enterprise engaged in activities affecting interstate commerce and that their acts are so related and continuous as to form a "pattern of racketeering." *Id.* Specifically, Plaintiffs allege

that Defendants committed the predicate racketeering acts of mail fraud, in violation of 18 U.S.C. § 1341, and wire fraud, in violation of 18 U.S.C. § 1343.  *Id.* ¶ 99.

Plaintiffs allege that Defendants mailed, caused to be mailed, knowingly agreed to mail various materials and information, and/or wired information, including correspondence, regarding the following:

- fraudulently and wrongfully claiming lack of insurance coverage for chronic Lyme disease;
- fraudulently and wrongfully denying insurance coverage to people with chronic Lyme disease;
- issuing false and misleading estimations of benefits to patients with Lyme disease;
- fraudulently and wrongfully claiming all Lyme disease patients can be easily treated and cured with short-term antibiotics;
- fraudulently and wrongfully claiming Lyme disease patients only have Lyme disease if they exhibit an EM rash or test positive with a two-tier serology test;
- wrongfully and illegally reporting doctors to their medical boards for treating chronic Lyme disease;
- fraudulently and wrongfully misleading people with Lyme disease, and their doctors, by classifying their chronic Lyme disease as a mental disorder;
- fraudulently and wrongfully misleading people with Lyme disease, and their doctors, by classifying their chronic Lyme disease as a different physical condition such as chronic fatigue syndrome or fibromyalgia; and
- fraudulently and wrongfully enforcing the IDSA guidelines even when doctors determine a patient requires long-term antibiotic treatment.

*Id.* ¶ 99.

Plaintiffs further allege Defendants mailed, wired, caused to be mailed or wired, and/or knowingly agreed to the mailing or wiring of various materials and information, including correspondence, between the IDSA and Insurance Defendants regarding the following:

- payments from the Insurance Defendants to IDSA Panelists to promote the false narrative "that Lyme is a simple, rare illness that is easy to avoid, difficult to acquire, simple to diagnose, and easily treated and cured with 28 days of antibiotics";
- payments from the Insurance Defendants to the IDSA and the IDSA Panelists to promote the false claim that chronic Lyme disease is not real;

- payments from the Insurance Defendants to the IDSA and the IDSA Panelists to promote the false claim that long-term antibiotic treatment is improper and unnecessary;
- payments from the Insurance Defendants to the IDSA Panelists so the IDSA panelists will serve as expert witnesses for the Insurance Defendants and testify that patients' requests for repeat or prolonged courses (e.g., greater than 4 weeks) of IV antibiotic therapy are considered not medically necessary;
- payments from the Insurance Defendants to the IDSA Panelists so that IDSA Panelists will serve as expert witnesses for the Insurance Defendants and testify that denial of long-term antibiotic treatment was proper;
- payments from the Insurance Defendants to the IDSA Panelists so the IDSA Panelists will serve as expert witnesses for the Insurance Defendants and testify that patients' chronic Lyme disease is actually a mental disorder or a different physical ailment not requiring long-term antibiotics;
- payments from the Insurance Defendants to the IDSA Panelists so the IDSA Panelists will serve as expert witnesses for the Insurance Defendants and testify against doctors who provide long-term antibiotic treatment to patients; and
- payments from the Insurance Defendants to the IDSA Panelists so the IDSA Panelists will serve as expert witnesses for the Insurance Defendants and testify that patients do not have Lyme disease because they do not exhibit an EM rash or test positive with a two-tier serology test.

*Id.*  Plaintiffs allege that Defendants are in violation of 18 U.S.C. §§ 1341, 1343, 1961 and 1962 by repeatedly and regularly using U.S. mail and interstate wire facilities to further all aspects of the alleged scheme and by delivering and/or receiving materials necessary to carry out the scheme to defraud Plaintiffs.  *Id.* ¶ 100.

<u>Sherman Act Allegations</u>

Plaintiffs assert that the IDSA holds itself out as the pre-eminent authority on the treatment of infectious disease in the United States and that the IDSA, the IDSA Panelists and Insurance Defendants represent to state medical boards that the IDSA guidelines are the appropriate standard of care when investigating and sanctioning doctors who treat Lyme disease patients.  *Id.* ¶ 112. Though the IDSA claims that its guidelines are not mandatory, they have been regarded as mandatory within the medical community.  *Id.* ¶ 111.  The Insurance Defendants treat the guidelines as mandatory and use the IDSA Panelists to enforce them as mandatory regulations.  *Id.*

Plaintiffs allege the Insurance Defendants engaged in a conspiracy to unreasonably restrain trade in the relevant market—the Lyme disease treatment market—by paying large consulting fees to the IDSA Panelists to pass the IDSA guidelines which deny the existence of chronic Lyme disease and establish the standard that all Lyme disease is cured with short-term antibiotics.  *Id.* ¶¶ 112, 119.  Then, when an insured individual appeals the denial of insurance coverage for long-term antibiotic treatment, the Insurance Defendants hire one of the IDSA Panelists to affirm the denial of coverage.  *Id.* ¶ 76.

Competitors in the market—physicians who treat chronic Lyme disease—have also been adversely affected by the IDSA guidelines because they have been excluded from participating in the IDSA Panels and have been excluded from diagnosing and treating Lyme disease.  *Id.* ¶¶ 119, 166.  Plaintiffs assert that the 2006 guidelines have no legitimate purpose and are used as a predatory device to injure doctors who do not follow them.  *Id.* ¶¶ 122, 169.  The 2006 IDSA guidelines prevent doctors from providing patients with treatment options because the guidelines are extremely restrictive and also limit patients' ability to obtain health care and eliminate their choice of medical treatment.  *Id.*  ¶¶ 123, 169.

Moreover, Plaintiffs allege that the guidelines' denial of the existence of chronic Lyme disease and failure to acknowledge long-term antibiotic treatment is not the least restrictive method available to protect the public.  *Id.* ¶¶ 126,170.  Plaintiffs further allege that the IDSA guidelines' development process did not have any procedural safeguards and was improperly influenced by the IDSA Panelists' financial interest in Lyme diagnostic tests and their consulting arrangement with the Insurance Defendants.  *Id.* ¶¶ 127, 128, 172.

Plaintiffs further allege that, as a result of this scheme, the IDSA, IDSA Panelists and Insurance Defendants willfully acquired possession of monopoly power in the Lyme disease

treatment and diagnosis market.  *Id.* ¶130, 173.  The Defendants have also monopolized interstate commerce by excluding competitors from a market, which has had an anticompetitive effect harmful to consumers.  *Id.* ¶ 131, 173.

## APPLICABLE LAW

Under the general pleading requirements of Rule 8(a), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). The complaint need not contain detailed factual allegations, but a plaintiff must plead sufficient factual allegations to show that he is plausibly entitled to relief.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56, 570 (2007) ("[W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face."); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949–50, 1953 (2009) (discussing *Twombly* and applying *Twombly* generally to civil actions pleaded under Rule 8). "Determining whether the complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 129 S. Ct. at 1950.

A Rule 12(b)(6) motion allows a party to move for dismissal of an action when the complaint fails to state a claim for relief that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  A claim is "plausible on its face" when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  The standard of plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that the defendant[s] ha[ve] acted unlawfully." *Id.* at 678–79.  "Where a complaint pleads facts that are 'merely consistent with' [defendants'] liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.' " *PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615

F.3d 412, 417 (5th Cir. 2010) (quoting *Iqbal* at 678).  In such a case, a claim will not survive an attack under Rule 12(b)(6).

Nonetheless, "a motion to dismiss under Rule 12(b)(6) 'is viewed with disfavor and is rarely granted.' " *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011); *accord Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000).  When considering a Rule 12(b)(6) motion to dismiss, the Court must accept as true all well-pleaded facts contained in the plaintiff's complaint and view them in the light most favorable to the plaintiff.  *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996).  The Court may not dismiss a complaint based solely on its supposition that the pleader is unlikely "to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder."  *Twombly*, 550 U.S. at 563 n.8.

