**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION**

|  |  |  |
|---|---|---|
| LISA TORREY, et al., | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No. 5:17-cv-00190-RWS |
| INFECTIOUS DISEASES SOCIETY OF AMERICA, et al., | § § § | JURY DEMANDED |
| Defendants. | § § § § | |

**DEFENDANT CIGNA HEALTH AND LIFE INSURANCE COMPANY'S ANSWER AND
AFFIRMATIVE DEFENSES TO PLAINTIFFS' ORIGINAL COMPLAINT**

Defendant Cigna Health and Life Insurance Company (improperly sued as Cigna Corporation) ("Cigna"), by and through its undersigned counsel, submits this Answer with Affirmative Defenses to Plaintiffs' Original Complaint (the "Complaint").  Although the Court in its Opinion on Defendants' Motions to Dismiss dated September 27, 2018 (ECF NO. 114) dismissed in part Plaintiffs' Complaint and granted Plaintiffs leave to file an amended pleading that, as a matter of law, would supersede the Complaint, Cigna submits this Answer in an abundance of caution.  In answering the Complaint, Cigna denies pursuant to Rule 8(b)(3) of the Federal Rules of Civil Procedure each and every one of Plaintiffs' allegations (including any allegations contained in headings in the Complaint) except to the extent those allegations are specifically admitted below.  Cigna further responds to the allegations of Plaintiffs' Complaint as follows:

## PARTIES AND SERVICE

1. Plaintiff Lisa Torrey is an individual and a citizen of the State of Texas.

2. Plaintiff Kathryn Kocurek is an individual and citizen of the State of Texas.

3. Plaintiff Lana Barnes is an individual and citizen of the State of Minnesota.

4. Amy Hanneken is an individual and a citizen of the State of Florida.

5. Jane Powell is an individual and a citizen of the State of Connecticut.

6. Carol Fisch is an individual and a citizen of the State of Florida.

7. Christopher Valerio is an individual and citizen of the State of Pennsylvania.

8. Steven Ward is an individual and a citizen of the State of Virginia.

9. Randy Sykes is an individual and a citizen of the State of Connecticut.

10. Brienna Reed is an individual and a citizen of the State of Ohio.

11. Rosetta Fuller is an individual and a citizen of the State of Alabama.

12. Adriana Monteiro Moreira is an individual and citizen of State of Florida.

13. Jessica Mckinnie is an individual and a citizen of the State of Michigan.

14. Kristine Woodard is an individual and a citizen of the State of Iowa.

15. Gail Meads is an individual and a citizen of the State of Georgia.

16. Dr. Michael Fundenberger is an individual and citizen of the State of Iowa.

17. Gayle Clarke is an individual and a citizen of the State of Iowa.

18. Allison Lynn Caruana is an individual and a citizen of the State of Florida.

19. Chloe Lohmeyer is an individual and a citizen of the State of Nevada.

20. Max Shindler is an individual and a citizen of the State of Nevada.

21. Tawnya Dawn Smith is an individual and a citizen of the State of Nevada.

22. Mike Peacher is an individual and a citizen of the State of Florida.

2

23.     Alarie Bowerman is an individual and a citizen of the State of Arkansas.

24.     Defendant INFECTIOUS DISEASES SOCIETY OF AMERICA is a non-profit corporation incorporated in Washington D.C., and may be served with process by serving its registered agent, Corporation Service Company at Bank of America Center, 16th Floor, 1111 East Main Street, Richmond, VA 23219.

**RESPONSE**:  Cigna is without knowledge or information from which to form a belief as to the truth of the allegations contained in paragraphs 1-24 of the Complaint and therefore such allegations are denied.

## THE BLUE CROSS DEFENDANTS

25.     Defendant BLUE CROSS AND BLUE SHIELD ASSOCIATION ("BCBSA") is a corporation organized under the state of Illinois and headquartered in Chicago, Illinois. It is owned and controlled by thirty-six (36) health insurance plans that operate under the Blue Cross and Blue Shield trademarks and trade names. BCBSA was created by these plans and operates as a licensor for these plans. Health insurance plans operating under the Blue Cross and Blue Shield trademarks and trade names provide health insurance coverage for approximately 100 million – or one in three – Americans. A BCBS licensee is the largest health insurer, as measured by number of subscribers, in forty-four (44) states. The principal headquarters for BCBSA is 225 North Michigan Avenue, Chicago, IL 60601. BCBSA may be served with process by serving its registered agent, Patrick C. Pope, 225 N. Michigan Ave., Chicago, IL 60601. BCBSA has contacts with all 50 States, the District of Columbia, and Puerto Rico by virtue of its agreements and contacts with the Individual Blue Plans. In particular, BCBSA has entered into a series of license agreements with the Individual Blue Plans that control the geographic areas in which the Individual Blue Plans can operate. These agreements are a subject of this Complaint.

26.     Defendant ANTHEM, INC. is an Indiana corporation with its corporate headquarters located at 120 Monument Circle, Indianapolis, Indiana 46204. Anthem, Inc., its subsidiaries, including Anthem Insurance Companies, Inc., Anthem Holding Company, LLC, Anthem Holding Corp., Anthem Southeast, Inc., and WellPoint Holding Corp., and its health care insurance companies, are collectively referred to as "Anthem" in this Complaint. Anthem, the largest licensee within the BCBSA, is a publicly-traded, for-profit company. By some measures Anthem is the largest health benefits company in the nation with more than 38.5 million members in its affiliated health plans. According to its website, one in nine Americans is an Anthem member, and Anthem has contracted with 92% of the physicians and 97% of hospitals nationwide through the Blue Card Program. Anthem, by and through its subsidiaries and affiliated companies, operates Blues in fourteen states, including California, Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Missouri, Nevada, New Hampshire, New York, Ohio, Virginia, and Wisconsin. Defendant may be served with process by serving its registered agent, Kathleen S. Kiefer, 120 Monument Circle, Indianapolis, Indiana 46204.

27.     Defendant BLUE CROSS AND BLUE SHIELD OF TEXAS, a division of Defendant Health Care Service Corporation with its principal place of business located at 300 East Randolph Street, Chicago, IL 60601. Blue Cross and Blue Shield of Texas, merged with Health Care Service Corporation, a Mutual Legal Reserve Company, d/b/a BlueCross BlueShield of Illinois on December 8, 1998, and is the parent of a number of subsidiaries that provide health care financing to 4.7 million enrollees in various health care plans in Texas. Blue Cross and Blue Shield of Texas, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Texas" or "BCBS-TX" in this Complaint. Defendant may be served with process by serving its registered agent Corporation Service Company, 211 East 7th Street, Suite 620, Austin, Texas 78701-3218.

**RESPONSE**:  Cigna is without knowledge or information from which to form a belief as to the truth of the allegations contained in paragraphs 25-27 of the Complaint and therefore such allegations are denied.

## THE AETNA DEFENDANTS

28.     Defendant, AETNA INC., is a corporation that is incorporated under the laws of the State of Connecticut. Defendant has its principal place of business in the State of Texas and may be served with process by serving its registered agent, CT Corporation System, 1999 Bryan St., Suite 900, Dallas, Texas 75201.

**RESPONSE**:  Cigna is without knowledge or information from which to form a belief as to the truth of the allegations contained in paragraph 28 of the Complaint and therefore such allegations are denied.

## THE CIGNA DEFENDANTS

29.     Defendant, CIGNA CORPORATION, is a corporation that is incorporated under the laws of the State of Connecticut. Defendant has its principal place of business in the State of Connecticut and may be served with process by serving its registered agent, CT Corporation System, One Corporate Center, Hartford, CT 06103-3220.

**RESPONSE**:  Cigna admits that Cigna Corporation has its principal place of business in the State of Connecticut, and may be served with process by serving its registered agent, CT Corporation System.  Cigna denies the remaining allegations.  Cigna further states that Cigna was improperly named in the Complaint as "Cigna Corporation."  Cigna Corporation is not an insurance company and is not a proper defendant in this matter.  Cigna Health and Life

Insurance Company is the proper entity for any claims related to Cigna's Lyme disease coverage policy.  Accordingly, Cigna Health and Life Insurance Company is the correct name of the party to this lawsuit.

## THE KAISER DEFENDANTS

30.     Defendant KAISER PERMANENTE, INC. is a corporation that is incorporated under the laws of the State of California. Defendant has its principal place of business in the State of California and may be served with process by serving its registered agent, CSC Lawyers Incorporating Service, 2710 Gateway Oaks Dr., Ste. 150N, Sacramento, CA 95833.

**RESPONSE**:  Cigna is without knowledge or information from which to form a belief as to the truth of the allegations contained in paragraph 30 of the Complaint and therefore such allegations are denied.

## THE UNITED HEALTHCARE DEFENDANTS

31.     Defendant, UNITED HEALTHCARE SERVICES, INC., is a corporation that is incorporated under the laws of the State of Minnesota. Defendant has its principal place of business in the State of Minnesota and may be served with process by serving its registered agent, CT Corporation System, 1010 Dale St. N., St. Paul, MN 55117.

32.     Defendant, UNITEDHEALTH GROUP INCORPORATED., is a corporation that is incorporated under the laws of the State of Delaware. Defendant may be served with process by serving its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

**RESPONSE**:  Cigna is without knowledge or information from which to form a belief as to the truth of the allegations contained in paragraphs 31-32 of the Complaint and therefore such allegations are denied.

## "IDSA PANELISTS" - DEFENDANTS

33.     Defendant Dr. Gary P. Wormser is an individual residing in New York. He may be served with process at the Department of Medicine, New York Medical College, Division of Infectious Diseases, 40 Sunshine Cottage Rd., Valhalla, NY 10595, or wherever he may be located.

34.     Dr. Raymond J. Dattwyler is an individual residing in New York. He may be served with process at his place of business, 325 Park Ave., Huntington, NY 11743, or wherever he may be located.

35.     Dr. Eugene Shapiro is an individual residing in Connecticut. He may be served with process at his place of business, 789 Howard Ave., Suite 14C, New Haven, CT 06519, or wherever he may be located.

36.     Dr. John J. Halperin is an individual residing in New Jersey. He may be served with process at his place of business, 99 Beauvoir Ave., Summit, NJ 07901, or wherever he may be located.

37.     Dr. Robert B. Nadelman is an individual residing in New York. He may be served with process at his place of business, 99 grasslands Rd., Valhalla, NY 10595, or wherever he may be located.

38.     Dr. Leonard Sigal is an individual residing in New Jersey. He may be served with process at his place of business, 125 Paterson St., #5200a, New Brunswick, NJ 08901, or wherever he may be located.

39.     Dr. Allen Steere is an individual residing in Massachusetts. He may be served with process at his place of business, 55 Fruit St #148, Boston, MA 02114, or wherever he may be located.

40.     Collectively these doctors are identified by name or as the "IDSA Panelists".

**RESPONSE**:  Cigna is without knowledge or information from which to form a belief as to the truth of the allegations contained in paragraphs 33-40 of the Complaint and therefore such allegations are denied.

## JURISDICTION AND VENUE

41.     The Racketeer Influenced and Corrupt Organizations Act (RICO) authorized nationwide service of process on nonresident defendants in civil RICO suits brought in Texas district court, where the court has personal jurisdiction over at least one participant in alleged conspiracy and there was no other district that had personal jurisdiction over all the alleged coconspirators. 18 U.S.C.A. § 1965(b).

42.     Venue is proper pursuant to 18 U.S.C.A. § 1965 because Defendants transact their affairs in this venue. 18 U.S.C.A. § 1965.

**RESPONSE**:  Paragraphs 41-42 of the Complaint contain conclusions or characterizations of the law to which no response is required.

## **FACTUAL ALLEGATIONS COMMON TO ALL COUNTS AND CLAIMS**

43.     All of the facts and allegations in all of the subsequent paragraphs are made upon information and belief.

44.     Lyme disease is the most common tick-borne infection in both North America and Europe and is the fastest-growing infectious disease in America. The CDC estimates that 300,000 Americans are infected with Lyme disease each year. Once infected, patients typically experience a wide range of symptoms, including fever, headache, swollen joints, fatigue, and skin rash. If the infection goes untreated, the disease may spread to the joints, heart, and the nervous system and may result in debilitating symptoms, including severe fatigue, anxiety, migraines, light sensitivity, and severe joint pain. If Lyme disease continues untreated for a prolonged period, the infected suffer with crippling muscle and joint pain, disabling fatigue, arthritis, neurological disorders, cardiac disorders, and eventually invades the brain causing depression, thoughts of suicide, brain fog, severe weakness, memory or concentration difficulties, bladder or bowel dysfunction, and visual loss. Left untreated, Lyme disease can lead to a painful and agonizing death.

**RESPONSE**:  Cigna is without knowledge or information from which to form a belief

as to the truth of the allegations contained in paragraphs 43-44 of the Complaint and therefore

such allegations are denied.

45.     The doctors who actually treat Lyme disease have known for a long time that while many patients who contract Lyme disease can be cured with short-term antibiotic treatment, a large number of patients, up to 40%, do not respond to short-term antibiotic treatment. These patients with chronic Lyme disease require long-term antibiotic treatment for many months until the symptoms are resolved. Lyme doctors also know that chronic Lyme disease patients who do not respond to short-term antibiotic treatment, and do not receive long-term antibiotic treatment, will suffer debilitating symptoms, will be in constant pain, will be unable to function or live a normal life, and will eventually die from Lyme disease.

46.     Similarly, Lyme doctors know that if Lyme patients are undiagnosed, or are misdiagnosed with another ailment, the Lyme disease can become so severe that without long term antibiotic treatment the disease will spread to their joints, their heart, and their nervous system causing crippling muscle and joint pain, disabling fatigue, arthritis, neurological disorders, cardiac disorders, depression, memory loss, bladder loss, bowel dysfunction, visual loss, and death.

**RESPONSE**:  Cigna is without knowledge or information from which to form a belief

as to the truth of the allegations contained in paragraphs 45-46 of the Complaint and therefore

such allegations are denied.

47.     Initially, the Insurance Defendants provided coverage for Lyme disease patients, covered long-term antibiotic treatment, and even paid for extended hospital stays to treat patients

with Lyme disease who did not respond to short-term antibiotic treatment. This allowed doctors to properly assesses and treat patients with chronic Lyme disease and prevented the suffering and death of many thousands of Lyme disease patients.

**RESPONSE**:  Cigna denies the allegations contained in paragraph 47 of the

Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information

from which to form a belief as to the truth of the remaining allegations contained in paragraph

47 of the Complaint and therefore such allegations are denied.

48.     In the 1990's the Insurance Defendants decided that treatment of Lyme disease was too expensive and "red-flagged" Lyme disease. The health insurance industry made a concerted effort to deny coverage for treatment of Lyme disease. The Insurance Defendants enlisted the help of doctors who were researching, not treating, Lyme disease. The Insurance Defendants paid these IDSA Panelists large fees and together they developed arbitrary guidelines for testing Lyme disease.

**RESPONSE**:  Cigna denies the allegations contained in paragraph 48 of the

Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information

from which to form a belief as to the truth of the remaining allegations contained in paragraph

48 of the Complaint and therefore such allegations are denied.

49.     Once these arbitrary guidelines were decided, the Insurance Defendants could, and did, deny coverage for patients if they did not meet their new stringent Lyme testing protocols. Since most Lyme patients would not test positive under the new protocols, the Insurance Defendants could deny coverage for many people suffering from Lyme disease.

**RESPONSE**:  Cigna denies the allegations contained in paragraph 49 of the

Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information

from which to form a belief as to the truth of the remaining allegations contained in paragraph

49 of the Complaint and therefore such allegations are denied.

