```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF TEXAS
 2                        TEXARKANA DIVISION

 3
   LISA TORREY, ET AL.            )
 4                               )     DOCKET NO. 5:17-cv-190-RWS
        -vs-                      )
 5                                     Texarkana, Texas
   INFECTIOUS DISEASES SOCIETY )  2:00 p.m.
 6 OF AMERICA, ET AL.                 March 11, 2019

 7

 8
                    TRANSCRIPT OF MOTIONS HEARING
 9        BEFORE THE HONORABLE ROBERT W. SCHROEDER, III,
                  UNITED STATES DISTRICT JUDGE
10

11

12                    A P P E A R A N C E S

13

14
   (SEE SIGN-IN SHEETS DOCKETED IN THE MINUTES OF THE
15 HEARING.)

16

17

18

19 COURT REPORTER:          MS. CHRISTY R. SIEVERT, CSR, RPR
                            DEPUTY OFFICIAL COURT REPORTER
20                          500 N State Line Ave #301
                            Texarkana, Texas  75501
21

22

23
   Proceedings taken by Machine Stenotype; transcript was
24 produced by computer-aided transcription.

25
```

```
 1                P R O C E E D I N G S
 2                THE COURT:  Mrs. Schroeder, if you would,
 3  call the case for us.
 4                THE CLERK:  Docket No. 5:17-cv-190, Lisa
 5  Torrey, et al., vs. Infectious Diseases Society of
 6  America, et al.
 7                THE COURT:  Announcements for the record.
 8                MR. EGDORF:  Gene Egdorf for the
 9  plaintiffs, Your Honor, along with Daniel Dutko, Ryan
10  Higgins and Lance Lee.
11                THE COURT:  Good afternoon.
12                MR. TUTEUR:  Good afternoon, Your Honor.
13  Michael Tuteur from Foley & Lardner with my partner
14  Eileen Ridley representing Anthem.
15                MR. CHASSMAN:  Hello, Your Honor.  Pete
16  Chassman on behalf of HCSC.
17                MR. DUNN:  Your Honor, Alvin Dunn from
18  Pillsbury Winthrop Shaw Pittman representing IDSA and
19  the defendant doctors.
20                MR. JONES:  Your Honor, Mike Jones for
21  United Healthcare here with Mr. Ben Holt.
22                MS. DOAN:  Your Honor, Jennifer Doan
23  together with Earl Austin and Randy Roeser.  We
24  represent Aetna.
25                MS. DONNELL:  Sarah Donnell for Blue
```

1  Shield Blue Shield Association.

2               MR. FEE:  Brendan Fee from Morgan Lewis

3  for Cigna.

4               MR. LAW:  Good afternoon, Your Honor.

5  Alan Law for Kaiser Permanente.

6               MR. TERRY:  And Will Terry for HCSC.

7               THE COURT:  Okay.  Anyone else?

8               All right.  Very well.  Let me begin by

9  saying welcome to you-all and thank you for being here.

10 We are set for a status conference in this case and for

11 argument on a number of motions set forth in the order

12 setting the hearing, the plaintiffs' motion for

13 extension of time to replead, the plaintiffs' motion to

14 compel, the plaintiffs' motion to continue, defendants'

15 motion to compel deposition dates and damages

16 computations, a motion for independent medical

17 examination, and the defendant doctors' renewed motion

18 to dismiss for lack of personal jurisdiction.

19              I want to make a couple of preliminary

20 comments before we get to the motions.  And let me begin

21 by saying our court reporter today is Christy Sievert.

22 And Christy probably doesn't know many of you-all, so I

23 would ask for purposes of a good, clean record that

24 you-all introduce yourselves before speaking.

25              I've spent a good deal of time in the last

1  few days reviewing the docket in this case and the

2  various filings that have been made by the parties in

3  the case subsequent to the scheduling conference that we

4  had 11 months ago, in addition to, obviously, the

5  motions set for hearing today.

6          At the risk of stating the obvious, it

7  seems like the cart has gotten a little bit into the

8  ditch in this case, and that may stem from a number of

9  reasons or causes.  It could be the parties' discovery

10 disputes that have occurred.  It may result from the

11 failure of the plaintiffs to file an amended complaint.

12 It could be the disagreement about the four-year period

13 that was discussed at the scheduling conference with

14 respect to when the -- for purposes of discovery.

15         And I acknowledge it could be the Court's

16 delay in getting the ruling out on the motions to

17 dismiss.  As I said, the scheduling conference was in

18 April.  We did set very quickly the hearing on the

19 motion to dismiss.  All of that got briefed in

20 relatively quick fashion, and we had the hearing fairly

21 quickly.  But it was some months later before we got the

22 Court's order on that motion to dismiss out.  So I'm the

23 first to acknowledge that the Court may have been

24 somewhat responsible for the case getting a little bit

25 into the ditch.

1                 What I would like to do is ask each side

2    to give me a little overview about how we got where we

3    are and where we're going.  I would like you to tell me

4    what discovery has been sought from the other side, what

5    has been provided by the other side, what discovery has

6    been sought from you, and what you have provided.  And I

7    would like for you to be as specific about that as you

8    possibly can.

9                 I want to know from the plaintiffs how

10   long it will take to get an amended complaint on file.

11   I know that a motion to continue has been filed by the

12   plaintiffs.  I'm interested in the plaintiffs' thoughts

13   and the defendants' thoughts as to when the case

14   reasonably can be ready, assuming we get to that stage.

15                And I don't have any preconceived ideas

16   about how long you-all want to speak.  I'm happy to hear

17   whoever on the plaintiffs' side wants to speak and one

18   or more or all of the defendants.  I am well familiar

19   with the advocacy skills of a lot of lawyers in this

20   courtroom.  I am not looking for advocacy.  I am looking

21   for a neutral presentation about how we got where we are

22   and where we're going.  All right.  There will be plenty

23   of time when we get to the motions.  So I'm looking for

24   a fairly straightforward neutral presentation about

25   what's been sought, what you've provided, what you

1  believe the other side owes you, and be as specific as

2  you can.

3                  Whoever wants to speak for the plaintiffs.

4                  MR. EGDORF:  If it may, Your Honor, Gene

5  Egdorf.  If it's all right with you, Your Honor, I'll

6  begin, and then I'll probably turn it over to Mr. Dutko

7  because he can tell you a little bit more about the

8  specifics.  But since I just know enough to be

9  dangerous, perhaps I can probably be the most neutral

10  person from our side.

11                  I certainly would agree with the Court's

12  characterization that we found ourself in the -- in the

13  ditch.  And, you know, at least from our perspective,

14  Your Honor, I think in terms of what we've asked for,

15  you know, it's set forth in the motion to compel that I

16  know you reviewed.  And we're primarily stuck on this

17  four-year issue that has caused the problem, and -- you

18  know, and I think, you know, I, somewhat on our side,

19  take the blame for that, because I know it's been almost

20  a year.  But if the Court recalls, the defendants said:

21  Hey, we think you're going to dismiss this case, we

22  shouldn't have to go back and look at 40 years' worth of

23  stuff.  And so I proposed the compromise of let's just

24  do it four years for now subject to the ruling on the

25  motion to dismiss.

 1                    THE COURT:  I reviewed the transcript

 2  yesterday, Mr. Egdorf.  You don't need to remind me.

 3                    MR. EGDORF:  So we have been pushing on

 4  that four-year issue quite a bit, and, obviously, the

 5  defendants have disagreed.  They say there should be a

 6  different order.  And so that's kind of caused us a

 7  problem because we see this a little bit like tobacco or

 8  asbestos, that, you know, the crime goes back a whole

 9  lot of years; the -- the result of it happened later.

10  That's why we need to go back.  Just like in tobacco,

11  they had to go to the '50s and '60s and '70s.  We think

12  we need to go back into the 1980s.  And we think if we

13  have that information and had gotten that information,

14  we would have already been able to replead and all those

15  things.

16                    I think the -- therefore, I think the

17  ditch analogy that you used really stems from what are

18  we going to be allowed to get from the defendant and not

19  get.  If we get -- if they have to go back more than

20  four years, depending how long that takes them, I think

21  we can file an amended complaint within 30 days, at the

22  most.

23                    THE COURT:  From today?

24                    MR. EGDORF:  From when -- 30 days from

25  whenever we get the documents that we're seeking that

1   you might allow us to have, the documents we think we

2   should have had a long time ago.

3                   And so I don't know what the volume is

4   going to be of that production.  I don't know,

5   obviously, if you're going to order that or not.  You

6   know, I think -- I think, obviously, without getting

7   those documents it's going to be really difficult to

8   replead because we're going to be stuck with the

9   information that we have been provided to date, and

10  that's where that comes from.

11                  THE COURT:  Can you tell me what you've

12  been provided to date, or do you want to rely on

13  Mr. Dutko?

14                  MR. EGDORF:  I probably ought to let

15  Mr. Dutko talk about that in more detail about what

16  we've gotten.  I'll just say, generally, we haven't

17  gotten anything back more than the four years.  And so

18  that's the biggest impediment.  But he can talk about

19  the specifics.

20                  THE COURT:  Okay.

21                  MR. DUTKO:  Good morning, Your Honor.

22  Good afternoon.  Daniel Dutko, D-u-t-k-o, on behalf of

23  the plaintiffs.  I will leave the advocacy for now, and

24  I'll just discuss what has been produced and what we

25  need produced.

1                    I will tell you on behalf of the

2    plaintiffs we have gone out of our way to produce

3    medical records going back to childhood from when some

4    of these people contracted Lyme disease.  We have

5    produced more than 4,000 pages of medical records

6    throughout the course of the discovery.  We continue to

7    supplement as we find new documents or new documents are

8    acquired.  We provided authorizations to all the

9    defendants, along with a list of every single doctor

10   that any of our clients could remember so that they

11   could use those authorizations -- and they have been --

12   to subpoena documents.

13                   We provided all of the documents we could

14   find on our own that are referenced in the complaints.

15   For example, deposition transcripts, we've, I believe,

16   produced three separate deposition transcripts of

17   defendant doctors.  We've produced discovery related to

18   testimony in front of Congress.  We've produced any sort

19   of Lyme policies that we could find.

20                   We have gone out of our way, Your Honor,

21   just to try to produce everything we could not limited

22   to any time frame at all.  Any documents that our

23   clients have and that we have seen, we have produced.

24   We have not withheld any documentation.

25                   Now, the question as to what we were

1    asking and what they have sent, to our eyes, Your Honor,

2    they have sent little more than documentation that we

3    could find on the internet.  They've sent their Lyme

4    policies.  They've sent the updated Lyme policies.

5    They've sent correspondence between organizations within

6    the insurance companies saying this is our Lyme policy,

7    let's update the Lyme policy.

8                    What they did not send and what they

9    refused to send, even within the four years, are the

10   documents set forth in the letters that we sent out

11   during the discovery phase, September 5th of 2018.  And

12   this includes very important documents such as

13   communications between the defendants related to Lyme

14   disease -- as you can imagine, that is very important

15   considering we have an antitrust standard setting

16   case -- communications between the defendants and the

17   medical boards.  And I will tell you on that note --

18                    THE COURT:  Yeah, and what was -- so what

19   was the basis of not producing that first group of

20   documents?

21                    MR. DUTKO:  Well, that's the confusing

22   part, Your Honor, because what happened was they didn't

23   produce them.  We sent the letter saying here's our

24   requests for production outlining specific documents we

25   needed.  They waited 30 days, and then they produced --

1 they sent us a letter saying that this court doesn't

2 have written discovery requests for production, so we

3 don't have to produce that.  And then when we called

4 them out on that, some of them started sending letters

5 saying, well, we couldn't find them anyway.

6              But to my eye, Your Honor, with the four

7 years issue, they have provided absolutely no basis for

8 why they won't produce those documents.  And just so the

9 Court is aware so the Court doesn't think we have been

10 sitting on our hands, we have subpoenaed third-party

11 subpoenas to the medical boards of the states in which

12 we believe the defendants reported doctors.  Almost all

13 of them have told us that there are statutes within the

14 states which are privacy statutes which they will not be

15 able to provide us.

16              We have Wisconsin, and a few other states

17 provided us some documentation.  But for the most part,

18 the documents we need to establish that they reported

19 doctors to the medical boards, because we know they

20 have, is -- are documents in their possession.

21              And so even though we know they're in

22 their possession, they won't give them to us.  We have

23 tried to third-party subpoena those documents from

24 medical boards, but as you can imagine, medical boards

25 being state governmental entities, they have tried to

1 quash those and have refused to produce them.

2                Your Honor, we have also sought

3 information for people who have been denied coverage for

4 Lyme disease.  And if I could give you an example, Your

5 Honor, of what's been going on -- and I'm not -- I'm

6 not -- this isn't advocacy.  This is pure fact.  For

7 example, I'll read you Cigna's -- we sent Cigna an

8 interrogatory, and there were requests for production

9 that are nearly identical, and we asked, "Every person

10 who was denied insurance coverage for you for treatment

11 of Lyme disease."  Their response was, subject to pages

12 and pages of objections, of course, "Cigna responds that

13 to the best of its knowledge at this time, Cigna did not

14 deny insurance coverage for treatment of Lyme disease to

15 any plaintiff in this case."

16                Now, as you can hear, there's a

17 disconnect.  We didn't ask for denial of coverage of the

18 plaintiffs.  We asked for denial of insurance coverage

19 of anybody so we can determine the people they are

20 improperly denying insurance coverage after 28 days of

21 Lyme treatment.  And that goes to the heart of our case.

22                So even within the four-year window, they

23 won't even answer a question as to people they have

24 denied insurance coverage for for Lyme disease.  None of

25 them would.

```
 1                    And so I'm not -- there are many lawyers
 2  on this side.  And as the Court is aware, you read all
 3  of the documents.  At any point did the Court see any
 4  reference to specific documents they produced that
 5  complied with our requests?  You would think if they had
 6  those documents, they would say to the Court, the first
 7  thing they would say is:  We've produced these
 8  documents, here they are.  Instead, they just make
 9  statements -- and, I'm sorry, I'm getting into advocacy,
10  but they just --
11                    THE COURT:  I think you are a little bit.
12                    MR. DUTKO:  Okay.  Well, I'll just --
13                    THE COURT:  Let me ask you this:  Have
14  you ever sent any requests under the e-discovery order?
15                    MR. DUTKO:  You mean for -- you mean for
16  e-mails?
17                    THE COURT:  Yes.
18                    MR. DUTKO:  No, because by the time we
19  got to the point where we were going to send e-discovery
20  requests, we realized that not only had they not
21  produced anything, we already filed our motion to
22  compel, and they refused to produce anything beyond four
23  years.  So until we get a ruling on the four years, the
24  e-discovery makes no sense.  If they're not giving us
25  any documents, they're not going to give us any
```

1  e-documents.

