**IN THE UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF TEXAS**

**TEXARKANA DIVISION**

---

| | |
|---|---|
| LISA TORREY, ET AL | CASE NO. 5:17-CV-00190 |
| PLAINTIFFS | JULY 17, 2019 |
| VS. | 2:10 P.M. |
| INFECTIOUS DISEASES SOCIETY OF AMERICA, ET AL | |
| DEFENDANTS | |

---

# MOTION HEARING

## BEFORE THE HONORABLE ROBERT W. SCHROEDER, III
## U.S. DISTRICT COURT JUDGE
## TEXARKANA, TEXAS

---

*Prepared by:*

**THERESA SAWYER, CCR**

6201 South 43rd Street

Rogers, AR  72758

479-866-0140

*(tjsawyer2000@yahoo.com)*

**APPEARANCES**

| | |
|---|---|
| MR. DANIEL DUTKO<br>MR. RYAN HIGGINS<br>Rusty, Hardin & Associates, LLP<br>5 Houston Center<br>1401 McKinney St., Suite 2250<br>Houston, TX  77010 | FOR THE PLAINTIFFS |
| MR. EUGENE EGDORF<br>MR. JAMES HARTLE<br>Shrader & Associates, LLP<br>3900 Essex Lane, Suite 390<br>Houston, TX  77027 | FOR THE PLAINTIFFS |
| MR. LANCE LEE<br>Attorney at Law<br>5511 Plaza Drive<br>Texarkana, TX  75503 | FOR THE PLAINTIFFS |
| MR. MICHAEL TUTEUR<br>Foley & Lardner, LLP<br>111 Huntington Avenue, Suite 2600<br>Boston, MA  02199 | FOR ANTHEM, INC. |
| MR. ALVIN DUNN<br>Pillsbury, Winthrop, Shaw & Pittman, LLP<br>1200 17th St., NW<br>Washington, DC  20036 | FOR IDSA AND DOCTORS |
| MR. BRENDAN FEE<br>Morgan, Lewis & Bockius<br>1701 Market Street<br>Philadelphia, PA  19103 | FOR CIGNA CORP. |
| MS. JENNIFER DOAN<br>MR. JEFFREY RANDALL ROESER<br>Haltom & Doan<br>P.O. Box 6227<br>Texarkana, TX  75505 | FOR AETNA, INC. |
| MR. MATTHEW SHERIDAN<br>Baker Botts, LLP<br>One Shell Plaza<br>910 Louisiana Street<br>Houston, TX  77002 | FOR AETNA, INC. |
| MR. PATRICK CLUTTER<br>Potter Minton<br>110 North College Avenue, Suite 500<br>Tyler, TX  75702 | FOR UNITED<br>HEALTHCARE GROUP |
| MR. BENJAMIN F. HOLT<br>Hogan Lovells, Columbia Square<br>555 Thirteenth Street, NW<br>Washington, DC  20004 | FOR UNITED<br>HEALTHCARE GROUP |
| MS. SARAH J. DONNELL<br>MR. MICHAEL FORBES<br>Kirkland & Ellis, LLP<br>300 North LaSalle Street, Suite 2400<br>Chicago, IL  60654 | FOR BLUE CROSS AND<br>BLUE SHIELD ASSN. |
| MR. DEREK DAVIS<br>Cooper & Scully, PC<br>900 Jackson Street, Suite 100<br>Dallas, TX  75202 | FOR KAISER<br>PERMANENTE, INC. |

 1                    PROCEEDINGS HELD JULY 17, 2019

 2

 3              THE COURT:  Ms. Combs, if you would, call the case for

 4    us.

 5              MS. COMBS:  Cause Number 5:17-CV-190, Lisa Torrey, et

 6    al vs. Infectious Diseases Society of America, et al.

 7              THE COURT:  Counsel, if you would, please make your

 8    announcements for the record.

 9              MR. EGDORF:  Good afternoon, Judge.  Thank you for

10    allowing us to postpone the hearing so I could be here today.

11    Gene Egdorf on behalf of the plaintiffs.  I have my co-counsel,

12    Lance Lee, Daniel Dutko, Ryan Higgins, and Jim Hartle.

13              THE COURT:  Good afternoon and welcome to you all.

14              MR. TUTEUR:  Good afternoon, Your Honor.  Michael

15    Tuteur from Foley & Lardner representing Anthem.

16              MR. FEE:  Good afternoon, Your Honor.  Brendan Fee

17    from Morgan, Lewis & Bockius on behalf of Cigna.

18              MR. DUNN:  Good afternoon, Your Honor.  Alvin Dunn

19    from Pillsbury, Winthrop, Shaw, Pittman representing IDSA and

20    the doctor defendants.

21              MS. DOAN:  Good afternoon, Your Honor.  Jennifer Doan.

22    Also Matt Sheridan representing Aetna.  Also with us here today

23    is Mr. Randy Roeser and Michael Gray.

24              THE COURT:  Thank you.

25              MR. DAVIS:  Derek Davis, Cooper & Skully, for Kaiser

1 | Permanente.

2 | THE COURT:  Good afternoon.

3 | MR. HOLT:  Good afternoon, Your Honor.  Benjamin Holt

4 | from Hogan Lovells on behalf of the United defense.

5 | THE COURT:  Good afternoon.

6 | MS. DONNELL:  Sarah Donnell, Kirkland and Ellis, for

7 | BCBSA.

8 | MR. CLUTTER:  Patrick Clutter, Potter Minton, on

9 | behalf of the United defense.

10 | MR. FORBES:  Michael Forbes and Reed Smith on behalf

11 | of Blue Cross Blue Shield of Texas.

12 | THE COURT:  Okay.  Good.  Anyone else?

13 | (NO RESPONSE.)

14 | All right.  Welcome to all of you.  Thank you for

15 | being here.  We have set for hearing this afternoon two motions,

16 | I think primarily the defendant's Motion to Dismiss the

17 | Plaintiff's First Amended Complaint, and then there is the

18 | doctors' Motion to Dismiss, which has actually been pending for

19 | some time.  My recollection from the last hearing is that we

20 | held that over to this hearing.

21 | So I don't know whether the parties have discussed an

22 | order for proceeding this afternoon, but it seems to me we can

23 | probably start with the Motion to Dismiss the Plaintiff's First

24 | Amended Complaint unless anyone thinks otherwise.

25 | MR. EGDORF:  Fine with us, Your Honor.

1          THE COURT:  All right.

2          MR. TUTEUR:  Thank you, Your Honor.  Michael Tuteur

3  again from Foley and Lardner representing all of the defendants

4  here.  Usually I always come with visual aids, so let me hand

5  them out if I may, and also put it up on the screen.  I know the

6  court no doubt has them, but here is a copy of the First Amended

7  Complaint.

8          THE COURT:  I have a copy of it.

9          MR. TUTEUR:  You've got that?  Okay.  And the original

10 Complaint as well, Your Honor, just to --

11          THE COURT:  I do have the original Complaint.

12          MR. TUTEUR:  You have that as well.

13          THE COURT:  Mr. Tuteur, let me suggest that we argue

14 these, I guess, seriatum.  So if you'll proceed under your

15 groupings, like with your first category, and then let me hear

16 from the plaintiffs on that, I think that'll be helpful to me.

17          MR. TUTEUR:  Very happy to do that.  And just so it's

18 clear, I'll be talking about the RICO and the fraudulent

19 concealment.  So, in other words, the 9(b) issues.  My

20 colleague, Mr. Fee, will be talking about the antitrust issues,

21 and then, of course, Mr. Dunn separately has the -- so if you'd

22 prefer that we do even -- to cut the Brief in half, essentially.

23 Is that helpful?

24          THE COURT:  I do, yes.  That's what I mean.

25          MR. TUTEUR:  Okay.  Terrific.

1        So, Your Honor, putting up on the screen, we're here
2  to -- on a renewed Motion to Dismiss the RICO counts, as well as
3  the allegation that the plaintiffs made that there should be
4  tolling for fraudulent concealment.

5        There's a fundamental question in this case which goes
6  back to the very beginning, and I think it's important to kind
7  of put it out there because it's critical to today's discussion.

8        The plaintiffs have alleged that six of the most
9  respected Lyme disease research scientists in the world,
10 including the person who discovered Lyme disease, Dr. Allen
11 Steere, that they have entered into a 25-year corrupt
12 racketeering conspiracy with the defendant insurance companies
13 to deny lifesaving treatment to Lyme disease sufferers.

14        And the fundamental question is, why would they do
15 that?  Why would they publish false papers?  Why would they harm
16 their own patients?   Why would they push out this fakery,
17 alleged fakery, to the CDC, to the NIH such that they accepted
18 the same theory, that this supposed lifesaving treatment, long-
19 term antibiotic therapy, is not efficacious.  Why would they do
20 that?

21        And the answer from the original Complaint was a
22 straightforward one.  It's about money.  It's about large sums
23 of money that the doctors purportedly received from the
24 insurers, and that in return, they did these things.  That is
25 the corruption that they say is at the core, cause otherwise

1  there's no explanation for why six highly respected research
2  scientists would do this.

3         The only other reason would be because they actually
4  don't believe it works.  So why would they do this?  There has
5  to be some quid pro quo, some something.  And the answer that
6  they gave was that there were large sums of money paid by the
7  insurance defendants to the doctors.

8         Now, as Your Honor will recall from the original
9  Complaint, this court found that the allegations that were in
10 the original Complaint were insufficient under Rule 9(b).  They
11 had not answered the newspaper questions.  They couldn't explain
12 who had paid what to whom.  And we'll look at that in a minute,
13 but what I want you to focus on, if I may, Your Honor, is the
14 answer that is now in the Amended Complaint, because in the
15 Amended Complaint the allegations of large sums of money, the
16 only real reason why the doctors would do this, has been scaled
17 back or eliminated.

18         There are no more allegations of large sums of money.
19 Rather, there are some vague references to consulting fees and
20 some payments here and payments there, but this core argument
21 that there are large sums of money being paid is gone.  And so
22 if this court concluded back in October that there were
23 insufficient allegations, insufficiently particularized
24 allegations under 9(b) that make out a RICO claim, well then, a
25 fortiori, they have failed to do it here.  And that's after this

1    court, of course, gave them another opportunity to do so.

2          Without the alleged payment of large sums of money,
3    there is, frankly, no plausible basis, either under 9(b) or even
4    12(B)(6), for these doctors to have denied this putative
5    lifesaving therapy, this antibiotic therapy, to the nation's
6    Lyme disease sufferers and caused all this harm.  Why would they
7    do it if there isn't money involved?  The plaintiffs give no
8    reason.

9          So let's take for a minute -- I've put it up on the
10   screen -- your order of 9/27/18, and you stated that the
11   plaintiff's allegations fall short of providing the newspaper
12   details regarding the communications and payments between the
13   defendants.   They do not allege facts specifying each
14   defendant's contributions to the fraud.  Plaintiff's Complaint
15   also fails to provide any details establishing which insurance
16   defendant made payments to which IDSA panelist or the date,
17   location, or amounts of those payments.

18         And then to jump ahead, but I just thought it made
19   sense to put it in here, this is what Your Honor said about the
20   fraudulent concealment piece in which you said, as well, that
21   the plaintiffs have not alleged facts with particularity, under
22   the Rule 9(b) heightened pleading standard, that would justify
23   tolling the limitations for fraudulent concealment.   They
24   provide nothing more regarding the circumstances constituting
25   such fraudulent concealment.

-8-

1   And then importantly you say, "But even if plaintiffs
2   had adequately pleaded that defendants fraudulently concealed
3   their actions, they do not allege any facts in their Complaint
4   that would support an inference that plaintiffs exercised due
5   diligence to discover these actions."  And I'll get back to that
6   in a minute.

7   But what Your Honor then did was you gave the
8   plaintiffs 30 days.  You said, "You've had four months of
9   discovery.  I want a Complaint, an amended Complaint, if you're
10  going to give me one, on 10/28."  Well, on 10/28, you don't get
11  an amended Complaint, you instead get a pleading which asks for
12  open-ended discovery.  They admit that they don't have the
13  particularized evidence to make the necessary allegations to
14  support either RICO or the fraudulent concealment tolling.

15  By that point, discovery has been underway for six
16  months.  And the fact is, regardless of the fights that Your
17  Honor will remember about, you know, we had a four-year
18  limitation for the beginning, they had four years worth of
19  evidence, 2013 to 2017, and there was not a single shred of
20  evidence of any payment, to say nothing of large sums of money,
21  from an insurance defendant to one of the defendant doctors.
22  And that's despite the fact that the plaintiffs have claimed
23  this is a continuing conspiracy, Your Honor.  But there was no
24  evidence of any such payment.

25  Fast forward to March of this year, and Your Honor

1  will remember that at that point you ordered the plaintiffs to

2  file an amended Complaint, and you gave them two weeks.  You

3  said,  "There's been discovery since the last hearing.  I want

4  an amended Complaint."  And so on the 25th of March -- I believe

5  it is the 25th of March -- they file the amended Complaint that

6  is at issue under this motion.  And by this point, discovery has

7  been underway for 11 months.

8           And the fact is, Your Honor, as I'll go through in

9  some detail, they don't answer the newspaper questions, and if

10 anything, the amended Complaint is significantly weaker and less

11 particularized than the original Complaint.

12          Let's go to the -- let's go to the story itself.  If

13 we look at the Complaints themselves and we compare them -- and

14 we can provide a red line, but it's a messy thing.  Let's just

15 look at some of what they have done.

