THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

* * * * *

LISA TORREY, et al            *    NO. 5:17-CV-190-RWS
                              *    Texarkana, Texas
VS.                           *
                              *
INFECTIOUS DISEASES           *    10:10 a.m. - 11:25 a.m.
SOCIETY OF AMERICA, et al     *    August 22, 2019

* * * *

**MOTIONS HEARING**

BEFORE JUDGE ROBERT W. SCHROEDER, III
UNITED STATES DISTRICT JUDGE

* * * *

Proceedings recorded by computer stenography
Produced by computer-aided transcription

*EDWARD L. REED*
9251 Lynne Circle
Orange, Texas 77630 * 409-330-1605

1 **APPEARANCES:**

2 For the Plaintiffs:

3     MR. DANIEL R. DUTKO
    **Rusty Hardin & Associates, LLP**
4     1401 McKinney, Suite 2250
    Houston, TX 77010

5

6     MR. EUGENE R. EGDORF
    **Shrader & Associates, LLP**
    3900 Essex Lane, Suite 390
7     Houston, TX 77027

8     MR. LANCE LEE
    **Attorney at Law**
9     5511 Plaza Drive
    Texarkana, TX 75503

10

11 For IDSA and Individual Doctors:

12     MR. ALVIN DUNN
    **Pillsbury Winthrop Shaw Pittman, LLP**
    1200 Seventeenth Street, NW
13     Washington, DC 20036

14 For Blue Cross & Blue Shield:

15     MR. PETER J. CHASSMAN
    **Reed Smith, LLP**
16     811 Main St., Suite 1700
    Houston, TX 77002

17

18     MS. SARAH J. DONNELL
    **Kirkland & Ellis, LLP**
    300 N. LaSalle Street, Suite 2400
19     Chicago, IL 60654

20 For Aetna, Inc.:

21     MR. J. RANDY ROESER
    **Haltom & Doan**
22     6500 Summerhill Road, Suite 100
    Texarkana, TX 75503

23

24     MR. MATTHEW G. SHERIDAN
    **Baker Botts, LLP**
    910 Louisiana Street
25     Houston, TX 77002

1   **APPEARANCES (Continued):**

2   For Anthem, Inc.:

3       MS. SARA A. BROWN
        **Gardere Wynne Sewell, LLP**
4       2021 McKinney Ave., Suite 1600
        Dallas, TX 75201

5   For Cigna Corporation:

6

7       MR. R. BRANDAN FEE
        **Morgan Lewis & Bockius**
        1701 Market Street
8       Philadelphia, PA 19103

9   For Kaiser Permanente, Inc.:

10      MR. ALAN F. LAW
        **Cooper & Scully, P.C.**
11      101 California St., Suite 3650
        San Francisco, CA 94111

12

    For United Healthcare Services, Inc.:
13

        MR. PATRICK C. CLUTTER, IV
14      **Potter Minton, P.C.**
        110 N. College Ave, Suite 500
15      Tyler, Texas 75702

16  Courtroom Deputy:

17      BETTY SCHROEDER

18  Court Reporter:

19      EDWARD L. REED

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2              10:10 A.M. - AUGUST 22, 2019
 3            THE COURT:  Mrs. Schroeder, if you would, call
 4   the case for us.
 5            COURT CLERK:  Cause Number 5:17-CV-190, Lisa
 6   Torrey, et al vs. Infectious Diseases Society of
 7   America, et al.
 8            THE COURT:  Announcements for the record?
 9            MR. LEE:  Your Honor, Lance Lee, Gene Egdorf,
10   and Danny Dutko on behalf of the plaintiffs.  Good
11   morning, Your Honor.
12            THE COURT:  Good morning.  Welcome.
13            MR. CHASSMAN:  Good morning, Your Honor.
14   Pete Chassman on behalf of Blue Cross/Blue Shield of
15   America.
16            THE COURT:  Good morning.
17            MR. FEE:  Good morning, Your Honor.  Brandon
18   Fee on behalf of Cigna.
19            THE COURT:  Good morning.
20            MR. SHERIDAN:  Good morning, Your Honor.
21   Matt Sheridan and Randy Roeser on behalf of Aetna.
22            THE COURT:  Good morning.
23            MR. DUNN:  Good morning, Your Honor.  Alvin
24   Dunn on behalf of Infectious Diseases Society of
25   America and its individual doctors.
```

```
 1              THE COURT:  Good morning.

 2              MS. BROWN:  Sara Brown on behalf of Anthem,

 3  Inc.

 4              THE COURT:  Good morning.

 5              MS. DONNELL:  Sarah Donnell on behalf of Blue

 6  Cross/Blue Shield --

 7              THE COURT:  Hello.

 8              MR. CLUTTER:  Patrick Clutter on behalf of

 9  United Healthcare, Inc.

10              MR. LAW:  Good morning, Your Honor.  Alvin Law

11  on behalf of Kaiser.

12              THE COURT:  Good morning.

13                  Good morning to everyone and welcome.

14  We've got set for hearing this morning two motions:

15  Plaintiffs' Emergency Motion to Compel Discovery,

16  which is Docket 219; and Defendant IDSA's Motion for

17  Protective Order, Docket 226.  I've had an opportunity

18  to read the parties' briefings on these two motions and

19  am prepared to hear the presentation of the parties

20  this morning.  And I think the parties had also

21  requested for a litle bit of a Status Conference, as

22  well.  So, to the extent we want to do that now, it's

23  acceptable to me, or we can do it after we hear

24  argument on the motions.

