```
           THE UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF TEXAS
                 TEXARKANA DIVISION

                  *  *  *  *  *

LISA TORREY, et al          *   NO. 5:17-CV-190-RWS
                            *   Texarkana, Texas
VS.                         *
                            *
INFECTIOUS DISEASES         *   10:00 a.m. - 10:45 a.m.
SOCIETY OF AMERICA, et al   *   February 5, 2020

                     *  *  *  *

               SCHEDULING CONFERENCE

          BEFORE JUDGE ROBERT W. SCHROEDER, III
               UNITED STATES DISTRICT JUDGE

                     *  *  *  *
```

```
          Proceedings recorded by computer stenography
           Produced by computer-aided transcription
```

*EDWARD L. REED*
9251 Lynne Circle
Orange, Texas 77630 * 409-330-1605

1   **APPEARANCES:**

2   For the Plaintiffs:

3       MR. EUGENE R. EGDORF
        **Shrader & Associates, LLP**
4       3900 Essex Lane, Suite 390
        Houston, TX 77027

5
        MR. RYAN HIGGINS
6       **Rusty Hardin & Associates, LLP**
        1401 McKinney, Suite 2250
7       Houston, TX 77010

8       MR. LANCE LEE
        **Attorney at Law**
9       5511 Plaza Drive
        Texarkana, TX 75503

10  For IDSA and Individual Doctors:

11
        MR. ALVIN DUNN
12      **Pillsbury Winthrop Shaw Pittman, LLP**
        1200 Seventeenth Street, NW
13      Washington, DC 20036

14  For Blue Cross & Blue Shield:

15      MS. SARAH J. DONNELL
        **Kirkland & Ellis, LLP**
16      300 N. LaSalle Street, Suite 2400
        Chicago, IL 60654

17
    For Aetna, Inc.:
18
        MR. EARL B. AUSTIN
19      **Baker Botts, LLP**
        30 Rockefeller Plaza Street
20      New Your, NY 10112-4498

21      MS. JENNIFER H. DOAN
        MR. J. RANDY ROESER
22      **Haltom & Doan**
        6500 Summerhill Road, Suite 100
23      Texarkana, TX 75503

24

25

*EDWARD L. REED*
9251 Lynne Circle
Orange, Texas 77630 * 409-330-1605

1   **APPEARANCES (Continued):**

2   For Anthem, Inc.:

3        MR. MICHAEL J. TUTEUR
         **Foley & Lardner, LLP**
4        111 Huntington Ave., Suite 2600
         Boston, MA 02199

5
         MS. EILEEN R. RIDLEY
6        **Foley & Lardner, LLP**
         555 California St., Suite 1700
7        San Francisco, CA 94104-1520

8   For United Healthcare Services, Inc.:

9        MR. BENJAMIN F. HOLT
         **Hogan Lovells US, LLP**
10       555 Thirteenth St., NW
         Washington, DC 20004
11
         MR. PATRICK C. CLUTTER, IV
12       **Potter Minton, P.C.**
         110 N. College Ave, Suite 500
13       Tyler, Texas 75702

14  Courtroom Deputy:

15       BETTY SCHROEDER

16  Court Reporter:

17       EDWARD L. REED

18

19

20

21

22

23

24

25

*EDWARD L. REED*
9251 Lynne Circle
Orange, Texas 77630 * 409-330-1605

```
1                        P R O C E E D I N G S

2              10:00 A.M. - FEBRUARY 5, 2020

3             THE COURT:  Mrs. Schroeder, call the case for

4  us.

5             COURT CLERK:  Cause No. 5:17-CV-19, Lisa

6  Torrey, et al vs. Infectious Diseases Society of

7  America, et al.

8             THE COURT:  Announcements for the record?

9             MR. LEE:  Your Honor, Lance Lee, Ryan Higgins,

10 and Gene Egdorf on behalf of the plaintiffs.

11            THE COURT:  Good morning.  Welcome.

12            MS. DOAN:  Your Honor, Jennifer Doan, Earl

13 Austin, and Randy Roeser for Aetna, and we're ready to

14 proceed, Your Honor.

15            THE COURT:  Good morning.  Welcome.

16            MR. HOLT:  Good morning, Your Honor.

17 Benjamin Holt, and with me is Patrick Clutter, on

18 behalf of United Health.

19            THE COURT:  Good morning.

20            MR. TUTEUR:  Good morning, Your Honor.

21 Michael Tuteur and Eileen Ridley on behalf of Anthem.

22            THE COURT:  Hello.

23            MS. RIDLEY:  Good morning.

24            MR. DUNN:  Good morning, Your Honor.  Alvin

25 Dunn on behalf of IDSA and its doctor defendants.
```

1        THE COURT:  Good morning, Mr. Dunn.

2        MS. DONNELL:  Sarah Donnell on behalf of Blue

3   Cross and Blue Shield.

4        THE COURT:  Hi.

5            Welcome to everybody.  Thanks for being

6   here.  We stayed this case back in September through

7   the end of the year for a number of reasons, and then

8   toward the end of the year the parties agreed that the

9   stay would be continued -- or asked for the stay to be

10  continued into February.  The Court granted that motion

11  and stayed the case through Valentine's Day and set a

12  Scheduling Conference for today and requested that the

13  parties meet and confer to discuss what remains to be

14  done in the case to get remaining discovery completed

15  and the case back on track.  Since then, I know that a

16  number of the parties have reached agreement -- or a

17  number of defendants have reached agreements with

18  respect to their continued involvement in the case.  I

19  do know the parties have met and conferred on a number

20  of issues they wish to raise today, including the case

21  schedule trial time, the requested independent medical

22  examinations.  I guess that's the only two major issues.

