IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| LISA TORREY, *et al.*, | § | CIVIL ACTION NO. 5:17-cv-00190-RWS |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | **[REDACTED VERSION]** |
| | § | |
| INFECTIOUS DISEASES SOCIETY OF AMERICA, *et al.*, | § | |
| | § | |
| | § | JURY TRIAL DEMANDED |
| Defendants. | § | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANTS' RULE 11 MOTION FOR SANCTIONS**

COME NOW Plaintiffs and file their Response in Opposition to Defendants' Rule 11 Motion for Sanctions (Dkt. 381), and in support thereof, would show the Court as follows:

**I.   BACKGROUND**

The IDSA and the Individual Defendants have twice now sent a Rule 11 letter and draft motion seeking sanctions on the Plaintiffs.

The first letter and draft motion was sent on September 1, 2020. Plaintiffs responded to such letter within the safe harbor time provided by Rule 11.

After Plaintiffs responded by letter on September 18, 2020, Plaintiffs sought to confer with the Defendants if they still planned to file such a motion. No motion was filed by the Defendants and Plaintiffs heard nothing further from the Defendants on the subject until almost five months later when the Defendants sent a substantially identical letter and draft motion to Plaintiffs again on January 28, 2021. *See* Ex. A.  By agreement, Plaintiffs responded by letter on March 3, 2021. *See* Ex. B.

It is the January 28, 2021 draft motion which the Defendants filed with the Court along with a "Cover Note" to the motion (Dkt. 381). In this Motion, the Defendants seek Rule 11 death penalty type sanctions against the Plaintiffs. They seek dismissal of the case along with attorneys' fees.

As an initial matter, Counsel takes the matter of any party seeking Rule 11 sanctions very seriously. Further, being accused of violating Rule 11 is an attack on counsel and the client rather than a vehicle at obtaining the truth.

Counsel for the Plaintiffs are mindful of the reputational and other harm the mere filing of a sanction motion can cause. Indeed, "the filing of a motion for sanctions [under F.R.C.P. 11] is itself subject to the requirements of [F.R.C.P. 11] and can lead to sanctions." *Smith v. Psychiatric Solutions, Inc.*, 750 F.3d 1253, 1260 (11th Cir. 2014).

In that regard, Counsel has reviewed the filings in this matter, the Court's rulings, and the evidence as well as Plaintiffs' own significant and extensive internal investigation. We also considered the fact that the Court already denied two separate motions to dismiss in which Defendants raised the same type arguments for which the Rule 11 Motion now seeks to sanction. As a result of this review, counsel for Plaintiffs strenuously disagrees with the Defendants' contention that Rule 11 was violated.

Accordingly, Plaintiffs respectfully request the Court deny this motion and award Plaintiffs their reasonable attorneys' fees in responding to the Defendants' Rule 11 Motion.

## II.   THE RULE 11 MOTION SHOULD BE DENIED.

There are two primary reasons such a motion should be denied.

The *first* reason is the destruction of the Civil Investigative Demand ("CID") information

sent to the Connecticut Attorney General ("AG") by the IDSA. The information received by the AG in the CID from the IDSA led to the AG's antitrust investigation into the Lyme guidelines which, according to published reports, "unearthed conflicts of interest between IDSA guideline authors and third-party entities who stood to benefit from the guidelines."

This destruction and potential spoliation by the IDSA will be an evidentiary item Plaintiffs will seek to present at trial.[1] The IDSA's reliance on any purported lack of documentary evidence of conspiracy comes head-on with the very fact that the IDSA (along with the other co-conspirator defendants) destroyed such documentary evidence.

The *second* is there is evidence related to payments made by the Insurance Defendants to the Doctor Defendants. This includes Eugene Shapiro, Leonard Sigal, and James Dattwyler, among others. Despite their testimony that they received large consulting fees from insurance companies, Defendants produced absolutely no documents. Defendants did not produce documents showing the payments the Doctor Defendants received, produced no correspondence between the insurance companies and the Doctor Defendants. Defendants produced nothing – even though their testimony establishes these documents existed.