## DISCUSSION

Plaintiffs allege the following causes of action: RICO § 1962(c) (Count 1); RICO § 1962(a) (Count 2); RICO § 1962(b) (Count 3); RICO § 1962(d) (Count 4) and Antitrust Violations of the Sherman Act, Sections 1 and 2 (Count 5).  Defendants filed three separate motions to dismiss (Docket Nos. 37, 38 and 40), seeking to dismiss the Complaint on all counts.  The Court groups the Defendants' arguments where possible.

### I.    Sherman Act claims

Defendants contend that Plaintiffs' antitrust claims should be dismissed because Plaintiffs fail to plead: (1) causation; (2) an antitrust injury; (3) an agreement or a relevant market; and (4) the elements of monopolization.  Docket No. 37 at 34–47; Docket No. 40 at 24–26.

Section 1 of the Sherman Antitrust Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  15 U.S.C. § 1.  To state a claim under

this provision, a plaintiff must allege that the defendants "(1) engaged in a conspiracy (2) that restrained trade (3) in a particular market." *Wampler v. Sw. Bell Tele. Co.*, 597 F.3d 741, 744 (5th Cir. 2010) (citing *Apani Sw. Inc. v. Coca-Cola Enters.*, 300 F.3d 620, 624 (5th Cir. 2002)).

### A.  Causation

The Insurance Defendants first contend that Plaintiffs' Complaint lacks allegations sufficient to give rise to an inference of causation because it does not explain how the Insurance Defendants' retention of the IDSA Panelists as experts and consultants is related to those physicians' participation in the IDSA's development of the guidelines.   Docket No. 37 at 37. Defendants also assert that the Complaint does not plead facts giving rise to a plausible inference of any connection between the IDSA's development of these guidelines and any Insurance Defendants' reliance on them when making individual coverage decisions.   Defendants further take issue that the Complaint lacks allegations sufficient to link the claimed harm of personal injuries and medical costs to the Insurance Defendants, specifically that the Plaintiffs submitted proper claims for long-term antibiotic treatment that were wrongfully denied and which left them unable to obtain treatment.

Antitrust cases are not subject to a heightened pleading standard.  *Wampler*, 597 F.3d at 744 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  But stating a claim under this provision does require a complaint with enough factual matter, taken as true, to suggest that an agreement was made. *Twombly*, 550 U.S. at 555.  In addition to presenting contextualized facts to show an agreement or conspiracy, the plaintiff must also allege sufficient factual material to show the alleged agreement had an anticompetitive effect.  *N. Tex. Specialty Physicians v. F.T.C.*, 528 F.3d 346, 358–363 (5th Cir. 2008).

Defendants' assertion that Plaintiffs' Complaint does not plead facts giving rise to a plausible inference of causation ignores Plaintiffs' many well-pleaded allegations asserting the same. *See* Compl. ¶¶ 48, 49 ("The Insurance Defendants enlisted the help of doctors who were researching, not treating, Lyme disease.  The Insurance Defendants paid these IDSA Panelists large fees and together they developed arbitrary guidelines for testing Lyme disease. Once these arbitrary guidelines were decided, the Insurance Defendants could, and did, deny coverage for patients if they did not meet their new stringent Lyme testing protocols."); ¶ 54 ("By the mid 1990s, the Insurance Defendants began paying large consulting fees to the same Lyme IDSA Panelists who helped them develop their arbitrary guidelines. The Insurance Defendants paid these Lyme IDSA Panelists to enforce their new stringent testing protocols and maintain the 28-day treatment requirement.").  Specifically, Plaintiffs identify Dr. Gary P. Wormser, Dr. Raymond J. Dattwyler, Dr. Eugene Shapiro, Dr. John J. Halperin, Dr. Robert B. Nadelman and Dr. Leonard Sigal as physicians who participated in the creation of the IDSA guidelines and who "were paid large sums of money by the Insurance Defendants in consulting fees, in expert witness fees, and to review, and deny, insurance coverage claims related to Lyme disease."  Compl. ¶ 55.

The denial of insurance coverage for long-term antibiotics to treat chronic Lyme disease is one aspect of the greater scheme alleged by Plaintiffs: that the Insurance Defendants, IDSA Panelists and IDSA conspired to unreasonably restrain the treatment of Lyme disease by enforcing the IDSA guidelines as a mandatory standard of care for the benefit of their own economic benefit. Plaintiffs have sufficiently alleged that as a result of Defendants' scheme, they have been unable to find doctors to treat chronic Lyme disease and have incurred out-of-pocket medical expenses and travel expenses to find treatment. *See* Compl. ¶¶ 56, 58, 66, 77, 79, 90.

The Court finds that Plaintiffs have alleged enough facts, which, taken as true, give rise to a plausible inference that Plaintiffs' injuries were caused by the Defendants' conduct.

### B.  Antirust Injury

The Insurance Defendants next assert that Plaintiffs' antitrust claims fail because they do not allege harm flowing from conduct that could be deemed anticompetitive within the meaning of the Sherman Act.  Docket No. 37 at 37–40.  Specifically, Defendants contend that Plaintiffs' injuries "have nothing to do with competition, much less the reduction of competition," and that, instead, Plaintiffs' purported injuries flow from the alleged promulgation and use of the non-binding IDSA guidelines, which is not a competitive market process.  *Id*. at 38.

The Fifth Circuit has repeatedly distinguished between antitrust injury and injury to competition.  *See, e.g., Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc*., 123 F.3d 301, 305 (5th Cir. 1997) ("Since 1983, we have pointed out a distinction between antitrust injury and injury to competition, the latter of which is often a component of substantive liability."); *accord Walker v. U–Haul Co*., 747 F.2d 1011, 1016 (5th Cir. 1984); *Multiflex, Inc. v. Samuel Moore & Co*., 709 F.2d 980, 986 n.6 (5th Cir. 1983); *Games People Play v. Nike, Inc.*, Civil Action No. 1:14–CV–321, 2015 WL 13657672, at *4–5 (E.D. Tex. Feb. 13, 2015); *Vaughn Med. Equip. Repair Servs., L.L.C. v. Jordan Reses Supply Co.*, Civil Action No. 10–00124, 2010 WL 3488244, at *12 (E.D. La. Aug.26, 2010).  Antitrust injury exists when (1) the injury was of the type antitrust laws were intended to prevent and (2) the injury "flows" from or was caused by the defendant's unlawful conduct.  *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc*., 429 U.S. 477, 488–89 (1977).  Injury to competition, on the other hand, need not be pleaded for a plaintiff's antitrust claims to survive a motion to dismiss.  *Doctor's Hosp.*, 123 F.3d at 305.

Plaintiffs have adequately claimed an antitrust injury, namely that Defendants have restrained trade by "treating the IDSA guidelines as mandatory" and setting a restrictive and false standard of care for the testing, diagnosing and treating of Lyme disease.  Docket No. 60 at 39–41.  *See Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500 (1988) (recognizing that a private standard-setting organization that abused its standard setting process may be held liable for antitrust violations);  *see also Acad. of Allergy & Asthma in Primary Care v. Am. Acad. of Allergy*, Civil Action No. SA-14-CV-35-OLG, 2014 WL 12497080, at *8 (W.D. Tex. Sept. 8, 2014) (finding that plaintiffs sufficiently alleged facts that defendants engaged in setting a false standard of care).