50.     Additionally, the Insurance Defendants, with the help of the paid IDSA Panelists, decided that long term antibiotic treatment was not necessary and all Lyme disease patients could be cured in less than a month. By August of 1992, the Insurance Defendants had imposed an intravenous antibiotic limit of twenty-eight days.

**RESPONSE**:  Cigna denies the allegations contained in paragraph 50 of the Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information from which to form a belief as to the truth of the remaining allegations contained in paragraph 50 of the Complaint and therefore such allegations are denied.

51.     For example, Dr. Richard Sanchez, the Senior Vice President for the Blue Cross Defendants testified during a deposition that the Blue Cross Defendants' accountants, Deloitte & Touche, advised the Blue Cross Defendants that their review physicians needed to issue more denials in order to increase its profitability. This was important because Blue Cross was transitioning from a not for profit to a for profit entity. Sanchez admitted that the Blue Cross Defendants raised the bar to make it more difficult for patients with Lyme disease to get reimbursement for treatment. When Sanchez was asked if he was aware of any particular scientific or medical justification for the Blue Cross Defendants' new policies, he answered "No".

**RESPONSE**:  Cigna is without knowledge or information from which to form a belief as to the truth of the allegations contained in paragraph 51 of the Complaint and therefore such allegations are denied.

52.     Sanchez acknowledged that the Blue Cross Defendants senior personnel knew that some patients who actually had Lyme disease would be denied treatment and that some would suffer as a result. He testified that the Blue Cross Defendants "rationalized" that Lyme disease sufferers who were denied coverage could appeal their denials. But Sanchez acknowledged that some patients might be unable to negotiate the tortuous appeals process, might "fall by the wayside", and might sustain irreversible injury as a result. Sanchez testified that it was "common knowledge" that "any time you put up a hurdle, certain people will fight to get over it and others will accept it and not appeal".

**RESPONSE**:  Cigna is without knowledge or information from which to form a belief as to the truth of the allegations contained in paragraph 52 of the Complaint and therefore such allegations are denied.

53.     The Blue Cross Defendants communicated with Deloitte & Touche via the mail in 1995. These communications were sent between the Blue Cross Defendants' home office in Chicago, Illinois and Deloitte & Touche's offices in New York City, New York. These communications harmed Plaintiffs because they deprived Plaintiffs, and all other people suffering with Lyme disease, insurance coverage and prevented them from being properly treated. Additionally, Plaintiffs, and all others suffering with Lyme disease, were forced to pay out-of-pocket for their treatment, thus costing them vast sums of money.

**RESPONSE**:  Cigna is without knowledge or information from which to form a belief as to the truth of the allegations contained in paragraph 53 of the Complaint and therefore such allegations are denied.

54.     By the mid 1990's, the Insurance Defendants began paying large consulting fees to the same Lyme IDSA Panelists who helped them develop their arbitrary guidelines. The Insurance Defendants paid these Lyme IDSA Panelists to enforce their new stringent testing protocols and maintain the 28-day treatment requirement. These doctors began publishing papers on the "Lyme hysteria" and the "Pseudo Lyme" problem.

**RESPONSE**:  Cigna denies the allegations contained in paragraph 54 of the Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information from which to form a belief as to the truth of the remaining allegations contained in paragraph 54 of the Complaint and therefore such allegations are denied.

55.     Dr. Gary P. Wormser, Dr. Raymond J. Dattwyler, Dr. Eugene Shapiro, Dr. John J. Halperin, Dr. Robert B. Nadelman, Dr. Leonard Sigal, and many others were paid large sums of money by the Insurance Defendants in consulting fees, in expert witness fees, and to review, and deny, insurance coverage claims related to Lyme disease.

**RESPONSE**:  Cigna denies the allegations contained in paragraph 55 of the Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information from which to form a belief as to the truth of the remaining allegations contained in paragraph 55 of the Complaint and therefore such allegations are denied.

56.     It is believed that Dr. Gary P. Wormser was paid via mail in New York from 1995 to 2017; Dr. Raymond J. Dattwyler was paid via mail in New York from 1995 to 2017; Dr. Eugene Shapiro was paid via mail in New Jersey from 1995 to 2006; Dr. John J. Halperin was paid via mail in New Jersey from 1995 to 2017; Dr. Robert B. Nadelman was paid via mail in New York from 1995 to 2017; and Dr. Leonard Sigal was paid via mail in New Jersey from 1995 to 2017. These payments, as well as communications related to the doctors' responsibilities and findings, were sent from the Insurance Defendants to these IDSA Panelists. These payments and communications harmed Plaintiffs because they deprived Plaintiffs, and all other people suffering with Lyme disease, insurance coverage and prevented them from being properly diagnosed and treated for Lyme disease. Additionally, Plaintiffs, and all others suffering with Lyme disease, were forced to pay out-of-pocket for their treatment, thus costing them vast sums of money.

**RESPONSE**:   Cigna denies the allegations contained in paragraph 56 of the Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information from which to form a belief as to the truth of the remaining allegations contained in paragraph 56 of the Complaint and therefore such allegations are denied.

57.    On August 12, 1996 Dr. Leonard Sigal gave a deposition and testified that he reviewed many Lyme disease files for insurance companies, almost always denied coverage, and charged $560 an hour to perform his work. He testified that he reviewed files for most of the Insurance Defendants:

> Q.    What insurance companies have you reviewed for with regard to Lyme disease?
>
> A.    Prudential, Aetna, Blue Cross Blue Shield. Something called Anthem. Met Life, or Met Health, I guess, Metro Health. Whatever it's called. I believe that's it.
>
> Q.    And have payments from these insurance companies been made directly to you in your name?
>
> A.    Yes.

**RESPONSE**:   Cigna denies the allegations contained in paragraph 57 of the Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information from which to form a belief as to the truth of the remaining allegations contained in paragraph 57 of the Complaint and therefore such allegations are denied.

58.    The Insurance Defendants paid Dr. Sigal to improperly deny insurance coverage to Lyme disease patients and to improperly influence the treating doctors to not provide long-term treatment for chronic Lyme patients. The Insurance Defendants made payments and sent communications to Dr. Sigal through the mail from 1993 through 2006 and these payments were mailed from the Insurance Defendants to Dr. Sigal's office in New Brunswick, New Jersey. These payments and communications harmed Plaintiffs because they deprived Plaintiffs, and all other people suffering with Lyme disease, insurance coverage and prevented them from being properly diagnosed and treated for Lyme disease. Additionally, Plaintiffs, and all others suffering with Lyme disease, were forced to pay out-of-pocket for their treatment, thus costing them vast sums of money.

**RESPONSE**:   Cigna denies the allegations contained in paragraph 58 of the

Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information

from which to form a belief as to the truth of the remaining allegations contained in paragraph

58 of the Complaint and therefore such allegations are denied.

59.     The Insurance Defendants also paid Dr. Allen Steere, a well-respected Lyme
researcher, to endorse their new Lyme disease treatment policy of limiting Lyme disease treatment
to 28-days. Dr. Steere published his treatment guidelines in Transactions of the American Academy
of Insurance Medicine. Dr. Steere also wrote a paper for the Insurance Defendants medical directors
claiming "all stages of the infection" could be treated in 10 to 30 days.

**RESPONSE**:   Cigna denies the allegations contained in paragraph 59 of the

Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information

from which to form a belief as to the truth of the remaining allegations contained in paragraph

59 of the Complaint and therefore such allegations are denied.

A.     **2000 IDSA Lyme Disease Guidelines**

60.     In 2000, the Infectious Diseases Society of America (IDSA) published the first
guidelines for treating Lyme disease. These guidelines were remarkably similar to the arbitrary
guidelines imposed by the Insurance Defendants. This is not surprising since the IDSA Panelists
who wrote the guidelines were made up mostly of the Lyme researchers being paid by the
Insurance Defendants. These researchers included Dr. Gary P. Wormser, Dr. Raymond J.
Dattwyler, Dr. Eugene Shapiro, Dr. John J. Halperin, and Dr. Robert B. Nadelman.

**RESPONSE**:   Cigna denies the allegations contained in paragraph 60 of the

Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information

from which to form a belief as to the truth of the remaining allegations contained in paragraph

60 of the Complaint and therefore such allegations are denied.

61.     The IDSA allowed the Insurance Defendants to stack the panel with Lyme
researchers on the payroll of the Insurance Defendants. Doctors who actually treated Lyme disease
were not invited to join the IDSA Lyme disease panel. In fact, panelists who did not agree with
the Insurance Defendants' arbitrary guidelines were kicked off the panel.

**RESPONSE**:   Cigna denies the allegations contained in paragraph 61 of the Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information from which to form a belief as to the truth of the remaining allegations contained in paragraph 61 of the Complaint and therefore such allegations are denied.

62.     Dr. Sam Donta, one of the most respected Lyme doctors in the world, questioned why the guidelines did not include treatment for patients with chronic Lyme disease. He was then removed from the panel by the IDSA.

**RESPONSE**:   Cigna is without knowledge or information from which to form a belief as to the truth of the allegations contained in paragraph 62 of the Complaint and therefore such allegations are denied.

63.     Dr. Benjamin Luft questioned why the panel was not considering Dr. Donta's request and recommended that the IDSA panel simply hear from the doctors who believed that 28-days of treatment was not sufficient for all Lyme disease patients. Dr. Luft was demoted by the IDSA for expressing these ideas and was not identified as an author of the 2000 guidelines.

**RESPONSE**:   Cigna is without knowledge or information from which to form a belief as to the truth of the allegations contained in paragraph 63 of the Complaint and therefore such allegations are denied.

64.     Leading up to the 2000 IDSA guidelines, many doctors who actually treated Lyme patients spoke out against the IDSA guidelines, complaining that the guidelines were too restrictive to properly treat and diagnose chronic Lyme patients. These doctors knew that short term antibiotics of twenty-eight days failed to treat up to 40% of patients with Lyme disease. This means more than 100,000 Lyme disease patients every year would be untreated if the IDSA guidelines were followed.

**RESPONSE**:   Cigna is without knowledge or information from which to form a belief as to the truth of the allegations contained in paragraph 64 of the Complaint and therefore such allegations are denied.

65.     As a result of their speaking out, from 1997 to 2000, more than 50 physicians in New York, New Jersey, Connecticut, Michigan, Oregon, Rhode Island and Texas were investigated, disciplined or had had their licenses removed. Many of these doctors were reported to their medical boards by the Insurance Defendants. The Insurance Defendants wanted the IDSA

guidelines followed by doctors so they would not have to pay for long term antibiotic coverage for patients suffering from chronic Lyme disease.

**RESPONSE**:   Cigna   denies   the   allegations   contained   in   paragraph   65   of   the

Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information

from which to form a belief as to the truth of the remaining allegations contained in paragraph

65 of the Complaint and therefore such allegations are denied.

66.     From 1997 to 2000, the Insurance Defendants sent correspondence by mail from their offices to the medical boards of New York, New Jersey, Connecticut, Michigan, Oregon, Rhode Island and Texas reporting medical doctors for treating patients with chronic Lyme disease. These communications harmed Plaintiffs because they deprived Plaintiffs of the ability to find doctors who would treat them for their chronic Lyme disease. These communications had a chilling effect on the medical community and caused doctors who would normally treat Lyme patients to refuse to treat patients with Lyme disease. Plaintiffs, and all other people with Lyme disease, were forced to travel long distances to receive treatment, if they could afford to travel. Plaintiffs, and all others suffering with Lyme disease, were forced to pay out-of-pocket for their treatment because the doctors who would treat Lyme disease did not want to submit the claims to the Insurance Defendants for fear of being reported to their medical boards.

**RESPONSE**:   Cigna   denies   the   allegations   contained   in   paragraph   66   of   the

Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information

from which to form a belief as to the truth of the remaining allegations contained in paragraph

66 of the Complaint and therefore such allegations are denied.

67.     These physicians used their own money to defend themselves. Some lost their licenses, some were not allowed to treat Lyme patients, and one of these physicians eventually committed suicide.

**RESPONSE**:  Cigna is without knowledge or information from which to form a belief

as to the truth of the allegations contained in paragraph 67 of the Complaint and therefore

such allegations are denied.

68.     Dr. Joseph Burrascano, Jr., an internationally known infectious disease specialist, made the following statements at a hearing before the Senate Committee on Labor & Human Resources:

> There is in this country a core group of university-based Lyme disease researchers and physicians whose opinions carry a great deal of weight. Unfortunately, many of them act unscientifically and unethically. They adhere to outdated, self-serving views and attempt to personally discredit those whose opinions differ from their own. They exert strong, ethically questionable influence on medical journals, which enables them to publish and promote articles that are badly flawed. They work with Government agencies to bias the agenda of consensus meetings and have worked to exclude from these meetings and scientific seminars those with ultimate opinions.
> They behave this way for reasons of personal or professional gain and are involved in obvious conflicts of interest.
>
> [T]hese individuals who promote this so-called "post Lyme syndrome" as a form of arthritis depend on funding from arthritis groups and agencies to earn their livelihood. Some of them are known to have received large consulting fees from insurance companies to advise the companies to curtail coverage for any additional therapy beyond the arbitrary 30-day course.

**RESPONSE**:  Cigna is without knowledge or information from which to form a belief as to the truth of the allegations contained in paragraph 68 of the Complaint and therefore such allegations are denied.

69.     Two months after Dr. Burrascano's testimony, New York's Office of Professional Medical Conduct (OPMC) began an intensive seven-year investigation of Dr. Burrascano because he treated chronic Lyme patients with long-term antibiotics. Eventually, the OPMC hearing panel cleared him of any wrongdoing relating to his treatment of Lyme patients but not until he spent more than $1 million on attorneys' fees defending himself.

**RESPONSE**:  Cigna is without knowledge or information from which to form a belief as to the truth of the allegations contained in paragraph 69 of the Complaint and therefore such allegations are denied.

## B.     2006 IDSA Guidelines

70.     The Insurance Defendants relied on the 2000 IDSA guidelines as hard-and-fast rules, instead of guidelines. But for the Insurance Defendants, the 2000 IDSA guidelines were not restrictive enough. A few years later; the Insurance Defendants put the IDSA Panelists back to work to come up with more restrictive guidelines. This time, the IDSA invited the input of one of the Insurance Defendants' top paid experts, Dr. Leonard Sigal.

**RESPONSE**:   Cigna   denies   the   allegations   contained   in   paragraph   70   of   the Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information from which to form a belief as to the truth of the remaining allegations contained in paragraph 70 of the Complaint and therefore such allegations are denied.

71.     Dr. Sigal, the man paid $560 an hour by the Insurance Defendants, is not referenced or mentioned in the 2000 IDSA guidelines. However, Dr. Sigal is referenced six (6) times in the 2006 guidelines and one of articles by Dr. Sigal that is referenced in the 2006 IDSA guidelines claims "'Chronic Lyme disease' is a common clinical diagnosis in some geographic areas and is based on thinking that is at odds with scientifically validated findings."

**RESPONSE**:   Cigna   denies   the   allegations   contained   in   paragraph   71   of   the Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information from which to form a belief as to the truth of the remaining allegations contained in paragraph 71 of the Complaint and therefore such allegations are denied.

72.     According to the 2006 IDSA guidelines, Dr. Sigal was allowed to review, and probably revise, the guidelines before they were finalized: "The Expert Panel also wishes to express its gratitude to . . . Leonard H. Sigal for [his] thoughtful review of an earlier draft of these guidelines."

**RESPONSE**:  Cigna is without knowledge or information from which to form a belief as to the truth of the allegations contained in paragraph 72 of the Complaint and therefore such allegations are denied.