2              THE COURT:  Yeah, but, I mean -- okay.

3  So here we are 11 months after the scheduling

4  conference, and you haven't submitted an e-discovery

5  request?  Is that what you're telling me?

6              MR. DUTKO:  Your Honor, we --

7              THE COURT:  Yes or no?

8              MR. DUTKO:  That is correct.

9              THE COURT:  Okay.

10             MR. DUTKO:  And I completely own that

11  fact.  But the reason why that is so is because we would

12  be in front of this court on an e-discovery motion to

13  compel.  We know that the defendants have attempted in

14  the last five years, five to seven years to try to clean

15  up their act and to try to avoid people appealing Lyme

16  treatment.  There is nothing in the last four years that

17  leads us to the conspiracy that is going on.  So for us

18  to send e-discovery that is limited to four years makes

19  no sense.  We need a ruling on the Court's four-year

20  ruling before we can send e-discovery.

21             And so we filed our motion to compel on

22  the four years, knowing that if we got a ruling on that,

23  then we could send e-discovery.  But until then, it

24  would just be a futile effort.

25             They did file a motion to compel our

1 e-mails, but I believe we have worked that out.

2                THE COURT:  Right.  Yeah, I understand

3 y'all had resolved that.

4                MR. DUTKO:  Yes, Your Honor.

5                THE COURT:  Okay.  Tell me a little bit

6 about the deposition issue.

7                MR. DUTKO:  Your Honor, the deposition

8 issue is -- and I'm -- through advocacy or just straight

9 up?

10                THE COURT:  Straight up.

11                MR. DUTKO:  All right.  Straight up, the

12 deposition issue is confusing because we have no problem

13 presenting our clients for deposition.  They sent a

14 letter saying we want depositions within this time

15 frame, December to May.  They sent a follow-up letter I

16 think a week and a half later, and said you didn't give

17 it to us.  And then they noticed depos of our clients.

18                And in the letter when they noticed the

19 depos, they said we can work with you on dates.  We

20 immediately responded and said these dates don't work.

21 Will you work with us?  We will provide you dates by

22 December, I think, 10th, within your time frame, within

23 the time frame you requested, that we will provide you

24 all of the plaintiffs' depositions within your time

25 frame so you can depose them.

1              They immediately responded back and said,

2    no, we have to have the depositions immediately.  We

3    have to have them on our time frame, not the time frame

4    we gave you just a few days ago.

5              And so we're not trying to prevent them

6    from taking plaintiffs' depositions.  As a matter of

7    fact, we want them to take plaintiffs' depositions.

8    There's no reason not to.  We just feel like the only

9    reason they're making that argument is so that they can

10   come in front of the Court and say we haven't presented

11   them for deposition.

12             But as the Court can see from the

13   briefing, we sent them a letter saying we will send you

14   dates.  They said no.

15             And then the depositions they noticed were

16   for one on the East Coast, the next day on the West

17   Coast, and then the next day in Minnesota.  It was

18   impossible for us to comply with them, and they knew

19   that.  It's basically -- I'm advocating.  But it's

20   basically gamesmanship, to be honest with you, Your

21   Honor, because we're willing to provide those dates.

22             THE COURT:  What about there was some --

23   I read in the filings there was some refusal to make the

24   witnesses available unless there was an agreement as to

25   the four years.

1          MR. EGDORF:  If I may, Your Honor, there

2  were actually -- there were two issues that we raised.

3  One was about the four years, and I'll come back to that

4  in just a second.

5          The primary issue we raised is we give --

6  we were going to present these folks.  They were saying

7  they still needed more documents, and we're getting

8  documents.  It was clear that they were trying to take

9  these folks more than one time.  And so the reason the

10  depositions are not going forward at the time,

11  primarily, is because we said if you're not going to

12  agree that you only get one stab at them, we're not

13  going to present them.  And it was only recently that

14  they agreed and said, all right, we'll do it one time,

15  and we have to get leave of court to do it a second

16  time.  And that was just part of the meet-and-confer

17  process we just had.  So that was one issue.

18          The second issue that got raised was kind

19  of a goose/gander, if you will, of if we only get four

20  years of discovery, then why do you only -- why should

21  you get more than four years of discovery.  We don't

22  think you should be asking questions outside the four

23  years.

24          We knew that was something that was going

25  to be coming up today, and so that's kind of where we

1  are with that issue, is we think whatever rule we have

2  for discovery, it should go both ways.

3             THE COURT:  All right.  Anything else on

4  behalf of the plaintiffs?

5             MR. DUTKO:  Just to address those issues,

6  that's all we have.  I mean, we obviously have some

7  arguments on the motions.

8             THE COURT:  Oh, yeah, certainly.  No,

9  we'll get to that.

10             All right.  Who wants to be heard from?

11  Mr. Jones.

12             MR. JONES:  Yes, Your Honor, if it please

13  the Court.

14             My name is Mike Jones, I represent United

15  Healthcare in this case.

16             Your Honor, I'll try to address the

17  questions you asked and try to do that, as hard as it

18  may be, without advocacy.

19             With regard to where we stand on the

20  discovery that we have sought and received from the

21  plaintiffs, we have sought the depositions of the

22  plaintiffs.  The Court then asked, well, how did that

23  break down?  I think it broke down over two items that

24  could not be agreed to ahead of the deposition.

25             The first item was that the plaintiffs

1  demanded that the defendants agreed that no subsequent

2  depositions could be taken.  Now, the agreement that was

3  sought was more than just, well, if we need a subsequent

4  deposition, we'll go to the Court, we'll ask for the

5  Court's permission to do that.  It was an agreement that

6  we couldn't even do that, which the defendants objected

7  to.

8           The second part of it really dealt with

9  the four-year period, because they said that if we took

10  the depositions, we had to agree before the depositions

11  started that we would not ask any questions about

12  anything that went on prior to the four years.  Not to

13  argue the point, but just to say our position was some

14  of these people may have been diagnosed and had Lyme

15  disease before four years, it was a waste of time not to

16  do that.  It was due to those reasons that the

17  depositions did not move forward and negotiations did

18  not continue.

19           We have sought e-mail discovery.  We have

20  sought document discovery.  And, in fact, are getting

21  some, but we have put out discovery to get production of

22  documents from treating physicians.  We have sought

23  damages discovery, but we have received no damages

24  discovery.  We have not received any disclosures

25  required by the rules with regard to any type of

1 disclosures with regard to damages theories, damages

2 amounts or anything like that.

3             We have received very little, even factual

4 basis for that.  For example, we have sought

5 out-of-pocket travel expenses that might be related to

6 damages, and only three plaintiffs have produced any

7 documents on that subject.  We have sought information

8 on out-of-pocket medical expenses, and there are ten

9 plaintiffs that have produced no documents on that

10 subject.  We have sought information concerning

11 out-of-pocket expenses related to seeking medical

12 treatment.  No plaintiff produced any additional

13 documents on that.

14            And we have sought documents on lost

15 wages, and as basic as -- as best we can tell, for the

16 purposes of just the facts, Your Honor, we have not been

17 able to locate any documents whatsoever on that subject.

18            So with regard to damages types of

19 discovery, we clearly have sought that, and clearly, as

20 we can see, other than the specifics I just gave you,

21 there's been no discussion of information on that.

22            Obviously, there's other discovery that

23 needs to be done.  We have -- we have tried, but not

24 completed it all, seeking depositions of treating

25 physicians.  At this point, we received no expert

1  reports whatever from the other side.  At this point, we

2  have not finished the document discovery from the

3  treating physicians.  And of course, as the Court well

4  knows, you have pending before you our seeking IMEs with

5  regard to these plaintiffs.

6          That would be my bare factual rendition of

7  where we stand on the discovery that we sought and what

8  we have received.

9          Now, with regard to what we have provided,

10 Your Honor, we have provided -- and I think I'll make

11 this as a factual statement on behalf of all the

12 defendants.  Keep in mind, this is based upon -- this is

13 not a factual representation I can make to the Court;

14 this is a hearsay statement that I understand from

15 having talked to the defendants.  And that is the

16 defendants think they have gone back and produced all

17 the discovery documents for the four-year period.

18         Now, what I can do to add a little bit of

19 detail to this, at least for my client, is give you more

20 detail in that regard and tell you how my client has

21 looked at its obligation.

22         And if it could, Your Honor, may I

23 approach the Court.

24         THE COURT:  Yes, please.

25         MR. JONES:  Being somewhat old-fashioned,

1 I'll just hand out -- I'll just provide this handout and

2 tell you what we -- with regard to exactly -- again,

3 just merely factual -- what has United Healthcare done

4 as far as affirmative discovery?  We have provided

5 initial disclosures in this case which we have served on

6 June 28, 2018.  We provided additional disclosures on

7 July 13, 2018, which included 748 pages of documents.

8 It included claims reports, policy, policy committee

9 meeting minutes, and related documents.  We further

10 complied with local Rule CV-34(c) by reference to

11 specific Bates numbers.

12                    We also responded to the plaintiffs'

13 common interrogatories, numbers 1 through 10.  We did

14 that on October 1, 2018.  We provided complete answers,

15 including a report of a revocation of a doctor's

16 clinical privileges due to inappropriate treatment and

17 diagnosis.  A statement that United responded to

18 requests for information from the Maine Bureau of

19 Insurance regarding insurance coverage of Lyme disease,

20 and a statement that United found no evidence of

21 payments to defendants doctors or communications with

22 defendants related to Lyme.

23                    And then further, we provided rebuttal

24 expert reports on March 1, 2019, as set forth there.

25 Now, I want to be totally transparent with the Court

1  about our expert reports.  Obviously, these are rebuttal

2  expert reports that were rebutting reports that had not

3  been given to us.  So that severely hampers what you can

4  do as far as expert report.  But in compliance with the

5  Court orders, we tried to do what we reasonably could

6  do, and that's the responses in detail of United

7  Healthcare.  I would have to let other counsel get into

8  that kind of detail with what -- with regard to what

9  their clients have done.

10          Having said that, I do just reiterate that

11  I believe, and I'll give anybody an opportunity to jump

12  up if they would like to, I believe they would all agree

13  with me that with regard to the four-year period, the

14  defendants think they have complied.

15          MR. TUTEUR:  And may I say -- Michael

16  Tuteur for Anthem.  Very briefly.

17          I agree entirely with Mr. Jones.  I did

18  just want to say that, you know, a fundamental issue in

19  this case is the allegation that these defendants paid

20  large sums of money -- that's a statement from the

21  complaint -- to the IDSA and the IDSA doctors, that they

22  communicated amongst themselves, and that they reported

23  these doctors to the medical boards.  And I can say on

24  behalf of Anthem, that we looked for precisely those

25  things, whether any payments went to any of the

1 defendant doctor -- plaintiff -- defendant doctors,

2 excuse me, or to the IDSA during relevant period.

3                THE COURT:  The four years.

4                MR. TUTEUR:  The four-year period.  There

5 is none.  So they may be unhappy as to what they

6 received, but there is none.

7                We looked for reports to medical boards,

8 which they say we know exist.  To the best of my

9 recollection, if there's one, I think that may be it.

10 There just is no evidence of the allegations that the

11 plaintiffs have been making here that they say we know

12 to be true.  We've looked; it doesn't exist.

13                The communications between and among the

14 insurance companies about the treatment of Lyme disease

15 and the decision to deny for medical reasons long-term

16 antibiotic therapy -- which all of these insurers

17 believe is not medically necessary, and is, in fact,

18 dangerous -- we've looked for those documents.  Not an

19 e-mail because they never promulgated an e-mail request.

20 But we looked for non-e-mail communications among and

21 between the defendants on behalf of Anthem; they do not

22 exist.  So I can state --

23                THE COURT:  So what would that be?

24 Correspondence?

25                MR. TUTEUR:  Correspondence or, you know,

1  minutes from some kind of a meeting or -- I mean, any

2  kind of non-e-mail communication that set out policies

3  that were communicated amongst one another, because,

4  again, as they say, it's a conspiracy case, so that

5  these communications, some kind of agreement would be

6  needed.

7            So we have looked for the documents that

8  they say we haven't produced.  Most importantly, these

9  payments, because without the payments -- and I'm

10  getting into advocacy here, and I apologize.  But

11  without the payments, there's no explanation as to why

12  the IDSA doctors would do what it is alleged that they

13  have done.  But there aren't any.

14            THE COURT:  How many documents did your

15  client produce?

16            MR. TUTEUR:  I think -- we produced I

17  think about 1,000, 2,000 pages.

18            THE COURT:  And what was that primarily

19  composed of?

20            MR. TUTEUR:  So, again, it relates to --

21  they're correct, we did produce Lyme disease policies,

22  but we also produced the minutes that established how

23  the policies were created.  I think we have some --

24  well, we looked for documents relating to the treatment

25  of any individual plaintiff.  And any that existed,

1  we've produced.  There are only a few plaintiffs who

2  have any Anthem coverage at all.  So we produced those

3  as well.

4              And I'm sorry to say, I don't have a

5  detailed listing of what it is.  But we didn't withhold

6  anything relating to the individual plaintiffs.  We

7  didn't withhold anything, although they didn't exist, on

8  payments or communications or any of these other -- the

9  reporting to medical boards.  We didn't -- we didn't

10 withhold any of that or object to any of that, Your

11 Honor.

12             MR. DUTKO:  May I address that?

13             THE COURT:  You may.

14             MR. DUTKO:  Your Honor, as you recall

15 from the motion to dismiss phase, the timeline of events

16 that occurred in this case that we set forth in our

17 complaint as the Court put in the order, is that in the

18 early 1990s, the insurance -- these insurance defendants

19 decided that they were tired of paying so much money for

20 the treatment of Lyme disease.  We have the deposition

21 transcript of a vice president from one of those

22 insurance defendants setting forth how the insurance

23 companies decided that they wanted to cut antibiotics

24 because they were too expensive.  And because of that,

25 they created this arbitrary guideline of 28 days.

1                    In 1992, by 1992, all of these defendants

2  had adopted that policy.  By the mid '90s, they began to

3  pay a group of researchers, that turned out to be the

4  IDSA panelists, large sums of money so they could

5  enforce those guidelines.  By 2000, those researchers

6  then created the IDSA guidelines.  And by 2006, they

7  used those guidelines again.

8                    There is nothing in our complaint related

9  to allegations of conspiracy within the last four years.