16          If we go to paragraph 48 of the original Complaint, it

17 talks about how this began in the 1990s, and importantly, it

18 says,  "The insurance defendants paid these IDSA panelists large

19 fees, and together they developed arbitrary guidelines for

20 testing Lyme disease."  That together is important because the

21 other thing they don't do anymore in the amended Complaint is

22 plead any kind of an agreement, any kind of real conspiracy,

23 which is, of course, the sine qua non of RICO.  It would have to

24 have a conspiracy.  There must be something together.

25          But in paragraphs 48 and 49 of the new Complaint,

-10-

1   you'll see that that language is gone and, instead, "Plaintiffs

2   hereby allege that the insurance defendants paid consulting fees

3   to the IDSA panelists to influence the IDSA guidelines and the

4   IDSA panelists."

5          So now we have, at best, without any particularity, of

6   course, consulting fees.  Not large ones, just consulting fees,

7   and the idea is to influence the IDSA panelists and guidelines.

8   There's no working together.

9          Paragraph 54.  By the mid-1990s, the plaintiffs

10  alleged in the original Complaint, the insurance defendants

11  began paying large consulting fees to the same line IDSA

12  panelists, and it says why.  The insurance defendants paid these

13  line IDSA panelists to enforce their new stringent testing

14  protocols to enforce it.

15         Well, paragraph 56.  And I know they're off a little

16  bit, but that's because they've deleted some other things, added

17  some other things.  We'll talk about that.  "It is clear from

18  the evidence set forth above that consulting fees were paid by

19  the insurance companies before the IDSA panelists created the

20  IDSA guidelines.  Not surprisingly, when the guidelines were

21  created, they contained the same arbitrary requirements."  So

22  once again, on the left side, we have a corrupt agreement to

23  enforce; on the right side, we've got influence and an inference

24  of not surprising.

25         Paragraph 58, talking about a Dr. Sigal, who is a

1  defendant here.  By the way, Dr. Sigal is not an IDSA panelist.

2  He never was an IDSA panelist in 2000, and he was, as the 2006

3  guidelines indicate, merely a reviewer.  And in paragraph 58

4  they say the insurance defendants paid Dr. Sigal to improperly

5  deny insurance coverage to Lyme disease patients, so a corrupt

6  bargain, and to improperly influence the treating doctors.  So

7  he's paid for something that relates to corruptly denying long-

8  term antibiotic therapy.

9      But in paragraph 54, that's gone, and now it's Dr.

10  Sigal testified he was paid $560 an hour in 1996 by these

11  insurance companies, and he lists a bunch of insurance

12  companies.  But there's no evidence -- no allegation, excuse me

13  -- that he does so for the corrupt reasons that are given in

14  paragraph 58.

15      Most notably, paragraph 59.  "The insurance defendants

16  also paid Dr. Allen Steere, a well-respected Lyme researcher" --

17  Let me pause.  He discovered Lyme disease -- "to endorse their

18  new Lyme disease treatment policy of limiting Lyme disease

19  treatment to 28 days.  Dr. Steere published his treatment

20  guidelines in transactions of the American Academy of Insurance

21  Medicine."

22      In other words, they paid Steere.  They paid him to

23  endorse these guidelines which they say are -- they say are

24  false, and then they say he published a fake paper.  So, again,

25  the man who discovered Lyme disease, has devoted his life to

1  Lyme disease, apparently fictitious papers, endorsement of a

2  policy, all of this.  Why?  Because he was paid.  Well, you know

3  what?  That's not in the current Complaint.  In fact, there's no

4  allegations about Dr. Steere at all.

5          Paragraph 76.  I'm not going to go through it.  "By

6  receiving large consulting fees."  And then they say that the

7  way it worked was the insurance defendants then hire one of the

8  IDSA panelists to affirm the denial.  Again, a quid pro quo.

9  We'll pay you, and you affirm the denial of the treatment, and

10 then we hire you as an expert witness and we pay you exorbitant

11 fees so that when the patient appeals, it will be denied.

12 Corrupt, corrupt, corrupt.   Money, money, money.   Large

13 consulting fees.

14         What does it say in paragraph 88?  The IDSA panelists

15 benefit financially from their arrangements with the insurance

16 defendants by receiving consulting fees.

17         Paragraph 79.  "The IDSA panelists are paid by the

18 insurance defendants to testify."  Paid to testify against the

19 doctors who they purportedly report to medical boards to keep

20 them in line.  That's another thing that they're supposed to

21 have done is that they report them to the medical boards.  But

22 why would they do that?  Because of money.  That's what the

23 original Complaint says.  We give you money and you keep those

24 guys under your wing.  That's gone.

25         So that's what the Complaint currently includes.  It

1    includes, Your Honor, the deletion, the wholesale deletion, of

2    allegations of large sums of money, large money in return for a

3    variety of specific acts that are done together in a conspiracy

4    to deny this long-term antibiotic therapy which they say is an

5    answer.  Our scientists say it's deadly, and that's why they

6    don't do it.  And that's what their scientific papers say, and

7    that's what the CDC says, and that's what the NIH says.  So you

8    have, once again, a plausibility question.

9         Do the scientists do this because they believe in the

10   science or do they do it because they're receiving large sums of

11   money?  Well, the original Complaint said it was large sums of

12   money, but that's not there anymore.  I'm not going to say that

13   there's no money.  They say there's consulting fees, there's

14   some money paid, but the quid pro quo, the corrupt bargain, the

15   argument that this is why these esteemed researchers would do

16   this has been toned down to almost nothing.

17        Now, last September, Your Honor, you reviewed the

18   original Complaint and you found it lacking.  You said that

19   contrary to 9(b), it did not identify with particularity the

20   who, what, where, why, and how of these alleged payments, not by

21   which insurance company, not by which insurance company, to

22   which defendant, which plaintiff was hurt by it.  They didn't do

23   so.

24        But now they've produced an Amended Complaint that in

25   late March, after all of this other discovery that says only

1   that they -- that there's some payments of money that changed

2   hands.  And once again, there is no particularity beyond what

3   was in the original Complaint.  The who, what, where, why, how

4   is still gone.

5          Now, what's remarkable, at least to me, is that the

6   plaintiffs, in response to our motion, have brazenly alleged

7   that their Complaint is actually stronger now than it was back

8   in the fall.  And in support of that -- and this is in their

9   Brief on page 2 -- they say,  "Here are the new paragraphs.

10  Here are the paragraphs that show why it's stronger than it was

11  before."  And they specifically cite in first one paragraph --

12  they say it's 55 and 135 of the First Amended Complaint, and

13  then they say more generally paragraphs 46 through 90 -- 46

14  through 60, I think.

15         So let's look at those paragraphs, because if you

16  look, first of all, at 135 in the First Amended Complaint, I am

17  assuming that's a typo cause that doesn't say anything about

18  payments at all.  That deals with a particular plaintiff, David

19  Kocurek, who said he went to 25 doctors, all of whom said,  "You

20  don't have Lyme disease."  And he kept going and finally found

21  somebody who said he did.  He's no longer with us.  He passed

22  away.  But that doesn't have anything to do with payments.

23         If you go to paragraph 55 in the First Amended

24  Complaint, which is one that they again have called out

25  specifically,  well,  that's  testimony  from  a  Dr.  Joseph

1  Burrascano.  Doesn't say it, but it's actually in 1993.  But
2  this paragraph was in the original Complaint.  So they haven't
3  added anything by adding Dr. Burrascano's testimony.  That's
4  where the phrase "large sums of money" appears.  I think pretty
5  much in the only place in the First Amended Complaint is in this
6  Burrascano testimony from 1993.  But, again, that was in the old
7  one which you found insufficient.  In any event, it doesn't say
8  which company and it doesn't say which panelist.

9       The guidelines didn't exist again in -- since 1993,
10  they didn't exist for seven years.  And we can do the same by
11  going from paragraph 49 through 60.  The only thing that's
12  really added that's new is that there is a reference to the
13  Connecticut AG's investigation.  There's three paragraphs.  This
14  is paragraphs 50, 51, and 52.  And what it says is that the
15  attorney general sent out CIDs.  He sent them out to insurance
16  companies, he sent them out to the IDSA, and he sent them out to
17  IDSA panelists.

18       And then it says, in some inferential manner in
19  paragraph 52, that in his findings, or in his -- it's actually
20  not a finding, it's a -- it's a press release -- the attorney
21  general says that he had found or concluded that several of the
22  most powerful IDSA panelists had undisclosed financial interests
23  in insurance companies, including consulting arrangements.
24  Well, that's it.  It doesn't say which insurance companies.
25  Doesn't say which panelists.  It doesn't even say that there's

1   anything wrong with what they did.  They were undisclosed, to be
2   sure, according to the attorney general, but it doesn't say what
3   the consulting arrangements did.  They don't say that they were
4   done in a way to cause a corrupt outcome.  It simply says there
5   was a conflict of interest.

6          The paragraphs go on to talk about Dr. Sigal, who says
7   that back in 1996, he did some work testifying in med-mal cases.
8   And he mentioned a bunch of insurance companies, but he also
9   mentions Prudential, Aetna, Blue Cross, etc., and he says he
10  gets $560 an hour.  Doesn't say what he does other than testify.
11  It doesn't say about creating false guidelines.  It doesn't say
12  about forcing doctors to do what he says.  He doesn't say
13  anything about lying to medical boards.  He just says, "I
14  testify as a consultant at $560 an hour."

15         And then in paragraph 56 it says, "It is clear from
16  the evidence set forth above that consulting fees were paid, and
17  that they were paid," it says, "before the IDSA panelists
18  created the IDSA guidelines.

19         And then the last three paragraphs of this section
20  that the plaintiffs have cited talk about three doctors who were
21  either kicked off the panels or weren't allowed to get on one of
22  the IDSA panels, and they feel that that was wrong.  But, again,
23  that's not tied to any large payments of money.  That's not tied
24  to any quid pro quo.  It's a statement that, in fact, these
25  doctors were not allowed on the panel.  You might think that's

1    a bad idea.  Maybe the learned society should keep them on.  But
2    it's not RICO and it's not a 9(b) situation.

3          So  as  I  said,  if  the  original  Complaint  was
4    insufficient,  then  the  First  Amended  Complaint,  which  has
5    followed months more of discovery, is even more insufficient.
6    And the plaintiffs have recognized they can't allege the large
7    sums of money which are the fundament.  They're the only basis
8    for justifying why the doctors would do what they do, and that's
9    not even an allegation anymore.

10         Let's turn for a minute to fraudulent concealment
11   which, again, Your Honor concluded that, as I wrote in the last
12   bullet point, even if plaintiffs had adequately pleaded that
13   defendants  fraudulently  concealed  their  actions,  they  do  not
14   allege  any  facts  in  their  Complaint  that  would  support  an
15   inference that they had exercised due diligence to discover
16   these actions.

17         And I think one thing that's important to point out
18   here is this is due diligence not just in this litigation
19   itself, I assume, you're meaning also, as the cases say, due
20   diligence in following up facts that were known in the public
21   domain.  I mean, the problem, if you wait a long, long time to
22   try to find out facts, those facts are going to disappear.  The
23   documents are going to disappear.  People's memories are going
24   to fade.

25         So they talk about a scientific paper by Dr. Allen

1   Steere.  These are the new allegations, by the way, in the -- in

2   the First Amended Complaint.   Paragraph 93.   There was a

3   scientific paper by Dr. Allen Steere.  Well, that's in the

4   public domain.  That's not concealed.  That's a statement by Dr.

5   Steere in which he said -- he has since said he was wrong, but

6   that's not in the Complaint.  But he said maybe Lyme persists in

7   the body even after we think it's gone.  He did that in vitro.

8   He says he can't do it in vivo.  But in any event, it's in 1994

9   and it's in the public domain, so there's no concealment there.

10          Paragraph 94 says that doctors are allegedly reported

11  to medical boards since the early 1990s.  Well, again, they have

12  this whole community of Lyme advocates.   They know who these

13  doctors are.  If there was an ability to find out what happened,

14  they could go to the individual doctors.   They've talked to

15  Burrascano, they've talked to -- to Jemsek.   They're all people

16  that they know.  This goes back twenty-something years.  Why did

17  the litigation get brought in 2017 when memories had faded,

18  documents were gone?

19          And then they cite paragraphs 95 through 97, the 2006

20  guidelines which purportedly deny the existence of treatment

21  failure for Lyme disease.   It doesn't really say that, but

22  that's what they say it does.  But anyway, the guidelines are

23  clearly in the public domain.   So here's information which

24  they've put in their First Amended Complaint to justify tolling,

25  and yet every piece is from decades ago and it's in the public

1   domain.

2        Now, the real truth of the matter is that the First
3   Amended Complaint is less a Complaint than it is a Brief.  I
4   don't see many Complaints which have case cites in them and
5   argument in them, and this one does.  And the reason that it
6   does is because they are making the case to you, Your Honor, as
7   they've done here and they've done in their papers, that you
8   should give them the so-called relaxed pleading standard under
9   Rule 9(b).  That's what, really, the answer is.

10        Let us take -- let us -- let us plead even just
11  inferences.  We don't have to do the newspaper questions.  I
12  should note that, again, nearly a year of discovery has taken
13  place.  And as Your Honor will remember from March, you were
14  concerned about the lack of diligence in this case.  I have it
15  a little bit later on, but at some point you asked Mr. Dutko --
16  this is in March -- "Have you sent out the email custodians
17  yet?"  And he, at first, kind of went back and forth, and then
18  said, "No, I haven't."  And, in fact, they didn't come out.
19  There was no request for email custodians until April of this
20  year, and the defendants all promptly responded.  We have given
21  them our custodians.