25              MR. EGDORF:  You Honor, if I may?
```

```
 1              THE COURT:  Yes.
 2              MR. EGDORF:  I can give you an update on kind
 3   of the status and a couple of questions remaining, at
 4   least on the plaintiffs' side, we might need to
 5   address or call to the Court's attention, if I may.
 6              THE COURT:  Please.
 7              MR. EGDORF:  Discovery is continuing.  We have
 8   taken the depositions of two of the defendant doctors,
 9   we've taken the deposition of Blue Cross and Blue
10   Shield Association, and we've had scheduling set for
11   the additional insurance company defendants.  We've run
12   into a couple hiccups with that because, one, we need
13   to get the Court's guidance on some of the parameters
14   of the depositions, and then there have just been
15   related other scheduling things, but I think it's fair
16   to say everybody is working together on trying to get
17   those worked out.
18              I believe there are four plaintiffs that
19   still have to be deposed, and I know Mr. Dutko is
20   working on getting dates.  I think we previously had
21   dates for all of those folks and they all had to get
22   moved for one reason or another.  So I think, setting
23   aside the discovery disagreements we have, at least
24   some of things are moving forward.  So I think that's
25   one important thing to let the Court know.
```

1          Secondly, we received the Court's order

2   yesterday regarding the IMEs and, obviously, we're

3   going to follow the orders of the Court and make all

4   that happen.  There are two housekeeping things with

5   respect to that which I think we need to raise to the

6   Court's attention and perhaps we need to talk to the

7   other side about what to do.

8          But as I understand the order -- and

9   candidly, I just skimmed through it yesterday because I

10  got in late last night.  As I understand it, we have

11  two plaintiffs who, at least medically, are not able to

12  travel at least as of right now.  And as your order --

13          THE COURT:  Where are they located?

14          MR. EGDORF:  Mr. Dutko can tell us where those

15  two are, or hopefully he knows where those two are.

16          MR. DUTKO:  Can you give me a couple minutes

17  and I can find out?

18          THE COURT:  Sure.

19          MR. EGDORF:  And then we have I believe it's

20  three plaintiffs who have been deposed and have

21  testified they no longer believe they have Lyme

22  disease.  They believe they have been cured from the

23  treatment that they acquired on their own outside the

24  insurance companies.  So we'll certainly talk to the

25  defendants about those, but I think with the testimony

1  we have with those folks, I don't know if it's worth

2  everyone's time and money to do an IME for them to

3  find what we're already agreeing to is the current

4  status of those three plaintiffs.

5           The next housekeeping point, Your Honor,

6  as the Court may recall, I believe we had an August 30

7  expert deadline for the plaintiffs, and I forget the

8  specific date for the defendants.  One of them can

9  remind us, but I think it was 30 days later or

10  something like that.  Because of some of the

11  difficulties we had in people's schedules, we had

12  agreed, and I think it's referenced in some of the

13  papers that you have, that we were going to agree

14  amongst ourselves to move the plaintiffs' expert

15  deadline a couple weeks to I believe September 13th

16  and contemporaneously move the defendants' expert

17  deadline a couple weeks.  I don't think we have, you

18  know, any kind of official order or anything from the

19  Court saying, "Yes, that's fine with me," but I would

20  certainly say that all the parties had agreed to that.

21  I do have --

22           THE COURT:  Have you filed a motion?

23           MR. EGDORF:  I'm sorry, Your Honor?

24           THE COURT:  Have you filed a joint motion?

25           MR. EGDORF:  We have not filed a joint motion.

1    And candidly, Your Honor, talking to Mr. Lee last

2    night, it certainly occurred to us maybe we need to

3    formally do something to --

4            THE COURT:  You might want to file a motion.

5            MR. EGDORF:  Now, obviously, you know, we may

6    have concerns about those deadlines in light of when

7    are we going to get to take these depositions depending

8    on your rulings and some things like that.  We were

9    going to take three depositions next week and now it's

10   either going to be one or -- I think it's two now and

11   so on.  So just some of those sorts of things.

12           The last point that I would raise is we

13   have had some discussions with one or more of the

14   defendants about whether it was time yet to have

15   discussions about whether or not the case could be

16   resolved.  As the Court may recall, when we entered

17   into all the joint scheduling dates, the defendants at

18   that time stated something to the effect of that they

19   didn't think mediation was warranted at this time, they

20   weren't interested, or whatever.  I don't want to be

21   pejorative about it.  But they did not want to set a

22   date for mediation or have a mediator.

23           I would advise the Court that I think in

24   light of having 20 plaintiffs, whether it's one

25   defendant that wants to talk or more than one

1  defendant, it's going to be a chore for whoever

2  mediates the case, that it would make sense to have one

3  mediator to the extent if and when everyone wants to

4  visit on the case.  And frankly, I think at our end we

5  need a mediator just because rounding up 20 folks who

6  are going to have perhaps disparate positions and

7  whatnot could be an issue.  So we would at least call

8  to the Court's attention the thought that maybe it

9  would make sense to appoint a mediator to the case.

10 It's certainly at the Court's discretion on whether to

11 bind everyone to go mediate and those sorts of things.

12 My experience has been judges usually are going to

13 force you to do it at some point.  So I'm not

14 necessarily suggesting, you know, we need to order

15 everybody to go tomorrow and do it, but I think it

16 might make sense to have someone appointed or ask the

17 parties to at least agree to somebody that will be

18 appointed for when the time comes.

19            I think that's all I have on my

20 big-picture-housekeeping issue subject to the hearing.

21 Mr. Lee says I forgot one and he's going raise that, if

22 he may, Your Honor.

23            THE COURT:  Yes, please.

24            MR. LEE:  Good morning, Your Honor, I wanted

25 to -- I let Mr. Collier know this yesterday in my email,

1  but I wanted to just kind of advise the Court where we

2  are on the agreement with respect to claims data.  That

3  was one of the big issues that we had for today.  And

4  all of the defendants have agreed to  provide us with a

5  certain subset of claims data that we're, you know,

6  going to look at and hopefully have here in the next

7  coming days.  But I wanted to make clear that both sides

8  have reserved their rights  because some of the

9  defendants have backup tapes that maintain claims data,

10  and they have taken the position that it would be too

11  burdensome to go back and generate information from

12  those backup tapes.  And what we've agreed to do is

13  let's put that on the back burner for the time being,

14  and if we're able to determine that the information we

15  do get is sufficient, then we will leave that alone.

16  But there is a possibility that we may  come back to

17  talk to the Court about that if we're unable to reach

18  some type of agreement on maybe cost sharing or

19  something of that nature.  So I just wanted to let the

20  Court know where we stood on the claims data issue.

21          THE COURT:  Thank you, Mr. Lee.

22           Mr. Chassman, Mr. Dunn, anyone want to

23  respond to anything either Mr. Egdorf or Mr Lee said on

24  those points?

25       MR. CHASSMAN:  This is Pete Chassman.

1    Mr. Dunn may have additional comments.  No disagreement

2    on the issue of the claims data.  It seems that there

3    have been some agreement.  I think it just kind of

4    remains to be seen.  Hopefully, that's resolvable if an

5    issue even remains.  I don't think we've had a chance

6    to talk about this mediation possibility.  We can.  And

7    maybe we should get back with plaintiffs' counsel and

8    the Court and just see what people think.

9                    Let's see, I guess I don't really

10   necessarily have anything else.  Does anyone from our

11   side?

12                   MR. DUNN:  Your Honor, on the IMEs, of course,

13   that involves the doctors in Anthem.  This is the first

14   we've heard of the issues.  We absolutely are prepared

15   to cooperate with them and have that discussion and, if

16   there are any problems, bring that to your attention.

17   And I believe all defendants have agreed with their

18   proposal to move the expert deadlines later by two

19   weeks.  So I think you're right, we'll just file a

20   motion.

21                   So I don't have anything else.

22                   THE COURT:  Okay, thank you, Mr. Dunn.

23                   Anybody else?

24                   I think on the expert disclosures, of

25   course, just file a joint motion moving those deadlines

1  by a couple weeks.  If it develops you end up needing

2  an additional extension on that, you can deal with that

3  at the time.  I don't foresee any reason at all that

4  could impact our schedule otherwise.  So get that

5  filed within the next couple of days and we'll get that

6  entered.

7           With respect to mediation, you know, I'm

8  all for mediation.  As a general rule, I don't order

9  it.  I think it's something that good lawyers know how

10 to figure out whether it's worthwhile or not.  The fact

11 is most cases get resolved one way or the other, and so

12 I think we should all be open to mediate in the case.

13 I have on occasion, in unique cases, ordered mediation

14 when I felt like it was necessary.  This case may be

15 one of those cases.

16           I would suggest you all visit about it,

17 see if you can have communication about it, whether the

18 parties would be agreeable to it, who good candidates

19 for mediators would be.  We've got no shortage of

20 excellent mediators here and, of course, within Texas,

21 so I have no doubt y'all will be able to settle on

22 someone who can take a crack at getting the case

23 resolved.  So y'all visit about that, and if you can

24 agree on a deadline and let me know that, I will put an

25 order out to that effect as well.

```
 1          MR. EGDORF:  Thank you, Your Honor.

 2          THE COURT:  Good.  So you saw the order on the

 3   IMEs.  You all, with respect to the specific persons

 4   you discussed, Mr. Egdorf, visit with Mr. Dunn and you

 5   all see if there are any remaining problems with

 6   respect to those, and if there are, bring them to our

 7   attention and we'll address them quickly; okay?

 8          MR. EGDORF:  Good.

 9          THE COURT:  All right.  Whoever wants to go

10   forward on the motions may do so.

11          MR. EGDORF:  Thank you, Your Honor.  I'm

12   going to address, hopefully briefly, the email issue on

13   Plaintiffs' Emergency Motion to Compel.  And I think at

14   least from a housekeeping perspective, I think the

15   Court is aware and understands in the emails that went

16   out last night there were other issues that were part

17   of the Emergency Motion to Compel, but the only one

18   we're going to talk about today is the emails.