23            So we've got a number of things to

24  discuss.  Don't have any particular preference about

25  how we proceed.  If the plaintiffs want to go first,

 1  I'll be glad to hear whatever you had to say.

 2          MR. EGDORF:  May it please the Court, Your

 3  Honor.  Gene Egdorf for the plaintiffs.  And Judge, I

 4  did want to let you know that Mr. Dutko, he's arguing

 5  in the Fifth Circuit today and so that's why he's not

 6  present today.

 7          It seems like perhaps the first issue to

 8  discuss and the major issue to discuss is the schedule

 9  of the case.  And as you, I'm sure, saw with what we

10  filed, the parties conferred, we were able to reach an

11  agreement regarding what you would call the typical

12  case schedule that we thought made some sense, try to

13  get all the documents produced from the parties, since

14  that hasn't been completed yet, take the party

15  depositions.  You know, there may be additional

16  depositions of the defendants.  As the Court may

17  recall, we're not limited to just a corporate rep.  If

18  the documents and depositions require, we might be able

19  to depose some additional fact witnesses from each of

20  the defendants.

21          So we set up a schedule to allow all that

22  to happen first.  You know, recognize that there are

23  issues with scheduling the IMEs and put a date in for

24  that and experts and so forth and agree to a trial

25  date.  And we were able to agree to everything in that

```
 1   schedule, except I don't know if I call it a
 2   disagreement, but we kind of have a different view as
 3   to how long the trial should take.  I think the
 4   defendants asked for 30 days and we suggested 15 to 20.
 5   And to be quite candid, Your Honor, some of that was
 6   based on my experience and knowledge with the Court
 7   that I'd be surprised if we were going to have 30 days
 8   for a trial.  And so we think that it certainly can be
 9   done shorter than that.
10                So, in one sense, you know, we're kind of
11   all set.  We have an agreed schedule and we can all go
12   do that.
13                The defendants, however, have asked for
14   this bifurcation proposal where they want you to
15   address this agreement issue first, have that go on
16   until close to the end of this year.  You know, and
17   then if you rule against the defendant, then we would
18   do all these other things.  And they posit that that
19   would be more efficient and so forth.
20                And, you know, I'm not a Yankees fan, so
21   I hate to quote Yogi Berra, but it feels like it's
22   "deja vu all over again."  You know, two years ago it
23   was you're going to grant our motions to dismiss, so
24   let's not do any discovery at all, and that's not what
25   happened.
```

```
 1          THE COURT:  Was there a request for bifurcated
 2   discovery before?
 3          MR. EGDORF:  Specifically, no, Your Honor,
 4   but there was a request that you rule on dispositive
 5   motions before any discovery took place.  So, you know,
 6   I would suggest that this is sort of a repackaging of
 7   the way they wanted to do it before.
 8               And I think what's really telling here,
 9   Your Honor, what's really important is, even the dates
10   they have belie the notion that this is for efficiency.
11   They propose a hearing on their summary judgment in
12   October.  If you look at the lengthy or the typical
13   case schedule, I would have all of my experts
14   designated by October.  This case will actually take
15   longer and cost more money if we do this bifurcated
16   proposal.  The whole notion of the bifurcated proposal
17   for them is on the assumption that they are going to
18   win their summary judgments.  This isn't efficient.
19   This case will drag on, we would be in trial many
20   months later than what is agreed to by the standard
21   case schedule.
22               So I don't really see how it promotes
23   efficiency.  I don't see how it saves costs.  I
24   certainly don't think we nor the Court is going to
25   operate under the assumption that they are going to
```

1   win a motion because that's the only basis that their

2   motion would make sense is an assumption they are going

3   to win.

4            And I recognize, you know, there has been

5   a stay, but even if you set aside the stay, this case

6   has gone on and gone on and gone on.  And to have

7   further delay to us doesn't seem to make sense.  We

8   operated on an agreed schedule before.  If they really

9   thought there should have been bifurcated discovery,

10  then they should have suggested that back in 2018

11  before they deposed nearly all of our plaintiffs, which

12  of course would have had nothing to do with their

13  bifurcated plan, before our plaintiffs produced their

14  documents, their damages documents.  We've already had

15  to do those things.  So I really don't see how it

16  promotes efficiency other than promoting their agenda

17  that they think you are going to grant a motion.

18            Now, I can move on and talk about some of

19  the other issues if you would like me to or we can just

20  stop here and have them respond.  However you want to

21  go, Judge.