A. **The Connecticut Attorney General Blumenthal's Investigation, Comments and Settlement & The Destruction of Evidence By The IDSA and Co-Conspirators.**

The Attorney General's investigation and settlement is factual information which is specifically allowed. "There is no absolute rule barring a private plaintiff from relying on settlements with government regulators to meet the requirements of Rule 9(b) for proving fraud. Still, these types of settlements may only be considered at the pleading stage as allegations made

---

[1] *See* Ex. C (Letter from the Connecticut AG's office sent to Plaintiffs' counsel in this case confirming that all information provided to the AG was sent back to the individual respondents of the CID (which includes the Defendants) pursuant to a requirement of the Connecticut statute.)

'upon information and belief.'" *Nguyen v. FXCM*, --F. Supp. 3d--, 2019 WL 416328, *5, Case No. 1:17-cv-2729 (S.D.N.Y. Feb. 1, 2019). Indeed, "[a]t the pleading stage, Plaintiffs need only allege facts that, upon their information and belief, will likely lead to admissible evidence in discovery." *Id*.

Defendants' argument that this may not be admissible is an argument at trial or perhaps at the motion for summary judgment stage. It does not go to the issue of Rule 11 which is whether there is factual support for the allegations. The evidence from the AG investigation alone provides such factual support.

To be sure, the IDSA cannot now claim there is not documentary evidence from the AG investigation because the IDSA destroyed that very information which was provided to the AG and then claim a Rule 11 violation. This destroyed information goes to the very heart of the AG investigation and is in the exclusive control of the IDSA and Doctor Defendants. Plaintiffs have every right to support their allegations by pointing to the AG investigation, comments, and settlement.

Indeed, Plaintiffs sent subpoenas to the Office of the Attorney General for the State of Connecticut requesting the documents and information obtained during their investigation into the IDSA, the Settling Insurance Companies, and the IDSA Panelists. The Attorney General's office produced the CIDs sent to the Defendants but not the responses because documents and information acquired were returned to Defendants:

> The documents were subpoenaed or furnished voluntarily to the Connecticut Office of the Attorney General ("CTOAG") in connection with an antitrust investigation. Pursuant to Conn. Gen. Stat. § 35-42(c)(l) & (2), such documents are held in the custody of the CT-OAG, shall not be available to the public, and shall be returned to the person who produced or furnished the documents upon the termination of the CT-OAG's investigation. The majority

> of the documents obtained in connection with the CT-OAG's antitrust investigation of the Infectious Diseases Society of America were returned at the termination of the investigation.

None of the documents sent from the Attorney General's office to the Defendants were ever produced by Defendants in this case. These are the documents that the Attorney General reviewed and concluded that the IDSA and Doctor Defendants committed antitrust violations and the Doctor Defendants received large fees from the insurance companies. Because Defendants never produced these documents, Plaintiffs cannot rely on them in this case.

Plaintiffs also have other information which supported the allegation of payments in the Complaint. For example, Dr. Joseph Burrascano Jr.'s August 6, 1993 testimony before congress in which he stated his personal knowledge of the IDSA Panelists receiving large consulting fees from insurance companies:

> Some of them are known to have received large consulting fees from insurance companies to advise the companies to curtail coverage for any additional therapy beyond the arbitrary 30-day course. And this is even though the insurance companies do not do this for other illnesses. *See* Ex. D.

Rule 11 imposes a standard of good faith and reasonable investigation as of the date of the signing. *Thomas v. Capital Security Services*, 836 F.2d 866, 874 (5th Cir. 1988). There is substantial evidence of payments made to the IDSA by third parties, including the insurance companies, detailed in the Blumenthal investigation: "**The IDSA's 2006 Lyme disease guideline panel undercut its credibility by allowing individuals with** financial interests -- in drug companies, Lyme disease diagnostic tests, patents and **consulting arrangements with insurance companies** -- to exclude divergent medical evidence and opinion."