Defendants primarily rely on *Viazis v. Am. Ass'n of Orthodontists*, 314 F.3d 758 (5th Cir. 2002), to argue that the creation and promulgation of the non-binding IDSA guidelines is not a competitive market process and that Plaintiffs' attempts to transform the mere existence of a trade association and establishment of guidelines into an antitrust claim should be rejected.  Docket No. 37 at 39; Docket No. 74 at 17.  In *Viazis*, the Fifth Circuit affirmed the district court's finding on judgment as a matter of law—following the conclusion of plaintiff's case-in-chief at trial—that *Viazis* had not established any competitive harm because he had failed to show that the ethics proceedings against him were a sham or that the advertising standard applied by the defendants was pretextual.  314 F.3d at 764–65.  The Fifth Circuit noted that "[a] trade association by its nature involves collective action by competitors[,] . . . [it] is not by its nature a 'walking conspiracy,' its every denial of some benefit amount to an unreasonable restraint of trade."  *Id*. at 764 (quoting *Consol. Metal Prods., Inc. v. Am. Petroleum Inst*., 846 F.2d 284, 293–94 (5th Cir. 1988)).

Defendants' reliance on *Viazis* is unavailing for multiple reasons.  First, in *Viazis*, the plaintiff failed to meet an *evidentiary* standard at trial, whereas here, Plaintiffs need only state a claim for relief that is plausible on its face.  Second, though the IDSA has always maintained that its guidelines are not mandatory—and Plaintiffs acknowledge as much, *see* Compl. ¶¶ 74, 111— Plaintiffs contend that "the Insurance Defendants treat the guidelines as mandatory," *id*. ¶ 111, and that "the Insurance Defendants treat them as 'de facto' law that must be followed by doctors and refuse to cover treatments beyond the IDSA guidelines," *id*. ¶ 74.  Plaintiffs allege that doctors who do not follow these guidelines are reported to their medical boards in an attempt to strip them of their medical licenses, *id*. ¶¶ 79, 88, 89, have been sued by insurance companies for improperly diagnosing and treating chronic Lyme disease with long-term antibiotics, *id*. ¶ 82–87, and have had to defend themselves before state administrative proceedings, *id*. ¶ 89.  Whether Plaintiffs can ultimately prove that the IDSA "had the power to compel any market actors to stop competing with the IDSA or each other in the 'Lyme disease market'," Docket No. 37 at 39, is a factual inquiry that the Court cannot resolve at this stage in the litigation, where Plaintiffs have sufficiently alleged that Defendants engaged in improper standard-setting.  *See Acad. of Allergy & Asthma in Primary Care*, 2014 WL 12497070, at *8 ("While Defendants may ultimately show they lack the ability to set industry standards and that their voice is merely 'persuasive,' Plaintiffs have alleged otherwise, and their allegations support a cause of action.").

Defendants' contention that Plaintiffs have failed to allege conduct that has anticompetitive effects is similarly unavailing.  Plaintiffs have sufficiently alleged a reduction in competition as a result of Defendants' standard-setting behavior, specifically that the Defendants' conduct has reduced the number of doctors who treat chronic Lyme disease to almost none and that there are

few, if any, insurance companies willing to cover treatment of chronic Lyme disease.  *See* Compl. ¶ 119.

### C.  Agreement and Relevant Market

Defendants next contend that Plaintiffs' Complaint merely presents conclusory allegations of parallel conduct without alleging an agreement or "meeting of the minds" among the Defendants.  Docket No. 37 at 41–42 (citing *Twombly*, 550 U.S. at 553, 556–57); Docket No. 40 at 24–25.  However, to prove conspiracy or "concerted action," Plaintiffs must only state that Defendants had a "conscious commitment to a common scheme designed to achieve an unlawful objective."  *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 374–75 (5th Cir. 2014) (citing *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984)).

Taking Plaintiffs' factual allegations as true, the Court finds that Plaintiffs have pleaded a plausible claim of conspiracy and concerted action among the Defendants to restrain trade: first, the Insurance Defendants enlisted the help of the IDSA Panelists to deny the existence of chronic Lyme disease and develop restrictive guidelines for testing Lyme disease in 2000, Compl. ¶ 48, and again in 2006, *id.* ¶ 70; then, the Insurance Defendants would report doctors who treated chronic Lyme disease in contravention of the guidelines to their respective state boards, *id.* ¶¶ 49, 82–89; and then, when these doctors appeared for proceedings before the state medical boards, the Insurance Defendants would pay the IDSA Panelists to testify as experts against these doctors, *id.* ¶ 79.

Plaintiffs also claim that the Insurance Defendants hired the same doctors who created these guidelines for the IDSA to later review and deny insurance claims for long-term antibiotic treatment, *id.* ¶¶ 54–59.  For example, Plaintiffs specifically identify Dr. Leonard Sigal, who was not only paid to review the 2006 IDSA guidelines, *id.* ¶ 71, but who also was then retained by

insurance companies, including Aetna, Blue Cross Blue Shield, and Anthem, to review—and deny—insurance claims for Lyme disease, *id*. ¶ 57.  Plaintiffs specifically allege that Dr. Gary P. Wormser, Dr. Raymond J. Dattwyler, Dr. Eugene Shapiro, Dr. John J. Halperin and Dr. Robert B. Nadelman were paid by the Insurance Defendants as expert consultants to review and deny insurance coverage claims.  *Id*. ¶ 55.  This alleged conduct more than adequately establishes a concerted action, meeting of the minds and commitment to a common scheme by the Defendants.

To state a Sherman Act § 1 claim, Plaintiffs must also allege a relevant market.  *See Apani*, 300 F.3d at 627.  A relevant market is comprised of a product market and a geographic market, which is the area in which sellers of the relevant product effectively compete.  *Id.* at 625; *see Nat'l Athletic Trainers' Ass'n, Inc. v. Am. Physical Therapy Ass'n,* Civ. Action No. 3:08-CV-0158-G, 2008 WL 4146022, at *12 (N.D. Tex. Sept. 9, 2008).  Plaintiffs allege that the relevant market in this case is the "Lyme disease treatment" market in the United States.  Compl. ¶¶ 119–124.

The boundaries of a product market are determined by the reasonable interchangeability of use and the degree of cross-elasticity of demand between the product and substitutes for it.  *Apani*, 300 F.3d at 626.  Defendants claim that Plaintiffs fail to define the relevant market in relation to interchangeable products or substitutes.  Docket No. 37 at 43.  However, Plaintiffs have clearly alleged that the Insurance Defendants' conduct has resulted in few, if any, insurance companies being willing to cover the treatment of chronic Lyme disease.  Compl. ¶ 119.  The Court credits Plaintiffs' assertions that Defendants have engaged in a concerted action to eliminate patient choice and to deny coverage for the treatment of chronic Lyme disease.  *See* Compl. ¶¶ 92, 124, 131, 169.

Moreover, though courts typically require that the proposed relevant market be defined with reference to the rule of reasonable interchangeability and cross-elasticity of demand, in the

context of a standard-setting organization, courts have allowed a relevant market to be defined by the product that was being regulated by the standard setting organization.  *See, e.g., Allied Tube*, 486 U.S. at 496 (defining the product market as "electrical conduits," the product regulated by the standard-setting organization); *Hydrolevel Corp. v. Am. Soc. of Mech. Eng'rs, Inc.*, 635 F.2d 118, 124 (2d Cir. 1980) (defining the product market as "low-water cut-off" devices, the product regulated by the standard-setting organization), *aff'd*, 456 U.S. 556 (1982);  *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 296 F. Supp. 3d 442 (E.D.N.Y. 2017) (defining the product market as "(1) top-tier and (2) second-tier men's professional soccer leagues," where plaintiff challenged the standard-setting organization's assignment of men's professional soccer leagues to these divisional designations); *Apple Inc. v. Samsung Electronics Co., Ltd*., 2012 WL 1672493, *5 (N.D. Cal. May 14, 2012) (defining the product market as "the various markets for technologies that— before the standard was implemented—were competing to perform each of the various functions covered by each of Samsung's purported essential patents").