73.     Again, the IDSA did not want any doctors who actually treated Lyme disease to try to be on the 2006 IDSA panel, so, the IDSA excluded all physicians who received income of more than $10,000 per year from treating Lyme disease. Under this rule, if a physician saw more than one Lyme patient per week, he/she was excluded from the IDSA panel. This meant the panel had no actual expertise on the testing of Lyme disease, the treatment of Lyme disease, or the treatment of chronic Lyme disease. This rule did not exclude the doctors receiving large fees from the Insurance Defendants.

**RESPONSE**:  Cigna is without knowledge or information from which to form a belief as to the truth of the remaining allegations contained in paragraph 50 of the Complaint and therefore such allegations are denied.

74.    Not surprisingly, the 2006 IDSA guidelines were even more restrictive than the 2000 guidelines. The 2006 IDSA Guidelines actually "promote the idea that Lyme is a simple, rare illness that is easy to avoid, difficult to acquire, simple to diagnose, and easily treated and cured with 28 days of antibiotics." Even though the IDSA guidelines are not rules or requirements, the Insurance Defendants treat them as "de facto" law that must be followed by doctors and refuse to cover treatment beyond the IDSA guidelines. The IDSA, the IDSA Panelists, and the Insurance Defendants ignore the organizations, information, and scientific data reporting that chronic Lyme disease is a legitimate medical condition, that chronic Lyme disease requires long-term antibiotic treatment, and that the current testing criteria fails to diagnose a majority of people with Lyme disease.

**RESPONSE**:    Cigna denies the allegations contained in paragraph 74 of the

Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information

from which to form a belief as to the truth of the remaining allegations contained in paragraph

74 of the Complaint and therefore such allegations are denied.

75.    The reason hundreds of thousands of people suffer with chronic Lyme disease is because they are refused long-term antibiotic treatment beyond the 28 days. The Insurance Defendants ignore their patients, ignore the results (people who get better with long term antibiotic treatment), ignore the many studies showing that many patients need antibiotic treatment beyond the 28 days, and ignore the doctors who keep saying that some patients need long term antibiotic treatment. The Insurance Defendants refuse to provide insurance coverage for long term antibiotics which could cure the chronic Lyme disease simply because the Insurance Defendants do not want to pay for the treatment.

**RESPONSE**:    Cigna denies the allegations contained in paragraph 75 of the

Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information

from which to form a belief as to the truth of the remaining allegations contained in paragraph

75 of the Complaint and therefore such allegations are denied.

76.    The Insurance Defendants work with, and compensate, the IDSA Panelists to keep the 28-day standard in place. The IDSA Panelists benefit financially from their arrangements with the Insurance Defendants by receiving large consulting fees. Additionally, when an insured appeals a denial of insurance coverage for long-term antibiotics, the Insurance Defendant then hires one of the IDSA Panelists to affirm the denial. If the Insurance Defendant is sued because the patient who is denied coverage gets worse, or even dies, then the Insurance Defendant hires IDSA Panelists as expert witnesses and pays them exorbitant fees.

**RESPONSE**:   Cigna denies the allegations contained in paragraph 76 of the Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information from which to form a belief as to the truth of the remaining allegations contained in paragraph 76 of the Complaint and therefore such allegations are denied.

77.     From 2006 to 2017, it is believed that Dr. Gary P. Wormser, Dr. Raymond J. Dattwyler, Dr. John J. Halperin, Robert B. Nadleman, and Dr. Leonard Sigal were paid by, and exchanged information with, the Insurance Defendants. These payments and communications were made via the mail were sent from the Insurance Defendants to these IDSA Panelists in New York and New Jersey. These payments and communications harmed Plaintiffs because they deprived Plaintiffs, and all other people suffering with Lyme disease, insurance coverage and prevented them from being properly diagnosed and treated for Lyme disease. Additionally, Plaintiffs, and all others suffering with Lyme disease, were forced to pay out-of-pocket for their treatment, thus costing them vast sums of money. These IDSA Panelists were mailed fees and information from the offices of the Insurance Defendants in furtherance of their scheme to prevent treatment of chronic Lyme disease and to prevent the proper testing of potential Lyme disease patients.

**RESPONSE**:   Cigna denies the allegations contained in paragraph 77 of the Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information from which to form a belief as to the truth of the remaining allegations contained in paragraph 77 of the Complaint and therefore such allegations are denied.

78.     Instead of providing long-term antibiotic treatment, the Insurance Defendants, with the assistance of the IDSA Panelists, classify chronic Lyme disease patients as having post treatment Lyme disease syndrome, a psychological issue, or other psychological issues such as Munchausen's syndrome. If that does not work, the Insurance Defendants, with the help of the IDSA Panelists, classify the patients' problems as chronic fatigue syndrome or fibromyalgia.

**RESPONSE**:   Cigna denies the allegations contained in paragraph 78 of the Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information from which to form a belief as to the truth of the remaining allegations contained in paragraph 78 of the Complaint and therefore such allegations are denied.

C.      **Insurance Defendants Report Doctors Who Treat Chronic Lyme Disease**

79.     To compound the problem for people with chronic Lyme disease, the Insurance

Defendants and IDSA Panelists report doctors that treat chronic Lyme disease to medical boards in an attempt to strip them of their medical licenses. The IDSA Panelists are then paid by the Insurance Defendants to testify against these doctors in front of the medical boards. This means people suffering with chronic Lyme disease struggle to even find doctors who are willing to treat their chronic Lyme disease and often have to travel to different states or countries to receive treatment. And when these patients do find a doctor to provide the treatment then need, they have to pay out-of-pocket for medical treatment because the Insurance Defendants will not cover their necessary treatment.

**RESPONSE**:   Cigna denies the allegations contained in paragraph 79 of the Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information from which to form a belief as to the truth of the remaining allegations contained in paragraph 79 of the Complaint and therefore such allegations are denied.

80.    Pat Smith, the President, Lyme Disease Association, Inc. testified in front of the New York State Assembly about her experiences:

> In New York, we met with representatives from the OPMC [Office of Professional Medical Conduct], Health Department and the Governor's office, motivated by the fact that almost 60 percent of doctors who treat chronic Lyme disease in New York State have faced OPMC scrutiny the past year. At a meeting this year, OPMC reps said that "some of our best tips come from insurance companies." New York law prevents doctors from ever knowing the original complaint or complainant, thus treating doctors run the risk of spending tens of thousands of dollars defending their right to treat a patient, even when the patient has improved, the patient is not complaining, and the patient objects to his or her records being used against the doctor.

**RESPONSE**:   Cigna is without knowledge or information from which to form a belief as to the truth of the allegations contained in paragraph 80 of the Complaint and therefore such allegations are denied.

81.    For example, Dr. Joseph G. Jemsek was one of the pioneers in HIV/AIDS research and treatment. He established twenty-two protocols for the treatment of HIV/AIDS and published more than forty peer-reviewed articles.

**RESPONSE**:   Cigna is without knowledge or information from which to form a belief as to the truth of the allegations contained in paragraph 81 of the Complaint and therefore

such allegations are denied.

82.     When Dr. Jemsek learned about the growing number of Lyme disease patients who were not being properly treated, he turned his attention to Lyme disease. Dr. Jemsek has been involved in several lawsuits and the information in this Complaint regarding Dr. Jemsek come from those documents currently in the public record.

**RESPONSE**:  Cigna is without knowledge or information from which to form a belief as to the truth of the allegations contained in paragraph 82 of the Complaint and therefore such allegations are denied.

83.     Dr. Jemsek learned, as most doctors who actually treat Lyme disease learn, that many patients do not get better with only 28 days of antibiotic treatment. He began treating these patients with long-term antibiotic treatment. He then submitted their claims to the Blue Cross Defendants.

**RESPONSE**:  Cigna is without knowledge or information from which to form a belief as to the truth of the allegations contained in paragraph 83 of the Complaint and therefore such allegations are denied.

84.     In 2003, the Blue Cross Defendants began examining Dr. Jemsek's claims and learned of his use of long-term antibiotic therapy for Lyme-disease sufferers. The Blue Cross Defendants applied their strict policy, which relied on the IDSA guidelines, that defined all courses of antibiotics lasting longer than 28 days to be "medically unnecessary" for treating Lyme disease. The Blue Cross Defendants never informed Dr. Jemsek that it used this specific policy to deny his patients' claims. Instead, the Blue Cross Defendants sent correspondence to Dr. Jemsek's patients that Dr. Jemsek's use of long-term antibiotics did not meet the general "medical necessity" standard. The Blue Cross Defendants sent this correspondence through the mail in an attempt to prevent Dr. Jemsek from treating Lyme patients and to have a chilling effect on all doctors around the country. This correspondence harmed Plaintiffs because it caused doctors who would normally treat Lyme patients to refuse to treat patients with Lyme disease, including Plaintiffs.

**RESPONSE**:  Cigna is without knowledge or information from which to form a belief as to the truth of the allegations contained in paragraph 84 of the Complaint and therefore such allegations are denied.

85.     In 2005, the Blue Cross Defendants stopped paying Dr. Jemsek's patients' claims for long-term antibiotic use in treating Lyme disease. The Blue Cross Defendants then worked with some of Dr. Jemsek's patients and the North Carolina Medical Board in an attempt to put Dr. Jemsek out of business and strip him of his medical license. In fact, Dr. Jemsek learned that Janelle R. Rhyne, a

member of the North Carolina Medical Board, was, at the same time, a paid consultant to the Blue Cross Defendants. According to Dr. Jemsek, the North Carolina Medical Board actively solicited, generated, or staged the complaints to stop him from practicing medicine. The North Carolina Medical Board's investigation into Dr. Jemsek focused solely on Dr. Jemsek's use of long-term antibiotics in treating Lyme-disease patients.

**RESPONSE**:  Cigna is without knowledge or information from which to form a belief

as to the truth of the allegations contained in paragraph 85 of the Complaint and therefore

such allegations are denied.

86.     The North Carolina Medical Board recommended charging Dr. Jemsek with professional misconduct for improperly diagnosing Lyme disease and improperly using long-term antibiotics to treat Lyme disease. After the charges against Dr. Jemsek were announced, the Blue Cross Defendants then used this recommendation to place a hold on all claims of Dr. Jemsek and his clinic.

**RESPONSE**:  Cigna is without knowledge or information from which to form a belief

as to the truth of the allegations contained in paragraph 86 of the Complaint and therefore

such allegations are denied.

87.     The Blue Cross Defendants then sued Dr. Jemsek for up to $100 million for treating patients who were insured by them. This put him out of business in North Carolina and forced his practice into bankruptcy.

**RESPONSE**:  Cigna is without knowledge or information from which to form a belief

as to the truth of the allegations contained in paragraph 87 of the Complaint and therefore

such allegations are denied.

88.     Another example is Dr. Kenneth B. Liegner, Dr. Liegner is a board certified internist with training in pathology and critical care medicine. He has been forced to defend himself in front of the New York State Department of Health for treating patients with chronic Lyme disease.

**RESPONSE**:  Cigna is without knowledge or information from which to form a belief

as to the truth of the allegations contained in paragraph 88 of the Complaint and therefore

such allegations are denied.

89.     Dr. Charles Ray Jones is the world's leading pediatric specialist on Lyme Disease. Yet, Dr. Jones has been hounded by the Connecticut State Medical Board for years and his patients and colleagues have had to help to defray the costs of his legal defense. Dr. Jones' legal defense costs have exceeded one million dollars.

**RESPONSE**:  Cigna is without knowledge or information from which to form a belief as to the truth of the allegations contained in paragraph 89 of the Complaint and therefore such allegations are denied.

90.     Dr. Jemsek, Dr. Liegner, and Dr. Jones are not the only one who have constantly had to defend their medical license at the same time as they are trying to save patients with Lyme disease. There are doctors all over the country who have been reported to their medical boards by the Insurance Defendants because they violate the IDSA guidelines and try to save the lives of their patients. From 2000 to 2017, the Insurance Defendants sent correspondence by mail from their offices to the medical boards of New York, New Jersey, Connecticut, Michigan, Oregon, Rhode Island, Texas, and others reporting medical doctors for treating patients with chronic Lyme disease. These communications harmed Plaintiffs because they deprived Plaintiffs of the ability to find doctors who would treat them for their chronic Lyme disease. These communications had a chilling effect on the medical community and caused doctors who would normally treat Lyme patients to refuse to treat patients with Lyme disease. Plaintiffs, and all other people with Lyme disease, were forced to travel long distances to receive treatment, if they could afford to travel. Plaintiffs, and all others suffering with Lyme disease, were forced to pay out-of-pocket for their treatment because the doctors who would treat Lyme disease did not want to submit the claims to the Insurance Defendants for fear of being reported to their medical boards.

**RESPONSE**:   Cigna denies the allegations contained in paragraph 90 of the Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information from which to form a belief as to the truth of the remaining allegations contained in paragraph 90 of the Complaint and therefore such allegations are denied.

91.     This is a current and ongoing conspiracy on the part of the Insurance Defendants, the IDSA Panelists, and the IDSA in trying to prevent patients with chronic Lyme disease, including Plaintiffs, from receiving treatment that could cure them.

**RESPONSE**:   Cigna denies the allegations contained in paragraph 91 of the Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information from which to form a belief as to the truth of the remaining allegations contained in paragraph 91 of the Complaint and therefore such allegations are denied.

### D.     Connecticut Attorney General's Investigation

92.     Shortly after the IDSA 2006 guidelines were released, the Attorney General of the state of Connecticut, Richard "Dick" Blumenthal (now Senator Blumenthal) served the IDSA with a Civil Investigative Demand (CID) because he was concerned that the 2006 IDSA Guidelines violated laws by restraining "doctor and patient choices for treatment of the disease," and preventing physicians' clinical judgment.

**RESPONSE**:  Cigna is without knowledge or information from which to form a belief as to the truth of the allegations contained in paragraph 92 of the Complaint and therefore such allegations are denied.

93.     Connecticut Attorney General Blumenthal inquired into whether IDSA ignored any studies supporting long-term antibiotic treatment and if there were any conflicts of interests. There was a concern that insurance companies might use these new guidelines to deny payment for Lyme treatment. Blumenthal also claimed that some members of the IDSA panel who wrote the guidelines consulted for insurance companies which could lead to unfair guidelines in respect to chronic Lyme disease.

**RESPONSE**:  Cigna is without knowledge or information from which to form a belief as to the truth of the allegations contained in paragraph 93 of the Complaint and therefore such allegations are denied.

94.     On April 30, 2008, the IDSA reached a settlement with Blumenthal but not before he found: "several of the most powerful IDSA panelists" had undisclosed financial interests in insurance companies including "consulting arrangements with insurance companies."

**RESPONSE**:  Cigna is without knowledge or information from which to form a belief as to the truth of the allegations contained in paragraph 94 of the Complaint and therefore such allegations are denied.

### E.     Testing

95.     In addition to improper treatment, the 2006 IDSA Guidelines cause many people suffering with Lyme disease to go undiagnosed for years, or even their entire lives. According to the guidelines, a physician diagnoses Lyme disease in two ways: (1) the patient must exhibit an EM rash or (2) the patient must test positive with a two-tier serology test. The IDSA and the Insurance Defendants know that many patients never develop the EM rash and the Guidelines' requirement of a positive lab test is problematic because the two-tier serology test fails to detect up to 90% of Lyme cases. As a result, many Lyme sufferers are left undiagnosed and untreated.

**RESPONSE**:   Cigna   denies   the   allegations   contained   in   paragraph   95   of   the

Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information

from which to form a belief as to the truth of the remaining allegations contained in paragraph

95 of the Complaint and therefore such allegations are denied.