10  They know that.  This is like tobacco saying, guess

11  what?  We looked for documents for the last four years,

12  and we can't find any documents saying that we know

13  nicotine is bad.  Well, because there were not documents

14  for four years.  So it's disingenuous for them to stand

15  up here --

16                    THE COURT:  I get the point.

17                    MR. DUTKO:  Okay.  And as for the

18  documents that they did produce, Your Honor, if the

19  Court were to look at them, when they have the documents

20  related to pages and pages, as they say, of documents,

21  what they did was they had the Lyme policy, and then

22  they had the studies that were relied on created by the

23  IDSA doctors behind that.  So there's hundreds of pages

24  of studies that you could find on the internet, that we

25  all have.

1                 They identified in this thing that was

2  handed to us a moment ago claims reports, policies,

3  policy committee meetings minutes and related documents.

4  You know what we don't see in there is we don't see

5  anyone that was denied Lyme coverage.  We don't see

6  anyone that appealed Lyme coverage.  We don't see any

7  documents related to the treatment of Lyme disease, or

8  we don't see any documents in there related to cutting

9  off people after 28 days.  The documents they produced

10  are exactly the documents they wanted to produce because

11  they know those documents are documents anyone can find

12  on the internet.

13                 And so while we have gone out of our way

14  to produce medical records relating -- going back to

15  childhood, they then come in here and say we've produced

16  748 pages of documents, the majority of which are

17  documents that we could look for, I could search right

18  now on the internet and find them.  And so even with the

19  four years, they still haven't complied with this

20  court's order.

21                 MR. JONES:  Your Honor, moving forward to

22  your next question, which was, I believe, how long will

23  it take to get this case ready for trial, where do we

24  stand in that regard, which I think was the Court's

25  final question.  Obviously, there are things that need

1    to be done before that can happen.  And on behalf of the

2    defendants, we thank Your Honor for this status

3    conference so that we can discuss them.

4                    I would apologize to the Court.  I know

5    our briefing on the motion to continuance may be a

6    little less than clear.  That's because sometimes our

7    position on this issue is a little less than clear with

8    all the defendants.  I think I can tell you now that for

9    a clear majority, with the exception of maybe one or two

10   defendants, our position is this:  That there's going to

11   have to be a reset, and that probably the fastest we

12   could get it ready to try is by October, something like

13   that.  And I think that's the majority of the

14   defendants' positions.  There are one or two that I

15   don't think would agree with that statement.

16                   THE COURT:  That's actually what the

17   plaintiffs had asked for, is it not?

18                   MR. DUTKO:  Yes, Your Honor.

19                   MR. JONES:  So that's the response from

20   the majority of the defendants to that question.

21                   THE COURT:  Thank you, Mr. Jones.

22                   MR. JONES:  With regard to the things --

23                   MR. EGDORF:  If I may make one comment on

24   that.

25                   THE COURT:  Certainly.

```
1              MR. EGDORF:  We did ask for October, of
2    course.  That's what we filed a couple of months ago,
3    and we were hoping we were going to get some guidance on
4    getting these documents.  So I don't know if October
5    still necessarily works or not.  Again, it's going to
6    kind of, in part, depend on how the Court sees ruling on
7    all these other discovery issues, but certainly October
8    is what we originally asked for a couple of months ago.
9              THE COURT:  Thank you.
10             MR. EGDORF:  You're very welcome.
11             MR. JONES:  With regard to the answer to
12   that question, though, I would, again, state without
13   getting into argument about it, that I think there are
14   some issues that the Court is going to give us direction
15   on today that very much do play a role in this.  The
16   first one the Court has already brought up, when are we
17   going to get an amended complaint.
18             The second one would be, you know, the
19   dispositive motion issue.  You know, another court hears
20   this in every case, but in this particular case, there
21   is a great need for a dispositive motion practice.  We
22   would like it as early as we could.  It will have an
23   effect on the trial and the trial date.
24             THE COURT:  Are you talking about summary
25   judgment, or are you talking --
```

1              MR. JONES:  Summary judgment.  I know the

2  Court is going to hear the motion to dismiss with regard

3  to certain defendants, but that's what I'm speaking of,

4  Your Honor.

5              THE COURT:  And my view of that,

6  Mr. Jones, is like any other case, as soon as discovery

7  is closed and the defendant can get its summary judgment

8  motion on file, you know, we'll get it teed up and ruled

9  on.  I mean, as a practical matter, I regret to say that

10  often, just because of other pressing business, we don't

11  get to that as quickly as I wish we did.  That is a fact

12  of life for us.  It's not out of design or intention;

13  it's just a fact of life.  We often do not get to them

14  until, you know, relatively shortly before our pretrial

15  conference.  And I do sometimes a little better than

16  that, but I have struggled with that for four years.

17              MR. JONES:  I understand, Your Honor.  I

18  also understand the reasons for that, and I apologize

19  for the request.

20              THE COURT:  No, I think it's perfectly

21  reasonable.  All I'm saying is, as soon as discovery

22  closes, get it on file, let's don't ask for extensions

23  of time, let's -- you know, let's get it teed up, and

24  I'll get it ruled on.

25              MR. JONES:  And then, finally, Your

1  Honor --

2               THE COURT:  And it certainly may narrow

3  the case even if it only does it on the eve of trial.

4               MR. JONES:  I understand.

5               And then, finally Your Honor, as you go

6  through the motion practice today, there are two huge

7  issues that the Court is going to have to address.

8  Again, I'm not going to argue them.  I would star them

9  for you.  And that is, what do we do about the time

10 period of discovery?  What's really relevant?  What do

11 we really -- how far do we really need to go back to

12 bring forward evidence that's going to really be likely

13 to lead to something that would be admissible in a

14 courtroom and that the jury would need to make a

15 decision?

16              THE COURT:  At the end of the day, the

17 plaintiff should be allowed an opportunity to try to

18 prove its case, Mr. Jones.  You do agree with that,

19 right?

20              MR. JONES:  Certainly.

21              THE COURT:  So how does the Court go

22 about managing that process?  We do have claims that

23 relate back many decades.  And, you know, I know you are

24 not satisfied with the complaint as it stands at this

25 point.  I am not satisfied with the complaint as it

1  stands at this point.  I am not happy that the

2  plaintiffs have not gotten their amended complaint on

3  file.  The dragging of time that has occurred in

4  11 months while that has been left unattended has

5  created major obstacles.

6            At the same time, documents are going to

7  have to be produced going back beyond four years.  Now,

8  Ms. Doan, you were the one at the scheduling conference.

9  If you want to speak to this, who argued vociferously as

10  I recall, for a four-year pause, so to speak, to let us

11  get through the dispositive motion hearing and a ruling

12  on that, and then, you know, we'll figure out where we

13  go from there.  Would you like to address that?

14            MS. DOAN:  I'm happy to, Your Honor.  I

15  know that Mr. Tuteur is going to address it in more

16  detail.  I think that the four years, Your Honor, at the

17  time was because that was the statute of limitations on

18  these claims.  And so if they discover something from

19  50 years ago, say, those statutes have all run.

20            THE COURT:  No, I'm talking about the

21  compromise agreement that was discussed at the

22  scheduling conference.  I reviewed the transcript

23  yesterday, Ms. Doan.  Have you looked at it?

24            MS. DOAN:  I have not, Your Honor.

25            THE COURT:  Well, I commend it to you.

 1  My reading of that transcript was you made several

 2  requests that we have a period of time while the

 3  discovery -- while the dispositive motions were getting

 4  fully briefed, and that the defendants would not have to

 5  go back 20 or 15 or 30 years, or whatever was going to

 6  be necessary to search for documents, and that a

 7  reasonable period of time associated with the statute of

 8  limitations of four years was acceptable.

 9                 MS. DOAN:  That's what I recall, Your

10  Honor.

11                 THE COURT:  Yeah.  And the plaintiffs

12  agreed to that.

13                 MS. DOAN:  And we did that, Your Honor.

14                 THE COURT:  But it's my understanding

15  that a number of defendants have taken the position that

16  the Court has ruled that only four years of documents

17  should be produced.

18                 MS. DOAN:  So I believe for Aetna, Your

19  Honor, we have produced even more than that.  I know

20  that Mr. Austin has the details on that specifically,

21  but I believe we have produced correspondence.

22                 THE COURT:  You have -- you have not

23  taken the position that only four years of documents

24  need to be searched for?

25                 MS. DOAN:  That has not been our position

1   on the meet and confers, Your Honor, with the

2   plaintiffs.  I think the position was how much more

3   would you like to see.  I mean, we have produced a

4   number of documents in this case.

5              THE COURT:  You have searched back beyond

6   four years?

7              MS. DOAN:  I believe that Aetna has.

8   Mr. Austin has got the details on that, Your Honor, but

9   I believe that we have searched -- I believe we

10  produced -- our client has produced some documents

11  beyond --

12             THE COURT:  I just want to make sure I

13  understand, Ms. Doan.  You're not taking the position

14  today that you believe only four years of documents

15  should be -- should be produced?

16             MS. DOAN:  So just to make sure we're --

17  I know we have different positions, Your Honor, at the

18  table.  I think for Aetna we have produced some

19  documents beyond four years, is my understanding, Your

20  Honor.  But for the group as a whole, since that was the

21  statute of limitations, that is why we offered the four

22  years to see if there was even anything in that four

23  years.

24             So, for example, I think our -- I can't

25  remember exactly what we said -- I don't -- the

1  transcript, I have not read before today.  But if there

2  was something 50 years ago that somebody said, they

3  can't recover on it anyway, I think, was the issue here.

4  So that would be fruitless --

5                    THE COURT:  But wouldn't that be an

6  argument for another day?

7                    MS. DOAN:  It might be an argument for

8  another day, Your Honor.  It's just extremely expensive

9  to have years and years of -- some companies --

10                    THE COURT:  Let's come up with some

11  reasonable compromise.

12                    MS. DOAN:  And we did offer that to them

13  on the meet and confer before we came in here, Your

14  Honor.  I mean, it's --

15                    THE COURT:  What did you offer?

16                    MS. DOAN:  I believe we asked them if

17  they would have wanted to have five years, six years,

18  seven years, what was the limit here.  Did you want to

19  go back to 2010.  That would have been acceptable.  And

20  there was no movement at all on the plaintiffs' side.  I

21  mean, they wanted to go back decades.  And that is a lot

22  of money and time for the issues here, Your Honor.

23                    THE COURT:  And I totally understand

24  that, and I am completely open to resolving that issue.

25                    MS. DOAN:  Yeah.

1                THE COURT:  I mean, I agree with you.  I

2    mean, I think we -- you know, we have to be sensitive to

3    the needs of the case and whether, you know, the

4    discovery requests are proportionate to that.  So I'm

5    sensitive to that, but that's a discussion that's going

6    to have to be had.

7                MS. DOAN:  We did try to have that on the

8    meet and confer with the other side, Your Honor, and we

9    did offer, I think, all the way back to -- I can't

10   remember if it was seven years or we offered all the way

11   back to 2010.

12               MR. LEE:  It was six years, Your Honor.

13               MS. DOAN:  I mean, we can offer all the

14   way back to 2010, Your Honor, if that would resolve the

15   issue.  I know that they're -- I don't know that certain

16   clients' companies would have anything more than what

17   they've already produced.  But that's definitely

18   something that the -- that I believe Mr. Tuteur is going

19   to address that the parties could do.  We're not

20   sticking it four years, pound sand, that's what the

21   Court ruled.  I don't think we've ever said --

22               THE COURT:  That's been represented to

23   me.

24               MS. DOAN:  Aetna has never said that,

25   Your Honor.

1                     THE COURT:  That's fair enough.  Thank

2  you.

3                     MS. DOAN:  Yes, I know we have not.

4                     MR. TUTEUR:  Your Honor, I do want to be

5  clear, and I think we took the Court at its word in the

6  discovery order that said that discovery for the

7  defendants would be limited to the four years.  And

8  while we have looked a little ways back -- and this is

9  Anthem now -- we have not produced documents that are

10 more than four years because the Court's order said

11 quite expressly four years.

12                    That said, we completely agree with what

13 Ms. Doan just said, that there can be a reasonable

14 period beyond the statute of limitations.  I think where

15 the challenge has been is that so far in the meet and

16 confers and in the papers, the plaintiffs have said we

17 have to go back to 1992.  This court -- and I'm getting

18 into advocacy and I'm going to --

19                    THE COURT:  A little latitude.

20                    MR. TUTEUR:  This court has found that

21 there's not evidence of fraudulent concealment.  They

22 had not pled it, as they must, and, in fact, as they

23 must in advance, not after discovery.

24                    So an approach, which I have not proposed

25 at the moment to the plaintiffs but I would like to

1 throw it out there is, as the Court is probably now

2 aware, there are these 2006 IDSA guidelines.  There was

3 a 2006 investigation by Attorney General Blumenthal.

4 That investigation led to a 2008 settlement which led to

5 the creation of an independent review panel overseen by

6 Attorney General Blumenthal actually run by some folks

7 here in Texas.  The -- the completely independent

8 doctors were an ombudsman from Texas.

9           They then spend two years looking at the

10 2006 IDSA guidelines, and in 2010 they issued a report.

11 Now, significantly, that -- and there was public

12 comment.  There was the attorney general's involvement,

13 all of that.  And in 2010 they came out with a report,

14 and that report ratified unanimously the 2006 guidelines

15 as being medically appropriate.

16           And then Attorney General Blumenthal said,

17 "Appreciate the report," and he said he would review it

18 and see what further steps he would take.  He never took

19 any further steps.

20           Now, it seems to me, seems to us, that a

21 reasonable break point is -- is then.

22           THE COURT:  '06?

23           MR. TUTEUR:  '10.  Because '10, you've

24 got the review panel, you've got the attorney general's

25 investigation.  This is completely open and notorious.

1  Everybody knows about it.  It's in the public record.

2  They're published in medical journals.  All of that.

3  There's no concealment here that could possibly extend

4  back.

5                    And so if we're looking at a reasonable

6  period -- and on behalf of Anthem, I would like to say,

7  you know -- and I know I said this at our last hearing.

8  You know, Anthem is a company that grew by accretion and

9  every --

10                   THE COURT:  As I said, I read the

11  transcript yesterday.

12                   MR. TUTEUR:  And every -- every two more

13  years or three more years, you've got another legacy

14  computer system from some acquired company which we

15  would have to then, you know, sort of unbutton, figure

16  out how to get to the materials from those days, see

17  whether we can spin it up again.  I mean, it's very,

18  very expensive.

19                   So I suggest -- and, again, I apologize

20  for not raising this with the plaintiffs.  But 2010,

21  that's -- that's almost ten years from now.  So ten

22  years back.  It's seven years back from the date of the

23  complaint, so it's well beyond the statute of

24  limitations.