22        Similarly, they cite the fact that they can't get
23  information about these reports to medical boards.  And they
24  say, you know, "We went to the Texas Board of Medicine on a
25  particular case, and they moved to quash the Subpoena, so we

1   couldn't get it."  But they leave out the fact that they didn't

2   oppose the motion to quash the Subpoena.  Perhaps if they'd gone

3   to the court and said, "This is what we need it for," the

4   court would have given it to them.

5           And they've now cited a new case.  I've now forgotten

6   her name, but a doctor in Maryland who was purportedly reported

7   by somebody to a medical board, the Maryland Board of

8   Physicians.  We are unaware of any effort to seek discovery from

9   the Maryland Board of Physicians.  If they've taken discovery

10  and it showed that there was an insurance defendant that

11  reported her, I think we would have heard about it.  We haven't.

12          So the simple fact is that under Fifth Circuit law,

13  the relaxed pleading standard is not mistaken, is not to be

14  mistaken, for a license to base claims of fraud on speculation

15  and conclusory allegations.

16          Here's the exchange that you had with Mr. Dutko in

17  which you asked him about the custodians, and he admitted that

18  they had not submitted any discovery requests.  So, again, I'm

19  not going to repeat myself, but the fact is, there are no new

20  material fact allegations in the -- in the First Amended

21  Complaint.  What there is is a request to you to eliminate the

22  9(b) standard and let them go ahead anyway.

23          But as I say, there are no particularized allegations

24  of fact that involve anything, anything, that took place within

25  the last decade.  None.  There's actually very few

1   particularized allegations of fact at all, but when it comes to

2   the insurance defendants and the -- and the IDSA panelists,

3   there is nothing new that occurred in the last decade.

4           Now, we've cited, and I've put them up on the screen

5   here, four cases that deal with this relaxed pleading standard,

6   and the case law is really pretty uniform.  You have to show

7   that you tried to get this evidence from all of the other

8   sources.  You tried to get the discovery from the defendants.

9   Only when you have really demonstrated that you have done that

10  is when you get a relaxed standard.

11          And, interestingly, and I think this is important,

12  they cite four cases for the relaxed pleading standard.  Not a

13  single one of those four cases actually allows the relaxed

14  pleading standard.

15          The Schoest case, which is the first one they cite, is

16  the same case that I believe Your Honor cited which said, "I'm

17  going to give you another try.  Go out, give me an amended

18  Complaint in 30 days, and we'll take a look."  I don't know what

19  happened in Schoest.  In this case, they didn't give you a

20  Complaint in 30 days.  It took them -- it took another order of

21  Your Honor, and then until the end of March for them to give you

22  an amended Complaint.

23          But in some ways, more important, is that the Fifth

24  Circuit, in the case they cite, the US Ex Rel v. Grubbs case,

25  puts forward what it takes to get the relaxed standard.  And

1  that's, I should add, in a qui tam case in which the court --
2  the Fifth Circuit specifically says, you know, in a qui tam
3  case, we should be particularly -- we should think more about
4  giving the relaxed standard because the remedial statute, you're
5  doing it on behalf of the government, it's on behalf of the
6  public, etc., so that's where we're going to look, even though
7  there's a fraud requirement.  9(b), if anyplace where 9(b) is
8  applied, that's where we would look most for a relaxed standard,
9  not in RICO.

10       But even there, the Fifth Circuit says that the
11  plaintiffs must show particular details of the conspiracy,
12  paired with reliable indicia that lead to a strong inference
13  that the conspiracy took place.  Or in that case, that the
14  claim, false claim, was made.

15       So there we've got particularized details, reliable
16  indicia, strong inference that the fraud occurred before there
17  should be any consideration of a relaxed pleading standard.  And
18  as I think we've tried to show in this comparison, there are no
19  particularized facts.  There are fewer particularized facts.  If
20  there were any in the original Complaint, they've been taken
21  out.  Although, of course, it really was just statements about
22  large sums of money.

23       But the thing about Dr. Steere, that's gone.  The
24  allegation that it was a quid pro quo, you will testify, we will
25  give you money, you will fight -- you will write these papers,

1    we will give you money, that's gone in this Complaint.

2              And that brings us back, again -- when you talk about
3    a strong inference and reliable indicia, it takes me back to
4    where I began.  You've got a plausibility issue here.  Whether
5    it's 9(b) or Rule 12, they have to answer the question.  If
6    they're going to get a relaxed pleading standard, or if they're
7    even going to get a Complaint to stand, they have to be able to
8    explain to this court at this stage, at the pleading stage, why
9    would these doctors do this.  And they don't have an answer.

10             Again, there's one answer which is the one that I
11   think plausibility would suggest, which is that these doctors,
12   scientists who have published literally hundreds and hundreds of
13   papers on Lyme, and who have treated thousands and thousands of
14   patients with Lyme, they believe that long-term antibiotic
15   therapy is deadly and it's inefficacious.  That's what they say
16   in their papers, that's what they say to their patients, that's
17   the way they treat their patients.

18             They say no, they do it for another reason.  It really
19   does work.  In their First Amended Complaint, they said it was
20   large sums of money.  I'm sorry, in their original Complaint
21   they said it was large sums of money.  Now they don't even say
22   it's large sums of money.  They have not met the standard for
23   the relaxed pleading and they've not established particularized
24   answers to the newspaper questions.  And for that reason, Your
25   Honor, we would respectfully ask that you reaffirm your decision

1  dismissing the RICO count and you reaffirm your decision that

2  they have failed to make the necessary showing to allow for

3  fraudulent concealment.  Thank you very much.

4           THE COURT:  Thank you.

5           MR. DUTKO:  May I respond, Your Honor?  My clicker is

6  messed up, so I'm going to move my computer over here, with the

7  court's indulgence.

8           Your Honor, I have some slides, but because I went

9  second, they're a bit out of order, so I'm going to jump around,

10 with the court's indulgence.

11          Your Honor, counsel asked a question a moment ago, why

12 would the doctors do this.  The answer to that question is the

13 same answer that you see every day in court, you see every day

14 out in public.  The reason why they did it is for money.  It's

15 a simple fact.  And now there is a lot of talk about the fact

16 that we took out the phrase "large sums of money and large

17 fees."

18          The issue in this case is not whether we took out

19 large sums of money and large fees, it's whether we established

20 they were paid large sums of money and large fees.  And so what

21 we did was, and we thought the court would appreciate this,

22 instead of just saying they were paid large sums of money and

23 they received large fees, we actually presented evidence of

24 large sums of money and large fees.

25          And as the court will see, one of the things that we

1    presented was the Connecticut attorney general's investigation

2    in which they sent CIDs to insurance companies, the IDSA, and

3    the IDSA panelists.  Now, counsel said,  "Which ones did they

4    send it to?"  Those are attached to the petition.  You'll see

5    the people that they sent it to are the people who are the

6    defendants in this case.  And that's one of the reasons why

7    they're the defendants in this case.

8            And when they sent the CIDs out, they asked the IDSA

9    panelists that we sued in this case to disclose money that they

10   received from the insurance companies.  They asked the insurance

11   companies to disclose money that they paid to the IDSA

12   panelists.  And in response, Blumenthal came out with a press

13   release that said based on the CID responses, several of the

14   most powerful IDSA panelists had undisclosed financial interests

15   in insurance companies including consulting arrangements with

16   insurance companies.

17           Now, counsel stood up here and said,  "Why would these

18   world-renowned researchers say that there's no Lyme disease?"

19   Well, the question that needs to be asked is,  "Why did they

20   hide this fact?"  Why were these world-renowned IDSA panelists

21   hiding the fact that they were receiving large consulting fees

22   from insurance companies?  Why wasn't that in the guidelines?

23   Why wasn't that made public?  Why didn't anybody know?  Why did

24   it take confidential CIDs from an attorney general of the state

25   of Connecticut to figure out that this was the case?  Because

1    they knew they were getting paid, and they didn't want anyone
2    else to know they were getting paid.

3            Another piece of evidence we attached is the 1996
4    deposition of Dr. Leonard Sigal.  And now $560 an hour in 1996
5    may not be a large sum of money to counsel, but it seems like a
6    large sum of money to me, especially in light of the fact that
7    when he was asked what he did for that money, he reviewed Lyme
8    disease   cases   for   insurance   companies.     Those   include
9    Prudential, Aetna, Blue Cross, Anthem, MetLife, Met Health,
10   Metro Health.

11           And you will take note that in the footnote of one of
12   our responses, or actually, in the Complaint, it goes on to say
13   that many of the entities that are like MetLife and Met Health
14   were bought by United Healthcare and other defendants that are
15   sitting at the table over there.  This is enough money to where
16   Dr. Leonard Sigal joked in 1996 that he could pay a lot of
17   college tuition with the amount of money that the insurance
18   companies were paying him to review Lyme cases.   That is
19   evidence of large sums of money and large fees.

20           Dr. Joseph Burrascano, at the time, was a world-
21   renowned HIV researcher.  He decided that he wanted to go into
22   the field of Lyme disease to help people.  He was concerned as
23   to why he was getting pushback from the IDSA panelists and why
24   he wasn't allowed to treat people that had chronic Lyme disease.
25   He learned, and he testified before the senate committee on

1    labor  and  human  resources  that  some  of  them  are  --  the  IDSA

2    panelists  --  are  known  to  have  received  large  consulting  fees

3    from insurance companies to advise companies to curtail coverage

4    for  any  additional  therapy  beyond  the  arbitrary  30-day  course.

5           Your  Honor,  that  is  evidence  that  we  have  attached  to

6    the  Complaint  to  show  that  they  received  large  payments  and

7    large  sums  of  money.   We've  also  attached  recent  disclosures

8    from  Dr.  Shapiro  saying  he's  been  paid  by  insurance  companies.

9    This  is  evidence  that  we  were  able  to  gather  on  our  own  because

10   the  insurance  companies  --  and  we'll  get  to  this  in  a  minute  --

11   and  the  defendants  in  this  case  refused  to  produce  it.

12          Another  argument  that  was  made  is  that  we  amended  the

13   Complaint  and  took  out  facts  demonstrating  in  a  conspiracy.

14   Your  Honor,  just  --  these  paragraphs,  60,  91,  115,  116,  117,

15   120,  156,  if  the  court  will  go  through  them,  the  court  will  see

16   there  are  many  allegations  of  an  agreement  and  a  conspiracy

17   amongst  the  defendants.   In  fact,  I  cited  one.   It's  long.   I

18   can  read  parts  of  it.   But  it  says  the  IDSA,  the  IDSA  panelists,

19   and  the  insurance  defendants  engaged  in  a  conspiracy  that

20   restrained  trade  in  the  relevant  market.

21          They  used  the  IDSA  guideline  development  process  to

22   consciously  agree  to  exclude  actual  Lyme  doctors,  exclude

23   competing doctors who disagree with the IDSA guidelines, exclude

24   doctors  who  use  their  own  clinical  discretion  to  diagnose  Lyme

25   disease,  and  to  exclude  doctors  who  do  not  follow  the  IDSA's  28-

1   day recommended treatment program. There are numerous

2   allegations throughout the Complaint of a conspiracy and an

3   allegation that these defendants got together and created these

4   guidelines, and then stopped any opposition to these guidelines.

5   It's throughout the Complaint, Your Honor.

6        Your Honor, we can all agree, and regardless of the

7   cases that are cited and the cases that are cited by defendants

8   or plaintiffs, we can all agree that 9(b) does have a relaxed

9   pleading standard.  It can be -- it can be had.  Plaintiffs are

10  entitled to a relaxed pleading if we can prove that the

11  defendants are the only ones who have the documentation, and

12  nobody else has them, and we have tried to get those documents

13  from third parties.

14        Just by way of background, Your Honor, as the court

15  will remember, the defendants sat here during the initial status

16  conference and said, "We will produce four years' worth of

17  discovery until the court rules on the Motion to Dismiss."

18  After the court ruled on the Motion to Dismiss, the defendants

19  refused to produce any documentation beyond four years.  Then we

20  came in front of the court and we had a hearing, and then we had

21  a dispute regarding the year.  You recall that, Your Honor?

22        THE COURT:  Very well.

23        MR. DUTKO:  Right.  So in April of 2019, this court

24  issued an order saying some of the documents it requested they

25  get from 1998, some of the documents requested get from 2010.

1    Do you recall?  The court issued that order in April of 2019.
2    Well, the reason why that's important is because before that
3    order was issued was when our Complaint was -- our amended
4    Complaint was due to be filed, and we did file it.

5              And so what we were faced with at that time was still
6    no documents from the defendants.  Nothing beyond four years.
7    Counsel stood up here and argued,  "Well, they had all this
8    discovery for four years and they didn't produce one shred of
9    evidence."  Well, as the court will recall, the evidence that
10   we're after involves the 2000 guidelines, the 2006 guidelines,
11   and the years leading up to those guidelines.  Those are the
12   crucial -- that's the crucial evidence.

13             And when the court asked me whether we had served e-
14   discovery, I did answer.  And by the way, I didn't say anything
15   about custodians, and I can tell you why.  Because at that time,
16   the defendants had not told us who their custodians were.  We
17   actually had to get that from them through numerous meet-and-
18   confers after the hearing.  But you will recall my answer was,
19   and I stand by that answer,  "Why would we send e-discovery when
20   they're not going to produce any documents?"

21             We wanted to go in front of the court and explain to
22   the court that they went back on their agreement.  They refused
23   to produce documents beyond four years.  Once we got a ruling
24   from the court, we immediately sent e-discovery terms out, and
25   now we're currently arguing over them.  They are the ones that

-30-

1    have these documents.  And, Your Honor, I can -- I can show you

2    proof of that.