19              This issue goes back many, many months,

20   Your Honor.  As I'm sure the Court recalls, we had some

21   disputes regarding discovery parameters and we've had a

22   lot of discussions about E-protocols and all those

23   sorts of things.  And obviously, the parties separately

24   had engaged in discussions long before this was even

25   brought to the Court's attention.
```

1            So, back in March there was an agreement

2    amongst the parties regarding discovery and the

3    production of documents, including emails.  And as part

4    of that agreement, the defendant doctors told us they

5    would be producing their emails in accordance with an

6    e-discovery protocol, we would send search terms, and

7    all those sorts of things.

8            At that time nothing was said to us along

9    the lines of what you've read in the papers, which is

10   now it's, you know, "Me no Alamo.  We can't do anything

11   with our employer emails, we can't do anything with our

12   work emails, you should have known and you should have

13   never assumed we were going to give you those emails."

14         THE COURT:  Certainly, that was the state of

15   play in March; correct?

16         MR. EGDORF:  Yes, Your Honor.

17         THE COURT:  But by May you all knew that the

18   defendants were taking the position that work employee

19   emails were going to have to be obtained through the

20   employers; right?

21         MR. EGDORF:  I would disagree with that

22   slightly, Your Honor, and let me explain why, and I'm

23   happy to not just necessarily go through all these

24   papers and try to directly answer the questions.

25            So, in May, what the emails tell us from

 1  Mr. Dunn is our doctors -- he doesn't talk about all of

 2  them.  He only talks about a couple of them and says,

 3  "Our doctors don't have the capability of searching the

 4  emails."

 5          But if we look at the email -- and I'm

 6  trying to see if I remember the right one.  On May

 7  29th, Mr. Dunn tells us -- this is the Dr. Shapiro --

 8  he says, "Yeah, those emails are at Yale," but he says,

 9  "while Dr. Shapiro can access at least some of the

10  emails, he's not able to search them."

11          And that's different than what we're told

12  now.  The indication we were given in May was that at

13  least this doctor -- we weren't told for all the

14  doctors, but at least this doctor didn't have the

15  technical know-how to search for his emails, but we

16  were specifically told by Mr. Dunn he has access to

17  those emails.

18          So it wasn't really until June 14th, when

19  we had a meet-and-confer with Mr. Dunn, that Mr. Dunn

20  came out affirmatively and said:  Our position is the

21  doctors, even though they have access to their own

22  emails, the emails are on their phones, the emails are

23  on their personal computers, the doctors are not going

24  to give you any of those work emails.

25          THE COURT:  Not until June?

 1          MR. EGDORF:  June 14th is when we were told
 2 that in a meet-and-confer we had with Mr. Dunn.
 3          THE COURT:  And there wasn't a letter in May
 4 that indicated that?
 5          MR. EGDORF:  No.  As I said, the letters in
 6 May, like what I just showed you, referenced that --
 7 told us, "Hey, you can contact these employers."  But
 8 we were told for each of these doctors, not just this
 9 Dr. Shapiro, that they had access to their emails, but
10 they just were not capable of searching for the search
11 terms.  And so that's the distinction that we were
12 told.
13          So it was sort of a stepladder process.
14 You know, first we're told, "We're going to give you
15 all the emails."  Then we're told, "Hey, our guys can
16 get the emails, but they can't search them." Then on
17 June 14th we get told, "We're not even going to search
18 them, we're not even going to give you what they have
19 handy.  You've got to subpoena the doctors yourself or
20 their employers yourself."
21          So, on June 17th, I believe it is,
22 Mr. Dunn and Mr. Dutko exchanged some emails where they
23 talked about, hey, can you tell us who the custodians
24 are or, you know, give us all the contact information,
25 if you haven't already?  Can you tell us if they will

1    accept service and so forth?

2              And the next week we subpoenaed all of

3    those employers.  We sent out 10 subpoenas.  And I

4    have -- you know, just as an example, we sent out -- I

5    think it was June 24th we went out to the court

6    reporting service that served the subpoenas, and as of

7    June 27th they had served all the subpoenas.

8              And you'll note, and I guess it's just a

9    side point, Mr. Dunn makes reference in his papers and

10   says, "Well, the plaintiffs didn't even bother to

11   subpoena Atlantic Health."  And you'll see on here

12   Atlantic Health is, in fact, one of the doctors that

13   were subpoenaed.

14             So we did that.  So kind of in our view,

15   we did a belt-and-suspenders thing.  We felt like,

16   based on the prior representations and the fact that

17   the doctors have access and custody of their emails,

18   that they should be required to produce what they could

19   produce, and that we would belt-and-suspenders it by

20   going to the employers.  And so that's what we did in

21   June.  We got radio silence for the most part.  Even

22   today, as we -- well, I've left out an important point.

23             On June 14th, Mr. Dunn also told us he

24   personally would work with the employers and have his

25   doctors work with the employers to ensure that we get

1    these emails.  He told us that he was going to help

2    facilitate this process and get that done.

3              And I'll fast-forward.  There's a couple

4    of things inbetween I need to mention, but fast

5    forward.  Here today, on August 22nd, we've gotten zero

6    pages of emails from the employers.  Only three of the

7    10 employers have even responded to the subpoenas that

8    we issued two months ago.  Two of them said, "We object

9    to everything, we're not giving you anything."  And one

10   of them said, "We don't have any documents," which of

11   course doesn't make a whole lot of sense in light of

12   what we've been told about where we would find these

13   emails.

14             So, in time that passed, as I think the

15   Court saw in the papers, I took the deposition of

16   Dr. Halperin.  And in Dr. Halperin's deposition, you

17   know, he testified that -- he was a unique case.  We

18   actually got emails from Dr. Halperin because all of

19   his Lyme emails were on his work -- excuse me, his

20   personal account.  So I actually had 9,000 pages of

21   emails for Dr. Halperin for the deposition that I took.

22   And he affirmatively stated in the deposition, though,

23   that whenever he got an email about Lyme to his work

24   account, he forwarded it to his personal account, that

25   there were no restrictions on that, that there were no

1  rules of his employer that he couldn't do that.  He

2  also told us, we learned for the first time, that his

3  employer destroys all their emails after six months and

4  that neither he nor his employer were ever told that

5  they needed to hold their emails.

6            Moreover, I asked Dr. Halperin, "Do you

7  get emails to your work account from Mr. Dunn?"

8            And he said, "Yes."

9            And Mr. Dunn then objects to me asking any

10 further questions about that, saying attorney/client

11 privilege and common interest privilege and so forth,

12 which seems to me a little bit, you know, hypocritical

13 in this whole thing, because if you say you have no

14 custody, control, or say about the emails, how can you

15 argue you have a privilege as to what's in those emails

16 to that account?  I don't think they can have that both

17 ways.

18            After Dr. Halperin was deposed, there

19 were a couple more doctors that were scheduled.  One

20 was Dr. Dattwyler, and one was Dr. Sigal.  I can never

21 say his name, (*sea-gull*) or (*sea-gaul*).  Dr. Sigal had

22 only produced 43 pages of documents.  I don't recall

23 the production of Dr. Dattwyler, but it was equally

24 small.  Because their views, or what we were told as to

25 those doctors is all the relevant documents were in

 1   their work emails.

 2            Mr. Dutko took the deposition of

 3   Dr. Dattwyler and Dr. Dattwyler testified that he was

 4   never even told to go look through his work emails or

 5   see if he could produce his emails and that nobody ever

 6   told him that he couldn't from his employer, that the

 7   instructions he got in that regard came from Mr. Dunn.

 8            You know, to further highlight the

 9   problem, Your Honor, next week we're taking the

10   deposition of Dr. Steere.  Dr. Steere is the guy who

11   named Lyme disease.  He's considered the founder of

12   Lyme disease.  Obviously a very important deposition in

13   this case.  You know, forget this email issue for a

14   second.  We got confirmation yesterday, Dr. Steere is

15   producing zero pages of documents for this case.  The

16   guy who founded Lyme, the position of the defendants is

17   they have zero documents to produce of his relevant to

18   the case.  So we are obviously having a problem here.

19            Now, Mr. Dunn, obviously, in his papers

20   takes the position:  You should have figured this out

21   in May.  I didn't affirmatively say you have to

22   subpoena them, but boy, I dropped enough nuggets along

23   the way, you should have figured that out.

24            I think in a sense that's kind of a red

25   herring because certainly in June, shortly thereafter,

1  we did subpoena all of these doctors, and we did it

2  right after we had the meet-and-confer with Mr. Dunn on

3  this issue.

4          So we're left with a problem that other

5  than the deposition I took of Dr. Halperin where I

6  don't know that we got full discovery, but we certainly

7  got enough for me to take a significant deposition, we

8  have no documents really to depose any of these doctors

9  because they are taking the view that they are all on

10  their work emails, where at least from the depositions

11  we have taken so far, the doctors we have taken have