22        THE COURT:  Let me hear from the defense.

23        MR. EGDORF:  Oh, I think Mr. Lee thinks I

24  omitted something, so if you don't mind one second,

25  Your Honor.

```
 1              (Conferring with co-counsel)

 2              Mr. Lee did correct me.  We did have a

 3   little bit of discovery we were allowed to do during

 4   the pendency of the motions to dismiss.  We had that

 5   four-year limitation.  But generally, we didn't have

 6   the full-fledged discovery like you would ordinarily

 7   have.

 8              THE COURT:  Thank you.

 9        MR. HOLT:  Good morning, Your Honor.  Benjamin

10   Holt on behalf of the United Health defendant, and I'm

11   going to speak now about the schedule on behalf of all

12   the defendants.  Some of my colleagues may want to

13   chime in separately on that.

14              THE COURT:  Okay.

15        MR. HOLT:  I want to give you a little bit of

16   thinking on the bifurcation proposal, but first, I want

17   to address the date issue that Mr. Egdorf raised.  The

18   schedule we proposed was attempting to build in as much

19   time as we thought the plaintiffs might need to take

20   the discovery that they would want on the agreement

21   issue, and we also built in a couple months for expert

22   discovery in the event they wanted to have an expert on

23   that issue.  In the meet-and-confer, it didn't get to

24   the point of whether they would want that or not, and

25   so the schedule actually could be compressed even more.
```

```
 1              The crux of the schedule that we've
 2   proposed really is that you get through the remaining
 3   discovery of defendants, which would be almost
 4   exclusively of defendants, on the issue of agreement in
 5   just about three months, and then we'd move to summary
 6   judgment.  So I just say that just to put a placeholder
 7   down that we think that if this is something the Court
 8   would entertain, we could actually get it done faster
 9   depending on the plaintiffs' view of what they actually
10   need to take on that issue.
11              But to give you a little background
12   here, we were looking at the case and it's a very
13   complex case.  It's become apparent, as we've taken a
14   bunch of discovery before the stay and if plaintiffs
15   have taken the discovery of the defendants, that there
16   are a lot of issues in the case.  There are 21
17   different plaintiffs, there are six individual doctor
18   defendants, and we started to think ahead to what we
19   might have to complete.  There is still a lot of
20   discovery to go on of the plaintiffs.  Each of them
21   have their own medical history, their own issues.  My
22   colleague, Mr. Tuteur, is going to talk a bit about the
23   IMEs, which of course is going to take some time to
24   accomplish.
25              THE COURT:  And which we've been talking about
```

1    for months.

2           MR. HOLT:  We absolutely have, Your Honor.

3    And we started to think about how we would ultimately

4    structure a trial, as well.  And you asked about the

5    trial time and I think that plays into this as well.

6    We think it's going to be challenging for all the

7    parties to figure out how to structure a trial with

8    this many plaintiffs, each with individual stories.

9    It's not a class.  We have to deal with each individual

10   plaintiff in their own situations.

11           And so we started to think about, is

12   there a way we could kind of narrow this and conserve

13   resources of the Court and the parties?  Now, we know

14   there are motions to dismiss pending and those may

15   narrow the issues.  We hope they will when the Court

16   decides them.

17           But the other option we considered was, is

18   there a way to get at the one common issue in this case

19   that cuts across all the plaintiffs?  And that would be

20   whether the unlawful agreement that's alleged in the

21   complaint actually exists.  And there is certainly

22   still discovery of the defendants to do, but a number

23   of defendants have been deposed.  Most of the

24   defendants have completed their document productions.

25   And we're not seeing any evidence at all to support the

```
 1   allegations in the complaint of this unlawful agreement.
 2   I know the plaintiffs will want to take more and they
 3   are entitled to do that.  But our thinking is that this
 4   structure would allow us to get to that issue quickly,
 5   which is dispositive.
 6               If summary judgment is successful on
 7   whether there is an unlawful agreement or not, the case
 8   is done.  And Mr. Egdorf mentioned that this schedule
 9   assumes that the motion will be successful.  It
10   doesn't.  Of course, even if the motion was denied,
11   that would be important information for the parties,
12   as well, in evaluating their claims going forward and
13   looking at this.
14          THE COURT:  That's true, but you're also
15   talking about many more months of delay in getting the
16   case resolved and, I would think from the defendants'
17   perspective, enormous expense.
18          MR. HOLT:  Well, I think the expense is going
19   to be there -- you know, under one scenario where the
20   motion is successful, all the parties, including the
21   defendant, avoid the additional burden of deposing the
22   remaining plaintiffs, dealing with the IMEs, and a lot
23   of third-party discovery that's still to go on of
24   treating physicians and other parties who may have
25   relevant information, as well as expert discovery.  So
```

```
 1  there's a lot of potential to avoid those expenses for
 2  everyone and avoid taking up the Court's time with
 3  disputes over IMEs, for example, and other discovery
 4  issues.
 5          THE COURT:  Mr. Holt, how many plaintiffs
 6  remain at this point -- individual plaintiffs?
 7          MR. HOLT:  I believe it's still 21.
 8          THE COURT:  What do you anticipate defendants'
 9  discovery of those plaintiffs will be?
10          MR. HOLT:  Well, we have gotten documents
11  from most of the plaintiffs.  I believe there are still
12  documents to be produced.  There certainly are some
13  follow-up requests that we have for plaintiff.  There
14  have been a number of depositions that have been gone
15  on of the plaintiffs, but many of them still elect to
16  be deposed.
17          THE COURT:  How many?  Do you know?
18          MR. HOLT:  You know, I actually don't have the
19  number of that.
20          MR. EGDORF:  I believe it's four, Your Honor.
21          THE COURT:  Four remain to be --
22          MR. EGDORF:  That's my recollection.
23          MR. HOLT:  (Addressing co-counsel)  Is that
24  right?
25          MR. TUTEUR:  Half a dozen.
```

1          MR. HOLT:  Half of those remain to be deposed.

2          THE COURT:  All right.

3          MR. HOLT:  And some of them do have -- you

4    know, the plaintiffs have told us that some of them

5    have medical issues that makes deposing them

6    complicated in terms of scheduling and the --

7          THE COURT:  Of the remaining four, a half

8    dozen?

9          MR. HOLT:  Yes, correct, Your Honor.  And then

10   there will be discovery of treating physicians who

11   treated these plaintiffs, as well as a number of other

12   third parties -- I believe from both sides that are

13   looking at third-party discovery.  And then again

14   expert discovery, of course, which, you know, there

15   may be some expert discovery focused on the unlawful

16   agreement, but much of the expert discovery is going

17   to be focused on the plaintiffs and their side of the

18   equation.