The IDSA's contention that this testimony was thirteen years before the 2006 guidelines and thus "irrelevant" is incorrect. For purposes of Rule 11, it is whether it can be used in a

5

determination of whether the Plaintiffs have factual support for the allegations. This clearly does. Moreover, this is not only relevant evidence, but it was what was cited by the AG in ultimately reaching a settlement on the AG's allegations against the IDSA and the Insurance Defendants.

If the IDSA seeks to preclude this evidence at trial, that is an evidentiary issue and on for which the Plaintiffs believe they have good arguments to present at trial. Regardless, if the IDSA thinks differently that does not matter for purposes of Rule 11.  It is whether this evidence can be used to determine if the Plaintiff have factual support for the allegations—Plaintiffs clearly do.

**B.     Payments by Insurance Companies to The Doctors.**

There is clear evidence of payment to the IDSA Doctor Defendants, and a complete lack of documentary evidence produced in this case by the IDSA or the Doctor Defendants.  The testimony supports the allegations regardless of whether the Defendants produce such documents.

For example, Eugene Shapiro testified that he has provided expert testimony in around 75 to 80 cases, offered testimony in court more than a "dozen" times, and twice testified in front of medical boards. (Shapiro deposition, page 6, lines 3-24). Much of Shapiro's testimony related to Lyme disease but he never produced any documents related to his testimony. Shapiro even failed to produce a list of testimony that he currently has in his possession:

> Q.     Do you have a list of your deposition and trial testimony somewhere?
>
> A.     Yes.
>
> Q.     Is it included in the CV?
>
> A.     No, I never -- it's -- I never include it in the CV. If somebody asks -- asks -- if somebody asks me for it, I -- I can get it.
>
> Q.     Do you currently have a copy of that list?

> A. Yes.
>
> Q. If I were to ask your attorney for that list, you could send it over to him?
>
> A. I could.
>
> (*See* Ex. E, Shapiro deposition, page 17, line 24 – page 18, line 12).

James Dattwyler testified that he was hired numerous times by insurance companies to testify as an expert witness in Lyme cases. (*See* Ex. F, Dattwyler deposition, page 13, lines 1-4). Dattwyler was also hired by insurance companies as a consulting expert and to review medical records for Lyme patients. (*See* Ex. F, Dattwyler deposition, page 13, lines 7-16).



> Q. Do you keep track of the amount of money that you receive in serving as an expert witness?
>
> A. No.
>
> (*See* Ex. F, Dattwyler deposition, page 189, line 19 – page 190, line 6).

Even though he testified numerous times over the years, Dattwyler cannot remember the number of cases, the names of any of the cases, the names of who hired him, or how much he was

paid over the years. (*See* Ex. F, Dattwyler deposition, page 18, line 22 – page 19, line 15). Dattwyler did not produce any documents at all related to numerous cases he worked on for insurance companies because he claims all of the documents were destroyed:

> Q. You've never been asked by a judge or by a lawyer to provide a list of the cases that you have worked on as an expert witness?
>
> A. I may have been asked, but I don't keep those records.
>
> Q. Do you have a list somewhere in your house or at work or anywhere in which you identify the cases that you've been hired as an expert witness?
>
> A. No.
>
> Q. If I wanted to look through your records to determine how many cases you've been hired as an expert witness, how would I find that information?
>
> A. I would guess you'd have to do it through legal resources that you have at your command. I certainly don't keep records like that.
>
> (*See* Ex. F, Dattwyler deposition, page 18, line 22 – page 19, line 15).

Dr. Leonard Sigal worked for insurance companies from 1990 to 2006 and was paid a tremendous amount of money by the insurance companies. Sigal is not sure how much he made from insurance companies in Lyme cases but testified it could be over a million dollars. *(See* Ex.G, Sigal deposition, page 25, lines 12-15). Sigal testified that from the early 1990's until 2003, he was an "active expert witness for insurance companies" and was hired on 3 to 5 Lyme disease cases a year for more than ten years. (*See* Ex. G, Sigal deposition, page 44, lines 7-19). Sigal

charged insurance companies $560 an hour plus $5,000 a day for deposition and trial testimony. (*See* Ex. G, Sigal deposition, page 80, lines 7-12 and page 26, lines 14-23).