Here, Plaintiffs have sufficiently alleged that, in the absence of the IDSA, there would be competition among doctors for the treatment of chronic Lyme disease and competition among insurance carriers for coverage for such treatments.  Similarly, Plaintiffs have alleged that Defendants' adoption of the IDSA guidelines and standard of care for the testing, diagnosis and treatment of Lyme disease has harmed patients and doctors nationwide.  *See, e.g.,* Compl. ¶¶ 84, 90.  The Court finds a nationwide geographic market has been properly alleged.  *See, e.g. Wilk v. Am. Med. Ass'n*, 671 F. Supp. 1465, 1478 (N.D. Ill. 1987) (finding that the geographic market was nationwide for the treatment of musculoskeletal problems); *Weiss v. York Hosp.*, 745 F.2d 786, 827 (3rd Cir. 1984) (finding that the geographic market was nationwide for inpatient hospital health care); *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1447 (9th Cir. 1988) (finding that the

geographic market was nationwide for anesthesia services).  Market definition is "a deeply fact-intensive inquiry that generally cannot be resolved at the motion to dismiss stage."  *Vaughn Med. Equip. Repair Servs. L.L.C.*, 2010 WL 3488244, at *19.  To require the Plaintiffs to allege anything further at the motion to dismiss stage in this case would invite the parties to improperly argue factual disputes.

### D.  Monopolization

Section 2 of the Sherman Antitrust Act not only prohibits the abuse of monopoly power but also any "attempt to monopolize . . . any part of the trade or commerce among the several States."  15 U.S.C. § 2.  To prevail on an attempted monopolization claim, a plaintiff must show: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power."  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).

Defendants contend that Plaintiffs fail to allege that any one Defendant has monopoly power or a dangerous probability of achieving such power.  Docket No. 37 at 45; Docket No. 40 at 26.  For the reasons explained above, the Court finds that Plaintiffs have sufficiently pleaded that Defendants possess control over the treatment of chronic Lyme disease and that Defendants obtained this position by excluding physicians who treat Lyme disease from participating in the formulation of the IDSA guidelines, reporting physicians who treated chronic Lyme disease in contravention to the IDSA guidelines and the Insurance Defendants hiring the IDSA Panelists to review and deny insurance claims for long-term antibiotic treatment for chronic Lyme disease.  Likewise, Defendants' argument that Plaintiffs have not alleged any conduct that could plausibly be considered predatory or exclusionary is unpersuasive.  *See* Docket No. 37 at 47.

Defendants also argue that Plaintiffs' claim of monopolization is implausible because Defendants are not engaged in the treatment or diagnosis of Lyme disease and, therefore, cannot monopolize a market in which they do not compete. *Id.* at 46; Docket No. 40 at 26–27. At the outset, Plaintiffs have sufficiently alleged that Defendants participate in the treatment of Lyme disease by propagating a standard of care for the treatment of Lyme disease and by excluding coverage for the treatment thereof.

Lastly, Defendants' argument that Plaintiffs' claim of joint monopolization fails because it must be based on the plausible allegation that only one firm has monopoly power is unconvincing. *See* Docket No. 37 at 46. The Fifth Circuit, to the contrary, has recognized a joint monopoly under § 2 of the Sherman Act. *U.S. v. Am. Airlines, Inc.*, 743 F.2d 1114, 1118 (5th Cir. 1984) ("At that same moment, the offense of joint monopolization would have been complete."); *see also Cont'l Airlines, Inc. v. Am. Airlines, Inc.*, 824 F. Supp. 689, 705 (S.D. Tex. 1993) ("To prevail on a claim of attempted joint monopolization [under § 2], plaintiff must prove that the defendant, having specific intent to monopolize, solicited other firms to engage in anticompetitive conduct."). Moreover, the Supreme Court has recently recognized that "[m]onopoly power may be equally harmful whether it is the product of joint action or individual action." *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 190 (2010) (noting that while "Section 1 applies only to concerted action that restrains trade[,] Section 2, by contrast *covers both concerted and independent action*, but only if that action 'monopolizes,' 15 U.S.C. § 2, 'or threatens actual monopolization' . . . ." (emphasis added)).

Accordingly, the Court finds that Plaintiffs have sufficiently alleged a claim of monopolization under § 2 of the Sherman Act.

For the foregoing reasons, Defendants' motions to dismiss Plaintiffs' claims brought under §§ 1 and 2 of the Sherman Act are **DENIED.**

## II.   RICO Claims

Plaintiffs assert violations of 18 U.S.C §1962 (a)–(d) based on the predicate acts of mail and wire fraud.  Compl. ¶ 141–163.  "These RICO subsections state, in their simplest terms, that:

(a) a person who has received income from a pattern of racketeering activity cannot invest that income in an enterprise;

(b) a person cannot acquire or maintain an interest in an enterprise through a pattern of racketeering;

(c) a person who is employed by or associated with an enterprise cannot conduct the affairs of the enterprise through a pattern of racketeering activity; and

(d) a person cannot conspire to violate subsections (a), (b), or (c)."

*Abraham v. Singh*, 480 F.3d 351, 354–55 (5th Cir. 2007) (citing *Crowe v. Henry*, 43 F.3d 198, 203–04 (5th Cir. 1995)). "Regardless of the subsection, RICO claims under § 1962 have three common elements: (1) a person who engaged in (2) a pattern of racketeering activity, (3) connected to the acquisition, establishment, conduct, or control of an enterprise." *Id.* (quoting *Word of Faith World Outreach Ctr. Church, Inc. v. Sawyer*, 90 F.3d 118, 120 (5th Cir. 1996)) (internal quotations omitted).

Defendants argue that Plaintiffs' RICO claims should be dismissed because: (1) Plaintiffs lack standing to bring their RICO claims, Docket No. 37 at 23; (2) Plaintiffs have not sufficiently pleaded a RICO enterprise, *id*. at 27, or that Defendants conducted the affairs of this enterprise, *id*. at 28; (3) Plaintiffs have not stated the predicate fraudulent racketeering acts under Rule 9(b) and, therefore, have not adequately pleaded a pattern of racketeering activity, *id*. at 30; (4) Plaintiffs have not sufficiently pleaded that the Insurance Defendants invested income derived from a pattern of racketeering into the enterprise in violation of § 1962(a), *id*. at 32; (5) Plaintiffs have not sufficiently pleaded that the Insurance Defendants acquired or maintained an interest in the

enterprise in violation of § 1962(b), *id*. at 33; and (6) Plaintiffs have not sufficiently pleaded that Defendants conspired with each other to violate § 1962(d), *id*. at 34.   *See also* Docket No. 40.

### 1.  Standing

The Insurance Defendants first argue that, as a threshold matter, Plaintiffs lack standing to bring their RICO claims because Plaintiffs only assert personal injuries, which are improper under RICO, and fail to allege that their injuries were proximately caused by any racketeering activity. Docket No. 37 at 23–25.

To state a civil RICO claim under § 1962, a plaintiff must establish that he has standing to sue.  *In re Taxable Mun. Bond Sec. Litig.*, 51 F.3d 518, 521 (5th Cir. 1995) ("The standing provision of civil RICO provides that '[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor . . . and shall recover threefold the damages he sustains.' ") (citing 18 U.S.C. § 1964(c)).  "Thus, a RICO plaintiff must satisfy two elements—injury and causation."  *Price v. Pinnacle Brands, Inc.*, 138 F.3d 602, 606 (5th Cir. 1998).  This restriction limiting standing to a person "injured in his business or property" "helps to assure that RICO is not expanded to provide a federal cause of action and treble damages to every tort plaintiff."  *Steele v. Hosp. Corp. of Am.,* 36 F.3d 69, 70 (9th Cir. 1994).  For RICO standing, a plaintiff must allege a "concrete financial loss," an actual loss "of their own money," and "not mere injury to a valuable intangible property interest."  *In re Taxable Mun. Bond Sec. Litig.*, 51 F.3d at 523 (quoting *Steele*, 36 F.3d at 70) (internal quotations omitted).