96.     Lyme disease that goes undiagnosed for even a short period of time can render the
patient chronically ill and even totally disabled. In addition, because these people fail the Lyme
disease test, Lyme patients are often misdiagnosed with other numerous conditions, including
chronic fatigue syndrome, fibromyalgia, amyotrophic lateral sclerosis, multiple sclerosis, heart
disease, and numerous neurological and psychological conditions, such as autism, strokes, and
bipolar disorder.

**RESPONSE**:  Cigna is without knowledge or information from which to form a belief

as to the truth of the allegations contained in paragraph 96 of the Complaint and therefore

such allegations are denied.

97.     The Insurance Defendants support, and strongly enforce, the IDSA testing
guidelines because it allows them to avoid covering expensive antibiotic treatment. When doctors
diagnose patients with Lyme disease that do not meet the IDSA testing requirements, the Insurance
Defendants and the IDSA work together in an attempt to make sure the patient's treatment is not
covered and the doctor loses her medical license.

**RESPONSE**:   Cigna   denies   the   allegations   contained   in   paragraph   97   of   the

Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information

from which to form a belief as to the truth of the remaining allegations contained in paragraph

97 of the Complaint and therefore such allegations are denied.

F.     **RICO Allegations Against Defendants**

98.     The IDSA and the Insurance Defendants are corporations, either for profit or non-
profit, and are thus persons pursuant to Section 1961(3). The IDSA Panelists are persons pursuant
to Section 1961(3). Together, the IDSA, Insurance Defendants, and the IDSA Panelists constitute
an enterprise engaged in activities affecting interstate commerce. The IDSA, Insurance
Defendants, and the IDSA Panelists engage in a pattern of racketeering, their acts are related and
continuous, and their acts form a "pattern of racketeering."

**RESPONSE**:   To the extent that paragraph 98 of the Complaint contains conclusions or characterizations of the law, no response is required.  Cigna admits that it is a for-profit corporation.   Cigna denies the remaining allegations contained in paragraph 98 of the Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information from which to form a belief as to the truth of the remaining allegations contained in paragraph 98 of the Complaint and therefore such allegations are denied.

99.    The IDSA, Insurance Defendants, and the IDSA Panelists, acting through their officers, agents, employees and affiliates, committed numerous predicate acts of "racketeering activity," as defined in 18 U.S.C. §1961(5), prior to and during the period made the basis of this suit, and continues to commit such predicate acts, in furtherance of their scheme to prevent treatment of chronic Lyme disease and to prevent the proper testing of potential Lyme disease patients, including (a) mail fraud, in violation of 18 U.S.C. §1341, and (b) wire fraud, in violation of 18 U.S.C. §1343. Such predicate acts include the following:

    a.   mailing, causing to be mailed, knowingly agreeing to the mailing of various materials and information, and/or wiring information including, but not limited to, correspondence regarding the following: fraudulently and wrongfully claiming lack of insurance coverage for chronic Lyme disease; fraudulently and wrongfully denying insurance coverage to people with chronic Lyme disease; issuing false and misleading EOB's to patients with Lyme disease; fraudulently and wrongfully claiming all Lyme disease patients can be easily treated and cured with short-term antibiotics; fraudulently and wrongfully claiming Lyme disease patients only have Lyme disease if they exhibit an EM rash or test positive with a two-tier serology test; wrongfully and illegally reporting doctors to their medical boards for treating chronic Lyme disease; fraudulently and wrongfully misleading people with Lyme disease, and their doctors, by classifying their chronic Lyme disease as a mental disorder; fraudulently and wrongfully misleading people with Lyme disease, and their doctors, by classifying their chronic Lyme disease as a different physical condition such as chronic fatigue syndrome or fibromyalgia; and fraudulently and wrongfully enforcing the IDSA guidelines even when doctors determine a patient requires long-term antibiotic treatment.

    b.   mailing, wiring, causing to be mailed or wired, and/or knowingly agreeing to the mailing or wiring of various materials and information including, but not limited to, correspondence between the IDSA and the Insurance Defendants regarding the following: payments from the Insurance Defendants to IDSA Panelists to promote the false narrative "that Lyme is a simple, rare illness that is easy to avoid, difficult to acquire, simple to diagnose, and easily treated and

cured with 28 days of antibiotics"; payments from the Insurance Defendants to the IDSA and the IDSA Panelists to promote the false claim that chronic Lyme disease is not real; payments from the Insurance Defendants to the IDSA and the IDSA Panelists to promote the false claim that long-term antibiotic treatment is improper and unnecessary; payments from the Insurance Defendants to the IDSA Panelists so the IDSA panelists will serve as expert witnesses for the Insurance Defendants and testify that patients' requests for repeat or prolonged courses (e.g., greater than 4 weeks) of IV antibiotic therapy are considered not medically necessary; payments from the Insurance Defendants to the IDSA Panelists so that IDSA Panelists will serve as expert witnesses for the Insurance Defendants and testify that denial of long-term antibiotic treatment was proper; payments from the Insurance Defendants to the IDSA Panelists so the IDSA Panelists will serve as expert witnesses for the Insurance Defendants and testify that patients' chronic Lyme disease is actually a mental disorder or a different physical ailment not requiring long-term antibiotics; payments from the Insurance Defendants to the IDSA Panelists so the IDSA Panelists will serve as expert witnesses for the Insurance Defendants and testify against doctors who provide long-term antibiotic treatment to patients; and payments from the Insurance Defendants to the IDSA Panelists so the IDSA Panelists will serve as expert witnesses for the Insurance Defendants and testify that patients do not have Lyme disease because they do not exhibit an EM rash or test positive with a two-tier serology test.

**RESPONSE**:   To   the   extent   that   paragraph   99   of   the   Complaint   contains conclusions or characterizations of the law, no response is required.  Insofar as a response is required, Cigna denies the allegations contained in paragraph 99 of the Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information from which to form a belief as to the truth of the remaining allegations contained in paragraph 99 of the Complaint and therefore such allegations are denied.

100.    In furtherance of its scheme to prevent patients with chronic Lyme disease from receiving proper treatment, preventing a positive diagnosis of Lyme disease for people with Lyme, and for trying to eliminate all doctors who properly treat chronic Lyme disease, the IDSA, Insurance Defendants, and the IDSA Panelists are in violation of 18 U.S.C. §§1341, 1343, 1961 and 1962, because they repeatedly and regularly used the U.S. mail and interstate wire facilities to further all aspects of their fraudulent and illegal scheme and by delivering and/or receiving materials necessary to carry out the scheme to defraud Plaintiffs.

**RESPONSE**:  To the extent that paragraph 100 of the Complaint contains conclusions or characterizations of the law, no response is required.  Insofar as a response is required, Cigna denies the allegations contained in paragraph 100 of the Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information from which to form a belief as to the truth of the remaining allegations contained in paragraph 100 of the Complaint and therefore such allegations are denied.

101.    The foregoing communications, sent via U.S. mail and interstate wire facilities, contained false and fraudulent misrepresentations and/or omissions of material facts, had the design and effect of preventing a meaningful evaluation of Lyme patients and preventing the proper treatment of patients with chronic Lyme disease and/or otherwise were incident to an essential part of the IDSA and the Insurance Defendants' scheme to defraud Plaintiffs as described in this Complaint.

**RESPONSE**:  To the extent that paragraph 101 of the Complaint contains conclusions or characterizations of the law, no response is required.  Insofar as a response is required, Cigna denies the allegations contained in paragraph 101 of the Complaint to the extent that they apply to Cigna. Cigna is without knowledge or information from which to form a belief as to the truth of the remaining allegations contained in paragraph 101 of the Complaint and therefore such allegations are denied.

102.    Each such use of the U.S. mail and interstate wire facilities alleged in this Complaint constitutes a separate and distinct predicate act of "racketeering activity" and, collectively, constituted a "pattern of racketeering activity The direct and intended victims of the pattern of racketeering activity described previously herein are Plaintiffs whom were not properly, or timely, diagnosed with Lyme disease, were not properly, or timely, treated for their chronic Lyme disease, were forced to pay for treatment out-of-pocket, were forced to travel long distances to receive treatment, were forced to miss work and school because they were not properly treated or diagnosed with Lyme disease, and were forced to pay all costs and fees associated with their care and treatment.

**RESPONSE**:  To the extent that paragraph 102 of the Complaint contains conclusions or characterizations of the law, no response is required.  Insofar as a response is required, Cigna denies the allegations contained in paragraph 102 of the Complaint to the extent that

they apply to Cigna.  Cigna is without knowledge or information from which to form a belief

as to the truth of the remaining allegations contained in paragraph 102 of the Complaint and

therefore such allegations are denied.

103.    Plaintiffs were injured by the IDSA, Insurance Defendants, and the IDSA Panelists because they were forced to pay for their treatments, were forced to pay all expenses associated with treating their Lyme disease, were forced to travel long distances for treatment, were forced to try to find doctors who would treat them, and were unable to work or earn money because of their debilitating illness. Further, because Plaintiffs were not timely diagnosed or treated, they now suffer long-term complications and are forced to continue to pay future medical costs for treatment and out-of-pocket expenses to receive this treatment. Plaintiffs are entitled to recover threefold their damages, costs and attorneys' fees from the IDSA, Insurance Defendants, and the IDSA Panelists and other appropriate relief they are entitled.

**RESPONSE**: To the extent that paragraph 103 of the Complaint contains conclusions

or characterizations of the law, no response is required.  Insofar as a response is required,

Cigna denies the allegations in paragraph 103 of the Complaint to the extent that they apply

to Cigna.  Cigna is without knowledge or information from which to form a belief as to the

truth of the remaining allegations contained in paragraph 100 of the Complaint and therefore

such allegations are denied.

104.    As a result of the fraudulent concealment of the conspiracy set forth in this Complaint by the IDSA, Insurance Defendants, and the IDSA Panelists the running of any applicable statute of limitations has been tolled with respect to any claims made in this case. Also, as a result of the fraudulent concealment of the conspiracy by the IDSA and the Insurance Defendants, Defendants are equitably estopped from asserting statutes of limitations defenses.

**RESPONSE**: To the extent that paragraph 104 of the Complaint contains conclusions

or characterizations of the law, no response is required.  Insofar as a response is required,

Cigna specifically denies (1) that the running of any applicable statute of limitations has been

tolled with respect to any claims made in this case, or (2).  that it is equitably estopped from

asserting statutes of limitations defenses.  Cigna further denies the allegations contained in

paragraph 104 of the Complaint to the extent that they apply to Cigna.  Cigna is without

knowledge or information from which to form a belief as to the truth of the remaining allegations contained in paragraph 104 of the Complaint and therefore such allegations are denied.

105.    Further, this is a multi-year conspiracy constituting a continuing tort. Therefore, the statute of limitations cannot accrue until the last act of the unlawful conduct. The unlawful conduct is still occurring.

**RESPONSE**: Paragraph 105 of the Complaint contains conclusions or characterizations of the law to which no response is required.  Insofar as a response is required, Cigna denies the allegations contained in paragraph 105 of the Complaint.

### G.    **Antitrust Allegations Against Defendants**

106.    Antitrust laws "are designed to preserve competition by prohibiting monopolistic practices and agreements that unreasonably restrict competition." Associations that set commercial standards are known as standard-setting organizations (SSO) or standard-development organizations (SDO). *Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500, 108 S. Ct. 1931, 1937, 100 L. Ed. 2d 497 (1988); *Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.3d 266, 273 (5th Cir. 2008).

**RESPONSE**: Paragraph 106 of the Complaint contains conclusions or characterizations of the law to which no response is required. Insofar as a response is required, Cigna denies the allegations contained in paragraph 106 of the Complaint.

107.    Standard-setting is important because of its pro-competitive benefits, such as quality and safety standards and the ability of products to interface with other products. But "a standard-setting organization . . . can be rife with opportunities for anticompetitive activity" because the standard-setting process can exclude products or businesses that fail to meet the standard. *Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.,* 456 U.S. 556, 571 (1982). When analyzing an SSO's standards, fact finders must evaluate whether the standard causes a severe economic detriment to excluded or nonqualifying firms or whether competitors of the injured firm participated in the standards development process, and whether the standards are voluntary. Standard-setting faces intense antitrust scrutiny when the standards are not voluntary.

**RESPONSE**: Paragraph 107 of the Complaint contains conclusions or characterizations of the law to which no response is required.  Insofar as a response is required, Cigna admits that standard setting is important has pro-competitive benefits.  Cigna

denies the remaining allegations contained in paragraph 107 of the Complaint.

108.   Section 1 of the Sherman Act applies to concerted conduct by two or more entities and prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade of commerce among the several States . . . ." Section 2 of the Sherman Act supplements Section 1 and specifically prohibits monopolizing, or attempting to monopolize, any part of interstate or foreign commerce. A legal entity can monopolize interstate or foreign commerce by excluding competitors from a market.

**RESPONSE**: Paragraph 108 of the Complaint contains conclusions or characterizations of the law to which no response is required. Insofar as a response is required, Cigna denies the allegations contained in paragraph 108 of the Complaint.

109.   Professional associations like the IDSA are subject to antitrust laws because their conduct is sufficiently commercial. Because the development of the IDSA guidelines involves commercial conduct with a "public service aspect," the IDSA, the IDSA Panelists, and the Insurance Defendants are not immune from antitrust regulations.

**RESPONSE**: Paragraph 109 of the Complaint contains conclusions or characterizations of the law to which no response is required. Insofar as a response is required, Cigna denies the allegations contained in paragraph 109 of the Complaint.

110.   The treatment of Lyme disease affects interstate commerce in that a large portion of money spent in treating chronic Lyme patients comes from all over the United States because many patients travel great distances to locate a doctor who is willing to treat the disease. Additionally, as Attorney General Blumenthal found in his antitrust investigation into the IDSA guidelines: "several of the most powerful IDSA panelists", including the IDSA Panelists in this case, had "undisclosed financial interests" "in drug companies, Lyme disease diagnostic tests, patents and consulting arrangements with insurance companies." In addition to being paid by the Insurance Defendant, the IDSA Panelists have economic interests in Lyme diagnostic tests and vaccinations. The IDSA, the Insurance Defendants, and the IDSA Panelists are directly benefited by the 2006 IDSA Guidelines' requirement of a positive lab test to diagnose Lyme disease. As stated above, many patients never test positive for Lyme disease because the two-tier serology test fails to detect up to 90% of Lyme cases. As a result, most Lyme disease sufferers are left undiagnosed and untreated. This means the Insurance Defendants benefit because they do not have to treat these Lyme disease patients. Additionally, the IDSA Panelists with economic interests in Lyme diagnostic tests are left richer.

**RESPONSE**: To the extent that paragraph 110 of the Complaint contains conclusions or characterizations of the law, no response is required.  Insofar as a response is required,

Cigna denies the allegations contained in paragraph 110 of the Complaint to the extent that

they apply to Cigna.  Cigna is without knowledge or information from which to form a belief

as to the truth of the remaining allegations contained in paragraph 110 of the Complaint and

therefore such allegations are denied.

111.    Although the 2006 IDSA claims its guidelines are not "mandatory," they have been
regarded as "mandatory" within the medical community. The Insurance Defendants treat the
guidelines as mandatory and use the IDSA Panelists to enforce them as mandatory regulations in
the treatment of Lyme disease.

**RESPONSE**:  Cigna denies the allegations contained in paragraph 111 of the

Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information

from which to form a belief as to the truth of the remaining allegations contained in paragraph

111 of the Complaint and therefore such allegations are denied.