25                   This court has already ruled that they

1  have failed to plead with particularity any fraudulent

2  concealment allegations.  So why you should be able to

3  go back as Mr. Dutko suggests, let's go back to the

4  '90s, let's go back to the aughts.  Let's go back -- I

5  mean, they can say it's tobacco, but a single paragraph

6  in a complaint that says, "We believe the defendants

7  fraudulently concealed," is not -- as this court has

8  already ruled, is not sufficient to say, okay, let's

9  just open up the old file drawers that are up at Iron

10  Mountain until we find something that we like.  It's

11  just not.

12          So we're not opposed to an extension of

13  the period, but I do think, as this court has already

14  indicated, every year that goes by is a multiplying

15  factor of the costs that it is for our clients.

16          THE COURT:  I'm sensitive to that.

17          MR. TUTEUR:  So that's a proposal that we

18  would suggest.  And, again, I think with the -- I'm

19  sorry, Your Honor, go right ahead.

20          THE COURT:  Oh, no, go ahead.

21          MR. TUTEUR:  I was just going to say that

22  seems to us to be a reasonable marker, because you've

23  got the attorney general, you know, who started this

24  investigation followed by a review panel.  Once we get

25  past that, if we -- if Anthem and the rest of us all

1  continued to secretly conspire amongst ourselves, you

2  know, and said, oh, the hell with that, we're going to

3  keep doing what we're doing, or whatever, then more

4  power to them.  But you can't argue today that this

5  whole body of discussions, "the Lyme wars," as they call

6  them, hasn't been fully ferreted through 2010; it was.

7           So that, to us, would be a reasonable

8  break point.  It's 2.5 years beyond the statute of

9  limitations.  It's not taking us back into these legacy

10 systems.  It is, actually, but only a bit.  And we're

11 prepared to do that.  And I know having spoken with the

12 other defendants, we're prepared to do that, and they're

13 prepared to do that as well.

14           THE COURT:  Okay.  Who else on the

15 defense want to speak about discovery timeline?

16 Anything, generally.

17           MR. CHASSMAN:  Pete Chassman on behalf of

18 HCSC.  I can just say briefly --

19           THE COURT:  Mr. Chassman, would you go to

20 the podium, please.

21           MR. CHASSMAN:  Pete Chassman on behalf of

22 HCSC.

23           I can say that Mr. Tuteur's representation

24 is reasonably representative of HCSC's position and

25 history as well.

1                    One other thing I'll tack on that's

2    unrelated to that, on the list of things that we still

3    need from plaintiffs is e-mail.  It's true that we

4    reached an agreement as we got closer to the hearing

5    about the scope of the production.  We still actually

6    will need the production.

7                    THE COURT:  Your e-mail?  Their e-mail?

8                    MR. CHASSMAN:  Their e-mail.  So we

9    started with -- we propounded e-discovery requests quite

10   some time back.  We were unable to reach any sort of an

11   agreement for a while.  We filed a motion to compel.

12   There was some subsequent discussion.  We agreed to

13   narrow our requests in order to try to put this issue to

14   rest, and what we proposed ultimately was agreeable to

15   the -- to the plaintiffs.

16                   The point is just that we reached that

17   agreement, but in terms of things we still actually

18   need, e-mail is on the list.  Not to say that we won't

19   get it, but you asked for a complete of list of what's

20   out there.

21                   So that's it.  Thank you, Your Honor.

22                   THE COURT:  Thank you, Mr. Chassman.

23                   Who else on the defense side?

24                   MR. DUNN:  Your Honor, very briefly,

25   Alvin Dunn representing IDSA and the defendant doctors.

 1                    And just to -- for IDSA and the defendant

 2    doctors, we produced everything they asked for within

 3    the four-year period and -- but it did not include

 4    e-mails because they have never asked for e-mails.  And

 5    they did not challenge us or ask for anything in

 6    addition to what we've produced.  The only thing they've

 7    asked for is beyond the four years.  So within the four

 8    years, IDSA and the doctors have produced everything

 9    that's been requested and everything else that's been --

10                    THE COURT:  And on the -- on the personal

11    jurisdiction discovery, the plaintiffs never sought to

12    take your clients' depositions; is that correct?

13                    MR. DUNN:  Correct.  We agreed on a

14    schedule that would take it all the way out to -- I

15    proposed December 31st.  They said, no, we'll need more

16    time, maybe.  We agreed on January 31st.  They had

17    plenty of time from the time you entered your order in

18    late September until the end of January, January 31st,

19    and they never asked for a single deposition.

20                    And we had one very quick discussion about

21    the written discovery responses, and what I answered a

22    quick question, they said they were satisfied.  So they

23    haven't complained about anything with respect to

24    discovery from IDSA and the doctors.

25                    Thank you, Your Honor.

1                    THE COURT:  Thank you.

2                    MS. DONNELL:  Your Honor, just quickly

3  for BCBSA, we get lumped in with the insurance

4  defendants because we're the licensing --

5                    THE COURT:  You're the marketing group,

6  right.

7                    MS. DONNELL:  We're the licensing

8  organization.

9                    So I just wanted to lay the marker down

10 that we've been asked for the, you know, same documents

11 as the -- as the other insurer -- I guess other

12 insurers, but we don't make coverage decisions.  So we

13 would haven't denials of coverage or appeals of denials

14 of coverage.  And we've responded that way in our

15 interrogatory responses.  So just to clarify that one

16 small point for us.

17                    Thank you.

18                    THE COURT:  Thank you.

19                    Anybody else?  Okay.  Mr. Dutko.

20                    MR. DUTKO:  Can I just address?

21                    THE COURT:  Please, yes.

22                    MR. DUTKO:  I would like to point out to

23 the Court, Your Honor, that many of my clients are

24 bedridden.  Many of my clients are constantly dealing

25 with aches and pains.  And yet the defendants, over and

1  over, send letters:  You've got to go get your medical

2  records.  We've got to have all your medical records.

3  Go out, talk to your doctors, get your medical records

4  going back to when you had Lyme disease in the 1970s.

5              And yet they stand up here today and they

6  say these multibillion-dollar corporations are going to

7  have a hard time finding documents from before 2010 is a

8  little bit disingenuous.  We have gone out of our way on

9  behalf of the plaintiffs -- they have literally wrapped

10  up boxes and taped them to send them to us because

11  they're not sure what they have, trying to find

12  documents, going back to doctors that have retired for

13  many years, knocking on doors to try to get documents.

14  And yet they want to compromise by giving us documents

15  beginning nine years ago before the guidelines were even

16  created.  Your Honor, these lawyers --

17              THE COURT:  Get to the point.

18              MR. DUTKO:  Yes.  Your Honor, they

19  know --

20              THE COURT:  Quickly get to the point.

21              MR. DUTKO:  Yes.  Your Honor, they know

22  the compromise is no compromise.  They know that the

23  documents that we need to prove our conspiracy occurred

24  in 1990 and on, and they know that any compromise

25  involving 2010 and beyond is going to lead to the fact

1  that they could file summary judgment.

2                THE COURT:  Okay.  We'll now hear

3  argument in the plaintiffs' motion for extension of time

4  to replead.  Who would like to be heard?

5                MR. DUTKO:  Yes, Your Honor, Daniel Dutko

6  on behalf of the plaintiffs, Your Honor.

7                Again, the motion for extension of time to

8  replead RICO comes down to the very fact that this

9  court, when it entered the order granting and denying in

10 part the motions to dismiss filed by the insurance

11 defendants, put in there that the plaintiffs should be

12 required to replead RICO within 30 days, because as the

13 Court held, the parties were currently engaged in

14 discovery and we had been conducting discovery for four

15 months.

16               The problem with that, Your Honor, as

17 we've seen here today, is that while the plaintiffs have

18 been engaged in discovery from the beginning of this

19 case, even until now, the defendants in this case have

20 not.  The defendants in this case backed off of an

21 agreement in which they agreed to produce documents

22 beyond four years, which they represented to this court

23 that they would produce those documents.

24               And when this court issued its ruling

25 saying we had 30 days to replead, we immediately reached

1 out to the defendants' counsel and said please produce

2 documents that are responsive to our requests and

3 responsive to the Court's disclosures and additional

4 disclosures beyond the four years beginning with our

5 conspiracy, and they refused to do so.  They also

6 refused to produce documents within the four years that

7 would allow us the opportunity to replead RICO.

8             Your Honor, as the Court held, we are

9 entitled to go forward on our antitrust claim, and the

10 antitrust claim, Your Honor, allows us, should allow us

11 to conduct discovery beyond four years and well into the

12 '90s when they were conducting this conspiracy and

13 creating these guidelines.

14             We are asking for the same documents in

15 antitrust that we would be asking for in RICO.  It is no

16 detriment for the -- for the defendants in this case to

17 allow us to proceed on a RICO claim, along with our

18 antitrust claim, and then to address the issue after

19 discovery is over.  There is no -- there's nothing bad

20 that can happen to them.  It's the same documents we

21 would request.

22             And further --

23             THE COURT:  Don't you have to have facts

24 supporting a RICO allegation before you file the

25 complaint?

1              MR. DUTKO:  Your Honor, respectfully,

2  there are numerous facts outlined in our complaint.  In

3  fact, there are deposition transcripts from some of the

4  insurance defendants.  There are deposition transcripts

5  from the IDSA panelists.  There are outlines -- there

6  are documents that -- provided by Congress in which

7  people testified at Congress.

8              We set forth, I think 70, 80 pages of

9  information setting forth a conspiracy that they have

10  engaged in since early 1990.  Your Honor, this isn't a

11  case in which we have simply alleged RICO like a state

12  court case and just hope to get by.  Your Honor, there

13  are numerous, numerous allegations that we believe meet

14  the pleadings requirements under RICO, under 9(b).

15             But, Your Honor, not only that, but there

16  is a relaxed pleading standard in this state -- within

17  the Fifth Circuit that allows us to move forward if we

18  can establish that all the documents are in the

19  defendants' possession.  We have made that allegation.

20  That is bared out here today with evidence of the fact

21  that they refused to produce documents beyond four

22  years.

23             Doesn't the Court think that if they

24  had -- if their words, no documents setting forth the

25  allegations in plaintiffs' complaint, that all of the

1   defendants would have made a search of that, come before

2   the Court and said:  There are no documents.  We've gone

3   all the way back to 1990, and there's nothing that

4   establishes any RICO, we should get out of this case.

5              There is a reason we have spent the last

6   better part of a year fighting over a four-year

7   form-over-substance argument, because the defendants in

8   this case know that once we get our hands on the

9   documents, in which they paid the IDSA panelists, in

10  which they reported doctors to insurance boards, in

11  which they denied insurance coverage beyond 28 days, in

12  which they created arbitrary guidelines, once we have

13  those documents, we will be able to meet our RICO

14  requirement.

15             And that's exactly what the relaxed

16  pleading standards says.  It says you are allowed to

17  make allegations enough to get over a prima facie case.

18  And we believe we've done that.  We believe there are

19  plenty of allegations in there, including deposition

20  transcripts -- and I've gone through that, Your Honor --

21  including their guidelines.  And so we have made more --

22  we have presented more than enough in our complaint

23  specifically to get past the relaxed pleadings, but we

24  believe enough for RICO.

25             And so --

1                    THE COURT:  Are you arguing the motion to

2  dismiss again?

3                    MR. DUTKO:  Well, based on your

4  question --

5                    THE COURT:  Because I've ruled on the

6  motion to dismiss.

7                    MR. DUTKO:  Based on your question, Your

8  Honor, I felt like I had to give --

9                    THE COURT:  I guess I'm more curious

10  about why you haven't filed your amended complaint.

11                    MR. DUTKO:  The reason why we haven't

12  filed our amended complaint, Your Honor, is because the

13  defendants refused to produce any documents.  The basis

14  that the Court gave for allowing us 30 days to replead

15  RICO was that the defendants have been engaged in the

16  discovery process for the last four months.  And when we

17  looked at the discovery process and realized that they

18  had not, we immediately filed a motion asking for more

19  time until they engaged in the discovery process.

20                    THE COURT:  When was that motion filed?

21                    MR. DUTKO:  May I, Your Honor?

22                    THE COURT:  Yes.

23                    MR. DUTKO:  That was filed on

24  October 22nd of 2018, Your Honor.  And September 27th

25  was when this Court issued its order.  So less than

 1  30 days later, Your Honor.

 2              THE COURT:  Okay.

 3              MR. DUTKO:  And so we are not sitting on

 4  our hands.  We're not doing nothing.  We're trying to

 5  engage in the discovery process and comply with

 6  everything that they are requesting from us.  We

 7  expected them to do the same.

 8              And so when they didn't do that, Your

 9  Honor -- and, Your Honor, we heard the counsel stand up

10  here and say:  When can we have dispositive motions

11  heard?  And so, basically, what the defendants want to

12  do is, they want to get a ruling on the motion to

13  dismiss.  That doesn't go their way.  Then they don't

14  produce any documents.  Then they come in front of the

15  Court and say:  Guess what, there are no documents to

16  prove their case.  When can we have our summary judgment

17  heard?

18              Well, that's not the way litigation --

19              THE COURT:  Anything else on the motion

20  for extension of time?

21              MR. DUTKO:  No, Your Honor.

22              THE COURT:  Thank you.

23              MR. TUTEUR:  Your Honor, Michael Tuteur

24  for Anthem and for the defendants.  I am going to be

25  very brief.  I have a deck that I could hand up to the

1  Court.

2              THE COURT:  Please do.

3              MR. TUTEUR:  I am going to go through it

4  very quickly because I think that the Court has actually

5  addressed nearly every issue that we've got.

6              Has this come up?  There we go.  Thank

7  you.

8              So let me -- before we get to the deck --

9  and I think to some extent I may really skip through it

10  really quickly -- I mean, what we have heard from the

11  plaintiffs is that there are events that occurred in

12  1992 and 1994 and sometime in 2000 in which there's some

13  depositions and there's some complaints.  This is, with

14  all respect, really ancient history for purposes of a

15  litigation.

16              This court ruled already the statute of

17  limitation is what it is.  They had failed to prove

18  with -- plead with particularity either their RICO

19  claims or their fraudulent concealment claims.  So that

20  means that the -- that the issues that we're going to

21  deal with are those that occurred in the four years

22  immediately preceding the filing of the complaint.  As

23  I've said, and I'm not going to repeat, we're prepared

24  to go back a reasonable period.