3             The Connecticut AG -- we subpoenaed the Connecticut

4    AG's records, all of Blumenthal's records related to the

5    investigation, all the CIDs sent to the insurance defendants in

6    this case, the CIDs sent to the IDSA panelists.  In response,

7    the Connecticut attorney general said,  "The majority of the

8    documents contained in connection with the antitrust

9    investigation of the IDSA were returned at the termination of

10   investigation."

11            Those documents were sent back to the insurance

12   defendants, sent back to the IDSA panelists.  And do you know

13   what we have not received?  Those documents.  Even though they

14   have them.  There are only three places -- or two places where

15   those documents could exist, the AG's office or with the

16   defendants.  We asked them for the documents.  They won't

17   produce them.  We asked the AG's office.  They sent them back to

18   them and destroyed the originals.  So we have done everything we

19   can to get those documents.  They are solely in the possession

20   of the defendants.  That is exactly what the relaxed pleading

21   standard calls for.

22            What we don't have and what we have asked for and

23   tried to get are evidence of the Connecticut AG's office,

24   payments between the IDSA panelists and insurance defendants.

25   Your Honor, the IDSA panelists that received money were sent

1    from the insurance companies to the panelists.  We know they

2    received money because Blumenthal found that out.  We know they

3    received money because of the few -- the little bit of testimony

4    that we can find based on our research without their help, we

5    know that Dr. Leonard Sigal was making $560 an hour.  The only

6    evidence of that is with the IDSA panelists and the insurance

7    defendants.  There's no other third party that we can subpoena

8    for those documents.

9            Evidence of insurance defendants reporting medical

10   boards, solely in possession of the insurance defendants.  Now,

11   counsel pointed out the fact that we -- we sent a subpoena to

12   the State of Texas Medical Board and we didn't fight it.  We

13   couldn't fight it.  We looked at the statute.  We're not

14   entitled to that information from them because it's private.  We

15   did send subpoenas to the Maryland Medical Board that they asked

16   for.  We got those documents, all redacted.

17           All the information as to who reported, who they

18   worked for, who did -- you know, who the insurance companies

19   hired, it just says "insurance company".  The only way we can

20   get that information is from the defendants in this case.

21   That's it.  And we still have not received that documentation.

22           Evidence of communications between the insurance

23   defendants, that's solely in their possession.  Evidence of

24   communications between the IDSA panelists and the insurance

25   defendants, solely in their possession.  We have subpoenaed --

1  we've sent out so many subpoenas and tried to get all these

2  documents, and the fact remains all of the documents reside over

3  here, and they still to this day -- well, I will tell -- I will

4  represent to the court in the last few days as we're leading up

5  to this hearing, they have started dumping documents on us and

6  we're trying to go through them.  So they may stand up and say

7  some of these have been produced.  But in going through them, we

8  haven't seen any of these documents.

9          This is a perfect example of a case that should have

10  a relaxed pleading standard because the defendants have the

11  documents.  They will not produce them.  It is not prejudicial

12  to them to proceed on in this case on the RICO claims because

13  the RICO claims are identical to the antitrust claims that this

14  court already ruled should move forward.  And so we have the

15  issue that we're going to take the same depositions.  We're

16  going to conduct the same discovery.  It's not prejudicial for

17  them if we have a relaxed pleading standard.

18          The next issue that was raised was fraudulent

19  concealment.  And fraudulent concealment is important because

20  you will see -- and here is a letter from Allen Steere in 1990.

21  In 1990, Allen Steere from Tufts University School of Medicine

22  sent a letter to Dr. Kenneth Liegner.  It has:

23          "Thank you very much for your kind letter," and

24  highlighted, "Because they were able to culture the spirochete,

25  they certainly proved that one may have persistent infection

1    after intensive antibiotic therapy and despite seronegativity."

2    So Dr. Allen Steere was recognizing the fact that even after

3    short-term antibiotics, chronic Lyme disease exists, and they

4    had no problem treating it.

5              In 1994, Dr. Allen Steere, again, the person that

6    counsel stood up here and lauded as the inventor of Lyme

7    disease, "It has become increasingly apparent that Lyme disease

8    spirochete may persist in some patients for years, may cause

9    chronic neurologic involvement."

10             So here are the IDSA guidelines.  The IDSA guidelines

11   that were developed after the insurance companies decided, as

12   you will see from the evidence attached to the Complaint from

13   Sanchez, who was from Blue Cross Blue Shield, after they created

14   these arbitrary guidelines, after they entered into these

15   agreements to pay the IDSA panelists, these guidelines were

16   created, and you will see there is no -- now -- "There is no

17   convincing biological evidence for the existence of symptomatic

18   chronic B. burgdorferi" -- which is Lyme -- "infection among

19   patients after receipt of recommended treatment regimens for

20   Lyme disease."

21             And so what is -- what happens is, they recognized

22   early on, these world-renowned scientists, that Lyme disease

23   exists.  Chronic Lyme disease exists.  They start getting paid

24   by insurance companies, and all of the sudden the two panelists

25   that were on the IDSA panel in 2000, including Donta, Dr. Donta

1   and Dr. Luft, who said, "We need chronic Lyme disease,"

2   they're kicked off, and the IDSA guidelines say there is no

3   chronic Lyme disease.

4          And so for years, this machine, this machine of the

5   IDSA, of the insurance companies, of these co-called world-

6   renowned researchers, have been putting out this misconception

7   that chronic Lyme disease doesn't exist, that it's not true,

8   that there is no such thing, even though they knew it existed.

9   And yet when we eventually find out that it exists is later on

10  after patients start finding out -- finding doctors who are

11  willing to speak up against the IDSA panelists.

12         This is a fraudulent concealment.   They knew it

13  existed.   They misrepresented to everyone else that it didn't

14  exist until later on when we could find it out.   The statute of

15  limitations on this should be tolled back to where they started

16  misrepresenting whether chronic Lyme disease existed or not.

17         And we heard some -- I heard some argument about how

18  documents from Allen Steere were in the public domain.   I don't

19  know where that exists.   I don't know if that's counsel just

20  saying that out loud.   But I have no evidence that the letters

21  from Allen Steere are in the public domain.   You'll see that

22  this letter is to a patient.   This letter is to one person.

23  There's no evidence that there's some public record of the

24  existence of chronic Lyme, because as the court will see, by the

25  time the guidelines came out, they were completely and totally

1    denying it.

2            Your Honor, all of the evidence that we need in this
3    case that we know exists that the Connecticut attorney general
4    has said exists is in the sole possession of the defendants.
5    There is a relaxed pleading standard for a reason, for cases
6    just like this.  They don't want to produce those documents and
7    so they're asking the court to chip away at this case.  We're
8    asking the court just allow us to move forward with discovery.
9    We're currently in the process of discovery, and allow us to get
10   the evidence that we know exists.

11           THE COURT:  So, Mr. Dutko, let me just ask you, even
12   if there's a finding, ultimately, by the court that, you know,
13   some of this information, or all of this information for that
14   matter, was concealed, what shows reasonable diligence on behalf
15   of the plaintiffs in discovering their claims?

16           MR.   DUTKO:   Well,  I  will  tell  you  what  shows
17   reasonable diligence is the part of the Complaint that talks
18   about how these patients are desperately driving from state to
19   state to try to get answers.  I mean, these are people that form
20   their own support groups.  These are people that were forced to
21   form  ILADS  to  create  alternate  guidelines.   I  mean,  the
22   plaintiffs in this case, Your Honor, and the people around the
23   country have desperately sought answers to this every day of
24   their life.  They have to live with this.

25           There is no lack of diligence.  This is all they do.

1    They get on the internet, they talk to friends, they meet with

2    people.  They try to figure out why they have something that the

3    world-renowned -- so-called world-renowned doctors are telling

4    them doesn't exist.   There is no lack of diligence in the

5    Complaint, Your Honor.  You will see -- and counsel kind of made

6    fun of David Kocurek, who was desperately looking for answers.

7    You will see in the Complaint that David Kocurek tested positive

8    for Lyme after 20 doctors refused to test him for it.  He wasn't

9    doctor-shopping, he was looking for answers.    That is the

10   definition of diligence.  These patients wanted answers.

11              THE COURT:  So why wasn't the case pursued earlier?

12              MR. DUTKO:   Your Honor, the case wasn't pursued

13   because we didn't have enough evidence to figure out what was

14   going on.  It wasn't until doctors -- frankly, it wasn't until

15   ILADS and doctors with ILADS started standing up and saying this

16   isn't right.  And that was just a few years ago, Your Honor.

17   And evidence of that, Your Honor, is the fact that the treatment

18   guidelines are now under review.

19              And there's a draft out there of the current treatment

20   guidelines, and they recognize the fact that there may be

21   chronic Lyme.  They don't think it exists, but they need more

22   studies on it.  I mean, that is a current guideline that they're

23   willing to put out to say "We've got to do more studies on

24   chronic Lyme."  Well, we know it exists.  Why won't they do the

25   studies?  I mean, we've known -- they've known it exists all the

1  way back to the '90s.

2         And so, Your Honor, there is no lack of diligence on

3  the part of the plaintiffs.  And, frankly, we didn't know about

4  this because they have done everything they can to conceal the

5  fact that chronic Lyme doesn't exist until recently.

6         THE COURT:  Okay.  Thank you.

7         MR. TUTEUR:  I'll be very brief, Your Honor, just

8  respond to a couple of things.

9         I think this is the fundamental question, Your Honor.

10  You know, what is, on the part about concealment, reasonable

11  diligence?  The ILADS guidelines, these people who they say have

12  a different view of Lyme, these scientists, all of whom, by the

13  way most of these doctors make all of their money from treating

14  Lyme, so...

15         The ILADS guidelines came out in 2014.  Their

16  guidelines came out in 2014.  So that, obviously, post-dates a

17  longer period in which this group of physicians is saying that

18  they disagree with the IDSA.  It's not in the record here

19  because, obviously, this is based on the pleadings, but we've

20  taken the depositions of about half of the plaintiffs.  The

21  overwhelming majority of them came to their Lyme realization

22  after watching a 2009 film called "Under Our Skin".  It's 2009.

23         And, yes, it's true, there are these people all over

24  the internet.  And I want to make it clear, Your Honor, if I

25  ever come off as trying to make fun of any of these people, I --

1    I -- I -- I hope I don't, because if you ever do hear the
2    testimony of the doctor defendants, every one of them says these
3    people are suffering.  "We know they're suffering.  We want to
4    do something about their suffering.  The answer is not to put a
5    PICC line in them and pump them filled with antibiotics which
6    could kill them.  That's not what we want to do."  So they know
7    they're suffering.

8             So there's a really good question about the diligence
9    because this Lyme war stuff, you can go back and look on 60
10   Minutes.  You can go back and look in the Oprah show.  The Lyme
11   wars goes back to 2006.  I mean, it certainly goes back to
12   before Secretary Blumenthal.  So there was a group of people who
13   have been saying there's something bad about the IDSA.  That
14   goes back decades.

15             THE COURT:  Now, when was the attorney general's
16   investigation in Connecticut?

17             MR. TUTEUR:  2006.  And it ended in 2008.  And just as
18   a reminder, Your Honor, and it's all in the public record, in
19   2008 there was a settlement.  The parties agreed, the IDSA and
20   the attorney general agreed, we'll create a new review panel
21   completely separate from the IDSA, actually run by an ombudsman
22   here in Texas who put together a panel of people who were not
23   IDSA to review the IDSA guidelines from 2006 and to take public
24   comment, which they did.  It's all in the public record.

25             And they took public comment.  They looked at all

1   those, and the test was if this panel -- if less than 75 percent

2   of the panel cannot agree that the guidelines are correct, they

3   will be stricken.   And every single one of the guidelines was

4   reviewed extensively, literature review, and every single one of

5   them, including the -- so, you know, this one about is there

6   such a thing as persistent chronic Lyme that is infectious Lyme,

7   again, I don't want to get into too many of the details, but

8   Your Honor should -- I think does understand it, that the

9   doctors here recognize that people have symptoms that are after

10  the Lyme is gone.

11          They get -- they may have autoimmune systems.   They

12  may have a variety of other symptoms that seem to result from

13  the Lyme, but there's no infectious agent that's going to be

14  killed by antibiotics.   So the thing is to treat the symptoms,

15  but if you give people antibiotics, that's to kill a bug, and

16  they now -- these scientists say that bug doesn't exist.

17          Now, it's true, back in the early '90s Dr. Steere

18  wrote those -- those letters.   And he also actually wrote a

19  paper.   That's why I thought it was in the public domain.   I

20  thought that's what they were referring to.   There's a paper

21  from back then that says that in vitro studies, we seem to find

22  that -- that it's persistent.

23          But the way science works is that you repeat and you

24  attempt to replicate the stuff that you've done before, and it

25  turns out they couldn't, and they have been unable to.   So

1    science moved forward and that's why the guidelines say what

2    they say.

3          Now, with respect to discovery, Anthem has produced --

4    at least Anthem -- I can tell you has produced 7,000 pages of

5    documents, and it includes -- we have looked for payments.  They

6    don't exist.  They continue to say "We know they do.  We know

7    they do."  Why do they know they do?  Because of Dr. Burrascano

8    testifying in 1993?  Because of Dr. Sigal's testimony that he

9    gets consulting fees for -- for being a med-mal expert?  That's

10   not -- that's not particularized evidence.