12  all said, "We have access and we could give you those

13  emails, but our counsel has told us not to do it," the

14  same counsel that told us he was going to cooperate to

15  help us get those emails.

16          So, you know, Mr. Dunn, at least for a

17  couple of the employers, has gone and gotten emails and

18  says that it said "no permission" for those to be done,

19  you know, "our doctors can't give you their emails,"

20  even though they have them on their home accounts, even

21  though they can forward them, they can print them, they

22  can do any of that.  I think they clearly have

23  possession of these emails and, under the rules, they

24  need to produce them.

25          You know, that said, the alternative, if

1  we aren't able to get some relief from the Court, is we
2  are going to have to go around the country and try to
3  enforce all 10 of these subpoenas, however how long
4  that takes.  I guess in the interim we would take these
5  doctor depositions with no documents and wing it the
6  best we can, but then be coming back to you in a month
7  or two months or three months, however long that
8  process takes, and so we will finally have resolved
9  these subpoenas and we've gotten orders from these
10 other courts, "We'd like these documents."
11          Now, we don't disagree that it appears or
12 at least it makes sense that for former employers, I
13 would agree that it's probably likely that these
14 doctors don't have access to those email servers, they
15 can't go into them again and print them out and all
16 that.
17          THE COURT:  Can you tell me, Mr. Egdorf, if
18 you know, how many of these are former employers we're
19 talking about and how many are current employers?
20          MR. EGDORF:  I think -- I'm going to put an
21 asterisk on that.  We have six doctors that are in the
22 case, so I think we have either five or six that are
23 current employers.  I keep thinking in my head one of
24 the doctors maybe is retired.  But it's either five or
25 six current employers, and then the other subpoenas are

1   for former employers.  So I certainly understand and

2   agree that there would be difficulty in asking the

3   Court to craft an order that tells the doctor they have

4   to somehow get access to the former employers.

5           THE COURT:  I don't think the Court could do

6   that.

7           MR. EGDORF:  Yeah.  No, no, no, I'm just trying

8   to certainly say out loud, you know, that point.

9               But for the current employers, you know,

10  Dr. Dattwyler, for example, testified, I mean, he could

11  pull out his iPhone and he can look at all the emails,

12  you know.  And, you know, we all know today emails can

13  be searched and you can put in "Lyme" or whatever.  I

14  mean, this isn't a complicated, technical process.

15  They have control custody of these emails.

16              It appears to us, Your Honor, that this is

17  sort of an after-the-fact position, you know, contrary

18  to what we are told in March.  Why weren't we told in

19  March that this was a problem?  The only thing we were

20  told in March was that Dr. Nadelman, who is a former

21  defendant in the case, Dr. Nadelman passed away before

22  we really got the case rolling and we were told as to

23  Dr. Nadelman, "He can't help you get his emails.

24  You're going to have to go to his employer."  That

25  certainly made sense.  But I don't agree that it makes

 1    sense that we should have somehow guessed from that,

 2    that he was going to take the position that none of the

 3    other doctors were going to give us the emails that

 4    they work with every day.

 5            So we would like the Court to, you know,

 6    candidly, require counsel to do what they told us they

 7    were going to do:  Produce the emails they have access

 8    to, work with those employers to get us those emails,

 9    and get them soon as we can so that we don't have to do

10    this dance so we don't get hampered in deposing the

11    doctors.

12          THE COURT:  Thank you, Mr. Egdorf.

13          MR. DUNN:  Your Honor, I have some slides.  I

14    don't know if they are necessary, but may I approach?

15          THE COURT:  Please.

16          *[Presentation slides tendered]*

17          MR. DUNN:  Your Honor, as a practical matter,

18    the plaintiffs really are better off here obtaining the

19    doctors emails from the employers.  Even if the doctors

20    had a choice and they could produce them themselves

21    versus the plaintiffs getting them from their

22    employers, the right way to do this forensically is to

23    draw the emails out in a PST file from the employer's

24    system and have proper searches done.  That's exactly

25    the right way to do it.  But the doctors don't have a

 1  choice.  And, Your Honor, we let them know this long

 2  ago.

 3              First of all, one of the problems here is

 4  that on March 11th we were here and at that point the

 5  plaintiffs had not served any e-discovery requests.

 6  They had the ability to ask the doctors for emails long

 7  ago, once the e-discovery order was in place.  It was

 8  probably more than 15 months ago.  They never did it.

 9  If they had asked for emails back then, we would have

10  resolved this issue long, long ago.

11              They first served email requests on the

12  doctors on March 17th.  And, Your Honor, before that

13  time -- and this is an attachment to our opposition --

14  on March 13th we sent an email to plaintiffs' counsel

15  pointing out not just -- not just that each doctor

16  doesn't have the capability to do a proper search --

17         THE COURT:  What's the difference between a

18  proper search and a search?

19         MR. DUNN:  Your Honor, I think a proper search

20  is -- I mean, yes, the doctors can look in the search

21  field and run a term against maybe their in-box or

22  something.  I think a proper search is what we've done

23  for their personal emails.  We took a PST file, we took

24  all the emails out to a robust search platform.  And

25  in that platform, for example, we were able to search

1    specifically say for communications between a doctor

2    and Aetna by searching, for example, maybe doing email

3    field searches.  And we were able to take all of the

4    emails out in one nice robust searchable file.  To me,

5    that's a proper search.  And also, that allows for

6    boolean searches that I don't think the doctors have

7    the ability to do.  They sent us search terms that

8    would say "Lyme and chronic" or something, or "Lyme

9    within 15 or chronic."  And I'm just giving you, you

10   know, a push.  These are search terms that no doctor,

11   using just the search field, that's not a boolean

12   search field.  I don't think any doctor has the ability

13   to do "Lyme within 5 of chronic" or those types of

14   searches.  Those search terms ask for those types of

15   searches when we finally got them on May 17th.  But

16   before getting them, Your Honor, we sent them an email

17   saying not just that they couldn't do these proper

18   searches, but that each email, all these work emails,

19   are the property of the employer -- we said that -- and

20   not the individual employee.

21          THE COURT:  But the agreement, Mr. Dunn, back

22   in March was that you were going to produce the

23   defendants' emails.

24          MR. DUNN:  Your Honor, that was subject -- the

25   agreement said it was all subject to the e-discovery

1    order.  That means they have to -- it's all part of

2    everything that's required in the e-discovery order,

3    and I don't think all these defendants started

4    searching emails until anybody got finally their email

5    search terms.  Those came in May.

6            THE COURT:  What did defendants' emails, as

7    you contemplated in the March agreement, mean?

8            MR. DUNN:  It meant all --well, this was IDSA

9    and the doctors.  And it meant all of IDSA's emails,

10   their corporate emails, and each doctor's personal

11   emails.  And some doctors have personal emails.

12           THE COURT:  Why didn't the agreement say that?

13           MR. DUNN:  We didn't -- I guess neither side

14   thought of that.  And, Your Honor, as soon as I saw

15   this in early May, I flagged it for them, and in early

16   May I think they should have known this.  But even if

17   you accept that they thought they were going to get all

18   their work emails through this process, in early May,

19   on May 13th, it was very clear in writing, and this is

20   attached.  And then it was followed up, Your Honor,

21   just right after that.  And I think they recognized

22   this.

23           They said -- you know, when they finally

24   sent email requests on May 17th, they said, "If you are

25   taking the positions that emails are maintained by an

1 outside entity and you can't get them, give us all

2 these details regarding the employer."  And we did that

3 right away.

4          Your Honor, May 20th, we said, "The

5 custodian of the emails is New York Medical College.

6 If you wish to request emails from New York Medical

7 College, you should contact Nicholas Janiga, Chief

8 Legal Counsel," et cetera, email, phone number.  I

9 don't think we could be any clearer.  This is as of May

10 20th.  That's what we told them.

11          But, Your Honor, if you look at the pace

12 of this, it was plaintiffs who were not being diligent,

13 and we were being extremely responsive.  As soon as

14 they asked us anything, we responded within a day or

15 two.  And it's not the doctors who are making this up.

16 Each employer has in place a policy, enforced by its

17 general counsel's office, that if you want medical

18 college emails, which many of them contain protected

19 health information, we have to manage -- we, general

20 counsel's office, we have to manage that process.  We

21 can't just allow a doctor, without us knowing about

22 it, to send out, in response to document requests, the

23 doctors' emails.  I've got that in writing from each of

24 these current employers.  And it's not the doctors -- I

25 don't know what we would do if you order Dr. Dattwyler

1 to turn over -- I think New York Medical College would

2 step right in and say, "Wait --

3          THE COURT:  That might happen, Mr. Dunn, but I