19          So our thought, Your Honor, was to

20   structure this in a way that we could get to that issue

21   quickly.  It will, of course, push back the overall

22   schedule, if the motions are unsuccessful, several

23   months.  That's accurate, but it does get us there

24   quickly and it gives us the opportunity to deal with

25   that and conserve resources on a pretty expedited basis.

```
 1              And I will say, you know, this may sound
 2   a little bit unorthodox, but it's actually a common
 3   approach in cases like this, particularly antitrust and
 4   RICO cases.  I've pulled up a few examples that I've
 5   found where Courts have done this very thing.
 6              There is a case, In Re: Domestic Drywall
 7   Antitrust Litigation.  That's in the Eastern District
 8   of Pennsylvania and it's 163 F.Supp. 3d, 175.  And
 9   actually, the very same thing happened.  The defendants
10   proposed, "Look, let's just get to the issue of
11   agreement quickly.  We don't think there is anything
12   here.  We can do that on an expedited basis and
13   potentially save a lot of time and trouble."  The Court
14   ordered that and they got the summary judgment.  And I
15   believe the summary judgment motion was successful in
16   part, but not in full, and so several defendants were
17   dismissed as a result.
18              Another case, Rebel Oil vs. Atlantic
19   Richfield.  That's out of the District of Nevada.  It's
20   133 F.R.D. 41.  That one was a little different.  It
21   was an antitrust case.  What the Court did there,
22   because it was a monopolization case, the Court decided
23   to focus first on relevant markets and entry barriers.
24   So it wasn't the agreement issue, but it was a similar
25   concept, and then go to summary judgment on that.
```

```
 1              And then there is an EEOC case in the
 2   Southern District of Texas, EEOC vs. Lawler Foods, 128
 3   F.Supp. 3d, 972.  And although that's not an antitrust
 4   case, the Court there agreed that under Rule 26 it
 5   made sense to bifurcate discovery and focus on the
 6   determinative issue in the case and see if that
 7   resolved things before going forward with much more
 8   burdensome discovery and a challenging trial if they
 9   ever got there.
10              So, Your Honor, a Rule 26 clearly gives
11   you the ability to structure discovery in a way that
12   would be efficient for the parties and for the Court,
13   and we think this would be a preferable way to go.
14              THE COURT:  Okay, thank you.
15              Anything further, Mr. Egdorf?
16         MR. EGDORF:  Just briefly, Your Honor.
17              Your Honor, as counsel I think had to
18   admit, unless they are successful, this case is going
19   to cost more money and take more time -- a lot more
20   time.
21              One other aspect I do want to raise.  You
22   know, we still are missing documents from a number of
23   the defendants.  Even under their proposal, we're not
24   going to get the documents until the end of February.
25   I don't know what's going to be in those documents, I
```

 1   don't know what discovery fights we're going to have

 2   about whether we've gotten all the documents.  Until I

 3   take the corporate rep depo, I don't know if I'm going

 4   to need another Anthem person or whatnot.  The notion

 5   that we're going to compress that and get that all done

 6   quickly, I think, is somewhat hopeful thinking.  And

 7   that's why in the regular scheduling order we built in

 8   time to make sure all the parties can get deposed, and

 9   that schedule has been agreed to.  I don't see any

10   reason why we can't do that.  It's going to be the most

11   efficient way to resolve this case.

12           THE COURT:  Okay.

13           MR. AUSTIN:  Your Honor, this is Earl Austin.

14   I haven't actually spoken at any of these hearings,

15   but as I come at this, my experience is a little bit

16   different than the lawyers here.  For 30-plus years,

17   I'm done mostly pharmaceutical products cases, so I've

18   seen cases like this, MDL cases where you have

19   plaintiffs from all over the country that have been

20   brought together.  Whether it manifests itself in

21   bifurcation or in some other way, I think it's going to

22   be impossible to try 21 or 18, whatever, plaintiffs in

23   one trial in this case.  And I think we would be

24   remiss as counsel if we don't really look candidly and

25   pragmatically at what's involved in this case.

 1              The Court effectively has a mini-MDL in

 2    front of it.  These plaintiffs have come from all over

 3    the country and you [have] them in front of you.  Yes,

 4    we maybe have a half dozen plaintiffs to depose, but

 5    there is more to it than that because some of the

 6    plaintiffs, as you know from the IME motions, some

 7    don't even -- there's a dispute whether they even have

 8    Lyme.

 9              So there is going to be a group of

10    plaintiffs that were we to try their claims, which

11    obviously we would, the issue would be do they even

12    have Lyme in the first place.  And in order to try

13    that issue, in a typical MDL, those plaintiffs would

14    probably be put off in a separate group.  Because in

15    order to look at that issue, we have to go to their

16    treating doctors.  If they don't have Lyme, well, then

17    what do they have?  There has to be some explanation

18    for what they have.  And the trial would end up

19    focusing a lot on for each individual plaintiff what

20    else is in the medical history that's going to account

21    for that.  I think we would have to try, devote a

22    significant portion of any trial to dealing with that

23    issue for those plaintiffs.

24              We have other groups of plaintiffs who,

25    yes, they may well have Lyme, but they never actually

1    got or sought the treatment that's at issue here, which

2    is the antibiotic or long-term antibiotic treatment.

3    They never requested it, they never sought it.  We

4    would have to explore what's their causation if they

5    never actually thought the treatment that they are

6    claiming we withheld.

7              And then there is the third group of

8    plaintiffs who did have the treatment.  They had

9    different outcomes.  Some of them it didn't work, they

10   never got any better.  Some of them, they had some

11   serious side effects.  The point is, none of these

12   cases is going to look alike, and in a typical MDL

13   these plaintiffs would be carved up into different

14   groups.  I won't say it's never happened, but I will

15   tell you, the most cases, most plaintiffs I've ever

16   tried in one case was five and they were selected

17   because they all took the same product, they all had

18   the same injury, and we were able to focus in on

19   causation.