Despite the numerous cases Sigal worked on for insurance companies, he produced absolutely no evidence including correspondence, payments, testimony, or anything else.

There is also senate testimony from Dr. Joseph Burrascano, Jr., in which he testified that the Defendant Doctors "received large consulting fees from insurance companies to advise the companies to curtail coverage for any additional therapy beyond the arbitrary 30-day course." *See* Ex. D.

The IDSA's "argument" that this testimony cannot support the allegations is simply that—*argument*. The IDSA is not the fact finder under a Rule 11 motion. Instead, the standard is whether there is factual support for the allegations. Moreover, the payments are not irrelevant given the timeframe when they were made. They instead are the circumstantial evidence of the conspiracy.

C.     **Payments Are But One Part Of The Conspiracy/Collusion.**

Payments are but one part of the allegations made on information and belief.

Items wholly separate and apart from the payments form the basis of the scheme. This includes:

- The Insurance Defendants conspired with the IDSA to create restrictive IDSA guidelines so they could refuse to pay for long-term antibiotic treatment.

- Insurance Defendants work together to find doctors treating chronic Lyme disease and report them to their medical boards based on the IDSA guidelines.

- Insurance Defendants decided to enforce an arbitrary 28-day cut-off for all antibiotics.

None of this would be possible but for the IDSA guidelines which were developed by the Defendant Doctors who, as the AG stated, "had a conflict of interest."

**D.     The Rule 11 Motion Does Not Address These and Other Allegations Which Independently Form the Basis for the Antitrust and RICO Claims.**

Additionally, in the Plaintiffs' most recent filing of the Third Amended Complaint on February 4, 2021, the Plaintiffs address items raised in the Motion. Specifically, Defendants allege that Plaintiffs "admit" that Plaintiffs cannot allege facts that would meet the standards for pleading the RICO and antitrust claims. *See* Ex. A (Defendants' January 28, 2021 Rule 11 letter to Plaintiffs).

Presumably, this is in reference to the prior complaints that said discovery was needed. Given that fact discovery has concluded that language is not in the Third Amended Complaint on file.

Not only do Plaintiffs have a tremendous amount of direct and circumstantial evidence to go to a jury but Plaintiffs have detailed it more fully in Plaintiffs' Response to Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint, as well as Plaintiffs' Response to Defendants' Motion for Summary Judgment.

Moreover, as discovery clearly showed, the IDSA as well as those participating with the IDSA (the Defendant Doctors) engaged in massive misrepresentations related to the treatment of Lyme. See ¶¶ 175-203 of the TAC.

Accordingly, Plaintiffs amended their Complaint[2] to allege the facts which the Defendants complained in their January 28, 2021 Rule 11 letter to Plaintiffs were missing. The Third Amended Complaint contains very specific and detailed information related to the fraudulent and negligent misrepresentations. And, contrary to the Motion this is a well-founded claim supported by the

---

[2] In accordance with the DCO, which the IDSA agreed to, the Plaintiffs have properly amended the Complaint.

evidence obtained during the IDSA Corporate Representative and the IDSA Doctors depositions.

E. **The IDSA Misinterprets the Evidence Required.**

The IDSA points to a lack of evidence of an agreement between the IDSA and the Insurance Defendants "to participate in a scheme to develop fraudulent disease guidelines." As the Defendants are no-doubt aware, collusion and illegal agreements are often not reduced to writing and Defendants do not readily admit to such illegal behavior in depositions or at trial. Accordingly, this agreement is inferred from the circumstantial evidence presented at trial.

To require that the Plaintiff have concrete admissions by the Defendants of an illegal agreement is a burden which would preclude all but the most unique RICO and Antitrust cases. This is not even the standard at the Motion for Summary Judgment which is a higher burden than that of the Rule 11.