Defendants' arguments that Plaintiffs' injuries are personal injury damages arising out of complications from Lyme disease miss the mark.  Docket No. 37 at 23–24.  Plaintiffs do not allege that the Insurance Defendants acted in a tortious or negligent way, directly causing the medical injuries which led to Plaintiffs' medical expenses.  Docket No. 60 at 19.  In fact, Plaintiffs

specifically disclaim any damages relating to physical pain, mental anguish, pain and suffering, disfigurement or any other personal injury damages caused by their Lyme disease.  *Id*. at 17. Instead, Plaintiffs seek damages for out-of-pocket travel expenses, out-of-pocket expenses to pay for antibiotics and lost wages—concrete financial expenses that Plaintiffs have incurred as a result of being denied treatment and insurance coverage for chronic Lyme disease due to Defendants' alleged racketeering activities.  *Id*. at 18–20.

Plaintiffs have adequately alleged that the damages they seek are to actual losses of Plaintiffs' own monies and so, are recoverable damages under RICO, *see id*.; Compl. ¶ 175–176, and that these damages were caused by the Defendants' alleged racketeering activities,  *see* Compl. ¶¶ 79, 132–140.

## 2.  RICO Enterprise

Defendants next argue that Plaintiffs have not properly pleaded a RICO enterprise or that they conducted the affairs of such an enterprise.  Docket No. 37 at 27–29; Docket No. 40 at 20–22.

"A plaintiff asserting a RICO claim must allege the existence of an enterprise*." Crowe*, 43 F.3d at 204.  An enterprise is defined as "a group of persons or entities associating together for the common purpose of engaging in a course of conduct."  *Whelan v. Winchester Prod. Co*., 319 F.3d 225, 229 (5th Cir. 2003).  The enterprise may be a legal entity or "any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4); *see also Crowe*, 43 F.3d at 204.  A pattern of racketeering activity does not, by itself, necessarily show that an enterprise exists.  *See U.S. v. Turkette*, 452 U.S. 576, 583 (1981). But the evidence establishing the enterprise and the pattern of racketeering may "coalesce."  *Boyle v. U.S.*, 556 U.S. 938, 945 (2009).  "The linchpin of enterprise status is the continuity or ongoing nature of the association."

*Allstate Ins. Co. v. Plambeck*, 802 F.3d 665, 673 (5th Cir. 2015).  The Supreme Court has identified three structural features as indispensable to an association-in-fact enterprise: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."  *Boyle*, 556 U.S. at 946.

Here, Plaintiffs have alleged more than enough facts to show a plausible basis for believing that the Defendants formed an association-in-fact enterprise.  Plaintiffs allege that the Defendants have a common purpose of preventing the treatment of chronic Lyme disease and that the Insurance Defendants, IDSA Panelists and IDSA stand to gain economic benefits from doing so. Compl. ¶¶ 48, 97, 111, 155.  Moreover, the Court has already addressed the relationships among the Defendants in the alleged scheme.  *See supra*, Section I. C.  Finally, Plaintiffs allege that the Defendants' enterprise began in the 1990s and continued through the creation and promulgation of the 2000 and 2006 IDSA guidelines and that this enterprise is ongoing today.  Compl. ¶ 48, 60, 70.  The Court has also already addressed the Insurance Defendants, IDSA and IDSA Panelists' participation in the enterprise.  *See supra*, Section I. C; *see also U.S. v. Posada-Rios*, 158 F.3d 832, 856 (5th Cir. 1998) (". . . in enacting § 1962(c) Congress intended 'participate' to have the common understanding of the word . . . 'to take part in.' ").

### 3.  Racketeering Activity

Defendants next contend that Plaintiffs' RICO claims (Counts I–IV) should be dismissed because Plaintiffs have failed to plead the predicate racketeering acts of mail fraud and wire fraud under the Rule 9(b) heightened pleading requirement for claims of fraud.

Though a plaintiff generally is only required to provide a short and plain statement of a claim to satisfy the pleading requirements under Rule 8(a), to state a claim for fraud, a plaintiff must meet the Rule 9(b) heightened pleading standard.  Rule 9(b) provides that "[i]n alleging fraud

or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b).  In the Fifth Circuit, a plaintiff pleading fraud must "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent."  *Hermann Holdings Ltd. v. Lucent Techs. Inc.*, 302 F.3d 552, 564–65 (5th Cir. 2002).   More colloquially, the Fifth Circuit refers to these requirements as the "who, what, when, where, and how" of the fraud alleged.  *U.S. ex rel. Williams v. Bell Helicopter Textron, Inc.*, 417 F.3d 450, 453 (5th Cir. 2005).

RICO claims based on allegations of fraud, such as wire or mail fraud, are subject to the heightened pleading burden imposed by Rule 9(b).  *See, e.g., Williams v. WMX Technologies, Inc.*, 112 F.3d 175, 177 (5th Cir. 1997); *Tel–Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134 (5th Cir. 1992); *Alufase USA LLC v. Palma*, Civil Action No. H–16–77, 2016 WL 3911127, at *3 (S.D. Tex. May 6, 2016); *Garcia v. Lion Mexico Consol., L.P.*, No. 5:15-CV-1116-DAE, 2017 WL 9479195, at *4 (W.D. Tex. Sept. 11, 2017); *Cypress/Spanish Ft. I, L.P. v. Prof. Serv. Indus., Inc.*, 814 F. Supp. 2d 698, 711 (N.D. Tex. 2011).  Though it is not necessary for a plaintiff to assert that each defendant in a RICO scheme personally made fraudulent mailings or wires, "Rule 9(b) requires that the plaintiff allege facts specifying each defendant's contributions to the fraud." *Garcia*, 2017 WL 9479195, at *4 (quoting *Cypress/Spanish Ft. I, L.P.*, 814 F. Supp. 2d at 711).

To state a claim for mail fraud, a plaintiff must allege: (1) a scheme to defraud by means of false or fraudulent representation; (2) interstate or intrastate use of the mails to execute the scheme; (3) the use of the mails by the defendant connected with the scheme; and (4) actual injury to the plaintiff.  *In re Burzynski*, 989 F.2d 733, 742 (5th Cir. 1993) (citing *Landry v. Air Line Pilots Ass'n Int'l*, 901 F.2d 404, 428 (5th Cir. 1990)).  The Fifth Circuit has also noted that although

reliance upon the defendants' representations is not an element of statutory mail or wire fraud, it is required when violations of those statutes are alleged as RICO predicates.  *In re MasterCard*, 313 F.3d 257, 263 (5th Cir. 2002).  "The elements of a wire fraud claim under 18 U.S.C. § 1343 are the same as those for a mail fraud claim except the use of the wire must be interstate."  *Walsh v. America's Tele–Network Corp*., 195 F. Supp. 2d 840, 846 (E.D. Tex. 2002).

Here, though Plaintiffs' Complaint is sufficient to meet the Rule 8 requirement to allege antitrust claims under the Sherman Act, it does not meet the Rule 9(b) heightened pleading standard for alleging a RICO claim predicated on acts of fraud.  Plaintiffs allege over 17 acts of mail or wire fraud, including wrongful denial of insurance coverage to people with chronic Lyme disease, wrongful reporting of doctors who treat chronic Lyme disease to medical boards, making payments from the Insurance Defendants to the IDSA and IDSA Panelists to promote the false claim that chronic Lyme disease does not exist and that it is treatable with a 28-day course of antibiotics, and making payments from the Insurance Defendants to the IDSA Panelists so that they will serve as expert witnesses to serve the interests of the Insurance Defendants.  Compl. ¶ 99.