112.    The IDSA holds itself out as the pre-eminent authority on the treatment of
infectious diseases in the United States. The IDSA, the IDSA Panelists, and the Insurance
Defendants represent to state medical boards that the IDSA guidelines are the appropriate standard
of care when investigating and sanctioning doctors who treat Lyme patients. The Insurance
Defendants report Lyme doctors to medical boards who do not conform to the IDSA guidelines and
testing protocols. As a result, many doctors are reluctant to diagnose or treat chronic Lyme patients
because they do not want to become the subject of an investigation by their state board of medical
examiners. In fact, the restraint on the Lyme treatment market is so great that members of Congress
believe that the 2006 IDSA Guidelines "have 'the potential to effectively shut down' all treatment
of chronic Lyme disease."

**RESPONSE**:  Cigna denies the allegations contained in paragraph 112 of the

Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information

from which to form a belief as to the truth of the remaining allegations contained in paragraph

112 of the Complaint and therefore such allegations are denied.

113.    The IDSA guidelines are treated as mandatory requirements by the IDSA, the IDSA
Panelists, and the Insurance Defendants by: (1) denying the existence of chronic Lyme disease, (2)
condemning the use of long-term antibiotics, (3) allowing doctors who treat chronic Lyme patients
to be sanctioned by medical boards, and (4) using the guidelines as a basis to deny insurance
coverage of chronic Lyme treatments. The power of the IDSA, the IDSA Panelists, and the
Insurance Defendants restrains trade, therefore, the IDSA guidelines have significantly reduced

the Lyme treatment market. Similarly, the IDSA, the IDSA Panelists, and the Insurance Defendants' conduct in developing the IDSA guidelines and the treatment of Lyme disease is sufficiently commercial for Sherman Act purposes.

**RESPONSE**:  Cigna denies the allegations contained in paragraph 113 of the Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information from which to form a belief as to the truth of the remaining allegations contained in paragraph 113 of the Complaint and therefore such allegations are denied.

114.    The IDSA, the IDSA Panelists, and the Insurance Defendants engaged in a conspiracy that restrained trade in the relevant market. The IDSA, the IDSA Panelists, and the Insurance Defendants uses the IDSA guideline development process to consciously agree to exclude actual Lyme doctors, exclude competing doctors who disagree with the IDSA guidelines, exclude doctors who use their own clinical discretion to diagnose Lyme disease, and exclude doctors who do not follow the IDSA's 28-day recommended treatment program. This exclusion has antitrust implications because the IDSA Panelists and the Insurance Defendants had an economic interest in the outcome of the development process.

**RESPONSE**:  Cigna denies the allegations contained in paragraph 114 of the Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information from which to form a belief as to the truth of the remaining allegations contained in paragraph 114 of the Complaint and therefore such allegations are denied.

115.    As set forth above, the IDSA, the IDSA Panelists, and the Insurance Defendants "consciously committed to a common agreement of an unreasonable restraint on trade" in the relevant market. Courts allow plaintiffs to demonstrate an agreement by showing that the defendants had a tacit understanding, courts also "allow 'inferences [to be] fairly drawn from the behavior of the alleged conspirators' to prove conspiracy." It is clear from the behavior of the IDSA, the IDSA Panelists, and the Insurance Defendants that there is an ongoing conspiracy to prevent patients with chronic Lyme disease, including Plaintiffs, from receiving treatment that could cure them.

**RESPONSE**:  To the extent that paragraph 115 of the Complaint contains conclusions or characterizations of the law, no response is required.  Insofar as a response is required, Cigna denies the allegations contained in paragraph 115 of the Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information from which to form a belief

as to the truth of the remaining allegations contained in paragraph 115 of the Complaint and

therefore such allegations are denied.

116.     When analyzing whether the conduct of the IDSA, the IDSA Panelists, and the Insurance Defendants imposes an unreasonable restraint on competition, This Court and the jury must "tak[e] into account a variety of facts, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." As part of this analysis, the fact finder balances the SSO's "anticompetitive effect against the procompetitive justifications for the conduct." As set forth above, there is a reduction of competition in the market as a result of the conduct of the IDSA, the IDSA Panelists, and the Insurance Defendants.

**RESPONSE**:  To the extent that paragraph 116 of the Complaint contains conclusions

or characterizations of the law, no response is required.  Insofar as a response is required,

Cigna denies the allegations contained in paragraph 116 of the Complaint to the extent that

they apply to Cigna.  Cigna is without knowledge or information from which to form a belief

as to the truth of the remaining allegations contained in paragraph 116 of the Complaint and

therefore such allegations are denied.

117.     According to former Connecticut Attorney General Blumenthal's investigation, "[s]kewing medical guidelines to benefit health insurers and HMOs, drug makers and self-interested panelists is a serious and growing problem." For example, "[p]ress reports abound of medical companies using financial incentives--speaking and consulting fees, research support, potentially lucrative patents--to improperly influence medical professionals." Antitrust law requires that economically interested parties not be allowed to improperly influence or bias the standard-setting process, "especially when the standard-setting is done by an association or other entity that is highly influential or dominant in the relevant market."

**RESPONSE**:  To the extent that paragraph 117 of the Complaint contains conclusions

or characterizations of the law, no response is required.  Insofar as a response is required,

Cigna denies the allegations contained in paragraph 117 of the Complaint to the extent that

they apply to Cigna.  Cigna is without knowledge or information from which to form a belief

as to the truth of the remaining allegations contained in paragraph 117 of the Complaint and

therefore such allegations are denied.

118.     In Blumenthal's antitrust investigation into the IDSA's guideline development process, he found that the IDSA and the IDSA Panelists, with the influence of the Insurance Defendants, consciously agreed to reduce competition in the Lyme treatment market in numerous way, including:

- The IDSA failed to conduct a conflicts of interest review for any of the IDSA Panelists prior to their appointment to the 2006 Lyme disease guideline panel even though it was well known that the IDSA Panelists had conflicts of interests;

- The IDSA failed to follow its own procedures for appointing the 2006 panel chairman, Dr. Gary P. Wormser, enabling Dr. Wormser, who held a bias regarding the existence of chronic Lyme, to handpick a likeminded panel without scrutiny by a formal approval of the IDSA's oversight committee;

- The IDSA's 2000 and 2006 Lyme disease panels refused to accept or meaningfully consider information regarding the existence of chronic Lyme disease, once removing a panelist from the 2000 panel who dissented from the group's position on chronic Lyme disease to achieve "consensus";

- The IDSA blocked appointment of scientists and physicians with divergent views on chronic Lyme who sought to serve on the 2006 guidelines panel by informing them that the panel was fully staffed, even though it was later expanded; and

- The IDSA portrayed the American Academy of Neurology's Lyme disease guidelines as corroborating its own when it knew that the two panels shared several authors, including the chairmen of both groups - Dr. Gary P. Wormser and also included Dr. Eugene Shapiro and Dr. John J. Halperin. In allowing its panelists to serve on both groups at the same time, IDSA violated its own conflicts of interest policy.

**RESPONSE**:   Cigna denies the allegations contained in paragraph 118 of the Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information from which to form a belief as to the truth of the remaining allegations contained in paragraph 118 of the Complaint and therefore such allegations are denied.

119.     Because courts allow inferences to be drawn from the behavior of the alleged conspirators, this Court should find that the IDSA, the IDSA Panelists, and the Insurance Defendants conspired to unreasonably restrain trade in the relevant market--the treatment of Lyme disease. When the IDSA, the IDSA Panelists, and the Insurance Defendants worked together to block the appointments of physicians with divergent views and refused to accept or meaningfully consider the existence of chronic Lyme disease, they conspired to unreasonably restrain trade.

Additionally, by excluding physicians with differing opinions from participating in its panel and suppressing scientific evidence, the 2006 IDSA Guidelines not only adversely affected IDSA competitors--physicians who treat chronic Lyme disease with long-term antibiotics --but also unreasonably restrained the Lyme treatment market. The 2006 IDSA Guidelines have significantly reduced the Lyme treatment market by denying the existence of chronic Lyme disease and condemning the use of long-term antibiotics. The Insurance Defendants have further reduced the Lyme treatment market by citing the 2006 IDSA Guidelines in their coverage plans to deny or limit treatment costs associated with chronic Lyme disease, claiming that the costly long-term treatments are "experimental" or "not evidence-based." Physicians who treat chronic Lyme sufferers know they should be allowed to use long-term antibiotics as treatment because "[e]vidence-based medicine requires only that medicine be practiced in accordance with the evidence that currently exists, not that treatment be withheld pending research." Moreover, in a free marketplace, both viewpoints should be available to patients.

**RESPONSE**:  To the extent that paragraph 119 of the Complaint contains conclusions or characterizations of the law, no response is required.  Insofar as a response is required, Cigna denies the allegations contained in paragraph 119 of the Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information from which to form a belief as to the truth of the remaining allegations contained in paragraph 119 of the Complaint and therefore such allegations are denied.

120.    The 2006 Guidelines do not have a legitimate purpose. "In evaluating standards developed by private associations under the rule of reason, courts have [also] considered whether the standard is intended to accomplish a legitimate purpose and, if so, whether it is reasonably related to that purpose and is objective."

**RESPONSE**:  To the extent that paragraph 120 of the Complaint contains conclusions or characterizations of the law, no response is required.  Insofar as a response is required, Cigna denies the allegations contained in paragraph 120 of the Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information from which to form a belief as to the truth of the remaining allegations contained in paragraph 200 of the Complaint and therefore such allegations are denied.

121.    The IDSA, the IDSA Panelists, and the Insurance Defendants claim that its 2006 Guidelines are intended to protect the public from the dangers of long-term antibiotic use. This is not true. The reasons the IDSA, the IDSA Panelists, and the Insurance Defendants rely solely on

the IDSA Guidelines is to use the IDSA Guidelines as a predatory device to injure competitors--physicians who treat chronic Lyme patients. Further, the IDSA Guidelines' denial of chronic Lyme disease and condemnation of long-term antibiotics are not the least restrictive methods available to the IDSA to protect the public.

**RESPONSE**:   Cigna denies the allegations contained in paragraph 121 of the

Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information

from which to form a belief as to the truth of the remaining allegations contained in paragraph

121 of the Complaint and therefore such allegations are denied.

122.     The evidence set forth above establishes that the IDSA, the IDSA Panelists, and the Insurance Defendants use the Guidelines as a predatory device to injure doctors who do not follow the Guidelines. For example, the 2006 IDSA Guidelines say the EM rash "is the only manifestation of Lyme disease in the United States that is sufficiently distinctive to allow clinical diagnosis in the absence of laboratory confirmation." Therefore, doctors are precluded from using their own clinical judgment in diagnosing Lyme disease and cannot provide treatment to Lyme disease patients who do not exhibit an EM rash. As many as fifty percent of all Lyme patients never develop the EM rash, therefore, up to 50% of all Lyme disease patients are not treated for this debilitating disease.

**RESPONSE**:   Cigna denies the allegations contained in paragraph 122 of the

Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information

from which to form a belief as to the truth of the remaining allegations contained in paragraph

122 of the Complaint and therefore such allegations are denied.

123.     The 2006 IDSA Guidelines also prevent doctors from providing patients with proven treatment options because the IDSA Guidelines are extremely restrictive. The IDSA Guidelines have an extensive list of prohibitive practices, including long-term antibiotic use and intravenous antibiotics. Doctors who treat chronic Lyme disease have successfully used long-term antibiotic treatment and intravenous antibiotics on chronic Lyme patients. These treatment options can even cure chronic Lyme disease. The IDSA Guidelines' restrictions are directly targeted at the treatment practices of doctors following other guidelines, including the ILADS treatment Guidelines. Unlike the IDSA Guidelines, the ILADS guidelines are flexible and recommend that physicians should decide how to treat their patients based "on the severity of each case, the patient's response to therapy and the physician's own clinical judgment."

**RESPONSE**:  Cigna is without knowledge or information from which to form a belief

as to the truth of the remaining allegations contained in paragraph 123 of the Complaint and

therefore such allegations are denied.

124.    The IDSA Guidelines also limit patients' ability to obtain health care and eliminate patients' choice of medical treatment in the Lyme treatment market. Most doctors refuse to treat Lyme patients because they fear the Insurance Defendants will report them to their medical boards and they will spend vast sums of money defending themselves. These doctors are also subject to sanctions or loss of their medical license because The IDSA, the IDSA Panelists, and the Insurance Defendants tell the medical boards that the IDSA Guidelines are standards that must be followed, instead of guidelines.

**RESPONSE**:   Cigna denies the allegations contained in paragraph 124 of the

Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information

from which to form a belief as to the truth of the remaining allegations contained in paragraph

124 of the Complaint and therefore such allegations are denied.

125.    Additionally, the Insurance Defendants deny payment for treatments that do not conform to the IDSA Guidelines which means that many Lyme sufferers go undiagnosed and untreated. Lyme disease patients who can find a doctor willing to treat their disease suffer severe economic harm because they have to travel great distances and pay for the costly treatments themselves.

**RESPONSE**:   Cigna denies the allegations contained in paragraph 125 of the

Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information

from which to form a belief as to the truth of the remaining allegations contained in paragraph

125 of the Complaint and therefore such allegations are denied.

126.    The IDSA Guidelines' denial of chronic Lyme disease and condemnation of long-term antibiotics is clearly not the least restrictive method available to protect the public. Instead of condemning the use of long-term antibiotics, the IDSA, the IDSA Panelists, or the Insurance Defendants could tell Lyme disease patients that a disagreement exists between actual Lyme disease doctors and research doctors as to whether chronic Lyme exists. The IDSA, the IDSA Panelists, or the Insurance Defendants could explain the nature of the controversy to patients and provide Lyme patients with a warning to address their concerns surrounding the use of long-term antibiotics. This information would allow patients to make an informed decision when deciding treatment options. Instead, Patients are told by the IDSA, the IDSA Panelists, or the Insurance Defendants that there are no treatment options, chronic Lyme disease does not exist, and they are not permitted to get better through the use of long-term antibiotic treatment.

**RESPONSE**:  Cigna denies the allegations contained in paragraph 126 of the Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information from which to form a belief as to the truth of the remaining allegations contained in paragraph 126 of the Complaint and therefore such allegations are denied.

127.    The IDSA Guideline development process did not have procedural safeguards. Blumenthal's findings clearly demonstrate that "[t]he IDSA's Lyme guideline process lacked important procedural safeguards." The facts above demonstrate that the IDSA's guideline development process was not fair, open, or unbiased. The IDSA Panelists and the IDSA, with guidance from the Insurance Defendants, improperly influenced the guideline process by:

- refusing to meaningfully consider information regarding the existence of Lyme disease;

- excluding scientists and physicians with divergent viewpoint

- failing to conduct a conflicts of interest review on the panelists; and

- failing to follow its own procedures for appointing panel members.

**RESPONSE**:  Cigna denies the allegations contained in paragraph 127 of the Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information from which to form a belief as to the truth of the remaining allegations contained in paragraph 127 of the Complaint and therefore such allegations are denied.

128.    The IDSA Panelists were biased during the Guideline development process due to their financial interests in Lyme diagnostic tests and their consulting arrangements with the Insurance Defendants.

**RESPONSE**:  Cigna denies the allegations contained in paragraph 128 of the Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information from which to form a belief as to the truth of the remaining allegations contained in paragraph 128 of the Complaint and therefore such allegations are denied.

129.    Because of this abuse in the Guideline development process, the Guidelines deny the existence of chronic Lyme disease and condemn the use of long-term antibiotics. This limits consumers' diagnosis and treatment options and causes economic harm to doctors who treat

chronic Lyme disease. The Guidelines also cause further economic harm to competing doctors because the Guidelines prevent them from exercising their clinical discretion in diagnosing and treating Lyme disease. The Guidelines have also caused economic harm to chronic Lyme patients because they have to pay for their own treatment because the Insurance Defendant use the Guidelines to deny treatment. Consequently, the IDSA development process should constitute exclusionary conduct under the Sherman Act.