25              Mr. Dutko is wrong to say, with all

1  respect, that if we knew that there weren't any of these

2  things, my client would reach back and look to see

3  whether there were any such documents.  This is a

4  tremendous effort to do that.  I will say that there are

5  some of the defendants, and they can speak here, who

6  did, in fact, look for the key issue, which is these

7  payments to the -- to the doctors that are alleged over

8  and over again in the complaint.

9            But allegations aren't facts.  Allegations

10 aren't proof.  And so far those defendants who have

11 looked have been unable to find these so-called "large

12 payments."  And I know that Mr. Dunn can speak for the

13 doctors, and they would also say they have received no

14 large payments.

15           So the fact is that this conspiracy theory

16 is based on a fiction.  They wish it to be tobacco.

17 They wish it to be asbestos.  It isn't those things.

18 And the record of recent events doesn't bear it out.

19 And at least with respect to some of the defendants who

20 were able to go back into their payment systems, they

21 don't bear out in any way, shape or form this

22 allegation.

23           Now, it is not form over substance to say

24 that we should not have to go back to the beginning of

25 time to look for -- to look for these documents.  This

1    is -- I put it up on the -- on the screen, Your Honor,

2    that this is your own words.  And you've obviously read

3    them recently.  They have failed to put forward, as they

4    were required to do, the newspaper details of RICO, of

5    the fraud, of the mail fraud, of the wire fraud that

6    they allege.

7                    And here, again, is your language from the

8    fraudulent concealment, which they are required to act

9    with diligence, and you noted that, that they must act

10   with diligence to look for appropriate facts to support

11   their claims.  And under 9(b), it's an exception to Rule

12   8, you are required to have those facts.  You just can't

13   go fishing around.

14                    They sent out third-party discovery.  It's

15   true that some of the medical boards, apparently, said

16   that for privacy reasons they were unwilling to produce

17   documents.  But we know that others weren't.  And there

18   were some disciplinary matters, but you could count them

19   on your hand, Your Honor.  This is hardly a situation of

20   a wholesale effort by the insurance companies to

21   discipline through, I should add, independent state

22   medical boards.  How is it they are part of the

23   conspiracy as well?  They're not the insurance

24   companies.  They're not IDSA.

25                    So you asked Mr. Dutko when did they file

1  their motion.  Well, they filed their motion for

2  extension of time on October 22nd.  They didn't actually

3  move to compel any documents until November 1st, more

4  than 30 days after Your Honor had entered the decision.

5              And I should note that the plaintiffs are

6  being a bit disingenuous here about the failure to

7  comply with discovery.  When Your Honor wrote what you

8  did in the end of September, the discovery that you were

9  referring to was perforce for four years, because that's

10  what you had ordered; that's what was in your order.

11  And so the four months of discovery that you had allowed

12  the plaintiffs to take was for that four-year period,

13  and you expected them to use that in the next 30 days to

14  write up an amended complaint.

15              I can't look into your mind, Your Honor,

16  and I don't know, but had you meant to say in the next

17  30 days I expect everybody to open their files back to

18  1992 and then give me an amended complaint at the end of

19  those 30 days, I think you would have said that.  You

20  didn't.  I mean, that period, I assume, was for the

21  drafting, of the sort of culling four months and then

22  issuing an amended complaint.

23              Again, I'm not going to go through it,

24  your discovery order, you know, was clear on its face.

25  We complied with it.  We're open to expanding it.  But

1 we did feel that we were acting in compliance with your

2 court's order in the discovery order of May 11, that the

3 four-year time period -- and let me add, it applies to

4 the defendants, not to the plaintiffs.  You said the

5 defendants.  You meant the defendants, I assume.

6             THE COURT:  There's actually a footnote

7 in the order.

8             MR. TUTEUR:  There is.  Exactly.

9 Exactly, Your Honor.

10             And you've commented on the e-discovery

11 order.  That came out on August 8, 2018.  Within a week

12 we promulgated search terms.  It has taken until a week

13 ago for the plaintiffs to agree on a meet and confer --

14 and a motion that we had to file, I should add, for them

15 to finally agree on the search terms that we had asked

16 for.  And we changed them and we limited them and we cut

17 them and we did a bunch of things, and they stonewalled

18 us on every term.  But we, unlike the plaintiffs, who

19 have never given us search terms, we did within the

20 first week after this court's order, and we have yet to

21 receive a single e-mail.

22             And I've heard already that we never

23 received a damages calculations.  You don't need the

24 defendants' discovery to give us a damages calculations.

25 The damages are peculiarly in their control.  When we

1  asked for it under -- it's not even -- it's part of the

2  initial disclosures.  We never got it.  We asked for it,

3  and they said that's expert stuff.

4              Said, well, I really don't think so.  But,

5  I mean, some of this stuff is not expert stuff.  "Well,

6  you'll get it when you hear from our experts."

7              Well, the expert deadline comes and goes.

8  They don't submit any expert report.  They don't

9  designate any retained expert except one, and that's on

10  the amount of attorneys' fees that would be charged.

11  There is no Lyme expert, no economic expert, no Sherman

12  Act expert, no conspiracy expert, nothing.  And

13  certainly no damages expert.

14              So there we are.  "Where's your damages

15  calculation?"  "You wait until our expert is there."

16  The expert then comes and goes.  No expert.  Still no

17  damages calculations.

18              I mean, we don't know if this case could

19  be settled, Your Honor, but we certainly can't settle it

20  unless we have an idea of what it is that they think the

21  damages are in this case.  And that's entirely on them.

22  It's not on us.  They can't say we didn't give

23  documents.  They should be able to give us that.

24              They have yet to make any named plaintiff

25  available for deposition.  You heard about the issues

1  that were there.  And I point out that I was really

2  struck -- as somebody from Boston, we don't have this in

3  our discovery orders.  Maybe we should.  But Your Honor

4  has issued standing orders that say no excuses.  If

5  you're unhappy with what they've produced, that is not

6  an excuse to, for example, not give us an expert report,

7  not to give us a damages calculation, not to give us an

8  amended complaint.  They have no excuses for failing to

9  engage in meaningful discovery.

10               So just to be clear, these are the

11  documents that we didn't produce.  We did not produce

12  payments from insurance companies to the defendant

13  doctors.  We did not produce receipts of payments.  We

14  did not produce complaints by insurance companies to

15  state medical boards.  And we didn't produce

16  communications between and among the insurance companies

17  in any scheme.  And the reason is such documents don't

18  exist.  This conspiracy is a conspiracy looking for

19  facts.

20               I've cited some cases at the end of the

21  deck.  I will leave them for Your Honor.  You know them

22  well.  Again, diligence is required.  Proportionality is

23  required in discovery.

24               And, finally, the plaintiffs' cases don't

25  stand for the principle if you get open-ended discovery

1  beyond the statute of limitation.  These are the cases

2  that they have cited.  In every single one, the request

3  that the plaintiffs make or the movant makes for

4  extended discovery is actually rejected, and some

5  shorter period is imposed by the Court.

6              And that's what we're really doing, trying

7  to suggest here is let's find a reasonable period of

8  time.  That's what all of these cases -- I mean, you

9  look at the Glenn v. Williams case that they cite over

10 and over again.  Ten years is an inordinate length of

11 time.  Three years is a reasonable time says that court.

12             The Doss case, 13 months more than the

13 statute of limitations.  That's reasonable.

14             The Jackson case says we're not going to

15 go beyond when the plaintiffs started their employment.

16 There's a claim that the discrimination went back years.

17 The Court says we'll start when you start.  And the same

18 for the DAC case.

19             So here is the relevant history that I set

20 out for you before, Your Honor.  This is the guidelines,

21 the review panel, and the final report of the

22 independent Lyme disease panel.  And I quoted from

23 Wikipedia.  I know it's a -- it's a somewhat suspect

24 source.  But I think actually this pretty accurately

25 says what happened, which was that this independent

1 panel overseen by the attorney general, run by nonIDSA

2 people, reviewed the 2006 guidelines word for word and

3 concluded unanimously that the 2006 guidelines, the ones

4 that they claim are such conspiratorial or whatever,

5 were correct, medically correct, scientifically correct.

6           THE COURT:  Can you tell me when the

7 process that led to the '06 guidelines began?

8           MR. TUTEUR:  Well, I mean, I guess maybe

9 I should back up a minute.  Guidelines by medical

10 societies, including the IDSA, began to be issued in the

11 '90s in every learned society.  You know, the plaintiffs

12 have acted as if these guidelines stand in a vacuum.

13 The IDSA alone, Mr. Dunn could tell us, would have put

14 out dozens and dozen of clinical guidelines.  So has the

15 American Institute of Neurology and radiology and so

16 forth.  Guidelines themselves are part and parcel of

17 modern medicine.

18           So the very first set of guidelines that

19 the IDSA puts out regarding Lyme is an informal set of

20 guidelines that start in the '90s.  There is a 2000

21 guidelines that the IDSA puts out regarding Lyme

22 disease.  And in 2006, there is -- because there's a --

23 they had an arbitrary rule that said every five years

24 you should -- which is no longer, they don't follow this

25 rule anymore.  But that every five years you should

1  update your guidelines with the latest medical research.

2  So that happened, you know, in 2005 to 2006 for the 2006

3  guidelines.

4             There is, and this is public, the IDSA,

5  the neurology learned society and the rheumatology

6  learned society are actively working on the next set of

7  guidelines.  Public comment.  Open -- open debate.  And,

8  in fact, it's likely that they'll be published within --

9  a draft will be published this month.

10            So I say that only to say that the fact of

11 the creation of guidelines, there's nothing special

12 about it other than that this was thought to be standard

13 of care beginning in the '90s.  And the 2006 guidelines,

14 you know, it depends on what you want to say, there was

15 a 2000 guidelines and the ones before them.  But it was

16 roughly from 2005 to 2006, Attorney General Blumenthal

17 immediately opened this investigation, and in 2008, the

18 review panel completely reviewed the guidelines and

19 reaffirmed them in whole.

20            So, you know, it seems to us that 2010,

21 which is when the review panel finishes its work,

22 Blumenthal says, okay, my investigation is closed, that

23 that's a reasonable period to start with.  Because as I

24 said, every year that goes back is a lot more money for

25 our clients, and nobody can claim -- you've already held

1  that -- that they have not pled fraudulent concealment.

2  So if everything that I just mentioned is known to the

3  public, how possibly would it make sense to go back

4  beyond 2010?

5              If the conspiracy has been able to be kept

6  going so that people are continuing to be hurt, some

7  actions must have occurred.  You know, it can't be that

8  payments back in 1992 to six doctors have somehow

9  managed to be so powerful that even today in 2019,

10 without any payments in between, because we haven't

11 found any payments in between, somehow that has the

12 power to keep thousands and thousands of doctors, who

13 could make money giving this treatment, keep them from

14 doing it.  It's strange credulity, Your Honor, because

15 it isn't true.

16             But anyway, we strongly urge the Court not

17 to take us back to 1992 or 2000 or 2005.  It's very

18 costly.  It's not proportional.  And if there's no RICO

19 pled and if there's no fraudulent concealment pled, then

20 it's just really a question of some reasonable period

21 before 2017 -- I mean, I'm sorry -- 2013 when the

22 statute of limitations runs, so that you can catch some

23 of the stuff that might lead to admissible evidence

24 within the statute of limitations.  And we're prepared

25 to do that, but we would -- we would hope that the Court

1  would not force the defendants to go further than that.

2                    THE COURT:  Thank you.

3                    MR. TUTEUR:  Thank you.

4                    MR. LEE:  Your Honor.

5                    THE COURT:  Yes.

6                    MR. LEE:  Could I clarify a point?

7                    THE COURT:  Yes.

8                    MR. LEE:  I was going -- Lance Lee on

9  behalf of the plaintiffs.

10                   I was going to deal with the e-mail issue

11 before we got it resolved, and I wanted to clarify

12 something that Mr. Tuteur just said.  We had the meet

13 and confer on the e-mail issue, their request to us,

14 sometime -- I don't know the exact date, but it was

15 sometime in December.  And at the conclusion of that

16 meet and confer, we requested that they send us narrow

17 terms.  They never did that until after they filed their

18 motion to compel.

19                   So I don't believe that he intended to

20 represent that we didn't continue anything further.  So

21 I wanted to make that clarification.  Once we got the

22 narrowed terms, we were able to take that issue off the

23 Court's plate.  And I believe that we've actually made

24 our first production from one of our plaintiffs so far.

25                   The second point I want to make is kind of

1  in response to what counsel just said about the

2  Blumenthal investigation.  Something triggered Senator

3  Blumenthal's investigation in Connecticut when he was

4  attorney general in the early 2000s.  They're not even

5  wanting to give us the information that that Senator

6  Blumenthal had that triggered his investigation.

7                  So I think that it goes to the point of a

8  reasonable period of time.  Well, it's a reasonable

9  period of time to go back to 2010 when the investigation

10  was closed, but it was not reasonable to go back to

11  2002, 2003, when the investigation was opened.  I think

12  that the information that was contained in the

13  investigation that Senator Blumenthal had, at the time

14  AG Blumenthal, is something that's clearly we should be

15  entitled to.  And so I just wanted to make that point as

16  well.

17                  THE COURT:  Thank you, Mr. Lee.

18                  MR. DUTKO:  Nothing further, Your Honor.

19                  THE COURT:  Nothing further from you?

20                  MR. DUTKO:  From the plaintiffs on that

21  issue.

22                  THE COURT:  Okay.

23                  MR. TUTEUR:  I don't mean to take issue

24  with Mr. Lee, but, in fact, we put out the search terms,

25  and then there was a meet and confer, actually back in

1  September, I think, where you rejected our search terms

2  and said come back with narrower ones.  And then we did

3  come back with narrower ones, and then you rejected

4  those.  And then we had some more discussion.  I just

5  don't want it to be left with the Court that we

6  somehow -- I mean, I made the statement, so I don't want

7  you to think I'm mis- --

8                THE COURT:  I understand.  Let me suggest

9  this.  Is it -- I know the parties had agreed that

10  dealing with the first three motions all at once made

11  the most sense in terms of efficiency.  Has everybody

12  said everything they want to say with respect to all

13  three of those motions?

14                MR. DUTKO:  Yes, Your Honor.

15                THE COURT:  Okay.

16                MR. TUTEUR:  Yes, Your Honor.  Thank you.

17                THE COURT:  All right.  Good.  Before we

18  take up the fourth motion, let's take a short recess.

19                (Recess taken, 3:23 p.m. to 3:38 p.m.)

20                THE COURT:  Okay.  I think the next motion

21  which we've touched on at various points, and may have

22  adequately covered, but if not, I'm happy to hear

23  anything the parties want to present on them, is the

24  defendants' motion to compel the deposition dates and

25  damages computations.