11         And Mr. Dutko stood up and he said, "I want to tell

12   you, we put new facts in."  Well, Burrascano, that's in the old

13   Complaint.  Sigal, that's in the old Complaint.  The only fact

14   that he cited to you that's new is that the Connecticut AG said

15   "I sent out a bunch of CID's," and then he concludes there were

16   conflicts of interest.  That's a far cry, Your Honor, from a

17   particularized statement that this insurance company paid that

18   doctor anything.  And the fact is, we can't find any evidence,

19   of Anthem at least, paying these doctors large sums of money to

20   do this.  Actually, to do anything.

21         THE COURT:  But has there ever been an affirmative

22   statement that the doctors were not paid?

23         MR. TUTEUR:  I think if the court would accept it, I'm

24   sure Mr. --

25         THE COURT:  I mean, I know we're getting well outside

1    the record there, but just --

2         MR. TUTEUR:   Yeah.   I mean, we -- we -- we are
3    prepared, certainly, to state that the -- I can only speak for
4    the insurance companies, but the insurance companies did not pay
5    those doctors.   Anthem didn't.   I can tell you that.   We had
6    some -- I don't want to mislead.   We paid, I think, Dr. Shapiro
7    a small consulting fee at some point.   We paid, obviously,
8    medical payments to these doctors when they were treating
9    patients, but we've not -- Anthem, speaking for Anthem, we
10   haven't paid the doctors, these doctors, anything.

11        And as a matter of practice -- again, we -- we thought
12   we'd get a sworn affidavit, that they'll take the 30(B)(6), you
13   know.   We don't pay the learned societies anything to review our
14   guidelines because we think -- Anthem thinks that's the job of
15   the learned society.

16        When we go to academic institutions, we do sometimes
17   pay them for their time, but, again, it's to review, it's to --
18   but this idea of paying the kind of money that you would think
19   it would take to cause doctors of this reputation to risk
20   everything and to publish false papers and to, most importantly,
21   mis-treat their patients, because that's what this allegation
22   really has to mean, that Dr. Steere and Dr. Shapiro and Dr.
23   Halperin, all of whom had clinics, they had to, with respect to
24   each and every one of the patients who suffered longer term, who
25   have post-Lyme syndrome, who have problems after they've cleared

1    the Lyme bug, these doctors have to be going to bed at night and

2    saying, "I know I could treat this person with antibiotics, but

3    because of that big chunk of money I got, I'm not going to do

4    that because that violates the guidelines."  That's what they

5    have to have you believe can be inferred from what's in this

6    Complaint.

7              And Rule 9(b) is an exception to the standard notice

8    pleading rules.  The courts have recognized it.  It means that

9    because fraud is easy to allege and hard to disprove, your point

10   about the affirmative -- the proving the negative, that the

11   drafters of the federal rules say, yeah, when you're going to

12   allege a fraudulent thing, racketeering -- I mean, you know, we

13   lawyers throw this stuff around.  You talk to these doctors, and

14   they're being put in the same category as mafiosi.  That's not

15   just no prejudice, that's a horrible thing.  And for that

16   reason, the courts say you need to state with particularity what

17   fraud are you talking about.  What money did they get.  Who paid

18   it.  When.  And if you can't, then you can't bring a fraud

19   claim.

20             I have nothing further.  Thank you, Your Honor.

21             MR. DUTKO:  A brief response, Your Honor?  Your Honor,

22   may I approach?

23             THE COURT:  Yes.

24             MR. DUTKO:  Your Honor, for the record, I'm referring

25   to Torrey 000197.  Your Honor, what we're looking at there is a

1  CID from the Connecticut attorney general to Anthem, and the

2  only question it asks is "Tell us how much you paid the people

3  on  Schedule  A."    The  people  on  Schedule  A  are  the  IDSA

4  panelists, Dattwyler, Wormser, Halperin, Nadelman, Steere.

5           In response to that document, in response to the CIDs

6  to  the  other  insurance  defendants,  the  Connecticut  attorney

7  general  came  out  and  said  there  are  undisclosed  financial

8  represent-  --  or  financial  money  that's  being  paid  from  the

9  insurance companies to these IDSA panelists.

10          It's easy for Anthem's lawyer to stand up here and say

11 "Anthem doesn't have any payments."  Why can't Anthem just give

12 us the documents they gave to Connecticut?  That's all they have

13 to do.  If those documents show there's no payments, why haven't

14 they given them to us?

15          MR. TUTEUR:  I believe we have, Your Honor.

16          MR. DUTKO:   Your Honor, at the time we filed this

17 pleading, they certainly had not.  If they have dumped them on

18 us in the last couple of days, that's a different story.  But

19 why not give us those documents to show?  You know, why wait

20 years before that.  There's clearly some evidence before this

21 court that Anthem paid them.  And I can say the same for every

22 single one of the insurance defendants in this case.

23          THE COURT:   Well, I got us sidetracked there.   I

24 appreciate -- I appreciate the comments by both sides on that.

25          MR. DUTKO:   Your Honor, something that needs to be

1  raised is, and it's a little bit off topic, but counsel keeps
2  arguing that long-term antibiotics are deadly.  Hopefully, no
3  one in this room ever has to spend time in an ICU, but if you
4  spend time in an ICU for months, or even years, the first thing
5  you're given is antibiotics every day.  And the reason for that
6  is because they're not deadly.

7          In fact, the super bugs we hear about, as you probably
8  saw in the New York Times, the super bugs come from antibiotics
9  that are given to us through our poultry and our beef.  There's
10 more antibiotics in our body through the food we consume than
11 any antibiotics that are given to us by doctors.  Antibiotics
12 are not deadly and dangerous.

13         We're not asking for antibiotics for life.  We're
14 saying that there are some people that have treatment failure
15 for short-term antibiotics, and for them, they need more
16 treatment.  They are the ones who are denying that.

17         There's also an issue with the science, how the
18 science moves forward and how Dr. Steere's letters must be
19 incorrect.  Well, the new guidelines must mean that the science
20 is going back because the new guidelines represent the fact that
21 there may be chronic Lyme disease, they just don't know it.  And
22 so either the science is going backwards or we're actually
23 learning what we learned then, which is the fact that chronic
24 Lyme disease exists and they've been denying it for all these
25 years.

1          And finally, Your Honor, the review panel and the
2    settlement with the attorney general, the review panel was not
3    asked to determine whether there was an antitrust violation, was
4    not asked to determine whether the insurance defendants paid the
5    IDSA panelists.   They were only asked to review the IDSA
6    guidelines.   And as the court is aware, we have taken the
7    position, and everyone agrees, that the IDSA guidelines work for
8    some people, just like every guideline for every medical
9    treatment can work for people.   The problem we have and what's
10   causing this case is that they're not recognizing that there's
11   treatment failure, and for some people, they don't exist.

12         They're treating those guidelines as hard and fast
13   rules and refusing to allow patients who need longer term
14   antibiotic treatment to get that treatment and to properly get
15   the treatment to get better.

16         THE COURT:   Thank you.

17         MR. DUNN:   Your Honor, if you would like, I'm prepared
18   to let you know what the doctors have let the plaintiffs already
19   know about their search for payments.

20         THE COURT:   Sure.   Yeah.   That might be helpful.

21         MR. DUNN:   And it's pretty simple.   They've gone back,
22   all six doctors, and looked all through their tax returns and
23   asked their accountants if they have their old tax returns.
24   They've gone back and looked as far as they can, because any
25   evidence of payment would be within their tax returns because it

1   would be a consulting arrangement outside of their normal W-2

2   income.    And we've already told them that they found no

3   payments.  And, Your Honor, that's -- that's the fact.

4           And with respect to the Connecticut AG's CIDs, etc.,

5   there's nothing in the record that said the Connecticut AG found

6   that any particular health plan, Anthem, anyone, paid any

7   particular panelist, but particularly one of the six doctors

8   here.   There were more than a dozen panelists on the 2000 to

9   2006 guidelines, Your Honor.

10          THE COURT:  Thank you, Mr. Dunn.

11          MR. FEE:  Good afternoon, Your Honor, Brendan Fee for

12   Cigna.

13          THE COURT:  Good afternoon, Mr. Fee.

14          MR. FEE:  With the court's permission, I am going to

15   address the arguments with respect to the antitrust claims and

16   the statute of limitations with respect to all but three

17   plaintiffs.  And I have a set of slides which I'll distribute

18   here with Your Honor's permission.

19          THE COURT:  Thank you.

20          MR. FEE:  Your Honor, with respect to the antitrust

21   claims, the plaintiffs have failed in their First Amended

22   Complaint to plead an actionable antitrust conspiracy, and that

23   is for many of the same reasons that Mr. Tuteur already outlined

24   for the court, so I'm not going to spend a lot of time

25   retreading that ground.

1          But what I do want to focus on here, at least to

2    start, is the legal requirements for pleading an antitrust

3    conspiracy.  And Your Honor is well familiar with the Twombly

4    precedent from the Supreme Court in 2007 which was an antitrust

5    case in which the court held that an agreement must be pled by

6    plausible facts.  And I'm paraphrasing there, but that's a now

7    well-established law in this circuit and elsewhere.

8          And what an agreement means for antitrust purposes

9    here is a conscious commitment to a common scheme designed to

10   achieve an unlawful objective.  That's the Golden Gate Bridge

11   case from the Fifth Circuit.  But that quote comes from the

12   Monsanto decision from the Supreme Court.  That is a well-

13   established rule of law.

14         And that's important here because it means that you

15   can't just say, well, that I tried to influence someone.  There

16   needs to be an agreement.  A meeting of the minds is what the

17   court -- the words of the Fifth Circuit have used in the Marucci

18   Sports case.  And the Marucci Sports case I think is very

19   important here as well because factually, there are some

20   parallels.

21         In that particular case, there was -- centered on

22   standards development activity.  And Your Honor has heard and

23   seen in plaintiffs' papers and heard in argument that they are

24   -- have frequently positioned this case as a standards case.

25   But Marucci addressed that pretty specifically, and it said, you

1  know, when looking at an agreement in the context of a standards

2  development case, it's taken as a given that the parties worked

3  in concert to establish and enforce the standard, but there's

4  still no antitrust violation.

5        There's still no conscious commitment unless there are

6  plausible facts demonstrating a meeting of the minds among the

7  defendants to restrain trade, and the meeting of the minds needs

8  to be pleaded with specific facts.  That's what the court in

9  Marucci Sports held.  And so I think that's an important

10  backdrop here to think about as the court is considering the

11  antitrust claims in this case.

12        And if you look back at Your Honor's prior ruling, the

13  court concluded, or observed at least, in describing the

14  antitrust claims -- and I'm quoting here from page 10 of the

15  court's opinion -- "Plaintiff's allege that the insurance

16  defendants engaged in a conspiracy to unreasonably restrain

17  trade in the relevant market, the Lyme disease treatment market,

18  by paying large consulting fees to the IDSA panelists to pass on

19  the IDSA -- pass the IDSA guidelines -- which denied the

20  existence of chronic Lyme disease and established the standard

21  that all Lyme disease is cured with short-term antibiotics."

22  And the court goes on.

23        But the principal fact, factual allegations that were

24  relied on by the court in concluding that the antitrust claims

25  were sufficient, centered on this allegation of payment.  And

1   I'm not going to go through in detail again what Mr. Tuteur

2   already touched upon, but I do want to highlight a couple of

3   allegations.  And you don't -- there's been some attempts to

4   characterize the Complaint here.  I'm not going to try and do

5   that.  What I'm going to do is show Your Honor the red line that

6   was filed with the plaintiff's First Amended Complaint, and

7   that's at ECF Number 86 -- or 186, I'm sorry -- Exhibit H.

8       And this is taken directly from that.  And here you'll

9   see that plaintiffs have significantly changed their allegations

10  by taking out the phrase "large payments", and also by talking

11  about this concept of influence, right?  So this is one such

12  allegation that has been materially changed from the initial

13  Complaint to this -- to the First Amended Complaint.

14      And the second here is this allegation about Dr.

15  Steere which -- which Mr. Tuteur mentioned in detail.  And so

16  you don't need to take my word for it or Mr. Tuteur's word for

17  it, you can look at the actual Complaint that was filed with

18  this court and you can see that the allegations as to payments,

19  as to large payments, have been significantly watered down and

20  eliminated.

21      And you can also see that this notion of an agreement

22  has changed substantially.  And I'm not going to again go

23  through all of the allegations with Mr. Tuteur did, but the

24  reality is, is there are no longer any specific allegations that

25  the insurance defendants paid large sums of money to the IDSA

1    **panelists to work together.  And in the current pleading, the**

2    **best   the   plaintiffs   can   muster   is   an   allegation,   upon**

3    **information and belief, that the insurance defendants paid the**

4    **panelists in order to influence them.**

5          **And there's something fundamentally different between**

6    **attempts to influence and the meeting of the minds that the case**

7    **law requires.  An attempt to influence is, for example, one**

8    **might attempt to influence a politician to vote a certain way**

9    **and may, in fact, try to do that by way of making a contribution**

10   **to their campaign.  That doesn't necessarily mean that there's**

11   **been an agreement between the person making that contribution**

12   **and the -- and the politician to vote a certain way or act a**

13   **certain way.**

14         **Attempts to influence and meeting of the minds are**

15   **fundamentally different and they're different -- and it's --**

16   **that is critical, because as the court in Marucci Sports held,**

17   **the critical question -- and I'm using the court's words there**

18   **-- the critical question is whether there was an intention on**

19   **the part of the defendants to engage in a conspiracy, and the**

20   **plaintiffs' allegations here, as they have been amended from the**

21   **initial Complaint to the First Amended Complaint, simply do not**

22   **satisfy that standard.**

23         **And we made this argument in our papers, Your Honor,**

24   **and   plaintiffs'   rejoinder   in   their   papers   was   to   simply**

25   **regurgitate arguments about causation, about market definition,**

1   about things that, frankly, Your Honor, we never argued.  So

2   nowhere in their papers did plaintiffs address this argument.