4 mean, the rule, as I understand it, Rule 34, applies to

5 documents within the possession, custody, or control of

6 a party; right?

7          MR. DUNN:  But these documents are the --

8          THE COURT:  Isn't that right?

9          MR. DUNN:  That's right, and they have access,

10 but they do not have -- they are not their property and

11 their employers have directed them --

12          THE COURT:  Do they not have control over them?

13          MR. DUNN:  They have some control, but they

14 would be in this situation violating -- doing a whole

15 en masse production, especially without a screen for

16 protected health information, they would be violating

17 the directions of their employer.  And I have that in

18 writing and I forwarded that to them.

19               Just for the record, the 10 subpoenas, of

20 them, four are to current employers.  Of the six

21 doctors, two are actually employed by New York medical

22 College, so that's a joint subpoena.  Each of the other

23 doctors, except for the last one, has a separate

24 employer.  Dr. Sigal doesn't have a current employer.

25 He's on his own and he's kind of semi-retired and he

1  doesn't have a current employer who he works with.

2  Many of the former employer subpoenas have gone to his

3  former employers.  I believe that Mr. Egdorf, when he

4  said that one of the responses was, "We have no

5  emails," I'm pretty sure it was from one of those

6  former employers, possibly somebody who employed him 10

7  years ago.  So it's not a surprise.  Again, you know,

8  this is a case that, you know, concerns events back in

9  the 2000s and it's just not a surprise that that former

10  employer would be notifying them of that.

11          Your Honor, I need to just go through a

12  few other things.  These are small points, but I think

13  we just need to correct the record.  Mr. Egdorf said  on

14  June 27th they were all sent, all the subpoenas.  That's

15  false.  Not one employer was served until July 8th, in

16  that week.  It's a small point, but I just  think that

17  just because he listed on there that he sent them to his

18  service person, they weren't served then.

19          Atlantic Health was listed in the list of

20  subpoenas and they sent it to us, a subpoena directed

21  to Atlantic Health.  I confirmed three times Atlantic

22  Health has never received a subpoena, even though I've

23  notified plaintiffs of how exactly Atlantic Health

24  agreed to accept a subpoena, I believe by email.  If

25  not that, by mail without using a process server.  Each

1  of the current employers, I offered to go to them and

2  see if they would accept by informal process in each

3  subpoena.  Each one said yes.  I offered to try and

4  find the former employers.  They never took me up on

5  that.  They never responded to that offer.

6          Your Honor, Mr. Egdorf said, after we

7  served the subpoenas, there was radio silence.  False.

8  I think, at least from each current employer, an

9  immediate response.  They were served the week of July

10  8th asking for a response by July 16th.  Each one sent

11  a response.  And in each response, yes, they objected,

12  they had some issues with the subpoena, but each one

13  invited them to call and discuss their objections.

14  Your Honor, they haven't picked up the phone and called

15  a single employer.

16          Mr. Egdorf says, "Oh, we are going to have

17  to run around the country and do Motions to Compel."

18  He doesn't know that.  He hasn't tried to work this out

19  with any employer.  And if he had done this back in

20  May, I think he would have the emails by now.  He

21  hasn't tried this at all.  So it's not true that

22  there's radio silence and he has to run around the

23  country.

24          With respect to Dr. Halperin, Mr. Egdorf

25  says that Atlantic Health destroyed the emails.  No,

1    false.  He has not checked with Atlantic Health to see

2    if, when they became aware of this lawsuit, they put a

3    document hold in place.  Dr. Halperin testified that he

4    was under a document hold.  He testified at his

5    deposition that he didn't delete any emails since the

6    lawsuit was filed.  So it's false to say that he

7    deleted emails.

8            Your Honor, he said Dr. Sigal gave him

9    only 43 pages.  That's because he doesn't have access.

10   He's the one that only has former employers.

11           Dr. Dattwyler said he didn't search his

12   work emails.  That's because New York Medical College

13   told him not to and said, "Come to us."  And we told

14   him that long ago in May.

15           Dr. Steere, correct, he doesn't have them

16   with him.  He never used his personal email address

17   until he got sued and I said, "We need to use your

18   personal email address, Dr. Steere."  He's never used

19   it for anything related to Lyme disease.  All of his

20   emails are going to be within the systems of Partners

21   Health Care, which is his employer and which has

22   responded to their subpoena and said, "Come to us to

23   talk about the scope of this."  So that's where things

24   are.

25           Your Honor, let's see if there is more.

1    It's all laid out in the papers.

2                    So next slide, please.  There on this

3    slide is quotes from three  of the -- the top two are

4    from current employers.

5                    "Yale would be willing to discuss with you

6    search terms."

7                    Partners Health that we just referred to,

8    it says, "Please contact me to discuss these objections

9    and the steps [you would take] to minimize the burden."

10                   Perexel, I think, is the motion recent

11   former employer of Dr. Sigal, the one that's probably,

12   if there's emails, is most likely to have them, and

13   they say, "[We] will agree to produce non-privileged

14   [emails as long as you come to an agreement with us]."

15   But at this point, Your Honor, they have not followed

16   up.

17                   So, Your Honor, we really believe that

18   the most efficient course here, and it should have been

19   taken no later than May, would be to just work with the

20   employers and get these emails through a proper search

21   and then a proper production.  And they are ready to do

22   that.

23              THE COURT:  Thank you, Mr. Dunn.

24                   Mr. Egdorf.

25              MR. EGDORF:  I'll be very brief, Your Honor.

1  I'm not going to get into all the minutias.  I will on

2  a couple of points.

3            This is just an example of one of the

4  subpoenas.  The subpoenas went on June 27th.  That's

5  the date that's on the subpoenas, and they were

6  supposed to be returned by July 8th -- or excuse me,

7  July 12th.  So I don't know where Mr. Dunn is getting

8  these dates from.  And I don't know why he's saying

9  we've heard from all these folks because we've gone

10 through our files and we've heard from three of ten.

11           But I think Your Honor's initial question

12 of Mr. Dunn is the one that's dispositive of all of the

13 issues of these current employers when we cut to the

14 chase.  As he says in his own slide:  Rule 34,

15 documents in "possession, custody or control."  There

16 is zero doubt, zero dispute that these doctors have

17 possession of all of their work emails.  And Mr. Dunn

18 could take the position, "Well, I think Mr. Egdorf, you

19 know, is better off if he does X, Y and Z."  That's

20 where I would argue a red herring, Judge.  The question

21 is, what is Mr. Dunn and his client's obligation?

22 Their obligation is to produce documents that are in

23 their possession.

24           The other tidbit I would reference is, I

25 could pull out Dr. Dattwyler's deposition and go over

1  it.  Dr. Dattwyler specifically testified under oath

2  that he had been given no instruction about his work

3  emails from his employer.  He's never been told that.

4  This all has come after Mr. Dunn talked to the

5  employers.  Magically, no employer will give us

6  documents after we were told that Mr. Dunn was going to

7  cooperate and help us get those documents.

8          I don't see how anyone could really look

9  at this and see other than, yeah, could we have done

10 one thing a day or one thing a week earlier?  The truth

11 of the matter is we were told in March, "We're going to

12 give you all the emails."  We weren't told there was a

13 problem with work emails.

14          And the fact of the matter is, when

15 Mr. Dunn says, "Well, you would already have them,"

16 I've got zero pages today two months after I asked for

17 them.  So it's fine, if I had asked in May, I've got

18 nothing that shows I would be in a different spot right

19 now.  I can't even get all of these employers to even

20 respond to my subpoena.  And if I have to go around the

21 country and do that, I will, but I certainly think as

22 to -- if it's four, I won't dispute words.  As I told

23 the Court, I wasn't sure if it was four or five.  But I

24 think it's the most current employers, those doctors

25 have possession, they should be ordered to produce the

1  emails that they have in their possession.

2          Thank you, Your Honor.

3          MR. DUNN:  Your Honor, he says they sent them

4  on June 27th.  Not a single employer got it before July

5  8th.  He just needs to follow what his process server

6  did.

7          I am aware that two of Dr. Sigal's former

8  employers have responded and that the three of the four

9  current employers, all of the ones who have subpoenas

10 have responded and they responded right away before a

11 week was done, and he hasn't followed up with a single

12 one of them.

13         THE COURT:  Mr. Dunn, do you have any case law

14 from the Fifth Circuit that says, if an email is in a

15 party's possession, they are not required to produce

16 it?

17         MR. DUNN:  Your Honor, I don't, but I have law

18 that says it's possession, custody, and control.  And

19 if the email is the property of the employer and he's

20 been directed not to do it because --

21         THE COURT:  Have you got case law from the

22 Fifth Circuit that says that?

23         MR. DUNN:  That if an employer directs?  I

24 don't have it handy, but, Your Honor, I can look for it

25 and submit it.  But I really believe that's the case.