20             And the other issue here is we don't

21   really even have the same products.  I guess they have

22   their guidelines that they developed and they have six

23   doctors that have been sued and presumably would want

24   to come in and be entitled to explain why they did what

25   they did and they would be subject to cross-examination.

1    That's going to take some time.

2              But my policy at Aetna is not the same

3    policy.  We don't follow the IDSA guidelines by rote.

4    They put limits on oral antibiotics.  We don't.  They

5    allow one or recommend one course of IV antibiotics.

6    We allow two.  United is going to be different.  Anthem

7    is going to be different.  We're going to have trials

8    on those.  So in some sense we don't even have the same

9    products for every plaintiff.  Some were Aetna members,

10   some were not.

11             And even if we took the time that it took

12   to try that case, it's going to be very difficult for

13   a jury to follow 21 different plaintiffs and remember,

14   this plaintiff was an Aetna member and Aetna's policy

15   was this, and they either have Lyme or they don't, and

16   they either requested the treatment or they didn't.  It

17   was paid for or it wasn't.

18             I think -- I just think with whatever

19   decision we make, and it may not be a decision we can

20   make today, I don't think it's reasonable to think that

21   we're going to be able to try 21 plaintiffs in 15 days,

22   or frankly even 30 days.  And I think we would be

23   remiss in not putting that out on the table in some

24   context.

25             The reason for the bifurcation, it

 1  doesn't matter what Aetna's policy is versus United,

 2  it doesn't mater whether they have Lyme or not, it

 3  doesn't matter whether they sought the treatment or

 4  not, it doesn't matter their individual limitations

 5  cases if there is no conspiracy.  If there is no

 6  conspiracy, all of the rest of this doesn't matter.

 7  Yes, we only have half a dozen plaintiffs to depose,

 8  but we don't need to depose any treaters.  We don't

 9  need to go depose -- each of these plaintiffs may have

10  five or six treaters that we would have to depose.  We

11  don't have to do that.

12            The only reason we have had the

13  bifurcation schedule back November is 90 percent of the

14  discovery that's going to happen under our proposal is

15  plaintiffs that are going to do discovery from us.  We

16  don't need to do discovery from the plaintiffs on the

17  conspiracy theory.  So, if he thinks that he can do

18  this discovery from us as soon as November, we're fine.

19  I realize he says he needs our documents and he'll want

20  to look at them and take a look --

21            THE COURT:  I was under the impression most of

22  the documents have been produced.

23            MR. AUSTIN:  Aetna has produced theirs.  I

24  think it's mostly IDSA, it's the emails, because -- I

25  won't speak for them, but my understanding is the

```
 1   doctors no longer work at these institutions and they
 2   haven't always had control of the emails.  But I
 3   think -- and the stay has been productive in that one
 4   sense, but Mr. Dunn can confirm, but I think that there
 5   is a process for now for pulling that together.
 6               But my point is, under bifurcation, we'd
 7   really be looking at almost a one-way street on
 8   discovery because we don't need any discovery from the
 9   plaintiffs, we don't need discovery from a bunch of
10   third-party treaters.
11               So, yes, he is correct that it's going
12   to push things down the road, but I think it's
13   unreasonable to think that this isn't going to get
14   pushed down the road anyway when we confront the issues
15   of what it's going to be like to try 21 disparate
16   plaintiffs.
17           THE COURT:  Well, Mr. Austin, what exactly --
18   I mean, I understand at the end you sort of wrapped
19   around and made an argument that bifurcating discovery
20   makes sense here, but what exactly is it you are
21   proposing about how we try the case?
22           MR. AUSTIN:  Ultimately?
23           THE COURT:  I mean, I guess I'm trying to
24   understand where you're coming from.  These are issues
25   that no one has ever raised before.
```

```
 1              MR. AUSTIN:  And I --

 2              THE COURT:  No motion has ever been filed,

 3    it's never been presented.  You've made a number of

 4    arguments here today that, frankly, are quite new to me.

 5              MR. AUSTIN:  And I will take part of the

 6    collective blame for that.

 7              THE COURT:  It actually strikes me that you

 8    all have finally figured out this case might actually

 9    have to be tried.

10              MR. AUSTIN:  We are certainly thinking about

11    that.

12              THE COURT:  That's a good idea since the case

13    was filed in 2017.

14              MR. AUSTIN:  And I will take part of the

15    corrective blame because I don't think the parties have

16    been realistic about what this case involves and I

17    think we need to be pragmatic before the Court.

18    Because even setting aside the time and expenses that

19    the parties spend, the Court's ultimately going to have

20    to try something and I think we need to be pragmatic

21    about what that trial is going to look like.  So I'll

22    take some blame.  We should have done it earlier, but I

23    guess I would fall back on better late than never.

24                   So, setting aside the bifurcation issue,

25    let say that we go under a typical schedule and we do
```

```
 1   all the discovery that we need.  I think the Court is
 2   going to have to look at some mechanism to call out
 3   common issues perhaps that apply to everybody, which
 4   we think their conspiracy issue is the prime.  The
 5   conspiracy issue is the prime example of the issue that
 6   cuts across -- even if we were looking at trial today
 7   and discovery was done, I think we would be having a
 8   candid discussion about can we really try a case with
 9   21 individual plaintiffs or is there something we
10   should  be carving out?
11            Even once we get down among the individual
12   plaintiffs, they are going to fall into groups.  The
13   ones that there is at least a dispute over whether they
14   have Lyme, that's going to be a different looking trial
15   than the plaintiffs where it's not in dispute that
16   they have Lyme and it's merely did they ask for the
17   treatment and did the treatment work, et cetera.  That
18   could be a different group of plaintiffs.  I just think
19   these are issues, unless we look at a six or eight week
20   trial, that we're going to be having to confront down
21   the read.
22            THE COURT:  Well, it seems to me that some of
23   those arguments are best made on summary judgment, and
24   the place that you are in a better position to do that
25   is after you have done your discovery.
```