The Plaintiffs are allowed to present the circumstantial evidence of an agreement to the jury and allow the jury to infer the illegal agreements as well as to detail the misrepresentation claims.

F. **Plaintiffs' Dismissal of the RICO Claim and Doctor Defendants.**

Plaintiffs know that there are documents supporting all of Plaintiffs claims, as set forth in this Response and in Plaintiffs' Complaints. Despite this, the Defendants' destruction of, or refusal to produce these documents puts Plaintiffs in the position of attempting to prove their RICO claim through mostly circumstantial evidence. Because of this, Plaintiffs represented to the Defendants in their March 3, 2021 letter to Defendants that they are going to dismiss the RICO claims and the Doctor Defendants. Plaintiffs also relayed in the letter they were disappointed in making the decision to dismiss the RICO claim and that it is unfortunate the Defendants are benefiting by the destruction of documents. However, Plaintiffs are comforted in knowing the validity and

provability of the antitrust claim and the misrepresentation claims.

Plaintiffs also identified in the March 3, 2021 letter to Defendants that Plaintiffs would be filing a Fourth Amended Complaint before the April 8, 2021 hearing. The Fourth Amended Complaint will remove the RICO claim and will dismiss all claims against the Doctor Defendants.

For whatever reason, the Defendants decided to bring the Rule 11 Motion which argues that the Plaintiffs should be sanctioned for continuing to have the Individual Defendants in the lawsuit—knowing that Plaintiffs will be dismissing these Individual Defendants as well as the RICO claim in the Fourth Amended Complaint and before the hearing the Court set on April 8, 2021.

Defendants filed this in light of the letter sent to them by the Plaintiffs which stated these Individual Defendants would be dismissed. Moreover, Defendants also knew this from the Plaintiffs' Response to the Defendants Motion for Summary Judgement in which Plaintiffs specifically informed the Court of this decision and made such a representation to the Court. (Dkt. 373 at pg. 1 of Response.)

## IV.  CONCLUSION

Plaintiffs respectfully request the Defendants' Motion for Rule 11 Sanctions be denied and that Plaintiffs be awarded attorneys' fees in responding to Defendants' Motion and the Rule 11 letters.

Respectfully submitted,

SHRADER & ASSOCIATES, LLP

BY:   /s/ Eugene Egdorf
EUGENE EGDORF
State Bar No. 06479570
3900 Essex Lane, Suite 390,
Houston, TX 77027
(713) 782-0000 phone
(713) 571-9605 fax
E-mail: gene@shraderlaw.com

BY: /s/ Lance Lee
LANCE LEE
State Bar No. 24004762
5511 Plaza Drive
Texarkana, Texas 75503
(903) 223-0276 phone
(903) 223-0210 fax
Email: wlancelee@gmail.com

RUSTY HARDIN & ASSOCIATES, LLP

BY:   /s/ Daniel R. Dutko
DANIEL R. DUTKO
State Bar No. 24054206
RYAN HIGGINS
State Bar No. 24007362
1401 McKinney St., Suite 2250
Houston, Texas 77010
(713) 652-9000 phone
(713) 652-9800 fax
Email: ddukto@rustyhardin.com
Email: rhiggins@rustyhardin.com

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

      I hereby certify that on March 18, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all registered parties.

Alvin Dunn
Michael A. Warley
PILLSBURY WINTHROP SHAW PITTMAN, LLP – WASHINGTON
1200 Seventeenth Street, NW
Washington, D.C. 20036
*-and-*
Ronald C. Low
PILLSBURY WINTHROP SHAW PITTMAN, LLP - AUSTIN
401 Congress Ave., Suite 1700
Austin, TX 78701

***Attorneys for Defendants Infectious Diseases Society of America,
Dr. Gary P. Wormser, Dr. Raymond J. Dattwyler, Dr. Eugene Shapiro,
Dr. John J. Halperin, Dr. Leonard Sigal, and Dr. Allen Steere***

                                                          */s/ Daniel Dutko*
                                                          Daniel R. Dutko