Plaintiffs' allegations, however, fall short of providing the "newspaper" details regarding the communications and payments between Defendants.  Plaintiffs do not allege facts specifying each Defendants' contributions to the fraud.  *See Garcia*, 2017 WL 9479195, at *4.  For example, Plaintiffs' Complaint does not explain when the fraudulent communications were made and between whom these communications were made, which Insurance Defendant denied coverage for chronic Lyme disease and when, or which Insurance Defendant reported doctors to medical boards.  Plaintiffs' Complaint also fails to provide any details establishing which Insurance Defendant made payments to which IDSA Panelist, or the date, location or amounts of those

payments.  *Compare Poe v. Brock*, EP-17-CV-00232-DCG, 2018 WL 4275839, at *6–7 (W.D. Tex. Sept. 7, 2018) (finding allegations of wire and mail fraud deficient where plaintiffs failed to plead with specificity the time when phone calls and emails establishing the fraud were made) *and Alufase USA LLC*, 2016 WL 3911127, at *3 (finding allegations of fraud deficient where the complaint identified the speaker, alleged that an invoice was fraudulent and detailed when the statement was mailed, but did not explain why or how the invoice was fraudulent), *with Garcia*, 2017 WL 9479195, at *5 (finding that plaintiffs' complaint set forth with particularity the "who, what when, where, and how" of defendants' involvement in, communications with, and representation to plaintiffs, including specifically identifying dates regarding the fraudulent property development, the individuals responsible for communication between the parties, the contents and purposes of these communication, and the timeline of events) *and Dell Inc. v. Mishra*, No. A-16-CV-00641-SS, 2018 WL 3717119, at * 6 (W.D. Tex. Aug. 3, 2018) (finding that plaintiff "recited four specific allegations of wire fraud and trafficking of counterfeit services.").

Plaintiffs recognize that they have provided an outline of the Defendants' scheme to defraud, Docket No. 60 at 27, but argue that Rule 9(b)'s heightened pleading rule should be relaxed because the Defendants have exclusive possession of the facts and documents establishing their fraudulent actions, *id*. at 23.  For this reason, Plaintiffs additionally request that if the Court finds any part their RICO claims is deficient, that they be permitted to conduct discovery.  *Id*. at 27.

Though a number of courts, including the Fifth Circuit, have recognized that the pleading requirements of Rule 9(b) may, to some extent, be relaxed when the facts relating to the alleged fraud are peculiarly within the perpetrator's knowledge, *U.S. ex rel. Willard v. Humana Health Plan of Texas, Inc*., 336 F.3d 375, 385 (5th Cir. 2003), the Court finds that the most appropriate course of action in this case would be to first allow Plaintiffs an opportunity to amend their

Complaint.  *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329

(5th Cir. 2002) ("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading

deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs

advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal.")*;

see also Frith v. Guardian Life Ins. Co.*, 9 F. Supp. 2d 734, 743 (S.D. Tex. 1998) ("When a party

has failed to plead fraud with sufficient particularity, the Court will generally permit leave to

amend to bring the complaint into compliance with the requirements of Rule 9(b)."); *Luce v.

Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986) ("Complaints dismissed under Rule 9(b) are 'almost

always' dismissed with leave to amend.").

Plaintiffs may be able to cure the deficiencies in their RICO allegations if they amend their

Complaint.  Plaintiffs have not filed an amended complaint since the filing of the instant motions

and the parties have been engaged in discovery for over four months now,[1]  and the Court believes

that it would be more appropriate to allow Plaintiffs an opportunity to amend their Complaint

before addressing whether their RICO claims should be considered under a relaxed pleading

standard.  *See Corley v. Rosewood Care Ctr., Inc.*, 142 F.3d 1041 (7th Cir. 1998) (relaxing the

Rule 9(b) pleading requirements for plaintiff's RICO claims alleged in fourth amended complaint);

*Schouest v. Medtronic, Inc.*, 13 F. Supp. 3d 692, 709–10 (S.D. Tex. 2014) (allowing plaintiff one

opportunity to amend her complaint before addressing the proper scope of the Rule 9 requirement

and applying it to plaintiff's allegations).

Accordingly, Defendants' motions to dismiss (Docket Nos. 37 and 40) Plaintiffs' RICO

claims are **GRANTED** on the basis that Plaintiffs have not met the Rule 9(b) pleading standard

for alleging predicate acts of fraud.  Thus, the Court need not reach the issues of whether Plaintiffs

---

[1] The parties have been engaged in discovery only on claims relating back to four years from the time the Complaint was filed.

have sufficiently alleged a pattern of racketeering or a claim under each subsection of § 1962, as each of these issues would require Plaintiffs to first successfully plead the predicate acts of alleged fraud.

### III.    Statute of Limitations

Insurance Defendants also argue that Plaintiffs' claims are barred by the statute of limitations.  The parties do not dispute that a plaintiff ordinarily need not plead facts negating an affirmative defense.  *See* Docket No. 60 at 46 (citing *Jaso v. The Coca Cola Co.*, 435 Fed. App'x. 346, 351–52 (5th Cir. 2011); Hr'g Tr. 14:23–15:1.  Insurance Defendants argue, however, that it is acceptable to bring a motion to dismiss on a statute of limitations defense where the face of the complaint indicates that the statute has not been satisfied.  Tr. at 15:2–9.  This is true, though, only when "it is evident from the plaintiff's pleading that the action is barred by the statute of limitations *and* the pleadings fail to raise some basis for tolling or the like."  *Jones v. Alcoa, Inc.*, 339 F.3d 359 (5th Cir. 2003) (emphasis added); *see also Cross v. Lucius*, 713 F.2d 153, 156 (5th Cir. 1983).  The statute of limitations on civil RICO and Sherman Act claims is four years from the time the claim began to accrue.

### 1.    RICO Claims

In the Fifth Circuit, a civil RICO claim accrues on the date "when a plaintiff knew or should have known of his injury."  *Rotella v. Wood*, 528 U.S. 549, 553–54 (2000).  The Fifth Circuit applies a "separate accrual" rule when RICO claims potentially involve a series of separate injuries.  *Love. v. Nat'l Med. Enters.*, 230 F.3d 765, 774–75 (5th Cir. 2000).  Under this rule, "[w]hen a pattern of RICO activity causes a continuing series of separate injuries . . .  a civil RICO claim . . . accrue[s] for *each* injury when the plaintiff discovers or should have discovered that injury."  *Id.* at 773 (emphasis added).  The Fifth Circuit has stated, however, that the "separate

accrual" rule does not apply where a plaintiff already knows or should have known of the fraud. *DeShazo v. Nations Energy Co. Ltd.*, 286 Fed. App'x. 110, 117–18 (5th Cir. 2008) (citing *Klehr v. A. O. Smith Corp.*, 521 U.S. 179, 186–87 (1997)).

Whether the Plaintiffs knew or should have known of the fraud during the promulgation of the 2000 and 2006 IDSA guidelines is a question of fact that the Court does not resolve at the motion to dismiss stage. *See Tanaka v. First Hawaiian Bank*, 104 F. Supp. 2d 1243 (D. Haw. 2000) ("The RICO claim accrued when [plaintiff] knew or should have known of his injury. Nevertheless, as discussed earlier, that is presently a disputed question of material fact.").

Plaintiffs have sufficiently alleged that they suffer from a continuing series of separate injuries each time they are denied coverage for chronic Lyme disease treatment, each time they have to travel to find a doctor who will treat chronic Lyme disease, and each time they have to pay out-of-pocket expenses for long-term antibiotic treatment.  Compl. ¶¶ 132–140.  Thus, any RICO allegations based on separate injuries discovered within four years from the time of filing this case are timely.