**RESPONSE**:  To the extent that paragraph 129 of the Complaint contains conclusions or characterizations of the law, no response is required.  Insofar as a response is required, Cigna denies the allegations contained in paragraph 129 of the Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information from which to form a belief as to the truth of the remaining allegations contained in paragraph 129 of the Complaint and therefore such allegations are denied.

130.    The IDSA, the IDSA Panelists, and the Insurance Defendants monopolize or attempt to monopolize the Lyme treatment market. Section 2 of the Sherman Act specifically prohibits monopolizing or attempting to monopolize, any part of interstate or foreign commerce. The IDSA, the IDSA Panelists, and the Insurance Defendants have possession of monopoly power in the relevant Lyme disease treatment and diagnosis market and they willfully acquired and maintain that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. The IDSA, the IDSA Panelists, and the Insurance Defendants also monopolize interstate commerce by excluding competitors from a market and their actions have an anticompetitive effect which harms consumers.

**RESPONSE**:  To the extent that paragraph 130 of the Complaint contains conclusions or characterizations of the law, no response is required.  Insofar as a response is required, Cigna denies the allegations contained in paragraph 130 of the Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information from which to form a belief as to the truth of the remaining allegations contained in paragraph 130 of the Complaint and therefore such allegations are denied.

131.    The IDSA, the IDSA Panelists, and the Insurance Defendants biased the Lyme treatment Guideline development process. They unlawfully monopolize the treatment of Lyme disease by excluding valid medical treatments, such as long-term antibiotic treatment. Finally, they deny the existence of chronic Lyme disease for their own economic benefits. This bias has allowed the IDSA, the IDSA Panelists, and the Insurance Defendants to eliminate consumer choice in the

Lyme treatment market and exclude competing doctors, the same doctors who actually treat chronic Lyme disease, clinically diagnose chronic Lyme disease, and are trying to help their patients. The IDSA, the IDSA Panelists, and the Insurance Defendants have also unlawfully monopolized the treatment of Lyme disease by forcing medical boards to investigate and sanction doctors who do not follow the IDSA Guidelines.

**RESPONSE**:  To the extent that paragraph 131 of the Complaint contains conclusions or characterizations of the law, no response is required.  Insofar as a response is required, Cigna denies the allegations contained in paragraph 131 of the Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information from which to form a belief as to the truth of the remaining allegations contained in paragraph 131 of the Complaint and therefore such allegations are denied.

### H.    Some of the Harm Caused by the IDSA and the Insurance Defendants

132.    All of the Plaintiffs in this case, as well as hundreds of thousands of other people in the United States, suffer debilitating injuries as a result of the wrongful, illegal, and fraudulent actions of the IDSA, Insurance Defendants, and the IDSA Panelists. It is impossible to state everything Plaintiffs have gone through as a result of the Defendants, however, a brief summary is as follows:[1]

**RESPONSE**:   Cigna denies the allegations contained in paragraph 132 of the Complaint (including footnote 1) to the extent that they apply to Cigna.  Cigna is without knowledge or information from which to form a belief as to the truth of the remaining allegations contained in paragraph 132 of the Complaint and therefore such allegations are denied.

133.    Lisa Torrey visited more than 36 doctors before she was properly diagnosed with Lyme disease. As a result, she suffers with neurological disorders affecting her balance, neurological disorders affecting her bladder, migraine headaches, heart arrhythmia, severe nerve pain, hearing problems, frequent fevers, muscle pain, fatigue, as well as many other symptoms. She was improperly diagnosed with Fibromyalgia, Multiple Sclerosis, and told her symptoms "were all in her head". Since her diagnosis with Lyme disease, she was forced to spend hundreds

---

[1] Many of the Plaintiffs still suffer neurological issues including memory loss and it is difficult for them to remember all of the details of their medical history. Further, there may be slight inaccuracies that are the fault of the lawyers preparing this Complaint, and not the fault of Plaintiffs. Any inaccuracies will be corrected as information and medical records are obtained by Plaintiffs and their lawyers.

of thousands of dollars of her own money to treat her Lyme disease because her insurers would not cover the necessary treatment. She still suffers every day.

**RESPONSE**:  Cigna is without knowledge or information from which to form a belief

as to the truth of the allegations contained in paragraph 133 of the Complaint and therefore

such allegations are denied.

134.     David Kocurek earned his Ph.D. in Aerospace Engineering from Texas A&M. He worked as a researcher in the fields of aerodynamics and performance of rotary-wing aircraft. He published his research internationally and served on the NASA aerodynamics oversight committee. For years he suffered with all of the symptoms of Lyme disease (headaches, nerve pain, muscle pain, fatigue, fever, etc.) but also suffered more severe symptoms including Parkinson's like jerks and tremors as well as palsy. He visited more than 25 doctors and was told he did not have Lyme disease. He even tested negative for Lyme disease based on the IDSA testing guidelines. He was only diagnosed with Lyme disease after he researched the issue himself and convinced his doctor to test him again. He was finally diagnosed as "very positive" for Lyme and began treatment. His doctor agreed to treat him for chronic Lyme disease until she was told she could lose her medical degree if she continued to treat chronic Lyme patients. He went from doctor to doctor and was forced to pay out-of-pocket because his insurer refused to cover his treatment. David Kocurek died from Lyme disease on April 13, 2016.

**RESPONSE**:  Cigna is without knowledge or information from which to form a belief

as to the truth of the allegations contained in paragraph 134 of the Complaint and therefore

such allegations are denied.

135.     Amy Hanneken had a successful career in real estate construction and land development. She became sick in 2009 with severe fatigue, muscle weakness, neurological and cognitive deficits, memory loss, and many other symptoms. Even though she had Lyme disease, she tested negative for Lyme disease because of the IDSA testing guidelines. Finally, in 2014 she tested positive for Lyme disease. She received the standard short term antibiotic treatment. The treatment did not cure her Lyme disease but her insurer refused to provide coverage for long-term antibiotic treatment. She was forced to pay out of pocket for this expensive treatment and is still trying to pay for treatment today. When she cannot afford the treatment, she is bedridden until she is able to pay for more care. As a result of the IDSA and the Insurance Defendants, Amy Hanneken lost her career, her family (her husband divorced her), and her home to foreclosure. Amy Hanneken once had a successful career, a family, and a house. Now she is sleeping on a friend's couch and trying to save money to pay for the treatment her insurer should be paying.

**RESPONSE**:  Cigna is without knowledge or information from which to form a belief

as to the truth of the allegations contained in paragraph 135 of the Complaint and therefore

such allegations are denied.

136.    Jane Powell tested positive for Lyme disease and was given four weeks of antibiotic treatment. She partially recovered but still suffered with joint disease and severe fatigue. Her doctors told her she could not have Lyme disease because she had already received the necessary amount of treatment. She was told she had either Lupus or another autoimmune disease. She suffered with pain and fatigue that eventually became so severe she was forced to go on disability. Five years later, after not getting better, she was finally given another Lyme disease test and tested positive. She was given antibiotics for 4 weeks and then another 4 weeks when she was still not better. She was told she could not have Lyme disease anymore because she received more than enough treatment. She again suffered with debilitating symptoms until she given another Lyme disease test more than fourteen years later. Not surprisingly, she tested positive for Lyme disease. She has been refused long-term antibiotic treatment and is currently paying large sums of money out-of-pocket to receive treatment even though she had insurance.

**RESPONSE**:  Cigna is without knowledge or information from which to form a belief

as to the truth of the allegations contained in paragraph 136 of the Complaint and therefore

such allegations are denied.

137.    Carol Fisch was bitten by a tick and exhibited the bullseye rash. She also tested positive for Lyme on the Elisa test, however, she did not test positive enough on the Western blot, as required by the IDSA, to be diagnosed with Lyme disease. She exhibited all of the normal symptoms of Lyme disease including severe fatigue, inability to think clearly, heart palpitations, and severe joint and nerve pain. The pain was so bad that she could not even walk up a flight of stairs. She was told that because she did not have Lyme disease she probably had Fibromyalgia or Chronic Fatigue. Eventually she also suffered short-term memory loss so severe that she was forced to stop working. She was eventually diagnosed with Lyme disease and given four weeks of antibiotic treatment. By this time, the treatment was ineffective. Carol Fisch's insurer will not pay for treatment so she tries to pay for long-term treatment out-of-pocket. The treatment helps with her symptoms but because she cannot afford long-term treatment. She is currently disabled.

**RESPONSE**:  Cigna is without knowledge or information from which to form a belief

as to the truth of the allegations contained in paragraph 137 of the Complaint and therefore

such allegations are denied.

138.    Christopher Valerio began suffering from an uncontrollable twitch in his left hand. He visited more than fifteen doctors who performed multiple tests including blood tests, MRI's, and neurological tests. He was told he had everything from anxiety to Parkinson's disease. After a couple of years, the tremors became so bad that Christopher Valerio was wheelchair bound. A friend of Christopher Valerio's saw a special on television about Lyme disease and told him he should get tested. He finally tested positive (after having to undergo multiple tests because he kept testing negative using the IDSA testing protocols). He was finally given antibiotics and was able

to walk and talk normally. After he stopped receiving treatment, he went back to his prior condition. Christopher Valerio's family is currently trying to get him treatment and are forced to drive more than four hours each way. They also have to pay large amounts of money, out-of-pocket, to treat him.

**RESPONSE**:  Cigna is without knowledge or information from which to form a belief as to the truth of the allegations contained in paragraph 138 of the Complaint and therefore such allegations are denied.

139.    Ashleigh Peacher suffered with a rash, fevers, aches, headaches, light sensitivity, shortness of breath, and other Lyme symptoms. She was diagnosed with everything but Lyme, including Fibromyalgia, Hypoglycemia, food sensitivity, Postural Orthostatic Tachycardia Syndrome, and others. Finally, she was tested for Lyme disease and tested positive. She underwent antibiotic treatment until her insurers refused treatment. Her family is currently trying to figure out how to pay for her treatment because her treatment is not covered by the Insurance Defendants.

**RESPONSE**:  Cigna is without knowledge or information from which to form a belief as to the truth of the remaining allegations contained in paragraph 139 of the Complaint and therefore such allegations are denied.

140.    The rest of the Plaintiffs have not fared much better:

- Al Barnes suffered debilitating symptoms including total paralysis until he eventually died from untreated Lyme disease.

- Gail Meads had undiagnosed Lyme disease for two years until she found a doctor who diagnosed her with Lyme disease. While she was undiagnosed she suffered severe Lyme disease symptoms including numbness, depression, anxiety, breathing problems, cardiac issues, and brain fog. Luckily, she found a doctor who would treat her with long-term antibiotics and after eight months of treatment she was cured. She was forced to pay for all of her treatment out-of-pocket even though she had health insurance.

- Dr. Michael Fundenberger is a physician who began exhibiting Lyme disease symptoms but was diagnosed with Chronic Fatigue Syndrome and then Fibromyalgia. Eventually he figured out, on his own, that he had Lyme disease and he took the test. He tested positive and sought long-term antibiotic treatment but was dropped by his insurance companies. When he can afford long-term treatment he is able to function and his symptoms improve dramatically. Unfortunately, he has not been able to practice medicine due to his illness and cannot afford the treatment the insurers should be covering.

- Steven Ward suffers from severe Lyme disease symptoms including seizures, nerve pain, joint pain, nervous twitching, memory loss, brain fog, and others. Because he was undiagnosed for five years his symptoms worsened and he needed long-term antibiotic treatment. His insurance company refused to pay for long-term treatment and he is currently trying to pay for treatment himself. He was forced to resign and is unable to work.

- Randy Sykes suffers from severe Lyme disease symptoms because he was undiagnosed for years. Once diagnosed, he was refused long-term antibiotic treatment and was forced to find a doctor who would treat him. His insurance company refused to pay for long-term treatment and he is currently trying to pay for treatment himself.

- Brienna Reed Sykes suffers from severe Lyme disease symptoms because she was undiagnosed for years. After being forced to research her condition on her own, she was finally diagnosed with Lyme disease. She was forced to find a doctor who would treat him because her insurer would not provide long-term antibiotic treatment. She is currently bedridden and suffers seizures as a result of her chronic Lyme disease.

- Rosetta Fuller suffers from severe Lyme disease symptoms because she was undiagnosed with Lyme Disease until 2016. Luckily, she found a doctor who would properly treat her and she is currently undergoing treatment but being forced to pay out-of-pocket.

- Adriana Moreira suffers from severe Lyme disease symptoms but was misdiagnosed with Dermatomyositis. Her condition got so bad that she ended up in intensive care. Her condition did not improve much and she was finally diagnosed with Lyme disease in 2016. She was placed on an IV of antibiotics for 28-days and saw a vast improvement, but she was not completely healed. After the 28-days of treatment, her doctor hugged her and wished her luck because the 28-days of antibiotics was all she could receive. Now her symptoms are returning and she has nowhere to turn for treatment.

- Jessica Mckinne suffers from severe Lyme disease symptoms but was misdiagnosed with Multiple Sclerosis. When an MS specialist told her she did not have MS, she went from doctor to doctor looking for help. She was finally diagnosed with Lyme disease but cannot afford the long-term antibiotic treatment her insurer refuses to cover.

- Kristine Woodard was diagnosed with Lyme disease but refused long-term antibiotic treatment. Her condition became so bad that she was sent to a psychiatric ward due to her neurological issues caused by Lyme disease. When she can afford antibiotics she feels better, but she struggles to pay for

the treatment her insurers should be paying.

- Gayle Clarke suffered classic Lyme disease symptoms but was misdiagnosed for three years while she suffered. She received long-term antibiotic treatment from a doctor who understands Lyme disease but cannot afford any more treatment. She is currently disabled due to Lyme disease.

- Allison Caruana had classic Lyme disease symptoms and had the bullseye rash associated with Lyme disease. She tested positive for Lyme disease and received the normal treatment, which did not cure her. She then suffered for years with debilitating symptoms of Lyme disease but was diagnosed with Fibromyalgia, Chronic Fatigue Syndrome, Parkinson's, and at one point was given 9 months to live. Eventually she was diagnosed with Lyme again and is currently seeking long-term antibiotic treatment.

- Elise Bowerman, Emory Bowerman, and Anais Bowerman are siblings who all tested positive for Lyme Disease. All three were denied long-term antibiotic treatment by their insurer and were forced to pay out-of-pocket for treatment.

- Max Shindler, Tawnya Smith, Chloe Lohmeyer, and Monet Pitre are a family and have been devastated by chronic Lyme disease. They have all of the severe symptoms of chronic Lyme disease and have spent years looking for a doctor to treat them. When they found a doctor, that doctor had to quit treating them because she was brought in front of the medical board for treating chronic Lyme disease beyond the 28-days. They have traveled to different states including California, New Mexico, and Nevada to receive the treatment they need. They are forced to pay cash to receive treatment and cannot afford the care their insurers will not pay for.

**RESPONSE**:  Cigna is without knowledge or information from which to form a belief as to the truth of the allegations contained in paragraph 140 of the Complaint and therefore such allegations are denied.

## **COUNT 1: RICO § 1962(c)**

141.    The allegations of paragraphs 158 through 192 are incorporated herein by reference.

**RESPONSE**:   Cigna incorporates by reference its responses to the allegations contained in paragraphs 158-192 of the Complaint.

142.     The IDSA, Insurance Defendants, and the IDSA Panelists operate an enterprise engaged in and whose activities affect interstate commerce. The IDSA and the Insurance Defendants are employed by or associated with the enterprise.