1          MS. DOAN:  Your Honor, before we take

2  that up, you asked me some specific questions about

3  Aetna, and I wanted to make sure we were clear on the

4  record, because Mr. Austin and I conferred during the

5  break.  We did go back in the neighborhood of about

6  20 years looking for the payments that the plaintiffs

7  were specifically looking for.  We did find one payment.

8  We did produce that payment.  It looks like that is on

9  the edge of the four years.  I just didn't want you to

10  think we had produced -- I can't remember if I said

11  searched for or produced, but we had searched back for

12  in the neighborhood of about 20 years looking for

13  documents.

14          THE COURT:  Thank you.

15          MS. DOAN:  Thank you, Your Honor.

16          MR. CHASSMAN:  Your Honor, Pete Chassman

17  speaking on behalf of all of the defendants on this

18  motion.

19          THE COURT:  Okay.

20          MR. CHASSMAN:  We have a slide deck which

21  has been handed up to you and also appears on the

22  screen.

23          THE COURT:  All right.

24          MR. CHASSAM:  All right.  And you are

25  correct that we have covered a lot of the material for

1 this motion, so I am going to streamline it.  But if

2 there's something, obviously, you'll ask me I'm sure.

3              Just to give you just a little history, we

4 asked the plaintiffs about a preliminary set of

5 plaintiffs.  There are, I think, about 25 plaintiffs in

6 this case.  And so we started by asking about

7 depositions of 11 plaintiffs.  It was -- it's true that

8 we were not certain that we had gotten the complete

9 document production from the plaintiffs at that time,

10 but we recognized that we needed to get this case going

11 because a lot of time was passing by and things were not

12 happening.

13             So we went through the plaintiffs and the

14 productions and said, okay, these are 11 who we think we

15 can take right now, give us -- please give us some dates

16 in December and January.  And that's when we were met

17 with the conditions that have already been presented to

18 you.

19             One was that we would never in any

20 circumstance seek a second deposition.  And just so it's

21 clear for the Court, we understand that if we sought a

22 deposition -- took an initial deposition and then wanted

23 another subsequent deposition of a plaintiff, that would

24 be at our peril, we would -- you know, we might have to

25 approach the Court for that.  But we were not in a

1  position to say that we never would approach the Court.

2  All right.  I just want that to be clear for the Court.

3              The second thing was that -- the second

4  condition was you won't ask any questions going back

5  more than four years, and that all really collapses down

6  to this four-year issue, which I am not going to

7  reargue.  We disagreed with that.

8              Where we are today, as it -- as it stands,

9  the issue about coming back for a second deposition, we

10  were able to agree on some language that went into the

11  joint report to the Court about seeking leave if we

12  wanted to get a subsequent deposition.  So I think that

13  issue has been resolved.

14              But there does still seem to be an issue

15  about the four-year issue and how it applies to

16  depositions.  We were told, well, if you want to take

17  the plaintiffs' depositions, you have to agree now that

18  we can take the defendants' depositions going back an

19  unlimited amount of time.  And I think that's all part

20  and parcel of the four-year issue that it seems you're

21  going to resolve on their motion to compel.

22              But what I will say here is that on these

23  depositions, first of all, I think we're going to need

24  some clear instruction from the Court on the four-year

25  issue, and specifically how it would apply to

1   depositions, because I don't think we want to find

2   ourselves back in front of the Court.  I think we need

3   to take care of that in an efficient way so we can get

4   the show on the road.

5              The other thing I want to mention is that

6   that was a preliminary set of 11 plaintiffs.  We do

7   intend to seek depositions of the remaining plaintiffs.

8   It's just that those are the ones that are right -- the

9   ones where we actually served notices and have not been

10  able to make any progress in getting deposition dates

11  without conditions that were unacceptable to the

12  defendants.

13             So that's what I have to say about the

14  depositions.

15             THE COURT:  Okay.

16             MR. CHASSAM:  All right.  So let's move

17  on to the damages computations and so forth.

18             So if we go back to November of 2017,

19  that's when the complaint was filed.  We're talking, you

20  know, almost a year and a half ago.  And in the

21  complaint there were allegations about injuries that

22  plaintiffs suffered and, you know, different types of

23  financial harms that the plaintiffs say they suffered.

24             Paragraph 133, Ms. Torrey said she was

25  force to spend hundreds of thousands of dollars for

1 treatments.  Paragraph 135, Ms. Hanneken lost her

2 career, her family, and her home to foreclosure, et

3 cetera.  So they've certainly put up the parade of

4 horribles in the complaint as to a range of harms for

5 which they may seek redress in this case.

6                So in the Court's docket control order,

7 standard language, "A complete computation of any

8 category of damages claimed by any party to the action,"

9 et cetera, "making available for inspection and copying

10 under Rule 34, the documents or other evidentiary

11 material on which such computation is based, including

12 materials bearing on the nature and extent of injuries

13 suffered."

14                So that was the Court's order.  And this

15 disclosure was due 85 days after the scheduling

16 conference, which would have made it due July 13th of

17 2018.  So we're talking, I don't know, eight or

18 nine months ago.

19                So here's what we got.  "Plaintiffs seek

20 all damages recoverable by law" -- I'm not going to read

21 the whole thing to you, but it mentions actual damages,

22 lost wages, out-of-pocket expenses for travel,

23 out-of-pocket expenses relating to medical treatment, et

24 cetera.  And it also says, well, you know, we'll

25 supplement as more medical records and bills and so

1  forth and receipts become available.  "A computation of

2  plaintiffs damages to be created by plaintiffs' economic

3  experts in compliance with the deadline to designate

4  experts."

5           Well, what I can tell you is that we -- I

6  actually had someone on our team go back and search

7  through the plaintiffs' production in this case, and I

8  can't say that our search was infallible, but I can say

9  one of my colleagues spent about two days going through

10 their production.  And, you know, here's what I can tell

11 you based on that is that as far as out-of-pocket travel

12 expenses, only three plaintiffs produced anything, as

13 best we can tell.  Mr. Jones mentioned this.

14          Out-of-pocket medical expenses, we have

15 identified ten plaintiffs for whom we have not found any

16 documents on this subject.  Out-of-pocket expenses seek

17 related to seeking medical treatment, while we're not

18 completely sure what that is, we don't think we found

19 anything on that.  And lost wages, we couldn't locate

20 any supporting documents.

21          Just taking a step back, it seems to me

22 that when you look at their disclosure back in July,

23 they didn't -- they didn't provide a computation, and it

24 seems pretty clear in the rule -- or I'm sorry -- in

25 your discovery order that a complete computation of any

1  category of damages is required.

2              Now, there's nothing that I can think of

3  from the defendants that would hold up the plaintiffs.

4  That seems to be their big response is, well, we haven't

5  given them discovery.  But these plaintiffs filed a

6  complaint, said they suffered all sorts of harms,

7  identified some categories of harms, but didn't provide

8  the computation.  And it seems to me that their dispute

9  is with the requirement, and they simply haven't

10  complied with it.

11              So in their response to our motion to

12  compel, this is now December 26th, this is plaintiffs'

13  representations to the Court.  They say, "More

14  importantly, plaintiffs' expert designations and expert

15  reports are not due until January 29th of 2019.  It is

16  in no way prejudicial for plaintiffs to supplement its

17  disclosures with a complete damages computation when

18  plaintiffs designate their experts."

19              Well, we disagree with that statement

20  because it is prejudicial.  There's a reason why that

21  disclosure is in the order, and it's so that we can get

22  an idea of what they're seeking.  A reasonable

23  computation, if they think that their expenses continue,

24  we get that.  It's not that we would try to preclude

25  them from adding another bill, you know, it's things

1  have accumulated since the time of their computation.

2  But we have nothing that would constitute a computation

3  in what they gave us.

4                And these disclosure requirements were

5  there for a reason, to provide fair notice to the other

6  side.  But even if you accept their position of

7  December 26th, we got to January 29th and that's when

8  the actual expert reports were due.  And as one of my

9  colleagues mentioned earlier, we didn't get a disclosure

10  of any damages expert on behalf of the plaintiffs.  They

11  identified, I think it was an employee of the

12  plaintiffs' law firm who would testify about I think

13  appropriateness of attorneys' fees or the amount of

14  attorneys' fees.  And that's really a completely

15  separate issue.  No damages expert and no damages expert

16  report.

17                So even if you, you know, accepted their

18  position as kind of kicking the can down the road that

19  it wouldn't have been prejudicial for us to wait until

20  late January to find out what they're really seeking,

21  well, you know, that was -- that was a month and a half

22  ago and we still didn't get anything.  And, you know,

23  it's easy to say, well, you know, it could be medical

24  expenses, it could be lost wages, but we really need to

25  have a good understanding of what it is that they're

1  seeking.

2                Standing here today, I don't have an idea

3  of the order of magnitude of what they're seeking and

4  whether all plaintiffs are seeking lost wages, certain

5  ones are.  This person who claims that she lost her

6  house to foreclosure, are they going to claim that we're

7  on the hook for that?  We just don't know.  And so it is

8  prejudicial to us, and as we see it, there is no valid

9  excuse why the plaintiffs couldn't have done it.

10               They stated to you that they were very,

11 very complete in producing all their documents, they did

12 everything they could.  They have not when it comes to

13 damages; I can tell you that.  I mean, maybe they're

14 going to rely on just what they have produced already

15 they told us, well, you know, we have to go back and

16 look for some documents and things.  They represented to

17 the Court they'd have them produced by March 29th;

18 although, you really should have your ducks in a row

19 before you file a case like this.  We're still waiting.

20               So the report that I gave you, I believe,

21 is current as of today.  And so at this point, you know,

22 we'd ask the Court to compel the plaintiffs to get us

23 the rest of those damages documents immediately and to

24 provide us a proper computation of damages, of course,

25 subject to some supplementation for the passage of time

1  and additional accumulation of expenses.  We need that

2  right away.  I mean, we'd ask to get that, you know,

3  within a couple of weeks, and we don't see any reason

4  why the plaintiffs can't -- couldn't have and can't give

5  that to us now.

6            THE COURT:  Thank you.

7            MR. CHASSMAN:  Thank you, Your Honor.

8            MR. DUTKO:  May I respond?

9            THE COURT:  Yes.

10           MR. DUTKO:  Your Honor, I believe we've

11 addressed the issue with plaintiffs' depositions.  We're

12 willing to produce plaintiffs for depositions.

13           THE COURT:  How quickly?

14           MR. DUTKO:  Within the next --

15           THE COURT:  Thirty days?

16           MR. DUTKO:  We can produce some

17 plaintiffs within the next 30 days, Your Honor.

18           THE COURT:  All right.  How about the

19 documents, when can the documents be produced?

20           MR. DUTKO:  We can produce the documents

21 within the next 30 days as well.

22           THE COURT:  Well, the documents will need

23 to be produced before the deposition, I think.

24           MR. DUTKO:  Yes, Your Honor, we can

25 produce them within the next two weeks.

1                    THE COURT:  All right.  Very well.

2                    MR. DUTKO:  So, I mean, I think that

3    addresses all the issues.

4                    THE COURT:  Yeah, what about the damages

5    calculation?

6                    MR. DUTKO:  Your Honor, the damages

7    calculation is an issue that is a little bit tricky in

8    the sense that we have fraudulent concealment pled with

9    respect to our statute of limitations for all of

10   plaintiffs.  We have asked for leave to replead that.

11   Obviously, our damages calculation is vastly different

12   if we have fraudulent concealment and we're allowed to

13   proceed with a damages model going back to the entire

14   lives as opposed to four years.  And so, Your Honor, we

15   were just waiting to seek guidance with respect to the

16   Court.

17                   THE COURT:  How long would it take you to

18   provide a damages assessment at this point in the case

19   without the other lengthy year period of time involved?

20   Could you do that within 30 days?

21                   MR. DUTKO:  Yes, Your Honor.

22                   THE COURT:  All right.  Very well.

23   Anything else?

24                   MR. DUTKO:  No, Your Honor.

25                   THE COURT:  Okay.  Next motion.

 1            MR. CHASSAM:  May I respond briefly?

 2            THE COURT:  You may.

 3            MR. CHASSAM:  I'll just add that this

 4  contingency that plaintiffs' counsel has mentioned with

 5  regard to, you know --

 6            THE COURT:  Damage.

 7            MR. CHASSMAN:  -- damages computation,

 8  first of all, it's the first we've heard of it.  And

 9  second of all, again, it really doesn't have anything to

10  do with what the defendants have produced or will

11  produce.  And, you know, my thought is if they want to

12  give it to us for both -- for both periods, they can do

13  it and should be in a position to do it now.  They're

14  the ones who are in possession of all the records.

15            Thank you, Your Honor.

16            THE COURT:  All right.  What do you say

17  to that, Mr. Dutko?

18            MR. DUTKO:  Again, Your Honor, we asked

19  for more time to replead fraudulent concealment based on

20  the fact that they haven't produced documents.  And if

21  we had the documents to properly plead fraudulent

22  concealment, then we could plead that and then get --

23  the damages computation would be vastly different.  And

24  so that was just simply the holdup, Your Honor, we were

25  seeking leave.  When we -- it got time closer to the

1 expert designation, we filed a continuance 30 days

2 before that asking for more time so that we could get

3 more time to do that, Your Honor.  We understand that we

4 need to keep the case moving, and we apologize to the

5 Court, Your Honor.

6                   THE COURT:  Well, I guess my question is,

7 Mr. Chassman suggested maybe you could produce damages

8 information for both periods of time; in other words,

9 the case as it exists today and then the longer period

10 of time.

11                   MR. DUTKO:  Yes.  And we have been

12 producing those documents as they come in.  Obviously,

13 some documents are much more difficult since they -- you

14 know, they may not exist.  You know, they weren't aware

15 at the time in the '80s if they were traveling to

16 Arizona to seek treatment that they needed to keep a

17 receipt from the Hilton.  And so those documents are

18 harder to get because the plaintiffs don't have them.

19 We have to try to seek them from outside sources.  And

20 so that's been a little bit of a holdup in seeking the

21 documents.

22                   THE COURT:  I understand.

23                   Mr. Chassman.

24                   MR. CHASSAM:  Your Honor, I think your

25 question to Mr. Dutko was about documents going back.

1  And just to be clear, you know, if they're alleging

2  damages going back, the computation going back is

3  especially what we want.  I mean, just so it's clear for

4  the Court that, you know, they're in possession of the

5  information that would underlie that, or should be.

6  That's all.

7                    THE COURT:  All right.

8                    MR. CHASSMAN:  Thank you.

9                    MR. DUTKO:  Computation within two weeks,

10  Your Honor.

11                   THE COURT:  That solves it.  Thank you.

12                   Next motion relates to the independent

13  medical examination.