3   It was only until we got here today that we heard from Mr. Dutko

4   that they perceived themselves to have actually beefed up their

5   Complaint.  And he pointed specifically to I believe it was

6   paragraph 115 of the Complaint, and he described that as being

7   sort of a paradigmatic example of how the plaintiffs, in their

8   First Amended Complaint, have alleged an actionable conspiracy.

9   And that paragraph reads as follows:

10       "The IDSA and the IDSA panelists and the insurance

11  defendants engaged in a conspiracy that restrained trade in the

12  relevant market."  And it goes on to say,  "The IDSA -- the IDSA

13  panelists and the insurance defendants used the IDSA guidelines

14  development process to consciously agree to exclude actual Lyme

15  doctors."

16       The recitation of an agreement, the recitation of the

17  words "consciously agree", those are legal conclusions.  Those

18  are precisely the types of allegations that the court in Twombly

19  in an antitrust case said ought not be credited.  And so they

20  simply do not satisfy the standard here.  And in light of the

21  plaintiff's removal of other key factual allegations around

22  payments, the plaintiffs' claims for antitrust conspiracy simply

23  don't pass muster.

24       And I would also add, Your Honor, that we heard again

25  today that -- I shouldn't say again today -- we heard for the

1   first time today that the plaintiffs are asserting that this

2   notion that the Connecticut attorney general did an

3   investigation, gosh, over 20 years ago, should lend some degree

4   of plausibility to their -- their conspiracy claims.  The case

5   law is virtually unanimous that the fact of a government

6   investigation in any antitrust context simply does not give rise

7   to a plausible inference of conspiracy.  The cases are unanimous

8   on that.

9          And, by the way, in this particular context, the

10  Connecticut AG found, purportedly, that there were conflicts of

11  interest, but didn't say anything about what insurance companies

12  made any payments or did anything.  So there's just this kind of

13  broad amorphous notion that insurance companies did something.

14  That's simply not enough.

15         And coupling that with the fact that the plaintiffs

16  have removed the critical allegations giving rise to their

17  conspiracy claim, the antitrust claims that have been asserted

18  in the First Amended Complaint should be dismissed.

19         THE COURT:  Thank you very much.  Mr. Dutko, let's

20  take a short recess before we hear your response.

21         MR. FEE:  Your Honor, if I might, I just had another

22  point to raise on the statute of limitations, and I can raise it

23  whenever Your Honor's ready.

24         THE COURT:  Yeah.  Let's take our -- let's take a

25  short break, and then we'll hear the statute of limitations, and

1    then we'll hear --

2            MR. FEE:  Certainly.  Thank you.

3            THE COURT:  Thank you.

4    (A RECESS WAS TAKEN, AFTER WHICH THE FOLLOWING PROCEEDINGS WERE

5    HELD:)

6            THE COURT:  Sorry to interrupt you.

7            MR. FEE:  No.  Thank you, Your Honor.  Appreciate it.

8            So in addition to their conspiracy argument which I

9    just addressed, I'd also like to touch on the continuing

10   conspiracy component.

11           In addition to fraudulent concealment, plaintiffs have

12   also relied upon the so-called continuing conspiracy exception

13   to the statute of limitations.  But even taking that, Your Honor

14   will recall in the court's earlier opinion, the court previously

15   noted that three plaintiffs alleged over anti-competitive action

16   occurring within four years of the Complaint, thus allowing the

17   continuing conspiracy exception to be triggered.

18           But I want to -- we are not challenging in this motion

19   necessarily the conclusion that the court drew with respect to

20   those three plaintiffs.  But as for the other plaintiffs, the

21   controlling law dictates that where there are no allegations

22   specific to those plaintiffs, that the continuing conspiracy

23   exception ought not apply.  And I want to just run through the

24   key provisions of Fifth Circuit law on the continuing conspiracy

25   exception because that is really what animates this argument.

-54-

1        So in order for the continuing conspiracy exception to
2   apply, there must be -- there are essentially two elements.
3   First, there must be some injurious act actually occurring
4   during the limitations period, meaning a new overt act that is
5   injurious to the plaintiff.  So there needs to be an injury to
6   the plaintiff, right?  And the second is, there needs -- that
7   injury needs to qualify as an antitrust harm.  So that means a
8   harm that is derivative of a reduction in competition.  And so
9   those are the two key elements that need to be present in order
10  for the continuing conspiracy exception to attach.

11       And, in fact, the court, in Kaiser Aluminum, even went
12  as far as to say that there needs to be a separate and distinct
13  antitrust violation within the four years for the continuing
14  conspiracy exception to attach.

15       Now, I would respectfully submit that at a minimum,
16  there needs to be an act that's injurious to the plaintiff and
17  that qualifies as an antitrust injury.  And it's important here
18  that the injury to the plaintiff means that it must be -- that
19  this analysis must be done on a plaintiff-specific basis.  In
20  other words, whether a claim is going to be time-barred or
21  whether a claim is subject to the continuing conspiracy
22  exception is an individualized inquiry that needs to be analyzed
23  plaintiff by plaintiff.

24       And this is not a class action, so the American Pipe
25  tolling exception whereby an individual plaintiff may be able to

1    take advantage of the pendency of a -- of a class action brought

2    by another party to toll the statute of limitations, that's not

3    present here.  We don't have a class action, so that's not an

4    issue.   So the key here is that we need to undertake an

5    individualized inquiry with respect to each of the plaintiffs in

6    this case and analyze the Complaint with respect to each of the

7    plaintiffs in this case.

8             THE COURT:  So that suggests to me this is something

9    that might more appropriately be dealt with on summary judgment.

10            MR. FEE:  Well, Your Honor, the court has been -- the

11   Fifth Circuit, at a minimum, has said that where the -- the

12   statute of limitations issues can be resolved when the defense

13   appears on the face of the pleadings, and it does here, Your

14   Honor, because all of the conduct alleged in this Complaint took

15   place well before November 10th, 2013.

16            And so in order to avail themselves of the exception,

17   the plaintiffs need to affirmatively plead facts that suggest

18   that there were overt acts within the limitations period that

19   caused injury to each plaintiff, and each of those injuries

20   needs to be an antitrust injury.

21            So taking as a given the fact that Ms. Hanneken,

22   plaintiff Hanneken, was allegedly denied coverage in 2014,

23   inside the limitations period, okay, potentially can take

24   advantage of it.  Rosetta Fuller, diagnosed with Lyme in 2016,

25   potentially can take advantage of the continuing conspiracy

1   exception, although I would point out that her being diagnosed

2   with Lyme is not necessarily an overt act by a defendant.  But

3   at least there is some sort of activity taking place within the

4   limitations period.

5       Same for plaintiff Moreira.  But with respect to all

6   of the other plaintiffs, there is not a single allegation that

7   there has been injurious conduct that has been -- that has

8   affected them within the limitations period.  And so for that

9   reason, Your Honor, all of those plaintiffs' claims are barred

10  by the statute of limitations with the exception of these three.

11      And, you know, Your Honor, I think it's helpful

12  because this is a pretty complicated story that's been told in

13  the Complaint.  And I think it's helpful to think about this in

14  a more traditional sort of antitrust conspiracy sense.  And if

15  you were to take, for example, the horizontal price-fixing

16  conspiracy, right, where the suit was filed in 2017, and the

17  conduct alleged took place in 2010.  You have two separate suits

18  filed, each by separate purchasers of the price-fixed product.

19      One, plaintiff purchased in 2016 within the statute of

20  limitations period, right?  Purchased the goods at an inflated

21  price during the statute of limitations period.  The other

22  purchased in 2011 before the statute of limitations period and,

23  therefore, did not suffer injury within the statute of

24  limitations period.  It is not the law that the plaintiff who

25  purchased outside of the statute of limitations period can take

-57-

1    advantage of, for statute of limitations purposes, the injuries

2    suffered by a separate plaintiff.  And that's precisely what we

3    have here.  So I think that's the gist of the argument, Your

4    Honor.

5           And plaintiffs have responded to this -- this argument

6    in our papers by saying this is an issue that the court has

7    already decided.  They say in their Brief at page 20 the court

8    has already decided this issue and thus need not decide it

9    again, but this issue was not presented in the earlier Brief.

10          What the defendants sought was a blanket dismissal of

11   all   claims   on   behalf   of   all   plaintiffs,   and   Your   Honor

12   acknowledged that in the court's opinion at page 33 and 34 where

13   it   says   that   the   allegations   with   respect   to   plaintiffs

14   Hanneken, Fuller, and Moreira precluded the court from granting

15   a blanket dismissal.  And that doesn't necessarily mean, and I

16   would submit it should not mean, that the court should not, and

17   ought not, dismiss the claims of the other plaintiffs in this

18   case   for   whom   there   are   no   factual   allegations   of   overt

19   injurious anti-competitive acts within the limitations period.

20          THE COURT:  Thank you, Mr. Fee.

21          MR. FEE:  Thank you, Your Honor.

22          MR. DUTKO:  May I respond, Your Honor?

23          THE COURT:  You may.

24          MR. DUTKO:  Your Honor, one of the issues in this case

25   is whether the antitrust allegations have been properly brought,

1    and one of the arguments made by counsel was that plaintiff

2    simply regurgitated the arguments that were made in the response

3    to the original Motion to Dismiss.  And the reason for that,

4    Your Honor, is because of 20-odd -- 20-some pages, 22 pages of

5    argument that plaintiffs had in their motion, Amended Motion to

6    Dismiss, the one we're here to talk about.  Three pages deal

7    with antitrust and two of those pages talk about the fact that

8    large fees got taken out.

9            And, basically, we had no clue exactly how to respond

10   other than to establish -- reestablish again that we have

11   properly pled an antitrust claim, which is exactly what we did.

12   And that's important because we only have to meet the 8A

13   pleading requirement to overcome the Motion to Dismiss on an

14   antitrust case.  Antitrust cases are not subject to the

15   heightened pleading standard, according to the Fifth Circuit,

16   and only a short and plain statement of the claims showing that

17   the pleader is entitled to relief is what's necessary.

18   Plaintiffs need only plead enough facts to state a claim to

19   relief that is plausible on its face.

20           Your Honor, two paragraphs of our Complaint were

21   brought up on a Powerpoint slide by counsel.  One of those came

22   from our RICO allegation and the other one came from our

23   fraudulent concealment allegation.  What counsel neglected to

24   tell this court is there are over 35 pages of non-conclusory

25   antitrust allegations that contain factual allegations and

1    evidence to support antitrust allegations, and they are

2    identical to the allegations that were made in plaintiffs'

3    original Complaint.

4         These are the same allegations that this court held,

5    "Plaintiffs have sufficiently alleged a claim of monopolization

6    under number 2 of the Sherman Act, and for the foregoing

7    reasons, defendant's motion to dismiss plaintiffs' claim brought

8    under 1 and 2 of the Sherman Act are denied."

9         Your Honor, we have already gone over, which is the

10   majority of the argument in the papers, the large sums of money,

11   and we've discussed the fact that instead of using the words, we

12   brought evidence.  And we've also gone over the fact that we

13   have established through numerous paragraphs of our pleadings an

14   intention on the part of the defendants to engage in a

15   conspiracy.  And I cited that in one of the paragraphs, Your

16   Honor.

17        Your Honor, if you look at the three pages of argument

18   that the defendants made in this case with respect to antitrust

19   allegation and you look at the cases that they relied on, it

20   shows you why defendants' arguments fail in this case, Your

21   Honor.  And if the court will allow me, may I approach?

22        THE COURT:  Yes.

23        MR. DUTKO:  Your Honor, what I have handed the court

24   is, I've handed the court the plaintiffs' original Complaint,

25   and one of the cases they relied on, Vendever versus Intermatic

1    Manufacturing, you will see that that plaintiffs' original

2    Complaint is, I believe, nine pages.  Of those nine pages, there

3    is one-half of a page with individual lines on page 6 dedicated

4    to conspiracy allegations under the Sherman Act.  What we're

5    talking about is roughly 10 paragraphs of one line each.

6         Likewise, Your Honor, the Marucci Sports versus the

7    National Collegiate Athletic Association has -- if you look on

8    the allegations of fact, Your Honor, on page 9 and 10 -- or, no,

9    it's actually page 3 and 4 -- there's a few paragraphs with a

10   couple of lines each.  And then once you get onto page 5,

11   there's a bunch of conclusory allegations as to how those few

12   paragraphs on two pages meet the antitrust violation.

13        That's not what we have in our case.  These cases were

14   dismissed because they actually alleged no facts.  That's why

15   these cases were dismissed and that's why they rely on it.

16   That's not our case, Your Honor.  In our case, we have alleged

17   more than 35 paragraphs of specific antitrust allegations

18   setting forth a conspiracy on the fact -- on the part of the

19   defendants.

20        We have alleged an allegation of standard-setting,

21   which the Fifth Circuit has held,  "A standard-setting

22   organization can be rife with opportunities for anti-competitive

23   activity."  And that's exactly what we have alleged in this

24   case.

25        Again, the United States Supreme Court,  "There's no

1   doubt that members of such standard-setting associations often

2   have economic incentives to restrain competition and that the

3   product standards set by such associations have a serious

4   potential for anti-competitive harm.  Accordingly, private

5   standard-setting associations have traditionally been objects of

6   antitrust scrutiny."