```
 1          THE COURT:  Thank you Mr. Dunn.

 2              Next motion.

 3          MR. EGDORF:  I believe the other motions is

 4   Mr. Dunn's Motion for Protection, Your Honor.

 5          MR. DUNN:  Your Honor, IDSA has brought a

 6   Motion for Protective Order to block unreasonable and

 7   unnecessary depositions, 30(b)(6) deposition topics

 8   that violate the scope of the Joint Report, which is

 9   the agreement among the parties regarding document

10   production and 30(b)(6) deposition topics.

11              Your Honor, when we were here on March

12   11th, we had a major dispute about the scope of

13   document production.  You encouraged the parties to do

14   their best to work it out and, actually, IDSA and the

15   doctors worked it out with plaintiffs' attorneys.  And

16   we filed an agreement, which we now call the Joint

17   Report, in which we have right there in black and white

18   very specific search requests for documents prior to

19   November 10, 2010, and there was a firm basis for this.

20              First of all, as you cited in your IME

21   order yesterday, one of the things you pointed out was

22   that a key allegation in plaintiffs' complaint is, "The

23   insurance defendants elicited the help of doctors who

24   were researching Lyme disease, the IDSA panelists, and

25   paid them large fees to develop arbitrary guidelines
```

1  for testing Lyme disease."  That's in their complaint.

2  You put that in your IME order.

3           That is a key, key, key allegation in this

4  case.  And I would submit that that is one of the bases

5  of the agreement in the Joint Report, which is for that

6  key allegation and for some other key allegations

7  concerning allegations that everybody work together to

8  report these Lyme treating physicians to medical boards

9  and government entities, that that forms the basis for

10 these three areas of document searches that would go

11 before November 10, 2010.  So those are very specific

12 and that's what the parties agreed to.  And, Your

13 Honor, part of that agreement was that it would cover

14 30(b)(6) topics as well.

15          And the next slide.

16          The Court's order was -- and this is the

17 order adopting the Joint Report and ruling on a dispute

18 between the insurance defendants and the plaintiffs --

19 Your Honor ordered:  "Depositions of organizations are,

20 of course, limited to the noticed topics set forth in

21 Rule 30(b)(6), which would adhere to the above

22 prescribed timeframes."  And those are the ones set in

23 the Joint Report.

24          Your Honor, that wasn't a surprise.  If

25 you look at the transcript from March 11th, there was a

1  discussion about the scope of the agreement on document

2  review.  And you directed that when the depositions of

3  the defendants' representatives would take place, that

4  they would be limited by the time frames agreed to by

5  the parties.

6          THE COURT:  That's as to the 30(b)(6).

7          MR. DUNN:  And not the individual depositions,

8  and you made that very clear.  And, Your Honor, that is

9  where we should go here.

10          Next slide, please.

11          And what makes the most sense and what

12  wouldn't violate the Court's prior orders and wouldn't

13  require any amendment of the prior orders and what

14  would give them the best testimony is taking individual

15  depositions.  And we are ready to cooperate with them

16  in connection with it really will be on the IDSA's

17  side, former employees who were involved back in the

18  2000s with this process.

19          But you know what, Your Honor?  They are

20  going to take each doctor.  I mean, the people with the

21  best knowledge of the information that they seek would

22  be each doctor who was on the panel, and those aren't

23  limited.  There is going to be no objection and saying,

24  "Oh, you can't ask questions from 1988 of Dr. Wormser,"

25  who's the chair of each panel.  They have no temporal

1  limits on that question.  I think that that's really

2  going to get them what they need.  They have the

3  ability, if they want, to depose other panelists, it's

4  all public.  Each one is listed as an author on the

5  2000 Guidelines and the 2006 Guidelines.  They allege

6  that the entire process was corrupted.  They have the

7  ability to do that.  No limit, no impact on the

8  temporal scope.  So, Your Honor, that's what really is,

9  we would argue, the right result.

10          Your Honor, there is another area that's

11  still in dispute and that's regarding the updated --

12      THE COURT:  Doctor -- Mr. Dunn, I'm sorry.  I

13  don't know why I keep calling you Dr. Dunn.  Mr. Dunn.

14      MR. DUNN:  My father is Dr. Dunn.

15      THE COURT:  Your father, all right.  So help

16  me understand exactly how that dispute is manifested.

17  So the issue about that you just discussed, is it an

18  argument that continues to come up at depositions or

19  exactly what relief are you asking for?

20      MR. DUNN:  I'm asking for relief for IDSA

21  only, that their topics did not -- their topics acted

22  as if we had not entered the Joint Report, as if the

23  Court had not ordered that 30(b)(6) topics would be

24  limited in time scope.  So it's really to say to

25  plaintiffs, for topics where they seek testimony

 1  before November 10, 2010, they need to conform to the
 2  limitations of the Joint Report.  That's really the
 3  relief we seek, Your Honor.
 4              Plus one more thing, which is the next
 5  slide.  We've worked everything else out, Your Honor.
 6  The last two slides are now not to be turned to.  The
 7  last thing is the revised, what we would call the
 8  updated IDSA Lyme Disease Guidelines, which, Your
 9  Honor, I submit are not part of the plaintiffs' case.
10              So what's been happening, since 2015,
11  IDSA has been working with a much larger group.  The
12  American Academy of Neurology has been in that group.
13  The American College of Rheumatology has been in that
14  group.  Other representatives have been in that group.
15  Some patient representatives have been in that group.
16  I think there is 12 separate organizations and 42
17  people involved with this process, which started in
18  2015, which is very public.
19              They posted on their website the process.
20  They put the process out for public comment.  Comments
21  were made in 2015.  And then they got their work
22  started.  And finally, June 26th, this year, a few
23  weeks ago, they published draft revised Lyme Disease
24  Guidelines.  And we are now within a public comment
25  period, which ends in September.  And, Your Honor, they

 1  sent us a 30(b)(6) topic that asks IDSA to testify

 2  regarding those revised Guidelines, something that's in

 3  process that involves a lot of other organizations and

 4  that, Your Honor, they never raised in their complaint

 5  and would be very burdensome for IDSA to get up to

 6  speed itself.

 7           THE COURT:  The question isn't limiting the

 8  topics for an individual witness' deposition, but

 9  whether it's properly noticed as a 30(b)(6).

10           MR. DUNN:  Absolutely.  And that's it, Your

11  Honor.

12           THE COURT:  All right, let me hear from

13  Mr. Lee.

14           MR. LEE:  Your Honor, as I'm apt to do

15  sometimes when I try to short-circuit an issue or

16  clarify something, it ends up creating another issue,

17  and I believe that's at least in part what we have

18  here.

19              First thing I want to say is Mr. Dunn

20  has continuously represented that we agreed to this, we

21  agreed to this.  Simple fact of the matter is, if you

22  look at the Joint Report that we submitted, nowhere in

23  this document is there a reference to depositions.  All

24  it dealt with was the production of documents and our

25  agreements on time frames related to that, which,

1  although it's not a part of this Motion to Protect

2  order, I think it raises a larger issue.

3           From the outset of this case, I could not

4  have fathomed or imagined that we would be precluded

5  from obtaining corporate testimony from the IDSA

6  regarding the 2000 and 2006 Guidelines.  That's what

7  he is seeking to preclude, that type of corporate

8  testimony that you get from every entity defendant or

9  every entity plaintiff in any complex commercial case

10 or any case for that matter.

11        THE COURT:  So take me exactly to what you are

12 talking about.

13        MR. LEE:  Okay, what I'm talking about, Judge,

14 is Mr. Dunn is taking the position that we agreed to

15 forego seeking information from the IDSA about those

16 two guidelines.  In our meet-and-confers -- and this

17 relates to the 2017 update -- he said this case is all

18 about the 2000 Guidelines and the 2006 Guidelines, but

19 he is objecting to our topic that requests that they

20 prepare someone to testify on those guidelines, the

21 IDSA, the entity that is a party in this case as a

22 defendant.

23           Now, he's pointing to the exchange that

24 you and I had as support for this position that that's

25 off limits, that time frame is off limits for

1  deposition testimony.

2            THE COURT:  As to a 30(b)(6) deponent.

3            MR. LEE:  As to a 30(b)(6) deponent, yes, Your

4  Honor.

5            And if you look at Your Honor's order,

6  which I'm sure you have, you state in that order,

7  number one, that the order is without prejudice to

8  either side coming back and requesting that it be

9  changed.  But you also said, in response to the parties

10  at the hearing asking whether objections to questions

11  outside the above time limits were acceptable at the

12  depositions, "To clarify the Court's oral response,

13  objections to questions during the oral deposition are

14  limited to 'objection/leading' and 'objection/form'.

15  Objections to testimony during oral depositions are

16  limited to 'objection/nonresponsive'."

17            And then you go on and say, "Depositions

18  under Rule 30(b)(1) are not subject to any temporal

19  limits.  Depositions of organizations are."

20            We didn't have that discussion during the

21  actual hearing.  So, putting aside the fact whether,

22  you know, there was really a thought that from our

23  standpoint that that was what was being covered, at

24  this point in time we're asking that it be changed.