1          MR. AUSTIN:  I absolutely agree with the Court
2    on that.  And I will say that on that theme, summary
3    judgments are going to be very complicated.  They will
4    be simple on the common issue.  Was there a conspiracy
5    is going to be a fairly straightforward issue.  The
6    evidence will be what it is and it will cut across the
7    case.
8               But then we're going to have -- for each
9    individual plaintiff, we're going to have limitations
10   issues, we're going to have damage issues, we're going
11   to have causation issues, we're going to have
12   deposition testimony or declarations perhaps from
13   treating physicians.  21 different times with 21
14   different stories.
15              We're looking at very complicated summary
16   judgment motions that are going to result from the
17   discovery and it's going to be a lot -- it's going to
18   be the IME motion magnified by at least 21-fold that
19   the Court is going to have to consider.  And I think
20   any schedule that gives the Court a month to do that
21   before trial is not realistic.
22              And as I said, whether it manifests itself
23   in bifurcation or in some other way, I do think that
24   the schedule is going to have to acknowledge that these
25   are 21 complicated individual cases and the Court is

1    going to have to have time to assess them, whether

2    it's we suggest bifurcation now or let's do all the

3    discovery in the ordinary course, but then recognize

4    that it may be not realistic to think that we're going

5    to do a 21-plaintiff trial a month after the summary

6    judgment motions are filed.  And I think it's fair -- I

7    just think it's pragmatic to flag that.  We should have

8    done it earlier --

9              THE COURT:  Thanks for bringing it up.

10             MR. AUSTIN:  -- and I'll take the blame for it.

11             THE COURT:  Thank you, Mr. Austin.

12             Others on the defense side want to speak

13   to that issue?  Mr. Egdorf, do you want to respond?

14             MR. EGDORF:  I'll just be very brief, Your

15   Honor.  You know, again, this whole idea of bifurcation

16   started with efficiency, and now Mr. Austin is talking

17   about we're going to have five or 10 or 20 separate

18   trials.  Certainly, trials happen with 20 plaintiffs.

19   Mr. Lanier just tried 20 plaintiffs against Johnson &

20   Johnson with different forms of cancer regarding their

21   baby powder and they did that trial in less than a

22   month.  So it's not like it can't be done.

23             If the real goal is efficiency, everything

24   they are proposing goes against that.  Everything they

25   are doing is posited under the notion of you are going

```
 1   to grant our motion and that way it will be faster and
 2   cheaper.  If you don't assume you're going to grant
 3   their motion, we just made a more expensive, lengthy
 4   and, according to what Mr. Austin is proposing, years
 5   of this litigation to get all these cases tried.  That
 6   doesn't make any sense.
 7              Thank you, Your Honor.
 8         THE COURT:  All right.  We're going to get to
 9   the IME motion, Mr. Tuteur.  I think you're going to
10   argue that.  I want to hear about that.  I do expect,
11   frankly, to ask the parties to brief that issue, and
12   perhaps you all have actually proposed a briefing
13   schedule on that.
14              But here's my point.  My point is, I
15   want you to brief this bifurcation issue.  It's not
16   something I've really had much time to think about.
17   Mr. Austin has introduced some issues that are new to
18   me and I think the better thing to do is to get that
19   issue briefed up.  And the schedule that the parties
20   agreed to with respect to briefing on the IME certainly
21   works well, at least the timing.  You all will not be
22   in a position, obviously, to file anything by February
23   7th, so we'll talk about that.
24         MR. EGDORF:  Yeah.  And, Your Honor, you asked
25   about the IME.  I'm not sure if there is something to
```

1    discuss on that or not.  We have a disagreement about
2    who the new doctor is going to be.  We've agreed to a
3    briefing schedule to present that to the Court.  So
4    I'm not sure there's -- unless the Court wants more
5    information, I'm not sure if there is anything else
6    really to be said about it.  We've agreed to a schedule
7    to present it to the Court.
8            THE COURT:  Okay, anything else, Mr. Tuteur?
9            MR. TUTEUR:  If the Court is acceptable to the
10   schedule, I think --
11           THE COURT:  The schedule is fine, the schedule
12   is fine.
13           MR. TUTEUR:  I don't know that I have
14   anything more --
15           THE COURT:  Thanks, that's fine.  That's
16   perfectly fine.  So the motion will be filed by
17   February 7th and opposition on the 18th and a reply on
18   February 24th.
19               If I ask you to brief the bifurcation
20   issue, what would be a reasonable briefing schedule for
21   that?  Mr. Holt?
22           MR. EGDORF:  Is your assumption with that,
23   Your Honor, that the defendants will file the motion or
24   a brief requesting it, and then we will respond, or do
25   you want --

```
 1              THE COURT:  No preconceived ideas about how we
 2    brief it.
 3              MR. EGDORF:  I was just trying to think of
 4    the schedule, if the idea is we're both going to file
 5    something at the same time, or they're going to file
 6    their request and then we respond to it, which seems to
 7    make more sense to me.
 8              MR. AUSTIN:  I would think it makes sense for
 9    us to --
10              THE COURT:  That's fine.  How much time?
11              MR. AUSTIN:  Two weeks to get ours on file and
12    then --
13              THE COURT:  Two weeks from today.
14              MR. EGDORF:  And then presumably a couple
15    weeks to respond.
16              THE COURT:  All right.  We'll put a schedule
17    out that adopts a briefing schedule like that.  Two
18    weeks from today, two weeks to respond, and seven days
19    after that to reply.  Fair enough?
20                   I had come in here, frankly, with the
21    plan to make a decision about this today, but I just
22    think it's probably better briefed up.
23                   All right, what else?
24              MR. DUNN:  Your Honor, Alvin Dunn.  We did
25    flag in the joint report one final issue --
```

1            THE COURT:  Okay.

2            MR. DUNN:  -- regarding non-retained experts,

3    and we could discuss it right now.