### 2.  Sherman Act

Similarly, in an anti-trust cause of action, the four-year statute of limitations begins to run when a defendant commits an act that injures a plaintiff's business. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321 (1971).  "In the context of a continuing conspiracy to violate the antitrust laws, . . .  this has usually been understood to mean that each time a plaintiff is injured by an act of the defendants . . . the statute of limitations runs from commission of the act."  *Id*. at 338.  The Fifth Circuit first recognized the continuing violation exception to the Sherman Act's four-year statute of limitations in *Poster Exchange, Inc. v. Nat'l Screen Serv. Corp.*, 517 F. 2d 117, 119 (5th Cir. 1975).  "In *Poster Exchange*, [the Fifth Circuit] considered whether

an antitrust conspiracy continued into the limitations period where the defendants, before the limitations period began, allegedly agreed not to sell items to the plaintiff. *U.S. v. Therm-All, Inc.*, 373 F.3d 625, 633 (5th Cir. 2004). "The Court held that to invoke the continuing-conspiracy doctrine, the plaintiffs had to show that 'there had been a specific act or word of refusal [by the defendants to do business with plaintiff] during the limitations period.' " *Id.* (quoting *Poster Exchange*, 517 F.2d at 129). "[I]t is not enough to show that an anticompetitive agreement [is] still in existence during the limitations period; the plaintiff must allege in addition that the defendant took some action in furtherance of the illegal agreement within the limitations period." *Delta Produce, L.P. v. H.E. Butt Grocery Co.*, 2013 WL 12121118, at *3 (W.D. Tex. Jan. 17, 2013) (finding that the continuing violation exception did not apply because plaintiff had not alleged any overt anticompetitive act within the four-year limitations period).

Defendants argue that on the face of their Complaint, Plaintiffs have not alleged any injurious acts by the Insurance Defendants within the last four years, and that the core injurious acts that form the basis of the Complaint are the 2000 and 2006 IDSA guidelines. Docket No. 74 at 21. In their Complaint, Plaintiffs identify at least three specific instances of overt, anti-competitive action occurring within four years from the time of filing the Complaint: Plaintiff Amy Hanneken was denied insurance coverage for chronic Lyme disease treatment in 2014, Compl. ¶ 135; Plaintiff Rosetta Fuller was diagnosed with Lyme disease in 2016 and continues to pay out-of-pocket for treatment, Compl. ¶ 140; and Plaintiff Adriana Moreira was diagnosed with Lyme disease in 2016 and is unable to obtain long-term treatment, *id.* There very well may be more specific injurious acts that occurred within the statutory time period, but it is evident that Plaintiffs have sufficiently alleged at least some acts that occurred within the statute of limitations that would

preclude the Court from granting a blanket dismissal on the basis of Plaintiffs' claims being time-barred. *See Jones*, 339 F.3d 359.

### 3. Fraudulent Concealment

As to injuries that occurred outside of the four-year limitations period, Plaintiffs argue that the statute of limitations should be equitably tolled because Defendants fraudulently concealed their actions. Defendants rebut that Plaintiffs have only made a conclusory allegation of fraudulent concealment and have not met the heightened pleading requirements of Rule 9(b) to allege the "who, what, when, where, and how" to assert fraudulent concealment. Tr. at 35:1–15.

Fraudulent concealment may toll the statute of limitations for antitrust and RICO claims. *See In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148, 1169 (5th Cir. 1979); *Klehr*, 521 U.S. at 188. "However, a plaintiff 'may invoke the fraudulent concealment doctrine only by proving two elements: first that the defendants concealed the conduct complained of, and second, that the plaintiff failed, despite the exercise of due diligence on his part, to discover the facts that form the basis of his claim.' " *Astoria Entm't, Inc. v. Edwards*, 159 F. Supp. 2d 303, 319 (E.D. La. 2001) (quoting *State of Texas v. Allan Constr. Co., Inc*., 851 F.2d 1526, 1528 (5th Cir. 1988)); *see also Bradley v. Phillips Petroleum Co.*, 527 F. Supp. 2d 625, 653 (S.D. Tex. 2007) (dismissing plaintiffs' RICO claim as time-barred where plaintiffs failed to allege diligence in uncovering their RICO claim and failed to allege facts to demonstrate the justification for tolling the limitations period); *Rotella*, 528 U.S. at 555–57 (2000); *cf. Charlotte Telecasters, Inc. v. Jefferson–Pilot Corp.*, 546 F.2d 570, 574 (5th Cir. 1976) (holding that fraudulent concealment of an antitrust claim must be alleged with particularity).

Similar to the deficiencies in stating their RICO claims, Plaintiffs have not alleged facts with particularity under the Rule 9(b) heightened pleading standard that would justify tolling the

limitations for fraudulent concealment.  Though Plaintiffs aver that the Insurance Defendants have "done everything they could to keep their actions a secret," Docket No. 60 at 48, Plaintiffs provide nothing more regarding the circumstances constituting such fraudulent concealment.  But even if Plaintiffs had adequately pleaded that Defendants fraudulently concealed their actions, they do not allege any facts in their Complaint that would support an inference that Plaintiffs exercised due diligence to discover these actions.

Accordingly, the Court finds that Plaintiffs have not shown they are entitled to recover on claims that accrued beyond the four-year statute of limitations period.  However, as with Plaintiffs' RICO claims, Plaintiffs may be able to cure the deficiencies in their fraudulent concealment claims upon filing an amended complaint.

## IV.    Personal Jurisdiction–IDSA Panelists

The IDSA Panelists, comprising of Dr. Wormser, Dr. Dattwyler, Dr. Shapiro, Dr. Halperin, Dr. Nadelman, Dr. Sigal, and Dr. Steer, argue that they should be dismissed because there is no basis for the Court to exercise personal jurisdiction over them.  Docket No. 40 at 27.  Plaintiffs respond that this Court has jurisdiction over the IDSA Panelists because they are members of a nationwide RICO conspiracy and because Plaintiffs have made a *prima facie* showing that the IDSA Panelists purposefully directed their activities towards Texas.  Docket No. 59 at 19, 20.

"Absent minimum contacts with a particular state, a court may nonetheless exercise personal jurisdiction in cases brought under federal statutes providing nationwide service of process."  *Dell Inc.*, 2018 WL 3717119, at *3 (W.D. Tex. Aug. 3, 2018) (citing *Busch v. Buchman, Buchman & O'Brien, Law Firm*, 11 F.3d 1255, 1258 (5th Cir. 1994)).  Section 1965(b) of the RICO statute provides that:

> In any action under section 1964 of this chapter in any district court of the United
> States in which it is shown that the ends of justice require that other parties residing

in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.

While the Fifth Circuit has not yet decided this issue, a majority of circuit courts, as well as each district within Texas, have concluded that RICO provides for nationwide service of process. *Hawkins v. Upjohn Co.*, 890 F. Supp. 601, 606 (E.D. Tex. 1994); *Meganathan v. Signal Int'l L.L.C.*, 1:13-CV-497, 2014 WL 11512241, at *2 (E.D. Tex. July 3, 2014), *report and recommendation adopted*, 1:13-CV-497, 2014 WL 11512244 (Sept. 9, 2014); *Harvest Nat. Res., Inc. v. Garcia*, Civil Action No. H-18-483, 2018 WL 2183968, at *3 (S.D. Tex. May 11, 2018) (quoting *Dimas v. Vanderbilt Mortg. & Fin., Inc.*, Civil Action No. C-10-68, 2010 WL 1875803, at *4 (S.D. Tex. May 6, 2010)); *Domain Protection LLC v. Keating*, Civil Action No. 3:15-CV-2244-L, 2016 WL 5661649, at *2–3 (N.D. Tex. Sept. 30, 2016); *Dell Inc.*, 2018 WL 3717119, at *3. "And, when a federal court is attempting to exercise personal jurisdiction over a defendant in a suit based upon a federal statute providing for nationwide service of process, the relevant inquiry is whether the defendant has had minimum contacts with the United States." *Busch*, 11 F.3d at 1258. Therefore, where personal jurisdiction and venue are proper as to at least one RICO defendant, the RICO statute allows for "nationwide service of process" to establish personal jurisdiction over non-resident defendants and if the "ends of justice" so require. *See Caldwell v. Palmetto State Sav. Bank of S.C.*, 811 F.2d 916, 918 (5th Cir. 1987).

IDSA Panelists do not contend that this Court does not have jurisdiction over *any* Defendant in this action. *See* Docket No. 40. In fact, none of the Insurance Defendants nor the IDSA contests that this Court has personal jurisdiction over them. *See id.*; Docket No. 37. Rather, the IDSA Panelists contend that the "ends of justice" are not satisfied by requiring them to defend this suit in Texas, particularly when New York is a more suitable forum. Docket No. 40 at 27.