**RESPONSE**:  Pursuant to the Court's opinion dated September 27, 2018 (ECF NO.

114), Plaintiffs' RICO claims have been dismissed, and thus no response is necessary.  Cigna

further states that to the extent that paragraph 142 of the Complaint contains conclusions or

characterizations of the law, no response is required.  Insofar as a response is required, Cigna

denies the allegations contained in paragraph 142 of the Complaint to the extent that they

apply to Cigna.  Cigna is without knowledge or information from which to form a belief as

to the truth of the remaining allegations contained in paragraph 142 of the Complaint and

therefore such allegations are denied.

143.     The IDSA, Insurance Defendants, and the IDSA Panelists agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiffs. Specifically: the IDSA and the Insurance Defendants acted to fraudulently and illegally prevent long-term treatment of chronic Lyme disease and to prevent the proper testing of potential Lyme disease patients.

**RESPONSE**:  Pursuant to the Court's opinion dated September 27, 2018 (ECF NO.

114), Plaintiffs' RICO claims have been dismissed, and thus no response is necessary.  Cigna

further states that to the extent that paragraph 143 of the Complaint contains conclusions or

characterizations of the law, no response is required.  Insofar as a response is required, Cigna

denies the allegations contained in paragraph 143 of the Complaint to the extent that they

apply to Cigna.  Cigna is without knowledge or information from which to form a belief as

to the truth of the remaining allegations contained in paragraph 143 of the Complaint and

therefore such allegations are denied.

144.     Pursuant to and in furtherance of their fraudulent scheme, the IDSA, Insurance Defendants, and the IDSA Panelists committed multiple related acts of racketeering activity including, but not limited to, (a) mail fraud, in violation of 18 U.S.C. §1341, and (b) wire fraud, in violation of 18 U.S.C. §1343.

**RESPONSE**:  Pursuant to the Court's opinion dated September 27, 2018 (ECF NO. 114), Plaintiffs' RICO claims have been dismissed, and thus no response is necessary.  Cigna further states that to the extent that paragraph 144 of the Complaint contains conclusions or characterizations of the law, no response is required.  Insofar as a response is required, Cigna denies the allegations contained in paragraph 144 of the Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information from which to form a belief as to the truth of the remaining allegations contained in paragraph 144 of the Complaint and therefore such allegations are denied.

145.    The acts identified above constitute a pattern of racketeering activity pursuant to 18 U.S.C.A. § 1961(5).

**RESPONSE**:  Pursuant to the Court's opinion dated September 27, 2018 (ECF NO. 114), Plaintiffs' RICO claims have been dismissed, and thus no response is necessary.  Cigna further states that to the extent that paragraph 145 of the Complaint contains conclusions or characterizations of the law, no response is required.  Insofar as a response is required, Cigna denies the allegations contained in paragraph 145 of the Complaint to the extent that they apply to Cigna.

146.    The IDSA, Insurance Defendants, and the IDSA Panelists have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C.A. § 1962(c).

**RESPONSE**:  Pursuant to the Court's opinion dated September 27, 2018 (ECF NO. 114), Plaintiffs' RICO claims have been dismissed, and thus no response is necessary.  Cigna further states that to the extent that paragraph 146 of the Complaint contains conclusions or characterizations of the law, no response is required.  Insofar as a response is required, Cigna denies the allegations contained in paragraph 146 of the Complaint to the extent that they

apply to Cigna.  Cigna is without knowledge or information from which to form a belief as to the truth of the remaining allegations contained in paragraph 146 of the Complaint and therefore such allegations are denied.

147.    As a direct and proximate result of the IDSA, Insurance Defendants, and the IDSA Panelists' racketeering activities and violations of 18 U.S.C.A. § 1962(c), Plaintiffs have been injured in their business and property in that: they were forced to pay for their treatments, were forced to pay all expenses associated with treating their Lyme disease, were forced to travel long distances for treatment, were forced to try to find doctors who would treat them, and were unable to work or earn money because of their debilitating illness. Further, because Plaintiffs were not timely diagnosed or treated, they now suffer long-term complications and are forced to continue to pay future medical costs for treatment and out-of-pocket expenses to receive this treatment.

**RESPONSE**:  Pursuant to the Court's opinion dated September 27, 2018 (ECF NO. 114), Plaintiffs' RICO claims have been dismissed, and thus no response is necessary.  Cigna further states that to the extent that paragraph 147 of the Complaint contains conclusions or characterizations of the law, no response is required.  Insofar as a response is required, Cigna denies the allegations contained in paragraph 147 of the Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information from which to form a belief as to the truth of the remaining allegations contained in paragraph 147 of the Complaint and therefore such allegations are denied.

148.    WHEREFORE, Plaintiffs requests this Court enter judgment against the IDSA, Insurance Defendants, and the IDSA Panelists for actual damages, treble damages and attorney's fees.

**RESPONSE**:  Pursuant to the Court's opinion dated September 27, 2018 (ECF NO. 114), Plaintiffs' RICO claims have been dismissed, and thus no response is necessary. Insofar as a response is required, Cigna denies that Plaintiffs are entitled to a judgment against Cigna in the sum of any amount whatsoever and Cigna prays that Plaintiffs' cause of action against it be dismissed and that judgment be entered in favor of Cigna and against Plaintiffs.

## COUNT 2: RICO § 1962(a)

149.    The allegations of paragraphs 158 through 200 are incorporated herein by reference.

**RESPONSE**:   Cigna incorporates by reference its responses to the allegations contained in paragraphs 158-200 of the Complaint.

150.    The IDSA, Insurance Defendants, and the IDSA Panelists are an enterprise engaged in and whose activities affect interstate commerce. The IDSA, Insurance Defendants, and the IDSA Panelists used and invested income that was derived from a pattern of racketeering activity in an interstate enterprise. Specifically: the Insurance Defendants used the money it gained from not treating chronic Lyme patients, not treating misdiagnosed Lyme patients, and misclassifying Lyme disease as other disorders to compensate the IDSA Panelists to keep the 28-day standard in place, keep the improper testing protocols in place, to testify against Lyme patients, to testify against doctors who treat chronic Lyme disease patients, and maintain the scheme which forces people, like Plaintiffs, to not be properly diagnosed or treated for their Lyme disease.

**RESPONSE**:  Pursuant to the Court's opinion dated September 27, 2018 (ECF NO. 114), Plaintiffs' RICO claims have been dismissed, and thus no response is necessary.  Cigna further states that to the extent that paragraph 150 of the Complaint contains conclusions or characterizations of the law, no response is required.  Insofar as a response is required, Cigna denies the allegations contained in paragraph 150 of the Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information from which to form a belief as to the truth of the remaining allegations contained in paragraph 150 of the Complaint and therefore such allegations are denied.

151.    The racketeering activity listed above constitutes a pattern of racketeering activity pursuant to 18 U.S.C.A. § 1961(5).

**RESPONSE**:  Pursuant to the Court's opinion dated September 27, 2018 (ECF NO. 114), Plaintiffs' RICO claims have been dismissed, and thus no response is necessary.  Cigna further states that to the extent that paragraph 151 of the Complaint contains conclusions or characterizations of the law, no response is required.  Insofar as a response is required, Cigna

49

denies the allegations contained in paragraph 151 of the Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information from which to form a belief as to the truth of the remaining allegations contained in paragraph 151 of the Complaint and therefore such allegations are denied.

152.    As direct and proximate result of the IDSA, Insurance Defendants, and the IDSA Panelists' racketeering activities and violations of 18 U.S.C.A. § 1962(a), Plaintiffs have been injured in their business and property in that: Plaintiffs have been injured in their business and property in that: they were forced to pay for their treatments, were forced to pay all expenses associated with treating their Lyme disease, were forced to travel long distances for treatment, were forced to try to find doctors who would treat them, and were unable to work or earn money because of their debilitating illness. Further, because Plaintiffs were not timely diagnosed or treated, they now suffer long-term complications and are forced to continue to pay future medical costs for treatment and out-of-pocket expenses to receive this treatment.

**RESPONSE**:  Pursuant to the Court's opinion dated September 27, 2018 (ECF NO. 114), Plaintiffs' RICO claims have been dismissed, and thus no response is necessary.  Cigna further states that to the extent that paragraph 152 of the Complaint contains conclusions or characterizations of the law, no response is required.  Insofar as a response is required, Cigna denies the allegations contained in paragraph 152 of the Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information from which to form a belief as to the truth of the remaining allegations contained in paragraph 152 of the Complaint and therefore such allegations are denied.

153.    WHEREFORE, Plaintiffs requests this Court enter judgment against the IDSA, Insurance Defendants, and the IDSA Panelists for actual damages, treble damages and attorney's fees.

**RESPONSE**:  Pursuant to the Court's opinion dated September 27, 2018 (ECF NO. 114), Plaintiffs' RICO claims have been dismissed, and thus no response is necessary. Insofar as a response is required, Cigna denies that Plaintiffs are entitled to a judgment against Cigna in the sum of any amount whatsoever and Cigna prays that Plaintiffs' cause of action against

it be dismissed and that judgment be entered in favor of Cigna and against Plaintiffs.

## COUNT 3 RICO § 1962(b)

154.    The allegations of paragraphs 158 through 205 are incorporated herein by reference.

**RESPONSE**:   Cigna incorporates by reference its responses to the allegations

contained in paragraphs 158-205 of the Complaint.

155.    The IDSA, Insurance Defendants, and the IDSA Panelists acquired and maintained interests in and control of the enterprise through a pattern of racketeering activity. Specifically: the IDSA and the Insurance Defendants refused to accept, acknowledge, or rely on the studies, organizations, information, and scientific data reporting that chronic Lyme disease is a legitimate medical condition, that chronic Lyme disease requires long-term antibiotic treatment, and that the current testing criteria fails to diagnose a majority of people with Lyme disease. Further, the IDSA, Insurance Defendants, and the IDSA Panelists work together to remove doctors who treat chronic Lyme disease and diagnose Lyme disease using different standards. These actions, among others, allow the IDSA, Insurance Defendants, and the IDSA Panelists to maintain control of the testing and treatment of Lyme disease.

**RESPONSE**:  Pursuant to the Court's opinion dated September 27, 2018 (ECF NO.

114), Plaintiffs' RICO claims have been dismissed, and thus no response is necessary.  Cigna

further states that to the extent that paragraph 155 of the Complaint contains conclusions or

characterizations of the law, no response is required.  Insofar as a response is required, Cigna

denies the allegations contained in paragraph 155 of the Complaint to the extent that they

apply to Cigna.  Cigna is without knowledge or information from which to form a belief as

to the truth of the remaining allegations contained in paragraph 155 of the Complaint and

therefore such allegations are denied.

156.    The racketeering activity listed above constitutes a pattern of racketeering activity pursuant to 18 U.S.C.A. § 1961(5).

**RESPONSE**:  Pursuant to the Court's opinion dated September 27, 2018 (ECF NO.

114), Plaintiffs' RICO claims have been dismissed, and thus no response is necessary.  Cigna

further states that to the extent that paragraph 156 of the Complaint contains conclusions or

characterizations of the law, no response is required.  Insofar as a response is required, Cigna

denies the allegations contained in paragraph 156 of the Complaint to the extent that they

apply to Cigna.  Cigna is without knowledge or information from which to form a belief as

to the truth of the remaining allegations contained in paragraph 156 of the Complaint and

therefore such allegations are denied.

      157.  The IDSA and the Insurance Defendants have directly and indirectly acquired and
maintained interests in and control of the enterprise through the pattern of racketeering activity
described above, in violation of 18 U.S.C.A. § 1962(b).

**RESPONSE**:  Pursuant to the Court's opinion dated September 27, 2018 (ECF NO.

114), Plaintiffs' RICO claims have been dismissed, and thus no response is necessary.  Cigna

further states that to the extent that paragraph 157 of the Complaint contains conclusions or

characterizations of the law, no response is required.  Insofar as a response is required, Cigna

denies the allegations contained in paragraph 157 of the Complaint to the extent that they

apply to Cigna.  Cigna is without knowledge or information from which to form a belief as

to the truth of the remaining allegations contained in paragraph 157 of the Complaint and

therefore such allegations are denied.

      158.  As direct and proximate result of the IDSA, Insurance Defendants, and the IDSA
Panelists' racketeering activities and violations of 18 U.S.C.A. § 1962(b), Plaintiffs have been
injured in their business and property in that: Plaintiffs have been injured in their business and
property in that: [sic] they were forced to pay for their treatments, were forced to pay all expenses
associated with treating their Lyme disease, were forced to travel long distances for treatment,
were forced to try to find doctors who would treat them, and were unable to work or earn money
because of their debilitating illness. Further, because Plaintiffs were not timely diagnosed or
treated, they now suffer long-term complications and are forced to continue to pay future medical
costs for treatment and out-of-pocket expenses to receive this treatment.

**RESPONSE**:  Pursuant to the Court's opinion dated September 27, 2018 (ECF NO.

114), Plaintiffs' RICO claims have been dismissed, and thus no response is necessary.  Cigna

further states that to the extent that paragraph 158 of the Complaint contains conclusions or

characterizations of the law, no response is required.  Insofar as a response is required, Cigna

denies the allegations contained in paragraph 158 of the Complaint to the extent that they

apply to Cigna.  Cigna is without knowledge or information from which to form a belief as

to the truth of the remaining allegations contained in paragraph 158 of the Complaint and

therefore such allegations are denied.

159.    WHEREFORE, Plaintiffs requests this Court enter judgment against the IDSA, Insurance Defendants, and the IDSA Panelists for actual damages, treble damages and attorney's fees.

**RESPONSE**:  Pursuant to the Court's opinion dated September 27, 2018 (ECF NO.

114), Plaintiffs' RICO claims have been dismissed, and thus no response is necessary.

Insofar as a response is required, Cigna denies that Plaintiffs are entitled to a judgment against

Cigna in the sum of any amount whatsoever and Cigna prays that Plaintiffs' cause of action against

it be dismissed and that judgment be entered in favor of Cigna and against Plaintiffs.

## COUNT 4 RICO § 1962(d)

160.    The allegations of paragraphs 158 through 211 are incorporated herein by reference.

**RESPONSE**:    Cigna incorporates by reference its responses to the allegations

contained in paragraphs 158-211 of the Complaint.

161.    As set forth above, the IDSA, Insurance Defendants, and the IDSA Panelists agreed and conspired to violate 18 U.S.C.A. § 1962(a) (b) and (c). The IDSA, Insurance Defendants, and the IDSA Panelists have intentionally conspired and agreed to directly and indirectly use or invest income that is derived from a pattern of racketeering activity in an interstate enterprise, acquire or maintain interests in the enterprise through a pattern of racketeering activity, and conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity. The IDSA and the Insurance Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C.A. § 1962(a), (b) and (c), in violation of 18 U.S.C.A. § 1962(d).

**RESPONSE**: Pursuant to the Court's opinion dated September 27, 2018 (ECF NO.

114), Plaintiffs' RICO claims have been dismissed, and thus no response is necessary.  Cigna

further states that to the extent that paragraph 161 of the Complaint contains conclusions or

characterizations of the law, no response is required.  Insofar as a response is required, Cigna

denies the allegations contained in paragraph 161 of the Complaint to the extent that they

apply to Cigna.  Cigna is without knowledge or information from which to form a belief as

to the truth of the remaining allegations contained in paragraph 161 of the Complaint and

therefore such allegations are denied.

162.    As direct and proximate result of the Count IV Defendant(s)' conspiracy, the overt
acts taken in furtherance of that conspiracy, and violations of 18 U.S.C.A. § 1962(d), Plaintiffs
have been injured in their business and property in that: Plaintiffs have been injured in their
business and property in that: they were forced to pay for their treatments, were forced to pay all
expenses associated with treating their Lyme disease, were forced to travel long distances for
treatment, were forced to try to find doctors who would treat them, and were unable to work or
earn money because of their debilitating illness. Further, because Plaintiffs were not timely
diagnosed or treated, they now suffer long-term complications and are forced to continue to pay
future medical costs for treatment and out-of-pocket expenses to receive this treatment.