14                   MS. RIDLEY:  Thank you, Your Honor.

15  Eileen Ridley with Foley & Lardner on behalf of Anthem

16  and on behalf of the defendant group.

17                   I understand, Your Honor, you've read

18  through all the papers.  I don't -- I'll be very brief

19  to highlight the issue.

20                   The plaintiffs' position appears to be an

21  argument that this is not a personal injury case.  Quite

22  frankly, we would love some clarity as to what they

23  think this case is.  It's fairly unclear.  But I would

24  note that the cases that we have cited that support IMEs

25  note that they are not all, quote/unquote, personal

1 injury cases.  We have discrimination cases.  We even

2 have an instance where somebody was making themselves --

3 or saying they were not available for deposition because

4 they were medically unable to do so.

5              In this case, they have made allegations

6 that have put the medical condition of the plaintiffs at

7 issue, i.e., whether or not they have Lyme disease.

8 It's both at issue as to whether or not they're part of

9 the claimed Lyme market.  It's also at issue on the

10 allegations of the complaint.  And we've directed the

11 Court to paragraph 147 of the complaint.

12             Notably, that paragraph specifically says

13 that plaintiffs, among other things, are looking at

14 issues regarding being forced to pay for treatments,

15 debilitating illnesses, and issues regarding claims

16 about suffering long-term complications and being forced

17 to continue to pay future medical costs for treatment.

18             In the Ellis case, those very same sort of

19 allegations, coming from this district, was the basis

20 upon which the Court granted the IME, noting that there

21 is good cause for it, that there was, in fact -- the

22 medical condition was, in fact, in controversy, and

23 noting that in the Eastern District, the standard by

24 which to determine whether or not an IME should be

25 granted is actually liberally construed.

1          We believe we hit all of those elements

2    here and ask the Court to grant our motion.

3          THE COURT:  Thank you.

4          MR. HIGGINS:  Your Honor, Ryan Higgins on

5    behalf of the plaintiffs.

6          What we're seeking here, and the Court

7    made clear in the order on the motion to dismiss, is

8    economic damages.  And that's at the order of page 18 to

9    20.  What the defendants need to do to get an IME in

10   order to establish it under Rule 35 is to show that

11   there's good cause.

12         THE COURT:  Doesn't it matter whether

13   your client, whether the plaintiff, or plaintiffs, has

14   Lyme disease?

15         MR. HIGGINS:  I'll answer that directly,

16   I don't think it does, Your Honor, because here's why.

17   We've alleged that these plaintiffs, after they were

18   diagnosed with Lyme disease, then go out into the market

19   to get treatment for Lyme disease.  And our -- and our

20   market that we have alleged is the treatment of Lyme

21   disease.  They go out, they pay their own money after

22   the diagnosis.  At the time, none of the defendants

23   challenged that diagnosis.  So our individual plaintiffs

24   go out, obtain care, pay for that themselves, and but

25   for the conspiracy, they would have been reimbursed for

1  those expenses.  So to answer it directly, no, I don't

2  think that that matters in this instance.

3              But to get to -- to even get to that

4  point, what the defendants would need to show under

5  Rule 35 is specific instances in which they have good

6  cause for each individual, each one of these 28

7  plaintiffs to have an IME.  Instead, they asked for a

8  blanket IME without establishing anything, even simple

9  stuff -- it wouldn't get them there, but even simple

10 stuff, for example, were these tests -- was this

11 two-tiered test already done for these 28 plaintiffs

12 already?  They don't address that at all.  And they have

13 all the medical information.  They don't address --

14             THE COURT:  When you say they have all

15 the medical information, what do you mean?

16             MR. HIGGINS:  At the very beginning of

17 this case, we had our plaintiffs sign consent forms that

18 they can go out and get whatever they want.

19             THE COURT:  Of their -- of their own

20 personal records?

21             MR. HIGGINS:  Exactly.  And they have

22 done that.  Just shortly before this motion was filed,

23 there was a flurry of subpoenas to medical providers and

24 to doctors themselves asking, actually, for a lot more

25 than just our plaintiffs' medical records.  If you look

1  at the subpoenas, they're asking the doctors themselves

2  who they've treated, what sort of treatments they've

3  provided.  That's not the issue that we're here for

4  today, but just to put some color on what these

5  subpoenas look like.

6                     But with respect to all of these

7  plaintiffs, they have not done anything to establish

8  good cause.  They have not established were the results

9  that they're looking at, were they inaccurate?  They

10  have not put forth any evidence in front of the Court to

11  establish that type of thing.  Were the clinical

12  evaluations that were done incorrect?

13                     So all that we have is we know that all 28

14  of these plaintiffs were diagnosed with Lyme disease.

15  They then go out, they obtain treatment, they pay for it

16  themselves.  At the time, paying it for themselves.  And

17  but for the conspiracy, they would have been reimbursed

18  for those payments.

19                     So that's just dealing with good cause,

20  which I don't think that they've established under

21  Rule 35.  And then if you look at the time, the place,

22  and the manner under Rule 35 that needs to be

23  established by the defendants, they failed to establish

24  this, too, because to begin with, the two-tiered test --

25  and I'll repeat this, the only time I'm doing this

1  hopefully -- they haven't established who has or has not

2  received the same tests that they want to give now in

3  2019 that these plaintiffs have been living with for

4  their entire lives, this particular disease.  So they

5  need to establish that just to get past that issue.

6              The other thing with respect to this

7  two-tiered test, we point the Court to various studies

8  which show that it's about as accurate as a coin -- a

9  coin flip.  Now, there is some discrepancy as to whether

10 that is at the beginning of the disease, whether it's

11 about 50 percent accurate, or whether as the disease

12 progresses.

13             But the four medical records that they put

14 before the Court, the only argument that they have with

15 respect to those is these plaintiffs at first did not

16 show that they had Lyme disease and now they're claiming

17 that they do, or that their doctor is claiming that they

18 do.

19             Well, that is completely consistent not

20 only with the studies that we have establi -- that we

21 have put in front of the Court, but also in front of --

22 but also the studies that the defendants put in front of

23 the Court, which is oftentimes a patient comes in, if

24 it's early in the disease and they get tested, they will

25 show negative for Lyme disease, and then later on, they

1 can in certain instances test positive for that disease.

2              But an important point with -- that these

3 studies made clear is if a patient receives antibiotics

4 in that early phase, sometimes even in later stages of

5 the disease, it will never show up under this two-tiered

6 test because the antibodies will not show up because

7 they received early antibiotic treatment.  And that's

8 Footnote 5, Your Honor, to -- to our response, that

9 study that I'm referring to.

10              And then the CDC, which the defendants

11 referenced, and which has a quote that I would -- I

12 would like to let Your Honor know about, it says, "It's

13 possible for someone who is infected with Lyme to test

14 negative because some people who receive antibiotics may

15 not develop antibodies or may only develop them at

16 levels too low to detect."

17              The other thing, moving to a -- to a

18 different part of this, so I don't think they've

19 established good cause.  I don't think the time manner

20 is correct.  They also asked for their -- their medical

21 provider to be able to provide multiple tests.  And in

22 that instance, basically, they're asking for carte

23 blanche from Your Honor to say that they can go and do

24 multiple IMEs, which just isn't appropriate in any

25 instance.

1          They also asked for a "full systems check"

2 on behalf of their doctor of all these plaintiffs.  I

3 personally don't know what that is.  I raised it in the

4 opposition brief, and it wasn't dealt with on reply as

5 far as I can see.

6          So with that said, Your Honor, under

7 Rule 35, I don't think they get there with respect to

8 what they have put into evidence and what they have

9 alleged.  If you have any questions on any of that, I

10 would like to address those now if possible.

11          THE COURT:  I don't.

12          MR. HIGGINS:  Thank you, Your Honor.

13          THE COURT:  Ms. Ridley.

14          MS. RIDLEY:  Thank you, Your Honor.

15          The plaintiffs argue that they're just

16 seeking economic damages but economic damages related to

17 Lyme treatment.  And if you look at the Ellis case,

18 again, from this district, the Court notes in that

19 instance that the defendant -- that plaintiff was

20 seeking examinations -- or excuse me -- defendants were

21 seeking the examinations because plaintiffs had been

22 seen by treating physicians and several of the treating

23 physicians had recommended future treatment.

24          That's exactly what we have here.  We have

25 allegations seeking economic damages related to future

1    treatment.  In that case, the Court recognized that it

2    was appropriate to do an IME.  Noting, by the way, that

3    good cause is met when, in fact, the plaintiff's medical

4    condition is put in controversy.  That is what we have

5    here.

6              THE COURT:  Have you reviewed these

7    tests, the two-tiered tests that have been produced in

8    the -- presumably produced in the plaintiffs' medical

9    records up to this point?

10             MS. RIDLEY:  Well, in the medical

11   records, as you can imagine, there are some -- a variety

12   of what's in the medical records.  But as we have shown

13   the Court, there are instances, quite frankly, where the

14   medical records indicate that the plaintiff in question

15   had been tested and, in fact, found to have a negative

16   result.  And yet they go to a different doctor -- they

17   could have several doctors saying you don't have Lyme,

18   and they suddenly go to a different doctor and suddenly

19   they say they have Lyme.  There is, in fact, a

20   controversy of whether or not they have Lyme.  It is at

21   issue.

22             Well, what's also interesting is --

23             THE COURT:  So the answer to my question

24   is, yes, you have reviewed that for each of the persons

25   for whom you are requesting an IME?

1                MS. RIDLEY:  Yes.  And I will also note

2  there are still some documents coming, so I cannot tell

3  you that it's been an exhaustive look.  I will note that

4  the tests recommended by our physician who's doing the

5  IME are recognized by both the NIH and the CDC.  They're

6  within the medical community's recognition.

7                The Court's question about doesn't it

8  matter whether plaintiff has Lyme disease, in our -- in

9  our position, the defendants' position, of course it

10  matters.  It matters because that's a central issue of

11  this case.  If they don't have Lyme disease, they can't

12  be in the alleged Lyme market, and they certainly

13  wouldn't be able to seek claims for treatment for Lyme

14  if they don't have Lyme disease.

15                Counsel also argues, well, you can get

16  this from the medical records.  I would note that under

17  the Ornelis case, the fact that some information might

18  be from other sources is not sufficient to avoid an IME.

19  An IME is different than medical records.

20                And importantly, the one last thing I

21  would note, the argument that these tests, according to

22  counsel, can't predict Lyme in early instances, none of

23  these plaintiffs are early instances.  We're at the late

24  stage here.  And so the tests that we're talking about

25  have notedly very accurate relevancy.

1                I would finally argue that the strictures

2  regarding the IME, we've not asked for multiple IMEs.

3  We've asked for one IME with regard to each plaintiff.

4  We have explained when and where.  We have given

5  available dates.  We have even said we would be

6  accommodating to the plaintiffs who wished to be

7  elsewhere.  It is -- we are not asking for anything

8  beyond what Rule 35 permits, and we believe we've met

9  each of the requirements.

10                THE COURT:  Thank you.

11                Ms. Ridley, I am going to grant your

12  motion, in part.  But here's what I'm going to ask you

13  to do.  I need you to submit with particularity the

14  reason you believe with respect to each person you are

15  requesting an IME on, what the basis for the request is.

16  And, for example, I want specific information filed

17  under seal that demonstrates why you believe an IME --

18  IME is necessary with respect to that particular

19  plaintiff.  Obviously, you'll file that under seal.  And

20  I would like that done within seven days.

21                So for each of the persons for whom you

22  seek an IME, I want a short narrative of why good cause

23  has been demonstrated.  If you get back and you don't

24  think you've got good cause for every one of them, let

25  me know that.  And if you don't have a complete set of

1  the medical records yet in order to demonstrate that

2  good cause, let me know that, too, and we will deal with

3  that.

4              Now, on the assumption that the Court is

5  going to order IMEs with respect to at least some of

6  those plaintiffs, I am going to also ask the parties to

7  meet and confer on a person who can serve as a

8  court-appointed independent medical examiner.  And the

9  way I propose to do that is the physician who is

10  assisting your side of the case, Ms. Ridley, is

11  Dr. Torten?

12              MS. RIDLEY:  Yes, Your Honor.

13              THE COURT:  Let's have Dr. Torten have a

14  conversation with whoever is providing medical advice to

15  the plaintiffs, and let's see whether Dr. Torten and

16  whoever that person is can agree on an independent

17  medical examiner to conduct these -- these IMEs.  I

18  would like all of that to occur, if possible, within the

19  next two weeks.

20              Any concern about the timing on that from

21  the plaintiffs' perspective?

22              MR. HIGGINS:  No, Your Honor.

23              THE COURT:  All right.  Obviously, it's

24  going to depend in some degree on where that person is

25  located.  I would prefer that person be in the Eastern

1  District, and if not in the Eastern District, in the

2  state of Texas, and if not in the state of Texas,

3  centrally located within the United States.  The degree

4  to which it will be difficult to get an agreement

5  between these two physicians I think may lead somewhat

6  to where that person might be located, but my preference

7  would be centrally located.  And let's see if we can

8  have that done, as I said, within a couple of weeks.

9              And then you get, if you would,

10  Ms. Ridley, your specific detailed information to me

11  within seven days, and I'll take a look at that.

12             The defendants shall be responsible for

13  the cost of the IME.  And travel expenses, lodging,

14  things of that nature of the plaintiffs will be shared

15  equally between the sides.

16             Any questions about that, Ms. Ridley?

17             MS. RIDLEY:  No, Your Honor.  Thank you.

18             THE COURT:  Mr. Higgins, any questions?

19             MR. HIGGINS:  Yes, Your Honor.  When you

20  say shared --

21             THE COURT:  Go to the podium.

22             MR. HIGGINS:  Pardon me.

23             Just a real quick point.  Where you say

24  shared equally between the sides, is that with respect

25  to the medical examiner or the plaintiff --

 1                    THE COURT:  No, no, with respect to the

 2  plaintiffs.

 3                    MR. HIGGINS:  Thank you, Your Honor.

 4                    THE COURT:  Okay.  Anything further we

 5  need to address in terms of argument?  I'm going to have

 6  some --

 7                    MR. DUNN:  The doctors' renewed motion.

 8                    THE COURT:  Oh, yes.  Sorry, yes.

 9                    MR. DUNN:  And, Your Honor, we have a

10  short deck.  Your Honor, Alvin Dunn, representing IDSA

11  and the doctor defendants, but this motion is brought

12  only by the doctor defendants.  Your Honor, we do have a

13  short deck.