7        Your Honor, those are the allegations that we have

8   made in this case.  Those are the same allegations this court

9   relied on in denying the Motion to Dismiss.  They simply want a

10  second bite at the apple.

11       Your Honor, we ask the court to look at the pleadings

12  and look at the allegations that we made and not look

13  specifically at two random paragraphs that we changed in our

14  Complaint.

15       Now, Your Honor, as to the statute of limitations,

16  Your Honor, I can certainly argue that, but it's the exact same

17  argument that we made in the first time.  It's the exact same

18  argument the court denied.  It's the same argument that this is

19  an issue.  I believe the court even may have said exactly what

20  the court said today, which is isn't this a summary judgment

21  issue?

22       There is nothing on the face of the pleadings to allow

23  counsel to have a motion to dismiss on the statute of

24  limitations.  It's simply a second bite at the apple, Your

25  Honor.  They said this is not the same argument that we made.

1    Why didn't they make it?  They could have made it.  They had

2    plenty of time to make that argument.  All they did was now they

3    carved out three separate people and they say our argument's

4    different.

5           Your Honor, we stand on the papers that we submitted

6    to the court and we stand on this court's prior ruling.

7           MR. FEE:  Very briefly, Your Honor.

8           THE COURT:  Oh, certainly.

9           MR. FEE:  Your Honor, just a few points.  First, I was

10   accused of representing to you only a few random paragraphs.  I

11   -- I attempted to do that as a favor to the court because I did

12   -- we had already discussed them at length.  And I think the

13   same points that Mr. Tuteur made apply equally to the antitrust

14   claim.  So I used those two paragraphs as an example.

15          The second thing is that counsel suggests that in

16   order to do the motion to dismiss analysis on the antitrust

17   claims pleaded in the First Amended Complaint, that there ought

18   to be some sort of weighing of paragraphs exercise that needs to

19   take place.  That's simply not the law.

20          And I would invite Your Honor to look at -- carefully

21   -- at the Marucci Sports decision because while it does say that

22   antitrust claims are subject to the Rule 8 standard, it goes on

23   to spell out specifically in the antitrust context, including in

24   a standards development type case, what needs to be alleged.

25   And under that standard which I've described to Your Honor, we

1    put in our Brief and I've put in my slides, the First Amended
2    Complaint fails.

3            And I would also say, Your Honor, that Mr. Dutko made
4    a point about this idea that this is a standard-setting lawsuit,
5    and  there's  really  nothing  special  from  the  antitrust
6    perspective about a standard-setting lawsuit.  And, in fact, the
7    Supreme Court cases that are cited by the plaintiffs in this
8    very slide spell out that standard-setting can be -- can, and
9    frequently  is,  pro-competitive.    And,  in  fact,  that's  a
10   concession that's made in the Complaint.  And I'll -- I'll read
11   to Your Honor from paragraph 108 where it says:

12           "Standard-setting is important because of its pro-
13   competitive benefits, such as safety -- or quality and safety
14   standards and the ability of products to interface with other
15   products."   Right?   So there's nothing inherently nefarious
16   about standards development.  And the Marucci Sports case speaks
17   to that directly.  And, in fact, the Supreme Court has said, and
18   the plaintiffs have conceded, that standards development is
19   frequently, and in this particular instance, pro-competitive.
20   So there ought not be some sort of prejudice or some sort of --
21   some sort of different standard that ought to apply.

22           Under  the  controlling  standard,  which  is  the  one
23   that's set forth in Marucci Sports, this Complaint fails.

24           THE COURT:  Thank you.

25           MR. DUTKO:  Nothing further.

-64-

1          THE COURT:  Okay.

2          MR.  DUNN:   Your Honor, Alvin Dunn for the doctor

3  defendants on this motion, for the Renewed Motion to Dismiss for

4  Lack of Personal Jurisdiction.  And I have some slides as well.

5          Your Honor, before I start, I just want to make sure

6  a couple of things are clear from the argument on the motions to

7  dismiss because I just want to make sure the court understands.

8  The doctors looked hard and found no evidence of payments from

9  any of the insurance defendants.

10          I'm not standing up here and saying to you that there

11  were never any payments.  I mean, there's absolutely evidence

12  that they've cited in their Complaint that Dr. Sigal, in the

13  mid-1990s, did have some arrangements with some health insurance

14  companies, and so he'll testify, when he's deposed, as to

15  whatever he recalls about that.  But he and the other doctors

16  looked for evidence of any such payments and found no evidence.

17          And some of the doctors will swear to you that they

18  never took any payments.  But as far as like what they could

19  find in looking back in their tax returns for as far back as

20  they could go, they found no evidence of any payments from any

21  of these insurance defendants.

22          And then just one more point of clarification.  I

23  think Mr. Tuteur -- somehow the ILADS guidelines came up, which

24  are the other set of guidelines, and he mentioned 2014.  Just to

25  clarify, and it's cited in their Complaint, the first ILADS

1    guidelines came out in 2004.

2              THE COURT:  Okay.

3              MR. DUNN:  Which had all of the things in them that

4    plaintiffs are now saying should be the guidelines.  The revised

5    guidelines came out in 2014, those revised guidelines.

6              So, Your Honor, during the argument in opposition to

7    the Motion to Dismiss the RICO claims, Mr. Dutko said that, oh,

8    RICO shouldn't matter.  It's all the same discovery, etc.  Just

9    let the RICO claims stand.  It matters to the doctors, Your

10   Honor.  If the RICO claims are dismissed, as they should be,

11   Your Honor, the doctors would need to be dismissed.  And that's

12   because under the basic rules for specific jurisdiction, the

13   plaintiffs haven't alleged, and they have no evidence, even

14   though they've gotten to take jurisdictional discovery, that the

15   doctors have specific contacts with Texas with respect to the

16   matters raised in the Complaint.

17             Your Honor, these slides are actually unchanged from

18   when we were here in March because in the new Complaint which

19   the plaintiffs filed after --

20             THE COURT:  Let me just -- Mr. Dunn, let me just

21   follow up on that.  Let's take the reverse.  Assuming the court

22   allows the RICO claims to proceed, is there any basis for your

23   Motion to Dismiss?

24             MR. DUNN:  Your Honor, I think there is.  Under the

25   interest of justice standard, I still don't think that it's met.

1  These doctors have no connection to Texas.  This case -- all the

2  doctors are based in the northeast.  The health plans do

3  business everywhere.  This case really could have been brought

4  in New York, much more convenient up in Lyme country where all

5  of that is, so I really --

6          THE   COURT:    I  don't  want  to  short-circuit  your

7  argument.  I'm happy to hear anything you want to present, but

8  one of the questions I was going to ask you is whether there is

9  another jurisdiction in which all of the doctors are subject to

10 personal jurisdiction.

11          MR. DUNN:  Many, many, many of the doctors -- and we

12 briefed this in the original round -- would absolutely be

13 subject to jurisdiction in New York.  Two of them -- or three of

14 them live there.  One of them is in New Jersey, comes to New

15 York all the time for business matters, and New York is a real

16 center for -- for all of these research activities you can see

17 in Stony Brook New York Medical College.  So if it's -- it may

18 be every one of them.  And if it's not one, it might be like

19 some -- for example, Dr. Steere, who they dropped all of their

20 allegations of any payments to Dr. Steere as you -- as you've

21 seen.

22          So I believe that absolutely New York if -- again,

23 almost everybody or -- or possibly everybody, particularly if

24 you drop Dr. Steere.  And we put that information in -- in the

25 prior round.

1    So, Your Honor, it's -- I really think they haven't

2 even tried to -- if you look in the briefing, they haven't even

3 tried to allege specific contacts with Texas concerning this.

4 And I'll just -- a sufficient nexus is required, and they don't

5 have -- alleged any contact with any doctor in Texas by a

6 plaintiff.  No plaintiff alleges having any communication from

7 any doctor or alleges any injuries.

8    And then the evidence on each doctor is in the record,

9 Your Honor.  Each doctor has occasional visits to Texas.  Many

10 of them say "My visit had nothing to do with Lyme disease," but

11 the plaintiffs argue that because a doctor might be a Lyme

12 disease expert, it must be that the only reason that the doctor

13 visits Texas is to spread false claims about Lyme disease.

14 There's no evidence of that, Your Honor.

15    They had jurisdictional discovery.  They had -- we

16 answered interrogatories.  We produced documents.  We made them

17 available for depositions.  The uncontroverted evidence is that

18 Dr. Halperin, for instance, he visits Texas to visit family.  He

19 doesn't visit Texas to spread false information about Lyme

20 disease.

21    And, Your Honor, it's in the Briefs.  It's for each of

22 these doctors.  They say just because the doctor is an expert

23 and they allege the doctor has signed on to the IDSA guidelines,

24 they allege that the doctor, oh, must have been in Texas to say

25 false things about the guidelines.  False things about Lyme

1   disease.  That's their speculation.  They have no evidence of

2   that.  No plaintiff has said anything about that.  It's the case

3   for all of these doctors.

4         Dr. Shapiro had a connection a long, long time ago to

5   Texas cases, but he never came to Texas to do anything on those

6   cases.  He was always up in Connecticut.  So, Your Honor, not

7   even Dr. Shapiro, who was on -- as an expert witness.  And

8   there's no evidence that these are expert witness engagements

9   that have anything to do with the insurance defendants.  This

10  might be like the med-mal or another type of case.  So even Dr.

11  Shapiro, Your Honor, has no connection to Texas regarding the

12  allegations in this case.

13        So for that reason, Your Honor, the doctors should be

14  dismissed.

15        THE COURT:  Thank you.

16        MR. DUTKO:  Quick response, Your Honor?

17        Your Honor, as the court stated, if there is a RICO

18  allegation -- and we ask that the court keep the RICO allegation

19  under the relaxed pleading standard -- if there's a RICO

20  allegation, then there is nationwide jurisdiction as to all of

21  these doctors.

22        But I do want to address some of the specific doctors.

23  And I do recognize that some of them have more contacts than

24  others, but here's the issue that we keep running into.  For

25  example, Dr. Shapiro, who counsel got up here and said has very

1  small contacts and in the discovery said an approximately eight

2  cases working for a Texas attorney, but later on we found a

3  deposition in which Dr. Shapiro testified he was hired by Mark

4  Muller, an Austin -- and another Austin lawyer between 10 to 20

5  times, and all of these cases were lawsuits pending in Texas.

6  He testified he provided deposition testimony in Texas cases

7  five or six times.  Many of these cases involved Lyme disease.

8          And so it goes on.  Dr. Raymond Dattwyler has visited

9  Texas more than 10 times.   He goes to Houston to act as a

10  witness in a grand jury appearance.  You know, Dr. Halperin has

11  visited three to five weekends a year, visited Memorial Hermann

12  in Houston.  Some of them have more contacts than others.  The

13  problem is, we can't get to the bottom of it because the

14  representations that we're getting as to the contacts are not

15  there.

16          We believe we're -- we're scheduling the depositions

17  of these doctors.  We can, obviously, get to the bottom of the

18  contacts that they have during those depositions, and those are

19  coming up starting next week, but we believe there are

20  sufficient contacts for some of these doctors, and it's set

21  forth in the papers, as to have minimum contacts to have this

22  court to have jurisdiction over them.

23          THE COURT:   Is there any evidence that any of the

24  doctors discussed chronic Lyme disease while they were in Texas?

25          MR. DUTKO:  Well, here's the issue, and the issue is

1  we haven't taken their depositions.  These are doctors who

2  specialize in Lyme disease.   In fact, you've heard counsel

3  earlier today say these are world-renowned Lyme experts.  They

4  keep coming to Texas to go to these seminars.  They won't tell

5  us what's discussed at these seminars, and so we have no idea.

6  But we can assume that it's true because at every turn, they

7  have no problem expressing the opinion that chronic Lyme doesn't

8  exist.  And so we don't know yet, based on the limited discovery

9  that we have, whether they brought up the idea that chronic Lyme

10 doesn't exist.

11        And as the court is aware, in the papers we cited a

12 Fifth Circuit law that says, "Specific jurisdiction exists when

13 a   non-resident   defendant   has   purposefully   directed   its

14 activities at the forum state and the litigation results from

15 alleged   injuries   that   arise   out   of   or   relate   to   those

16 activities."

17        Several of these doctors that we cite in the papers

18 say Lyme doesn't exist in Texas.  We know that's not true.  One

19 of them talked about George Bush or somebody not having Lyme

20 disease because it doesn't exist in Texas.   Your Honor, we

21 believe that the only reason why you would come to Texas as a

22 world-renowned Lyme researcher and give a presentation is to

23 talk about Lyme disease.  I mean, that -- that's what they do.

24 And so we believe once we get the testimony of the doctors,

25 starting next week, we will be able to establish just that fact,

1  Your Honor.

2  And as for the reference --

3  THE COURT:  I'm going to ask my question again.

4  MR. DUTKO:  Yes.

5  THE COURT:  Is there any evidence that the doctors

6  discussed chronic Lyme disease while they were in Texas?

7  MR. DUTKO:  No.

8  THE COURT:  Thank you.  Is that all?

9  MR. DUTKO:  Yes.

10  THE COURT:  Okay.

11  MR. DUNN:  Your Honor, can I just respond just very

12  briefly?