25  We're asking that we take the normal steps of being

1  able to depose an entity, obtain testimony on the
2  record from an entity related to what Mr. Dunn himself
3  has said are the two central issues in this case, and
4  those are the 2000 and 2006 Guidelines.
5              So here's the problem with what he is
6  suggesting:
7              Number one, we don't get any binding
8  testimony from a defendant party in the case on these
9  two very important issues.  I asked Mr. Dunn on one of
10  our meet-and-confers, when he was referencing the
11  30(b)(1) depositions, I said, "Will the IDSA adopt the
12  testimony of the 30(b)(1) witness as its own?"  Because
13  otherwise, we've got a shortfall in our evidence
14  against the IDSA.
15              And he said -- and I won't characterize
16  it, I don't know whether he was serious or joking, but
17  probably a little bit of both -- "Depends on who it is
18  and depends on what they say."
19              So we're left in the precarious position
20  of not knowing what the testimony of this entity
21  defendant would be.
22              Second thing:  It's obvious that if we
23  are forced to go take the depositions of these
24  individuals that he is saying have all the information
25  that we need, that are no longer employed by the IDSA,

you're looking at increased costs, you're looking at
more time that we are going to have to spend.  The
schedule that we're trying so hard to maintain becomes
problematic, quite frankly.

And the other problem is now these other
corporate defendants, the insurance defendants, are
latching on to what Mr. Dunn is saying and they are
taking the same position.  So, if this position isn't
changed, if this provision in the order is not changed,
then each of these other defendants are going to say,
"Nope, we're not going to present a witness to testify
about whatever knowledge they may have or whatever
knowledge the entity may have about the 2000 and 2006
Guidelines."  Our hands are tied on that issue as well.
So, presumably, we would have to find out who the
30(b)(1) witnesses would be for all those other
insurance defendants, and go around the country and
take those depositions.  It increases the cost, it
increases the time, and it potentially blows the
schedule.

The other thing and maybe the most
important thing, Your Honor, is it hinders our ability
to get to the truth.  Let me give you an example.

Let's say that a draft of the 2006
Guidelines or an exchange between two of the panel

1    members included a provision that said "Long term

2    effects of antibiotic use past 28 days" and there is a

3    debate about that.  We don't get to talk to the

4    corporate defendant about that, and that is extremely

5    relevant to our case and the allegations that we are

6    making.  And if we aren't able to get binding testimony

7    on something like that from a corporate defendant, as I

8    said earlier, we potentially have an issue with a

9    failure of proof.

10              Now, I said earlier that this also gets

11   to or potentially raises another issue, and it does.

12   And that is, are they withholding documents and emails

13   related to the 2006 Guidelines or 2002 Guidelines based

14   on this limitation that is in the order?  And if they

15   are, I think we need to know that.

16         THE COURT:  Have y'all asked them that?

17         MR. LEE:  We have had those discussions on the

18   meet-and-confer calls generally.  I don't believe that

19   we have been told -- or I don't believe that we have

20   specifically asked the question I just raised here or

21   have been told specifically yes or no.

22              But I can say this:  Yesterday, I talked

23   to one of Mr. Egdorf's associates.  And the IDSA

24   production of documents, the vast majority of the

25   document production came in on August 5th, and we have

1   approximately 3,000 pages of documents.  Now, I haven't

2   personally reviewed those documents.  But suffice it to

3   say, I would strongly suspect that there are not

4   documents in there related to those that should be.

5          So, with respect to the time frame issue,

6   Your Honor, we would request that you modify this order

7   to require the IDSA and all of the other defendants on

8   a going forward basis to prepare a 30(b)(6) witness to

9   testify about the issues related to formulation of the

10  guidelines in 2000 and 2006.

11         With respect to the new guidelines, Your

12  Honor, Mr. Dunn is correct, they are not in our

13  complaint, they aren't referenced in our complaint, but

14  they are relevant.  They are relevant.

15         THE COURT:  How?

16         MR. LEE:  Well, first of all, Your Honor, you

17  know the relevancy standard, it's a fairly low bar.

18  And I would go back to my example that I gave earlier

19  about internal documents or internal information,

20  exchanges between panelists that may have debated the

21  issue of what to include about our position that

22  long-term antibiotic use is appropriate in many cases

23  and should be used.  That's directly relevant, as such

24  a debate would be in the 2000 and 2006 Guidelines.

25  That's something that we should be entitled to know.

1          It's also relevant from the standpoint of

2    standard setting and whether these guidelines are

3    treated by the insurance defendants as a standard that

4    they are just applying automatically and how that's

5    viewed under the anti-trust laws.

6          And I think that with respect to the 2017

7    Guidelines, if we are allowed to inquire of that, of a

8    30(b)(6) witness from the IDSA, I think that we're

9    going to find extremely important information for

10   purposes of our clients.

11         So, if the Court doesn't have any

12   additional questions --

13         THE COURT:  Thank you.

14         Mr. Dunn, I forgot to ask you this, there

15   is a Motion for Protective Order filed by Aetna.  Does

16   resolution of the IDSA's Motion for Protective Order

17   resolve that as well?

18         MR. DUNN:  I cannot speak to that because we

19   did resolve separately from the Aetna motion a number

20   of topics.  In particular, everything but what I've

21   discussed with you has been resolved between IDSA and

22   plaintiffs.  That is, plaintiffs have agreed to

23   withdraw and possibly re-serve on us Topics 6, 7, 14,

24   15, and the topic regarding the lobbying.  So, with

25   respect to IDSA and the plaintiffs, those disputes have

 1   been resolved, but that was really separate from what

 2   Aetna and the plaintiffs worked out.  So, if somebody

 3   wants to address that?

 4        MR. EGDORF:  If I may, I had a conversation

 5   with Mr. Austin and, you know, per the Court's rules on

 6   meet-and-confer prior to the hearing, as I understood

 7   Mr. Austin's position -- and counsel can tell me if

 8   they understand it differently -- he was not going to

 9   argue today or present that motion.  He wanted to see

10   how the Court ruled on the IDSA motion and then we

11   would meet and confer again to figure out where we

12   would stand on it with respected to Aetna's motion.

13        MR. SHERIDAN:  Your Honor, Matt Sheridan for

14   Aetna.  That's accurate.  It's the same issue about the

15   application of the dates to the 30(b)(6).

16        THE COURT:  That's helpful.  Thank you,

17   Mr. Sheridan.

18             Okay, Mr. Dunn, sorry.

19        MR. DUNN:  No problem, it's an appropriate

20   question.

21             Your Honor, plaintiffs did agree that

22   these topics would be ones that would apply to 30(b)(6)

23   depositions.  Slide 10 shows, Your Honor, what you made

24   very clear and you directed all the parties to

25   encourage us to work together and control our destiny,

1  whatever we would agree to.  So I don't think he can

2  stand up here and say they did not agree to it.

3            He says he can't imagine that they

4  wouldn't get testimony from ISDA on the 2000 and 2006

5  guidelines.  They are getting testimony from IDSA on

6  the topics covered in the Joint Report, which concern

7  the most important matters to the case:  Was there an

8  agreement?  Were there payments?  Was there a report of

9  doctors?  IDSA will testify as to that and on

10 everything else.  More generally, the 2006 Guidelines,

11 2000 Guidelines, they have adequate testimony from

12 individuals.

13           The binding testimony, they will get

14 binding testimony from IDSA on the most important

15 topics, the ones in the Joint Report:  Were there

16 payments?  Were there reports about doctors to medical

17 boards?  Was there correspondence communication about

18 the guidelines with the insurance defendants?  They

19 will get binding testimony from IDSA on that.  They

20 will get binding testimony from each doctor defendant,

21 the chair of the panel, each author that they want to

22 depose.  Your Honor, they will get that.

23           Your Honor, they think the case is going

24 to take much more time and effort.  At least on the

25 IDSA side, I think there is maybe just a couple of

1  people who are former employees who were involved with

2  organizing the panels, and that's really all they did,

3  Your Honor.  This is in the 2000s.  These are staff

4  persons who are employed by a professional society.

5  They're not doctors, they're not medical professionals.

6  The people who have the knowledge of this who could be

7  individual deponents who might know about the

8  discussions, et cetera, are really not the best people,

9  but they can depose them.  They should depose them if

10  they want.

11            But as far as what they want to talk

12  about, and that is what you heard, about was there a

13  discussion about chronic Lyme disease, treatment using

14  antibiotics for chronic Lyme disease, that testimony is

15  best gotten from the doctors, who they will depose them

16  all, and any other panelist who they might want to

17  depose.

18            Your Honor, IDSA has not withheld a single

19  document prior to 2010 that's called for by the Joint

20  Report.  Look long and hard for anything reflecting a

21  payment, anything reflecting communications with

22  insurance defendants, anything reflecting report of the

23  doctor.  Produce documents prior to 2010?  Didn't

24  withhold anything under the Joint Report.  Nothing was

25  withheld.