4            THE COURT:  I knew there was a third thing.

5            MR. DUNN:  It's not immediate because the

6    plaintiffs have designated two retained experts and six

7    non-retained experts and have let us know they want to

8    go ahead and take the depositions of three of the

9    non-retained experts.  We have a dispute as to whether

10   they are truly properly designated as non-retained

11   experts or whether, as defendants contend, based on

12   their description of their expected testimony, they are

13   actually retained experts and neither provide a report.

14   The Rule 26 is clear that if it is an expert who's

15   required to provide a report, you have to provide the

16   report before the deposition.

17            So, Your Honor, I think what makes sense

18   is just flag it for you and we could brief it in the

19   ordinary course as soon as the stay is lifted and just

20   according to the normal court schedule, because I

21   haven't heard any urgency on the plaintiffs' side for

22   the need to take the depositions.  They haven't set

23   dates or whatever.  It's just something that we think

24   should be decided by the Court before we have a

25   situation where we would take a deposition and be

1   exposed to having a second deposition, which is what we

2   want to avoid.

3            THE COURT:  Thanks, Mr. Dunn.

4              Mr. Egdorf?

5            MR. EGDORF:  I'll try to be brief, Your Honor.

6              First of all, we've been trying to take

7   those depositions for some time and we've asked for

8   dates, particularly for Dr. Donta for some time, and

9   each time we get rejected.  So the notion of we haven't

10  asked to do this or any urgency isn't true.

11             Secondly, we don't have a current expert

12  deadline, obviously.  What happened back then is we

13  were never allowed to take these depositions, and I'll

14  explain in just a second what these people really are.

15  So, out of an abundance of caution, not knowing what

16  they were going to say, we listed them as non-retained

17  experts because these are physicians that are involved

18  in the Lyme field -- and in particular, Dr. Donta, who

19  is a major issue for us.

20            THE COURT:  Are they treating physicians?

21            MR. EGDORF:  Well, they are not for our

22  plaintiffs, Your Honor.  So Dr. Donta was a member of

23  the IDSA.  He was on the Lyme Committee.  He got kicked

24  off the Lyme Committee because he didn't agree with

25  what the IDSA was doing.  And we want to take his

 1  deposition to find out about that.

 2          THE COURT:  Well, is he a fact witness, then?

 3          MR. EGDORF:  I think he's primarily a fact

 4  witness.

 5          But for argument sake, Judge, I'd say,

 6  "Dr. Donta, why did you tell the IDSA they were wrong

 7  to have the Lyme guidelines?"

 8          And he'd say, "Well, the literature says

 9  dada, dada, dada, dah."

10          I'm now going to get told, "Well, you're

11  trying to offer expert testimony from him."

12          So that's why we designated in the way we

13  did.  I haven't paid him, I haven't hired him, I can't

14  make him write a report.  He doesn't write a report

15  like this in the ordinary course.  I don't know what

16  he's going to say.  But if he gives answers that

17  arguably touch on expertise, then arguably I'm going to

18  have to name him as a non-retained expert or a hybrid

19  or however you want to refer to it.

20          But I'm not going to know what he's going

21  to say until I take his deposition.  So what I want to

22  do is take his deposition.  If he has something,

23  opinions that sound like expert things, then when I

24  have a deadline, I'll make the decision, do I want to

25  designate him as a non-retained expert?  If he's

1  non-retained, I have to give a disclosure.  I don't

2  have to give a report.

3          THE COURT:  You have to give a summary of the

4  facts, summarize the opinions on which he's expected to

5  testify.

6          MR. EGDORF:  In the disclosure, which frankly

7  I'm going to know because he's going to say it in the

8  deposition, because that's the only way I'm going to

9  know what those opinions are.  I mean, I want to get

10  his fact answers, his fact discovery.  If it turns out

11  that touches on expert stuff and I need to make a

12  disclosure, I will.  And that's where we are with that.

13          THE COURT:  Well, I think Mr. Dunn's concern

14  is that you're basically doing that after the fact and

15  that the rules require you do that before the

16  deposition.  Is Mr. Dunn not correct about that?

17          MR. EGDORF:  Well, there's two things:

18                One, I don't know what his opinions are,

19  so I can't disclose them.

20                The second thing is, Mr. Dunn, if I do

21  disclose him as an expert, can take his deposition

22  again on those expert issues.

23                But it's up to me to decide if I'm going

24  to make him an expert or not.  I don't have an expert

25  deadline or disclosure right now.  I want to take this

1  man as a fact witness.  And if he turns out he has

2  expertise or they argue what he says is expertise,

3  I'll name him and then we do expert discovery like we

4  ordinarily would do, and they will have that

5  information before they take that deposition.  Or if

6  they don't get to take it, then you'll rule whether I

7  get to use that expertise or not.  But either way, I

8  need the fact information.

9         And it is a pressing issue because he was

10 on the IDSA.  He got kicked off for these very issues.