According to the IDSA Panelists, Plaintiffs' generalized allegations that the Insurance Defendants asked the IDSA Panelists to research and write the IDSA guidelines, review insurance claims and testify as experts does not show that their presence in this Court is necessary for Plaintiffs to be able to pursue their claims, especially when balanced with the overall convenience of litigating this matter in New York.  Docket No. 40 at 31–33.

"[T]he 'ends of justice' is a flexible concept uniquely tailored to the facts of each case." *Cory v. Aztec Steel Bldg., Inc.*, 468 F.3d 1226, 1232 (10th Cir. 2006).  A circuit split exists as to what set of facts meets "the ends of justice" requirement, and the Fifth Circuit has not yet decided this issue.  Courts within this district, however, have found the "ends of justice" to be met in situations where the defendants resided in different states and no likely alternative forum existed in which jurisdiction would be proper as to all defendants.  *See, e.g., Hewlett-Packard Co. v. Byd:Sign, Inc.*, No. 6:05-cv-456, 2006 WL 2822151, at *9 (E.D. Tex. Sept. 28, 2006) ; *Rolls-Royce Corp. v. Heros, Inc.*, 576 F. Supp. 2d 765, 782 (N.D. Tex. 2008); *Allstate Ins. Co.*, 2009 WL 347423, at *3–4.

Here, all of the Defendants are incorporated, reside in or have their principal place of business in Texas, Washington D.C., Illinois, Indiana, Connecticut, California, Delaware, New York, New Jersey and Massachusetts.  Compl. ¶¶ 23–39.  Though the IDSA Panelists contend that New York is an available and more appropriate forum where all Defendants would be subject to personal jurisdiction, they have provided no evidence for support.  *See* Docket No. 40 at 33–34.  Nor have IDSA Panelists shown that the Insurance Defendants are amenable to suit in New York over Texas.  *See id*.  As there is at least one Defendant residing in Texas over whom jurisdiction is proper, and where IDSA Panelists provide no evidence that a New York court would have jurisdiction over all of the Defendants, the "ends of justice" require a finding that personal

jurisdiction over the non-resident Defendants is proper.  To the extent IDSA Panelists argue that the "ends of justice" do not require that they be brought before this Court because Plaintiffs have not established specific jurisdiction as to each Defendant, the Court notes that there is no requirement that a plaintiff plead or prove that a nonresident defendant committed an overt act within the forum state in further of a RICO conspiracy for that defendant to be subject to § 1965(b). *See Allstate Ins. Co.*, 2009 WL 347423, at *4.

The matter, however, is further complicated because Plaintiffs' RICO claims are dismissed with leave for Plaintiffs to amend their Complaint, whereas their Sherman Act claims are adequately pleaded to survive dismissal at this stage in the litigation.  Because the Sherman Act does not provide for nationwide service of process over individual antitrust defendants, the Court must next consider whether Texas' long-arm statute confers personal jurisdiction over the IDSA Panelists.

Defendants assert that neither general nor specific jurisdiction may be exercised over the IDSA Defendants.  *See* Docket No. 40 at 36–41.  Plaintiffs respond that the necessary minimum contacts exist to establish specific jurisdiction over each IDSA Panelist, Docket No. 59 at 15–28, but that Plaintiffs should be allowed to conduct jurisdictional discovery before the Court rules on the motion.

The Court finds that Plaintiffs have pointed to enough evidence preliminarily establishing personal jurisdiction over the IDSA Panelists to warrant jurisdictional discovery.  Specifically, Plaintiffs point to the declarations provided by each of the IDSA Panelists in which each doctor attests to having visited Texas for professional purposes during the relevant time periods.  *See* Docket No. 59 at 16–21.  Moreover, Plaintiffs have established that the IDSA Panelists' research and professional activities focus primarily on Lyme disease.  *Id.*

Accordingly, the Court **DENIES** the IDSA Panelists' motion to dismiss for lack of personal jurisdiction and **GRANTS** Plaintiffs leave to conduct jurisdictional discovery. If Plaintiffs amend their complaint to allege additional facts establishing specific personal jurisdiction over each IDSA Panelists, the Court shall grant the IDSA Panelists leave to re-file a motion to dismiss for lack of personal jurisdiction, though the Court notes that ultimately Plaintiffs may not need to establish specific jurisdiction over each IDSA Panelist if Plaintiffs properly re-plead their RICO claims.

## V.     Group Pleading

Insurance Defendants (Docket No. 37) and Defendant Blue Cross and Blue Shield Association ("BCBSA") (Docket No. 38) have also moved to dismiss Plaintiffs' Complaint for improperly relying on group pleading.

To the extent that Defendants take issue with Plaintiffs' Complaint because it fails to attribute conduct to each individual defendant in satisfaction of the Rule 9(b) pleading requirements for allegations of fraud, Docket No. 37 at 20, the Court has already addressed this issue. *See supra*, Section II. 3 ("Plaintiffs do not allege facts specifying each Defendants' contributions to the fraud."). As to the remaining claims, Plaintiffs allege that each Insurance Defendant committed the exact same acts and that the Insurance Defendants acted together in the conspiracy. Docket No. 60 at 37. Moreover, Plaintiffs specifically identify where any Insurance Defendant acted separately and without the other insurance companies. *Id*. (citing Compl. ¶¶ 51–53, 57, 84–87). Plaintiffs acknowledge that the Fifth Circuit has not expressly permitted group pleading. Hr'g Tr. 88:22– 89:7. But Plaintiffs also contend that there are no controlling cases that would compel this Court to dismiss the Complaint purely on the basis of group pleading and, indeed, Defendants cite to no such authority. *Id*.

BCBSA, in particular, also argues that the Complaint references BCBSA only twice, with no particular facts alleged against it.  Docket No. 38 at 1–2.  BCBSA further claims that, unlike the other Insurance Defendants, it is not an insurer and does not provide healthcare coverage, and so, it does not make any insurance-coverage decisions.  *Id*. at 2.  BCBSA contends, rather, that it merely owns the Blue Cross and Blue Shield trademarks and licenses the use of those trademarks to the Blue Cross and Blue Shield Plans.  *Id*.

Plaintiffs raise a number of factual disputes regarding BCBSA's assertions and argue that BCBSA is involved with making healthcare-related decisions, specifically in setting standards of care.  Docket No. 57 at 2–3.  The Court does not resolve the parties' factual disputes at this stage in the litigation and finds that Plaintiffs have adequately alleged that BCBSA participated in standard-setting conduct relating to the treatment of Lyme disease.

## CONCLUSION

In accordance with the above, the Court **GRANTS-IN-PART** Defendants' motions to dismiss (Docket Nos. 37 and 40) under Rule 9(b) with respect to Plaintiffs' RICO and fraudulent concealment claims and **DENIES-IN-PART** on all other grounds.  Moreover, Defendant BCBSA's motion to dismiss (Docket No. 38) is **DENIED.**

The Court further **GRANTS** Plaintiffs leave to replead their RICO and fraudulent concealment allegations within **thirty (30) days** from the date of this order.  If Plaintiffs file an amended complaint, they shall attach a redlined copy as an exhibit.

Additionally, the Court **GRANTS** Plaintiffs' request to conduct jurisdictional discovery with regards to the IDSA Panelists.  The parties are **ORDERED** to meet and confer and submit a joint schedule for conducting jurisdictional discovery within **fourteen (14) days** from the date of this order.  If Plaintiffs amend their Complaint to allege additional facts establishing specific

personal jurisdiction over each of the IDSA Panelists, the Court shall grant the IDSA Panelists

leave to re-file a motion to dismiss for lack of personal jurisdiction.

**So ORDERED and SIGNED this 27th day of September, 2018.**


ROBERT W. SCHROEDER III
UNITED STATES DISTRICT JUDGE