**RESPONSE**: Pursuant to the Court's opinion dated September 27, 2018 (ECF NO.

114), Plaintiffs' RICO claims have been dismissed, and thus no response is necessary.  Cigna

further states that to the extent that paragraph 162 of the Complaint contains conclusions or

characterizations of the law, no response is required.  Insofar as a response is required, Cigna

denies the allegations contained in paragraph 162 of the Complaint to the extent that they

apply to Cigna.  Cigna is without knowledge or information from which to form a belief as

to the truth of the remaining allegations contained in paragraph 162 of the Complaint and

therefore such allegations are denied.

163.    WHEREFORE, Plaintiffs requests this Court enter judgment against the IDSA and
the Insurance Defendants for actual damages, treble damages and attorney's fees.

**RESPONSE**: Pursuant to the Court's opinion dated September 27, 2018 (ECF NO.

114), Plaintiffs' RICO claims have been dismissed, and thus no response is necessary.

Insofar as a response is required, Cigna denies that Plaintiffs are entitled to a judgment against

Cigna in the sum of any amount whatsoever and Cigna prays that Plaintiffs' cause of action against

it be dismissed and that judgment be entered in favor of Cigna and against Plaintiffs.

## <u>COUNT 5 – ANTITRUST VIOLATIONS OF THE SHERMAN ACT</u>

164.    Plaintiffs bring this civil action to obtain equitable and other relief against Defendants as a result of restrain Defendants' violation of Section 1 and Section 2 of the Sherman Act, 15 U.S.C.A. § 1.

**<u>RESPONSE</u>**:    Paragraph 164 of the Complaint contains conclusions or

characterizations of the law to which no response is required.

165.    Section 1 of the Sherman Act applies to concerted conduct by two or more entities and prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade of commerce among the several States . . . ."

**<u>RESPONSE</u>**:    Paragraph 165 of the Complaint contains conclusions or

characterizations of the law to which no response is required.

166.    As set forth above, Defendants violated Section 1 of the Sherman Act. Specifically, the IDSA, the IDSA Panelists, and the Insurance Defendants engaged in a conspiracy that restrained trade in the relevant market. The IDSA, the IDSA Panelists, and the Insurance Defendants uses the IDSA guideline development process to consciously agree to exclude actual Lyme doctors, exclude competing doctors who disagree with the IDSA guidelines, exclude doctors who use their own clinical discretion to diagnose Lyme disease, and exclude doctors who do not follow the IDSA's 28-day recommended treatment program. This exclusion has antitrust implications because the IDSA Panelists and the Insurance Defendants had an economic interest in the outcome of the development process.

**<u>RESPONSE</u>**:  To the extent that paragraph 166 of the Complaint contains conclusions

or characterizations of the law, no response is required.  Insofar as a response is required,

Cigna denies the allegations contained in paragraph 166 of the Complaint to the extent that

they apply to Cigna.  Cigna is without knowledge or information from which to form a belief

as to the truth of the remaining allegations contained in paragraph 166 of the Complaint and

therefore such allegations are denied.

167.    The IDSA, the IDSA Panelists, and the Insurance Defendants "consciously committed to a common agreement of an unreasonable restraint on trade" in the relevant market. There is a reduction of competition in the market as a result of the conduct of the IDSA, the IDSA Panelists, and the Insurance Defendants.

**RESPONSE**:  To the extent that paragraph 167 of the Complaint contains conclusions or characterizations of the law, no response is required.  Cigna denies the allegations contained in paragraph 167 of the Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information from which to form a belief as to the truth of the remaining allegations contained in paragraph 167 of the Complaint and therefore such allegations are denied.

168.    Because courts allow inferences to be drawn from the behavior of the alleged conspirators, this Court should find that the IDSA, the IDSA Panelists, and the Insurance Defendants conspired to unreasonably restrain trade in the relevant market--the treatment of Lyme disease.

**RESPONSE**:    Paragraph 168 of the Complaint contains conclusions or characterizations of the law to which no response is required.  Insofar as a response is required, Cigna denies the allegations contained in paragraph 168 of the Complaint.

169.    The 2006 Guidelines do not have a legitimate purpose. The IDSA, the IDSA Panelists, and the Insurance Defendants use the Guidelines as a predatory device to injure doctors who do not follow the Guidelines. The 2006 IDSA Guidelines also prevent doctors from providing patients with proven treatment options because the IDSA Guidelines are extremely restrictive. The IDSA Guidelines also limit patients' ability to obtain health care and eliminate patients' choice of medical treatment in the Lyme treatment market.

**RESPONSE**:    Cigna denies the allegations contained in paragraph 169 of the Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information from which to form a belief as to the truth of the remaining allegations contained in paragraph 169 of the Complaint and therefore such allegations are denied.

170.    The IDSA Guidelines' denial of chronic Lyme disease and condemnation of long-term antibiotics is clearly not the least restrictive method available to protect the public.

**RESPONSE**:  To the extent that paragraph 170 of the Complaint contains conclusions

or characterizations of the law, no response is required.  Insofar as a response is required,

Cigna states that it is without knowledge or information from which to form a belief as to

the truth of the allegations contained in paragraph 170 of the Complaint and therefore such

allegations are denied.

171.    The IDSA Guideline development process did not have procedural safeguards. The IDSA Panelists were biased during the Guideline development process due to their financial interests in Lyme diagnostic tests and their consulting arrangements with the Insurance Defendants.

**RESPONSE**:  Cigna is without knowledge or information from which to form a belief

as to the truth of the allegations contained in paragraph 171 of the Complaint and therefore

such allegations are denied.

172.    Because of this abuse in the Guideline development process, the Guidelines deny the existence of chronic Lyme disease and condemn the use of long-term antibiotics. This limits consumers' diagnosis and treatment options and causes economic harm to doctors who treat chronic Lyme disease. The Guidelines also cause further economic harm to competing doctors because the Guidelines prevent them from exercising their clinical discretion in diagnosing and treating Lyme disease. The Guidelines have also caused economic harm to chronic Lyme patients because they have to pay for their own treatment because the Insurance Defendant use the Guidelines to deny treatment. Consequently, the IDSA development process should constitute exclusionary conduct under the Sherman Act.

**RESPONSE**:  To the extent that paragraph 172 of the Complaint contains conclusions

or characterizations of the law, no response is required.  Insofar as a response is required,

Cigna denies the allegations contained in paragraph 172 of the Complaint to the extent that

they apply to Cigna.  Cigna is without knowledge or information from which to form a belief

as to the truth of the remaining allegations contained in paragraph 172 of the Complaint and

therefore such allegations are denied.

173.    As set forth above, Defendants violated Section 2 of the Sherman Act. The IDSA, the IDSA Panelists, and the Insurance Defendants monopolize or attempt to monopolize the Lyme treatment market. Section 2 of the Sherman Act specifically prohibits monopolizing or attempting to monopolize, any part of interstate or foreign commerce. The IDSA, the IDSA Panelists, and the Insurance Defendants have possession of monopoly power in the relevant Lyme disease treatment and diagnosis market and they willfully acquired and maintain that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. The IDSA, the IDSA Panelists, and the Insurance Defendants also monopolize interstate commerce by excluding competitors from a market and their actions have an anticompetitive effect which harms consumers.

**RESPONSE**:  To the extent that paragraph 173 of the Complaint contains conclusions or characterizations of the law, no response is required.  Insofar as a response is required, Cigna denies the allegations contained in paragraph 173 of the Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information from which to form a belief as to the truth of the remaining allegations contained in paragraph 173 of the Complaint and therefore such allegations are denied.

174.    The IDSA, the IDSA Panelists, and the Insurance Defendants biased the Lyme treatment Guideline development process. They unlawfully monopolize the treatment of Lyme disease by excluding valid medical treatments, such as long-term antibiotic treatment. Finally, they deny the existence of chronic Lyme disease for their own economic benefits. This bias has allowed the IDSA, the IDSA Panelists, and the Insurance Defendants to eliminate consumer choice in the Lyme treatment market and exclude competing doctors, the same doctors who actually treat chronic Lyme disease, clinically diagnose chronic Lyme disease, and are trying to help their patients. The IDSA, the IDSA Panelists, and the Insurance Defendants have also unlawfully monopolized the treatment of Lyme disease by forcing medical boards to investigate and sanction doctors who do not follow the IDSA Guidelines.

**RESPONSE**:  To the extent that paragraph 174 of the Complaint contains conclusions or characterizations of the law, no response is required.  Insofar as a response is required, Cigna denies the allegations contained in paragraph 174 of the Complaint to the extent that they apply to Cigna.  Cigna is without knowledge or information from which to form a belief as to the truth of the remaining allegations contained in paragraph 174 of the Complaint and therefore such allegations are denied.

## DAMAGES

175.    The IDSA, Insurance Defendants, and the IDSA Panelists is liable to Plaintiffs and Plaintiffs are entitled to recover the following damages:

        a.      Actual damages;

        b.      Treble damages;

        c.      Reasonable attorney's fees; and

        d.      Court costs.

**RESPONSE**:  To the extent that paragraph 175 of the Complaint contains conclusions or characterizations of the law, no response is required.  Insofar as a response is required, Cigna denies that Plaintiffs are entitled to any damages with respect to their claims against Cigna.

176.    Therefore, in accordance with the Racketeer Influenced and Corrupt Organizations Act, Plaintiffs seek all actual damages, treble damages, attorney fees, and any other relief allowed under Texas law and deemed appropriate by this Court, which is believed to exceed the jurisdictional requirement of this court.

**RESPONSE**:  To the extent that paragraph 175 of the Complaint contains conclusions or characterizations of the law, no response is required.  Insofar as a response is required, Cigna denies that Plaintiffs are entitled to any damages, attorneys' fees or other relief with respect to their claims against Cigna.

## DEMAND FOR TRIAL BY JURY

177.    Plaintiffs hereby demand trial by jury on all claims for which the law provides a right to jury trial.

**RESPONSE**:  Cigna admits that Plaintiffs have demanded a trial by jury.

## PRAYER FOR RELIEF

178.    WHEREFORE, PREMISES CONSIDERED, Plaintiffs LISA TORREY, KATHRYN KOCUREK Individually and on behalf of the Estate of J. DAVID KOCUREK, PH.D., LANA BARNES Individually and on behalf of the Estate of AL BARNES, AMY HANNEKEN, JANE POWELL, CAROL FISCH, JOHN VALERIO, STEVEN WARD, RANDY SYKES, BRIENNA REED, ROSETTA FULLER, ADRIANA MONTEIRO MOREIRA, JESSICA

MCKINNIE, KRISTINE WOODARD, GAIL MEADS, DR. MICHAEL FUNDENBERGER, GAYLE CLARKE, ALLISON LYNN CARUANA, CHLOE LOHMEYER, MAX SHINDLER, TAWNYA DAWN SMITH, Individually and as Next Friend of MONET PITRE, MIKE PEACHER, Individually and as Next Friend of ASHLEIGH PEACHER, ALARIE BOWERMAN, Individually and as Next Friend of ELISA BOWERMAN, EMORY BOWERMAN, and ANAIS BOWERMAN, respectfully pray for actual damages in an amount to be determined by a jury, for treble damages according to proof, for costs of suit incurred herein, including reasonable attorneys' fees, and for such other and further relief, in law or in equity, to which Plaintiffs and those similarly situated may be justly entitled and this Court deems just and proper.

**RESPONSE**:  Cigna denies that Plaintiffs are entitled to any relief from Cigna, whether sought in the Prayer for Relief or otherwise.  Plaintiffs' Prayer for Relief should therefore be denied in its entirety and with prejudice, and Plaintiffs should take nothing from Cigna.

## CIGNA'S AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

Plaintiffs' antitrust claims are barred because they have failed to state a claim for relief inasmuch as they have not alleged and cannot prove antitrust injury or standing, causation, concerted action, a relevant market, market power, or anticompetitive effects.

### SECOND AFFIRMATIVE DEFENSE

Plaintiffs' RICO claims are barred because they have failed to state a claim for relief inasmuch as they have not alleged and cannot prove any predicate acts, a pattern of racketeering activity, an enterprise, or proximate causation.

### THIRD AFFIRMATIVE DEFENSE

Plaintiffs' claims against Cigna are barred, in whole or in part, by the McCarran-Ferguson Act.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred in whole or in part, due to their failure to join indispensable parties.

### FIFTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the applicable statutes of limitations and repose.

### SIXTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the doctrines of laches, estoppel and waiver.

### SEVENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims for damages are barred or should be reduced based on Plaintiffs' failure to mitigate damages.

### EIGHTH AFFIRMATIVE DEFENSE

To the extent that Plaintiffs attempt to seek equitable relief against Cigna, they are not entitled to such relief because they have an adequate remedy at law.

### NINTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are too remote and speculative to form the basis for relief.

### TENTH AFFIRMATIVE DEFENSE

Plaintiffs have not suffered, and will not suffer, any injury to a legally protected or cognizable interest by reason of the conduct of Cigna as alleged in the Complaint.  If Plaintiffs suffered damages as a result of the allegations set forth in the Complaint, then those damages were the result of intervening or superseding acts or omissions of others.

### ELEVENTH AFFIRMATIVE DEFENSE

To the extent Plaintiffs obtain or obtained recovery in any other proceeding predicated on the same factual allegations, Plaintiffs are barred from seeking recovery against Cigna based on

the Complaint pursuant to the doctrines of res judicata and collateral estoppel, and the prohibition on double recovery for the same injury.

## TWELFTH AFFIRMATIVE DEFENSE

Cigna reserves the rights to raise any additional defenses, cross-claims and third-party claims not asserted herein of which it may become aware through discovery or other investigation.

## THIRTEENTH AFFIRMATIVE DEFENSE

Cigna incorporates by reference as though fully set forth herein any affirmative defense asserted by any other Defendant in this action.

## PRAYER FOR RELIEF

WHEREFORE, Cigna prays as follows:

that all claims contained in the Complaint against Cigna be dismissed with prejudice;

that Cigna be awarded costs and attorneys' fees; and

for such other and further relief as this Court deems just and proper.


Dated:  October 22, 2018                              Respectfully submitted,

                                                      MORGAN, LEWIS & BOCKIUS LLP
                                                      By: _/s/ R. Brendan Fee_____
                                                      R. Brendan Fee*
                                                      brendan.fee@morganlewis.com
                                                      Amy M. Dudash*
                                                      amy.dudash@morganlewis.com
                                                      1701 Market Street
                                                      Philadelphia, PA 19103
                                                      Telephone: (215) 963-5000
                                                      Facsimile: (215) 963-5001
                                                      *Admitted *pro hac vice*

                                                      - and -

Crystal R. Axelrod
crystal.axelrod@morganlewis.com
State Bar No. 24078170
1000 Louisiana Street, Suite 4000
Houston, Texas 77002
Phone: (713) 890-5171
Facsimile: (713) 890-5001

**ATTORNEYS FOR DEFENDANT CIGNA HEALTH AND LIFE INSURANCE COMPANY, IMPROPERLY SUED AS CIGNA CORPORATION**

## CERTIFICATE OF SERVICE

Pursuant to Local Rule CV-5(c), the undersigned certifies that a true and correct copy of the foregoing document has been served on all counsel of record via electronic mail on this the 22nd day of October 2018.

*/s/ R. Brendan Fee*
R. Brendan Fee