14                    Your Honor, in your order you gave the --

15  you dismissed the RICO claims, you dismissed the

16  fraudulent inducement claims, but you have the

17  plaintiffs to allege additional facts establishing

18  specific personal jurisdiction of the doctors and you

19  gave plaintiffs personal jurisdiction discovery.  But

20  the doctors have fully participated in that discovery,

21  but there have been no additional facts establishing

22  specific personal jurisdiction.

23                    Your Honor, in your order you recognized

24  that there's a different standard under the Sherman Act.

25  The Sherman Act does not provide for a nationwide

1   service of process over individual antitrust defendants.

2   It does over corporations.  But unlike RICO, it does not

3   over individuals, and you recognized that.  And you

4   recognized in your order that the plaintiffs need to

5   show specific personal jurisdiction, but they haven't

6   done that.

7              Your Honor, the standard in the Fifth

8   Circuit, it really -- it requires a nexus between the

9   contacts that the plaintiffs and the defendant

10  individuals have had with each other that give rise to

11  the cause of action.  Sufficient nexus, it's been

12  defined here, but the Fifth Circuit -- and I'm assuming

13  you're familiar with the cases.

14             Your Honor, no facts showing nexus between

15  any doctors' Texas contacts and any plaintiffs' claims.

16  No plaintiff alleges any contact with any doctor in

17  Texas.  Nowhere.  No plaintiff alleges hearing or

18  reading any communication from any doctor in Texas.  No

19  plaintiff alleges any injuries caused by anything that

20  any doctor did that had any connection to Texas.

21  There's been no facts shown with respect to drawing a

22  connection between any doctors' contacts and the state

23  of Texas.

24             So, Your Honor, here's the evidence.

25  Dr. Halperin, yes, he's visited Texas, but his

1  professional visits, he swore in sworn interrogatory

2  responses, he swore that neither professional visit

3  concerned Lyme disease.  He also said he visits for

4  personal reasons.

5               But here's what the plaintiffs say.  "It's

6  clear the only reason Halperin visits Texas is to spread

7  the false claim that chronic Lyme disease does not exist

8  and all Lyme disease can be cured with short-term

9  antibiotics."  That's just their words, Your Honor, in

10  their pleading.  There's no document.  There's no

11  affidavit.  And they haven't even pled it in a complaint

12  or an amended complaint.

13               And, Your Honor, it's the same for

14  Dr. Wormser, he has no contacts with Texas that have

15  anything to do with Lyme disease.  The plaintiffs turn

16  it around and they say because he is a Lyme expert,

17  anytime he says anything anywhere, it must be because

18  he's trying to spread false information about Lyme

19  disease in Texas.  No facts support that, none at all,

20  Your Honor.

21               The same thing with Dr. Dattwyler.  He

22  swears he has no connections with Texas that have

23  anything to do with Lyme disease.

24               And, Your Honor, even the doctors that

25  have some connections with Texas where they might have

1  spoken about Lyme disease, like Dr. Sigal, he came more

2  than 14 years ago to speak to a group of

3  rheumatologists, and he said:  Yes, I believe I remember

4  speaking with them about Lyme disease 14 years ago.

5              Your Honor, that's not a nexus between

6  that contact and any plaintiffs' claim.  Nobody has come

7  to the Court and presented evidence on the plaintiffs'

8  side that says:  I heard Dr. Sigal say things that were

9  false about Lyme disease that caused my injury, that

10 caused me to be denied treatment, whatever their claims

11 are.  They have no evidence that any doctor has any

12 connection with them in Texas regarding their claims.

13             Your Honor, they're going to get up here

14 and say this motion is premature, but, Your Honor, it's

15 not.  First of all, you haven't ruled on whether they're

16 allowed to replead the RICO claims.  If you don't allow

17 them to replead their RICO claims, this motion is very

18 timely.  And only antitrust claims are in the case, and

19 they need to --

20             THE COURT:  It's not really timely,

21 though, until the Court rules on the RICO motions,

22 correct?

23             MR. DUNN:  Well, but, Your Honor, you --

24 you dismissed the RICO claims.  They've been gone for --

25             THE COURT:  On the -- on the amended

1  complaint.

2            MR. DUNN:  Right.  But, Your Honor, if

3  you -- if you do -- even if you give them leave to

4  replead, they've already told you they don't have the

5  facts.  They have to go find the facts to replead.  So,

6  Your Honor, since late September there have been no RICO

7  claims with a live pleading in the case.  They've told

8  you that they need more facts.  You're going to either

9  say you don't get the chance to do that and you can't

10 replead, or you may give them the chance to do that.

11            Pending that time while they're looking

12 for facts, there's still no pled RICO claims, and the

13 doctors should not be in the case because there's no

14 jurisdiction over them on the antitrust claims.  The

15 only claims still in the case, until they get the facts,

16 which they haven't gotten and they've told you they

17 don't have, and everybody on this side of the room has

18 also told you they've looked for them and haven't found

19 them, they have no facts.

20            So they've said that the burden is on them

21 to find these facts and properly replead facts.  Under

22 those circumstances, Your Honor, I think it would be

23 quite just not to keep the doctors in the case pending

24 their effort to find the facts and their promise that

25 they're going to replead.  It would really be just to

1  dismiss the doctors at this point.  If they find the

2  facts and replead, then if that survives another motion

3  to dismiss, look at that under the RICO jurisdictional

4  standards and see if they can come back in.  But pending

5  that, the doctors should be out, Your Honor.

6                    THE COURT:  Thank you.

7                    MR. LEE:  As you so often do, you hit the

8  nail on the head with the question about whether this is

9  premature or not.  We believe that it is in the first

10  instance.  The scenario, as Mr. Dunn would have it play

11  out, is problematic, Your Honor, because let's say that

12  you do allow us an opportunity to replead based on

13  whatever you determine on the four-year discovery issue,

14  in his world he would have you go ahead and dismiss them

15  now because technically there is not a RICO claim.  If

16  we're able to sufficiently plead RICO at some later time

17  that you provide us with, then we would have to

18  potentially come back, add them in, reserve them, get

19  them on track with discovery, and it would further delay

20  the conclusion of this litigation, that I think we all

21  agree has gotten into the ditch and needs to be moved

22  along  further.

23                    So I think that a short period of time in

24  which the Court is going to decide the issue of RICO and

25  if we're going to be able to amend, then we provide that

1  amendment, and then I'm sure that we're going to have

2  briefing on whether that pleading is sufficient for

3  purposes of Rule 9, then I don't see any prejudice to

4  these individual doctor defendants in letting that take

5  place.

6                    So I think that the better course would be

7  to either deny this motion without prejudice to refiling

8  or forgo resolution until such time as the Court finally

9  resolves the issue of RICO.

10                   THE COURT:  Thank you, Mr. Lee.

11                   MR. LEE:  If I could make one other

12  comment, Your Honor.  Mr. Dunn said that on the

13  four-year issue -- and these -- all these motions

14  overlap in some way except for the IME motion.  He said

15  that the defendants have looked for these documents, but

16  they've all said unequivocally that they don't exist.  I

17  think it's very important to point out they don't exist

18  for the four years that they have presently looked for

19  them.  That's not to say that they don't exist for the

20  longer period of time.

21                   Thank you, Your Honor.

22                   THE COURT:  Thank you.

23                   MR. DUNN:  Your Honor, one thing real

24  quick.

25                   THE COURT:  Yes.

1              MR. DUNN:  Your Honor, plaintiffs have

2   just admitted that if there's no RICO claims, there's no

3   jurisdiction over the doctors.  I think they have not

4   even raised one bit of argument that you have personal

5   specific jurisdiction over the doctors under the

6   antitrust claims.

7              And, Your Honor, with respect to

8   prejudice, I would argue that the right thing to do is

9   let the doctors out, create a very short time frame if

10  you're going to give the plaintiffs the chance to

11  replead RICO to do that, and then that will be decided

12  very quickly.  If they can do it and they can meet the

13  jurisdictional standards there, then it will be very

14  quick; they would not be prejudiced if they can bring

15  the doctors in.  But in the interim, the doctors should

16  be dismissed, Your Honor.

17             THE COURT:  Thank you, Mr. Dunn.

18             Anything else that anybody wants to say on

19  the defense side of the case?

20             Anything else the plaintiffs want to say?

21             MR. EGDORF:  No, Your Honor.

22             THE COURT:  All right.  Mr. Dunn, I am

23  going to hold your motion in abeyance.  I am going to

24  give the plaintiffs 14 days to file an amended

25  complaint.

1                    In the meantime, I want the parties to

2    meet and confer beginning as soon as we recess regarding

3    a reasonable amount of time back to which documents

4    should be searched for.  I've heard the arguments, you

5    know, I know what four years is.  I know what

6    20 years -- I'm not sure 2010 is an argument that was

7    well presented this afternoon.  I'm not sure what's

8    right.

9                    I can choose a number, certainly, but

10    you-all know much more about your clients and much more

11    on the defense side and much more about your case on the

12    plaintiffs side.  If you-all can try to negotiate with

13    each other in good faith and resolve this, it is going

14    to require some movement on both sides.  If anything has

15    been demonstrated today, you-all are going to have to

16    work together to get this case ready for trial, assuming

17    we get that far.

18                    But the type of motions and the argument

19    and the inability to work together and resolve disputes

20    really does rival anything I've seen in four years in

21    this case.  And I'm embarrassed and somewhat ashamed to

22    have to tell you-all that.  You-all have got to work

23    together.

24                    When the depositions are taken, I want the

25    parties to be very mindful of CV 30, local Rule CV 30.

1  There are very few permitted objections that may be

2  appropriately lodged.  If either party, either side

3  going forward in the next 30 days, 60 days, 90 days,

4  120 days feels the need for a status conference, all you

5  have to do is file a notice on the docket, and we'll set

6  it.  So if there is difficulty getting along with the

7  other side and someone is taking the position that you

8  think violates an order the Court has previously issued,

9  file a notice, and we'll set a hearing.

10            Now, you-all should try to resolve what a

11  reasonable amount of time should be that the defendant

12  should have to search for documents.  With respect to

13  the plaintiffs, I think whatever the -- if the

14  plaintiffs have not produced all of their documents,

15  they need to, going back to the beginning of time.

16  That's quite clear to me.

17            On the defense side, you-all -- as I've

18  said, when we recess I want you-all to begin the process

19  of meeting and conferring and coming up with a period of

20  time back to which the defendant should be required to

21  look for records and produce them that is reasonable.

22  Within seven days you should notify me whether you have

23  been able to reach agreement.  I want the discussion to

24  begin today.

25            I recognize on the defense side you-all

1  will have to visit with your clients and understand what

2  particular concerns they may have.  You-all won't be

3  able to reach agreement.  Otherwise, I would keep you

4  here until midnight.  But I know that's not going to be

5  productive, and I know you have to consult with your

6  clients.  So within seven days let me know if you can

7  agree.  If you cannot, let me know what your competing

8  proposals are, and I will decide.

9              Any questions about any of that?

10             MR. LEE:  Your Honor, I have a question,

11  if I may.

12             THE COURT:  Yes.

13             MR. LEE:  So that we don't have to bother

14  the Court again once this issue about the time period is

15  dealt with or resolved, you mentioned Rule 18 -- or

16  local Rule 30 on the depositions.

17             THE COURT:  Correct.

18             MR. LEE:  I guess I am asking for

19  guidance from you.  Does that rule still apply in full

20  force, or does it -- is it potentially limited by the

21  agreement that we either reach or that the Court

22  imposes?

23             THE COURT:  Yes, potentially.  But what

24  my particular concern was the refusal to make the

25  plaintiffs available for deposition and limiting any

1    questions to only what's occurred in the last four

2    years.  It's not a proper objection.

3                    MR. LEE:  I understand, Your Honor.  But

4    so when depositions do take place, they will be limited

5    by whatever time limitation you put forth?

6                    THE COURT:  When the depositions of

7    defendants' representatives take place, yes, they will

8    be limited by whatever you-all can agree to, which I

9    encourage you to work together to, you know, control

10   your destiny, or what I decide.

11                   MR. LEE:  Okay.  That's what I wanted to

12   hear.  Thank you.

13                   MR. TUTEUR:  I just want to make clear so

14   we don't -- with respect to the plaintiffs?

15                   THE COURT:  The plaintiffs' depositions

16   shall be unlimited in time.

17                   MR. TUTEUR:  Thank you, Your Honor.

18                   THE COURT:  The only objection that may

19   be lodged in the depositions of the plaintiffs is

20   "objection to form" or "objection to leading."

21                   MR. TUTEUR:  Understood.

22                   THE COURT:  Or an instruction to the

23   witness not to answer because the question potentially

24   violates the privilege.

25                   MR. TUTEUR:  But just to be -- the

 1    goose/gander issue is you have not accepted that.  The

 2    defendants are limited in time to whatever we agree on

 3    or whether -- if the Court has to impose it.

 4              THE COURT:  Correct.

 5              MR. TUTEUR:  The plaintiffs, we can go

 6    back as far as needed?

 7              THE COURT:  That's absolutely right.

 8              MR. TUTEUR:  Thank you, Your Honor.

 9              THE COURT:  And whatever -- I mean, when

10    we get to the point when the depositions are going to be

11    taken, you know, to the extent that's a recurring

12    problem, we can get that teed up a time or two and get

13    it resolved and we'll have a practice for the rest of

14    the case.

15              So I do think it's part of this discussion

16    about what a reasonable amount of time the defendants

17    should be required to -- what is a reasonable amount of

18    time the defendants should be required to search for and

19    produce documents is a question about timing and how

20    quickly those can get produced, because I'd like to see

21    this case get back on track.

22              We're going to leave it -- I mean,

23    obviously, I think it goes without saying the case won't

24    be tried in June, but I think in the meantime, what I

25    would prefer you-all to do is to work together to get

1   some of this discovery taken care of, and then we'll get

2   it back on track with the schedule.  And at that point,

3   I'll order you-all to meet and confer again on the

4   remaining deadlines that need to be resolved.

5              What other questions?  Anybody on the

6   defense side?  The plaintiffs' side?

7              Thank you-all for being here.

8              (Hearing adjourned at 4:29 p.m.)

9

10

11                    CERTIFICATION

12              I HEREBY CERTIFY that the foregoing is a

13  true and correct transcript from the stenographic notes

14  of the proceedings in the above-entitled matter to the

15  best of my ability.

16

17

18  /s/ Christy Sievert              March 18, 2019

19  CHRISTY R. SIEVERT, CSR, RPR

20  Deputy Official Court Reporter

21  State of Texas No.: 8172

22  Expiration Date: 4/30/21

23

24

25