13  With respect to Dr. Shapiro, they allege in their

14  papers that many of his cases involve Lyme disease.  Look at the

15  transcript.  That's not the case.  He's not sure.  He said maybe

16  one involved Lyme disease.  He's not even sure if it was in

17  Texas.

18  The Dattwyler grand jury appearance, he says, did not

19  involve Lyme disease.  Did not involve disease, I don't think.

20  I think it was a white collar crime thing.  It has nothing to do

21  with this case.  Plaintiffs want -- are asking you to let them

22  take depositions and -- and ask questions about Texas contacts.

23  Your Honor, you granted them three or four months of

24  jurisdictional discovery last fall and winter.  We responded to

25  each document request, each interrogatory.

1          They never asked for jurisdictional depositions.  They

2     had every right.  I offered them depositions.  They had every

3     right to take depositions to ask then about Texas contacts.

4     Their time is up, Your Honor, and they have no evidence that

5     these six doctors have had any connection to Texas regarding

6     this case, and we urge that you dismiss them for personal

7     jurisdiction grounds.

8               THE COURT:  Okay.  Thank you, Mr. Dunn.

9               Mr. Dutko, anything further?  Mr. Dutko, let me ask

10    you a slightly belated question.  Is there -- were any of the

11    plaintiffs injured in Texas by the alleged actions here?

12              MR. DUTKO:  I believe one or two of the plaintiffs

13    reside -- when we found plaintiffs, one of the two of them

14    resided in Texas at some point and suffered some injury in

15    Texas.  I don't have that specific information, but I believe --

16              THE COURT:  Okay.

17              MR. DUTKO:  I believe Lisa Torrey lived here for a

18    period of time in which she was injured.

19              THE COURT:  Was that --

20              MR. DUTKO:  I can certainly get the court that

21    information in some briefing if you want, but I don't have that

22    information in front of me right now.

23              THE COURT:  What about during the four years preceding

24    the filing of the lawsuit?  I know what Mr. Fee argued, but from

25    your perspective, do you know?

1          MR. DUTKO:  Well, here's the thing, Your Honor.  I

2   mean, all of them -- and that's part of the argument we made in

3   response to that -- all of them are continually injured because

4   they're still suffering injury.  So anybody that was living in

5   Texas was still suffering within the last four years, because

6   the idea of not having chronic Lyme disease and having to pay

7   out of pocket for something that supposedly doesn't exist, they

8   continue to suffer these injuries every day.  And so anytime in

9   the last four years, if any of them have lived in Texas, they

10  would have suffered those injuries in Texas.

11          THE COURT:  Okay.  All right.  Thank you.

12          MR. DUNN:  Your Honor, just for the record, and it's

13  in the briefing, before Lisa Torrey filed this Complaint, she

14  had already moved to California, even though the Complaint and

15  the Amended Complaint allege she's a Texas resident.  According

16  to the records produced by plaintiffs, that actually is false.

17          MR. DUTKO:  Your Honor, Kathryn Kocurek is -- lives in

18  Texas.  That is a fact.  And Lisa Torrey, we believe at the time

19  of the Complaint that was originally filed, lived in Texas.  She

20  moved to California.  I don't know the exact date.  But Kathy

21  Kocurek is certainly a defendant in Texas.  I mean plaintiff in

22  Texas.

23          THE COURT:  Mr. Fee?

24          MR. FEE:  Your Honor, if I may just very briefly.  As

25  to this notion that plaintiffs have continued to suffer injury

1   in Texas in the last four years by suffering the effects of Lyme

2   disease, I would just point Your Honor to a case that was cited

3   in our papers, and it's RX.com versus Medco from this court in

4   which the court clearly said that the unabated inertial

5   consequences of a pre-statute of limitations event is not

6   sufficient to trigger the continuing conspiracy exception.  So

7   I would just point Your Honor to that precedent.

8            THE COURT:  Okay.

9            MR. EGDORF:  Briefly.  Unless there's an ongoing

10  conspiracy, Your Honor, and our allegations are there is an

11  ongoing conspiracy.

12           THE COURT:  Okay.  All right.  What else?  Anything

13  else?

14           Tell me how discovery is proceeding.  I know there was

15  a Motion to Compel that was filed last week.  I don't think the

16  plaintiffs had requested expedited briefing.  My suggestion is,

17  as soon as it's fully briefed, we're going to set it for a

18  hearing.

19           MR. EGDORF:  And that's fine, Your Honor.  We've been

20  trying.  We've had numerous certificates of -- certificates --

21  we've had numerous meet-and-confers with all the defendants.

22  We've been struggling to get the deposition dates worked out.

23  Some of the defendants don't want to give us deposition dates

24  until after the expert disclosure deadline which, obviously, we

25  take some issue with, and if need be, we'll file another motion

1   on that.

2          You know, we're still trying to get documents from

3   defendants.  We had a large document dump put on us in the last

4   day or two.  So at least we're getting them, but we're getting

5   them awfully late in terms of what the schedule is in the case.

6          We're trying -- one of the things we filed a motion on

7   is we're trying to get claims data just to find the histories of

8   denials of Lyme disease claims, specifically for chronic Lyme

9   disease complaints.  So we'd obviously like those issues briefed

10  as soon as we can, and if we need to file something for

11  expedited, we will, but it's going to start raising as an issue

12  with the expert deadlines in terms of all -- all the things

13  we're trying to get done here.

14         In terms of the other side, I'd defer to Mr. Dutko to

15  get my numbers right, but I think more than half of the

16  plaintiffs have been deposed, and I believe all the plaintiffs'

17  depositions have been scheduled, at least, and are ongoing.

18         THE COURT:  Okay.

19         MR. DUTKO:  We've had to move a couple, but I believe

20  more than half have been taken.

21         THE COURT:  Okay.  All right.

22         MR. DUNN:  And, Your Honor, just -- there's been a

23  protocol to make sure you have your documents produced a week

24  before the deposition, and we've been following that protocol.

25  So Dr. Halperin produced his documents yesterday or the day

 1  before.

 2          And just to be clear, the doctors, if they're

 3  dismissed, will continue to appear for depositions and -- and

 4  produce documents as non-parties, unindicted co-conspirators.

 5          THE COURT:  All right.  Good.

 6          MR. TUTEUR:  Just so that the timing is right, I

 7  believe that an Amended Motion to Compel was filed which added

 8  some new arguments, I'm assuming.  I don't know the rules of

 9  this court, but when you amend something --

10          THE COURT:  You'd better know the rules of the court.

11          MR. TUTEUR:  I know.  And I'm sorry.  I should never

12  have said anything like that.

13          MR. EGDORF:  Oh, I can help on that.  So all we did

14  was, there was some references indicating that some of the

15  defendants had not provided deposition dates.  In the interim,

16  they had provided dates, so we took out those defendants in

17  terms -- that's -- that's all that's changed.

18          THE COURT:  Fair enough.

19          MR. TUTEUR:  I thought there were some additional

20  arguments, but anyway, I -- we've assumed that the clock begins

21  to run when a -- an amended motion comes.  If that's not the

22  case, then we should -- you know, we would want to know that,

23  but --

24          THE COURT:  The rules may not address that.

25          MR. TUTEUR:  Well, so that -- maybe that's why I don't

1    know the rules, Your Honor.

2          MR. EGDORF:  Well, Judge, if I may, can we just --

3    since it's going to impact our expert deadlines, if we don't get

4    it ruled and decided upon, I'm going to end up asking you to

5    move the expert deadlines.  Can we go ahead and set a briefing

6    schedule and/or a hearing or a date that you want to rule upon

7    it?

8          THE COURT:  When was the amended motion filed?

9          MR. EGDORF:  Monday, I think.

10          THE COURT:  Okay.  Well, I saw the original motion, I

11    guess.

12          MR. EGDORF:  The original motion was a couple of weeks

13    ago, and I think we amended it on Monday when I realized or

14    advised my folks that some of the information in there had

15    changed.

16          THE COURT:  So let me suggest the parties meet and

17    confer on some sort of reasonable briefing schedule.  We'll take

18    a look at the response when it is filed, and if we feel like we

19    need a hearing, we will set it for a -- set it for hearing.

20    What is today?  Wednesday.  Let me suggest by Friday you all let

21    us know if you can agree on some type of a briefing schedule,

22    and we'll get that teed up and we'll --

23          MR. EGDORF:  Sure.

24          MR. TUTEUR:  If I may, Your Honor, I -- quite frankly,

25    we -- we've felt that the meet-and-confer requirement was not

1  satisfied here.  I think there's a lot of agreement that we can

2  come up with.  For example, in recent days, quite recent days,

3  the plaintiffs have said as to this claims data, we might be

4  able to accept aggregated claims data, the identified claims

5  data.  I don't know the answer, whether that changes the burden

6  that -- their original request was enormous.  It would have

7  involved all sorts of people's name, PHI, etc.

8           So I have to go back to my people and say, "Okay,

9  let's see whether we can do that."  And I'm going to try to

10 actually see whether -- we may not be able to give them

11 everything, but I really do think that had we had a bit more

12 dialogue, we could have had a discussion about that.

13          MR. EGDORF:  Well, in fairness to counsel, he was out

14 of town.  We had a meet-and-confer with his client on June the

15 30th where we were told -- and July the 1st -- where we were told

16 they'd get back to us.  We still haven't heard a peep about it

17 from any of the defendants of the proposals we made on the

18 claims data.  We had meet-and-confers with all the defendants

19 about the claims data at the end of June.

20          THE COURT:  Well, you know, I can't separate this out

21 right now, but I can tell you if I -- if I determine that a

22 party is not meeting and conferring in good faith and attempting

23 to reach resolution, you will regret it.  And I think you all

24 are good lawyers and I expect you to behave that way.

25          So let me suggest that you all work out an expedited

1    briefing schedule on it.  And, you know, obviously there is a --
2    I will tell you, Mr. Tuteur, since you're not familiar, or may
3    not be familiar with the rules of the court, I do have a
4    standing order on meeting and conferring with respect to
5    discovery disagreements.  It's fairly straightforward.  But I
6    really do expect you all to try to resolve things, and I'm going
7    to expect that here as well.

8            The standing order requires that it's done after a
9    hearing is set.  Obviously, you have to -- you have to comply
10   with the meet-and-confer obligation required prior to filing a
11   motion, and then there's an additional requirement that requires
12   a meet-and-confer following the setting of a hearing.  So one
13   way or the other, I expect you all to do that and we'll get it
14   set quickly if we think we need a hearing.  But I would suggest
15   you sit down and see if you can't resolve the issues that you
16   can, and then to the extent you can get some of that resolved
17   before the response is due, you can set that forth in the
18   response.

19           But one way or the other -- how about Monday?  One way
20   or the other, you all let me know by Monday if you can't work
21   out some sort of schedule.

22           MR. EGDORF:   I can't imagine we can't work out a
23   schedule.  Whether we resolve the issues, we'll see, but I --
24           THE COURT:  Sure.
25           MR. EGDORF:  -- certainly would think a schedule can

-80-

1  be agreed to.

2            THE COURT:  Okay.

3            MR. TUTEUR:  Agreed.

4            THE COURT:  We have, in the final stages, an order on

5  the defendants' request for an independent medical examination.

6  And I know there's been some significant back and forth, and we

7  had asked for some additional information from the parties.

8  That's been provided.  We're working our way through that now.

9  We'll hope to have that out relatively quickly.

10            MR. TUTEUR:  And one thing, it may be -- I hope it's

11  not too late, but the plaintiffs have actually already announced

12  that they're dismissing I think five of the plaintiffs.  I think

13  -- is that right?

14            MR. DUTKO:  Yes.  Some of the plaintiffs have to be

15  dismissed due to health issues or other issues, and so we have

16  told the defendants, and so we'll file a stipulation.

17            THE COURT:  Can you file that stipulation within the

18  next --

19            MR. TUTEUR:  Yeah.  I was going to say, rather than

20  the court having to go through some of those people as to

21  whether IMEs are needed or not.

22            MR. DUTKO:  I believe somebody from that side

23  circulated a document.  It's just --

24            MR. TUTEUR:  We did.

25            MR. DUTKO:  Okay.

                                                                 -81-

 1              MR. TUTEUR:  And you take a look at it.  But we'll get

 2  it to the court right away cause I -- again, I don't see any

 3  reason to have to look at those.

 4              THE COURT:  Please do.

 5              MR. DUTKO:  I think we can get it filed this week,

 6  Your Honor.

 7              THE COURT:  That's great.  Looking forward to that.

 8              I'm not going to make you a promise about when I'll

 9  have orders out on the motions that were argued today, but I

10  recognize the importance of them, both to the case overall and

11  to the parties.  So I will look forward to getting that done as

12  quickly as we can.

13              Thanks to all of you.

14  (WHEREIN THE HEARING WAS CONCLUDED.)

15

16

17

18

19

20

21

22

23

24

25

## COURT REPORTER'S CERTIFICATE

I, THERESA SAWYER, official court reporter, certify that I have made a

verbatim record of the proceedings by voice reporting method in the United States

District Court case Lisa Torrey, et al, Plaintiffs vs. Infectious Diseases Society of

America, et al, Defendants, Case No. 5:17-CV-0190, before the Honorable Robert

W. Schroeder, III, District Court Judge, Texarkana, Texas; that said recording has

been reduced to a transcript by me, and the foregoing pages constitute a true and

correct transcript of the proceedings to the best of my ability.

WITNESS MY HAND AND SEAL as such court reporter on this 29th day of

July, 2019.


*Theresa Sawyer*

**THERESA SAWYER**
**SUPREME COURT CERTIFIED**
**REPORTER NO. 235**


THERESA SAWYER
MY COMMISSION # 12375184
EXPIRES: February 22, 2020
Benton County