```
 1              Your Honor, the one thing we haven't
 2  addressed is the new guidelines.  Number one, they are
 3  not relevant.  But number two, requiring IDSA to
 4  testify as to them would be a substantial burden.  I
 5  think there may be 15,000 documents that talk about --
 6  within IDSA.  This has been a four-year process.  This
 7  involved again, I think, 42 people or more.  I think
 8  the 42 might not even include the staff from IDSA, AAN,
 9  ACR.  I think it would just be a very, very large
10  burden to have somebody from IDSA get up to speed with
11  respect to the revised guidelines, which have been
12  going for four years.
13              THE COURT:  Okay, thank you, Mr. Dunn.
14                  Anything further from the plaintiffs?
15          MR. LEE:  No, Your Honor, unless the Court has
16  any additional questions.
17              THE COURT:  I don't think I do, actually.
18                  Okay, those were the two motions that we
19  had set for hearing this morning.  I appreciate the
20  conversation we had at the beginning of the hearing.
21  Anything else we need to address before we adjourn?
22          MR. EGDORF:  Not from the plaintiffs' side,
23  Your Honor.
24              THE COURT:  Thank you, Mr. Egdorf.
25          MR. DUNN:  Your Honor, I do believe, but I
```

1    don't have it in hand and I'm sorry, but the question

2    is whether if by Friday or Monday, if we have it, we

3    can submit any case law that would inform the Court on

4    when an employee has been directed by his or her

5    employer not to turn over material from the employer.

6              THE COURT:  I'm all ears, Mr. Dunn.  If you've

7    got a case out there that's along those lines from the

8    Fifth Circuit or within the district in the Fifth

9    Circuit, I'm happy to look at that.  I do expect to get

10   an order out very quickly on this.

11             MR. DUNN:  Would Monday be too late?

12             THE COURT:  Monday would probably be too late.

13             MR. DUNN:  Okay, would tomorrow be too late?

14             THE COURT:  No, tomorrow won't be too late.

15             MR. DUNN:  By tomorrow.

16             THE COURT:  Okay, thank you, Mr. Dunn.

17             MR. EGDORF:  Your Honor, I apologize, I was

18   too hasty.  Apparently Mr. Dutko has some additional

19   information, I think, about the IME question which the

20   plaintiffs applied that we mentioned might have issues.

21             MR. DUTKO:  May I?

22             THE COURT:  Yes, please.

23             MR. DUTKO:  Just to address the issue we

24   raised earlier this morning, Christopher Valerio is in

25   Philadelphia and is bedridden.  And Brienna Reed is

1    blind.  She is in Ohio and she doesn't leave the house.

2    Those are two of the plaintiffs that are at issue.

3                Additionally, three of the plaintiffs

4    that Mr. Egdorf talked about, the mother and them

5    testified that they don't have Lyme anymore, and so I

6    don't think that IME is at issue.  But more importantly,

7    as counsel will tell you, who took the depositions,

8    their kids, one I think is 11, one is seven, and one is

9    four or five.  And so in light of both of those facts,

10   it seems a little bit harsh to have them fly to Dallas

11   to get blood drawn, when they have already testified

12   they don't have Lyme any more.  And those are the

13   Bowerman girls.

14           MR. DUNN:  Your Honor, of course, we're going

15   to work with plaintiffs on those.

16           MR. DUTKO:  I just wanted to bring it up to

17   the Court, Your Honor.

18           THE COURT:  Thank you very much.

19                All right, safe travels to you all.

20           *[11:25 a.m. - Proceedings adjourned]*

21

22

23

24

25

REPORTER'S CERTIFICATE


I certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled

cause.


/s/ Ed Reed                              8-22-19
Edward L. Reed                           Date
Court Reporter