11 He's somebody I've got to depose.  Whether we have

12 bifurcation or not, he's somebody I've got to depose.

13        THE COURT:  So, Mr. Dunn, under Mr. Egdorf's

14 hypothetical here, is that witness a fact witness or is

15 he an expert witness?

16        MR. DUNN:  Your Honor, I think he's proposing

17 him as both.  And it would be inefficient to take his

18 deposition twice.

19        If you look at their disclosures, they

20 did give us descriptions in their disclosures of these

21 three that they want to depose.  And when you read

22 them, to me it leads like four expert testimonies.

23 Dr. Liegner is the second one that they want to depose.

24 Dr. Liegner has expertise regarding chronic Lyme

25 disease, treating chronic Lyme disease, how health

1   insurance companies cover and do not cover chronic Lyme

2   disease, et cetera, et cetera.  And I believe the same

3   disclosure they gave us concerns Dr. Donta and the

4   other one that they want to depose, Dr. Burrascano.

5   And those are four expert questions for which a report

6   is required.

7              The law says, yes, if you're a treating

8   physician and you saw Lisa Torrey, then that's a

9   non-retained expert and that's more like  a fact

10  witness.  However, if you're testifying as an expert

11  opinion regarding standard of care, which is really

12  what this is all about, you are required to give a

13  report before the deposition, and the law says whether

14  or not you paid them, and that's what the rule says and

15  that's what the cases say and that's what we'd like to

16  brief for Your Honor before the deposition.

17          THE COURT:  Fair enough.  It needs to be

18  briefed.  Again, I think that's something that we are

19  just going to have to look at a little more carefully.

20          MR. EGDORF:  One issue I forgot to raise.

21  Dr. Donta is extremely elderly, so it's really

22  important we figure this out promptly.

23          THE COURT:  Okay.  Mr. Dunn?

24          MR. DUNN:  As soon as the stay is lifted or

25  as soon as the Court would like to set briefing

1  deadlines.  It seems like a standard schedule for a

2  motion would be fine for us.  So, as soon as he wants

3  to set a deadline for us to file that motion, we'll

4  file it.

5          THE COURT:  Let me suggest this.  I'm going

6  to go back on something I said earlier in terms of

7  briefing on the bifurcation issue.  Instead of two

8  weeks, could you all live with a week?  I mean, all of

9  the sudden we're five more weeks down the road under

10  the schedule.  Could you live with a week, Mr. Holt,

11  and get a response in a week and then a reply in a week?

12          MR. HOLT:  Yes, we could.

13          THE COURT:  All right, fair enough.

14          Okay.  I guess the last thing I'd say is,

15  you know, there were some issues raised today by

16  Mr. Austin, I think, that are thoughtful and

17  provocative in a way.  The parties are going to need to

18  talk about a trial plan at some point.  I think these

19  are things probably we all should have been thinking

20  about before now, but they are real issues and they are

21  not going to go away.  I don't know the best way to do

22  that sort of mechanically, other than I would encourage

23  the parties on both sides to be thinking about this.

24          And then I'll ask you, you know, to have

25  discussions back and forth about what makes the most

1   sense in terms of going forward.  If you all can agree,

2   obviously, great.  The odd of that, I think, are slim.

3   And so at some point I think it makes sense for me to

4   hear from both sides about what makes the most sense in

5   terms of actually trying the case if we get to that

6   point.  But I think the bifurcation issue is more

7   important than that at this point.  And so let's get

8   that issue briefed up.  And then the IME issue, as

9   well, and then the deposition issue -- or the

10  non-retained expert issue.

11                   What else?

12         MR. DUNN:  Just to be clear on that, when

13  would you like to see the motion on the non-retained

14  experts?

15         THE COURT:  We didn't resolve that.

16  I guess the issue is when can it be filed?

17         MR. EGDORF:  I'm not sure how you want to do

18  it, Judge, whose motion it would be.  I just want to

19  take a deposition.  In theory, they are looking to

20  quash it.  So it seems to me it's probably their motion

21  saying why I can't depose this fact witness.

22         THE COURT:  I think that's probably right.

23         MR. DUNN:  It's a motion for a protective

24  order --

25         THE COURT:  I think that's fine.  Could you do

1    that within a week?

2            MR. DUNN:  I believe we could, Your Honor.

3    It's the same deadline, so a week from today?

4            THE COURT:  Week from today.

5            MR. DUNN:  Yes, Your Honor.

6            THE COURT:  Any problem with that or you can

7    live with that?

8            MR. DUNN:  No problem with that.

9            THE COURT:  Okay, that's fine.

10           MR. DUNN:  Just to be clear, I think you said

11   that for the bifurcation, plaintiffs would respond in a

12   week and then defendants would reply in a week?

13           THE COURT:  That's correct.

14           MR. DUNN:  Is that the same schedule you want

15   for the other non-retained experts?

16           THE COURT:  I think that makes sense if that

17   works for everybody.  And then we've got a shorter

18   deadline or a more immediate deadline on the IME.

19              Are we all clear?  What else?

20           MR. EGDORF:  I think that's all for the

21   plaintiffs, Your Honor.

22           MR. HOLT:  That's all for the defense.

23           THE COURT:  Okay, thanks to everybody for

24   being here.  Safe travels.

25           *[10:45 p.m. - Proceedings adjourned]*

*EDWARD L. REED*
9251 Lynne Circle
Orange, Texas 77630 * 409-330-1605

REPORTER'S CERTIFICATE


I certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled

cause.


/s/ Ed Reed                            2-7-20
Edward L. Reed                         Date
Court Reporter

*EDWARD L. REED*
9251 Lynne Circle
Orange, Texas 77630 * 409-330-1605