```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF TEXAS
 2                       TEXARKANA DIVISION

 3     TORREY, ET AL,              |  DOCKET 5:17-CV-190
                                   |
 4                                 |  APRIL 23, 2021
       VS.                         |
 5                                 |  10:10 A.M.
                                   |
 6     INFECTIOUS DISEASES         |  TEXARKANA, TEXAS
       SOCIETY OF AMERICA          |
 7     ----------------------------------------------------------

 8

 9            REPORTER'S TRANSCRIPT OF MOTION HEARING

10       BEFORE THE HONORABLE ROBERT W. SCHROEDER, III
                 UNITED STATES DISTRICT JUDGE
11     ----------------------------------------------------------

12

13   APPEARANCES:

14   FOR PLAINTIFF:  DANIEL DUTKO
                     RYAN KEES HIGGINS
15                   RUSTY HARDIN & ASSOCIATES, LLP
                     5 HOUSTON CENTER
16                   1401 MCKINNEY, SUITE 2250,
                     HOUSTON, TEXAS 77010
17
                     LANCE LEE
18                   ATTORNEY AT LAW
                     5511 PLAZA DRIVE
19                   TEXARKANA, TEXAS 75503

20                   EUGENE ROGER EGDORF
                     SHRADER & ASSOCIATES, LLP - HOUSTON
21                   3900 ESSEX LANE
                     SUITE 390
22                   HOUSTON, TEXAS 77027

23   FOR DEFENDANT:  ALVIN DUNN
                     MICHAEL A. WARLEY
24                   PILLSBURY WINTHROP SHAW PITTMAN LLC -
                     WASHINGTON
25                   1200 SEVENTEENTH STREET, NW
                     WASHINGTON, DC 20036
```

```
 1
     FOR DEFENDANT:  JEFFREY RANDALL ROESER
 2   AETNA, INC.     HALTOM & DOAN
                     6500 SUMMERHILL ROAD
 3                   CROWN EXECUTIVE CENTER SUITE 100
                     P.O. BOX 6227
 4                   TEXARKANA, TEXAS  75505

 5
     FOR DEFENDANT:  BENJAMIN F. HOLT
 6   UNITED HC       HOGAN LOVELLS US LLP - WASHINGTON, DC
                     COLUMBIA SQUARE
 7                   555 THIRTEENTH STREET, NW
                     WASHINGTON, DC  20004
 8

 9   FOR DEFENDANT:  KATHRYN A. SHOEMAKER
     ANTHEM, INC.    FOLEY & LARDNER, LLP - WASHINGTON, DC
10                   3000 K STREET, N.W.
                     SUITE 600
11                   WASHINGTON, DC 20007

12
     COURT REPORTER:    KATHRYN E. MCALPINE, CSR, RPR
13                      FEDERAL OFFICIAL REPORTER
                        500 N. STATE LINE AVENUE
14                      TEXARKANA, TEXAS  75501

15

16       PROCEEDINGS RECORDED USING MECHANICAL STENOGRAPHY;
         TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION.
17

18

19

20

21

22

23

24

25
```

```
 1                    (OPEN COURT, ALL PARTIES PRESENT.)
 2              (REPORTER'S NOTE:  During the following
 3          proceedings there were disruptions in the audio
 4          as a result of it being held via
 5          videoconference.  These are noted in the
 6          transcript.)
 7              THE COURT:  We'll go on the record now.  Lisa
 8     Torrey, et al., versus the Infectious Diseases Society of
 9     America, Civil Action Number 5:17-cv-190.
10              Would counsel please state their announcements for
11     the record.
12              MR. EGDORF:  Good morning, Your Honor.  This is
13     Gene Egdorf, lead counsel for the Plaintiffs with my
14     cocounsel Daniel Dutko, Ryan Higgins and Lance Lee.
15              THE COURT:  Good morning, Mr. Egdorf.
16              MR. EGDORF:  Good morning, Your Honor.  Good to
17     see you again.  I hope you're well.
18              THE COURT:  Nice to see you.
19              MR. DUNN:  Your Honor, Alvin Dunn of Pillsbury
20     Winthrop representing IDSA and the six doctor Defendants.
21     With me as a presenter on the video conference is Michael
22     Worley, an associate in our office, and I hope that was
23     clear enough.
24              THE COURT:  Yeah, that's fine, Mr. Dunn.  Good
25     morning to you.
```

1          MR. HOLT:  Good morning, Your Honor.  Benjamin

2    Holt on behalf of United Health.

3          THE COURT:  Good morning.

4          MR. ROESER:  Good morning, Your Honor.  Randy

5    Roeser this afternoon on behalf of Aetna.

6          THE COURT:  Good morning, Mr. Roeser.

7          MS. SHOEMAKER:  Good morning, Your Honor.

8    Katherine Shoemaker on behalf of Anthem.

9          THE COURT:  Good morning, Ms. Shoemaker.

10         Okay.  I believe that's it.

11         We have set for hearing this morning a number of

12   motions.  There's a motion for summary judgment, two

13   motions for -- two motion to dismiss, a motion to stay and

14   a motion for sanctions.

15         The Court had previously set time limits for the

16   -- for the various motions and shared that information with

17   the -- with the parties.  The parties have met and

18   conferred and let us know that the preferred order for

19   proceeding this morning is first the argument on the motion

20   for summary judgment, then motions to dismiss, followed by

21   the motion to stay and then the motion for sanctions.  I

22   think that puts us at a -- a potential hearing length of

23   about three hours.  We'll see where we are and whether it's

24   necessary to take a break for lunch.

25         So with those preliminary comments, Mr. Dunn, if

```
 1   you wish to go forward at this time on the motion for

 2   summary judgment, you may do so.

 3         MR. DUNN:  Thank you, Your Honor.  And if I go too

 4   fast or get to a point where you're not able to hear me,

 5   please interrupt if you ever have a question.

 6         Your Honor, we do have four motions.  They're

 7   linked and in part they're overlapping.  Four points are as

 8   follows.

 9         Your Honor, the Defendants, the IDSA doctors are

10   here today seeking the Court's help because Plaintiffs,

11   after conducting full discovery, now have no evidence to

12   support their claims.

13         Your Honor, they have no evidence of payments from

14   the Insurance Defendants to the doctors who wrote the

15   guidelines.  Your Honor, the Plaintiffs know they have no

16   evidence to support their claims and they knew it at least

17   more than three months ago.  And the case should have been

18   over at that point.

19         Your Honor, Plaintiffs should have dismissed their

20   claims at the beginning of January when discovery ended,

21   but Plaintiffs did the opposite.  They refiled their RICO

22   and antitrust claims in the Second Amended Complaint

23   without alleging a single new fact.  But in that Second

24   Amended Complaint, they yet again alleged they needed

25   meaningful discovery to find evidence of the alleged
```

1  payments that are the foundation of their RICO and

2  antitrust claims.

3        But, Your Honor, at that point, discovery was

4  over.  Plaintiffs have had three years of full and

5  unlimited discovery regarding the core allegations

6  supporting their claims.

7        Now, in that same pleading, Second Amended

8  Complaint, Plaintiffs brought brand-new misrepresentation

9  claims without alleging a single new fact.  Zero new facts.

10 And those new misrepresentation claims, Your Honor, if

11 permitted to stand undisputed would require extensive

12 additional discovery regarding new and different liability

13 allegations, brand-new damages allegations.

14       But, Your Honor, discovery was over and

15 Plaintiffs, knowing that their original claims had no

16 evidence, they want to start over with a brand-new case.

17 And, Your Honor, this misconduct is just a continuation of

18 Plaintiff's misconduct throughout the case.

19       Your Honor, they have ignored court orders and

20 court rules, delayed discovery and delayed the IMEs.  We

21 tolerated most of the misconduct but at this point we had

22 to call Plaintiffs on their undisputed Rule 11 violation,

23 their filing of a new complaint after discovery without

24 evidentiary support for their factual allegations.

25       Your Honor, even after that, their misconduct got

1    worse.  They filed another amended complaint and doubled

2    down on false claims, same allegations of payments with no

3    evidentiary support.

4         And then, Your Honor, they set forth all the

5    justifications for their late filing.  They said they filed

6    their new claims only because they learned new facts during

7    the recent depositions.  Your Honor, that was false.  All

8    the facts they needed to relate to the new claims at the

9    beginning of the case prove they brought their new claim

10   without putting a single new fact in their Second Amended

11   Complaint.

12        Your Honor, the response to our summary judgment

13   motion, Plaintiffs admitted finally they had no evidence of

14   payments from the Insurance Defendants to the doctors and

15   they promised to dismiss their claims against the doctors,

16   all of them, and to dismiss their RICO claims against IDSA.

17        But, Your Honor, in the very next breath in the

18   opposition paper, this claim they have evidence of payment

19   from, quote, insurance companies to the doctors to support

20   their antitrust claims.

21        Your Honor, the Court should not be deceived by

22   this slight of hand.  This case concerns payment from

23   health insurance companies to the doctors.  Not from

24   disability insurance companies, not medical malpractice

25   insurance companies.  No Plaintiffs claimed they were

1   denied disability payments.  Plaintiff sued no disability

2   insurance carriers and they sued no medical malpractice

3   insurance companies and their case is about payments from

4   health insurance companies.

5          Finally, Your Honor, the worst.  To justify their

6   false claims, they allege IDSA and the doctors destroyed

7   documents.  That was completely false.

8          Your Honor, Plaintiffs made a complete mess of the

9   case.  We're here today asking for the Court's assistance

10  to put an end to the case, please.  Put an end to the

11  misconduct, please.  And please protect the Court and the

12  integrity of the judicial process by doing what Rule 11

13  says should be done and impose appropriate sanctions.

14         Your Honor, regarding our summary judgment motion,

15  way too long but yesterday after repeated requests from the

16  Defendants, Plaintiffs agreed to dismiss their RICO claims

17  and their antitrust claims against the doctors with

18  prejudice and agreed to dismiss their RICO claim against

19  IDSA with prejudice and we join them in a stipulation

20  seeking that dismissal.

21         THE COURT:  So, Mr. Dunn, I have that joint

22  stipulation of dismissal before me, as well as an order and

23  we will get that entered and docketed today.  So for

24  purposes of arguing today, as far as I'm concerned at

25  least, you can at least assume that will be entered today

1  and focus your attention on the IDSA.

2        MR. DUNN:  Thank you, Your Honor.  And that was my

3  intention.  We appreciate that.

4        It is relevant, though, to our argument regarding

5  the remaining antitrust claims.  The fact that the reason

6  Plaintiffs agreed to dismiss their RICO claims is that they

7  have no evidence of payments from the Insurance Defendants

8  to the doctors.  They say that and of course that's the

9  case.

10        That admission alone should do Plaintiff's

11  antitrust claims against IDSA but Plaintiffs persist

12  alleging that there's evidence of payments to support their

13  antitrust claims.

14        But, Your Honor, that is false.  Look at their

15  complaints, all of them.  They alleged payments that

16  support -- allegedly support the RICO claims are the exact

17  same alleged payments that allegedly support the antitrust

18  claims.  No payments, no RICO claims; no payments, no

19  antitrust claims.

20        But, Your Honor, even if that admission is not

21  enough and we move to looking at the evidence Plaintiffs

22  are obligated to set forth to go to trial on their

23  antitrust claims, Plaintiffs fall far short.  As Your Honor

24  well knows to survive summary judgment on their antitrust

25  claims at this stage, Plaintiffs need evidence.  To survive

1   summary judgment on their antitrust claims, Plaintiffs need

2   to actually dispute the Defendants undisputed material

3   facts with evidence.

4          And in particular under Fifth Circuit law to

5   survive summary judgment, when the Defendants submit

6   declaration in which they deny that there was a conspiracy

7   or agreement in sponsoring antitrust claim, the Fifth

8   Circuit makes clear that the Plaintiff bear an even heavier

9   burden to produce substantial probative admissible evidence

10  to support their antitrust claims.

11         Your Honor, we submit Plaintiffs don't even try.

12  The Local Rules are clear.  They say the Plaintiff needs to

13  respond, provide a written response to our statement of

14  undisputed material facts.  Plaintiffs did not submit such

15  a response.  Under the Local Rules the Court will assume

16  the facts as claimed and supported by the admissible

17  evidence by the moving party are admitted to exist without

18  controversy.  The Court will assume those facts are

19  admitted without controversy and beyond that the Court will

20  not scour the record in attempt to unearth an undesignated

21  issue of material fact.

22         Your Honor, there's no admissible evidence at all.

23         Your Honor, that brings us to six independent

24  reasons that the antitrust claims should be dismissed on

25  summary judgment and I will briefly address them and, if

1  necessary, would like to save time for rebuttal if

2  Plaintiffs have any evidence at this point to support them.

3          Your Honor, there's no evidence of an agreement

4  between IDSA and the Insurance Defendants.  Only the

5  payments from the Insurance Defendants to the doctors are

6  relevant to the alleged agreement and there's no evidence

7  of any such payments.  Plaintiffs admit that.

8          Your Honor, because they don't have the evidence

9  they're left to argue that doctors and IDSA destroyed the

10  evidence.  But that is not true.  No doctor destroyed

11  relevant evidence.  IDSA did not destroy relevant evidence.

12  Not at all.

13          There is no evidence of payment, there's no --

14  nothing from which you could even infer an agreement.

15  Never suggested that evidence of direct agreement.  They

16  have always said you don't see such evidence we have to

17  find circumstantial evidence from which you can draw an

18  inference.  Here there is no circumstantial evidence.

19  There's nothing from which to draw an inference.

20          Your Honor, the second reason, independent reason,

21  summary judgment on the antitrust claims is appropriate,

22  the statute of limitations.  Your Honor, you held earlier

23  that statute of limitations is a defendant-by-defendant,

24  plaintiff-by-plaintiff inquiry that is more appropriately

25  addressed on summary judgment than on this complaint on the

 1   motion to dismiss.

 2          Here we are, Your Honor.  There's no evidence

 3   submitted by the Plaintiff that IDSA, the last the

 4   Defendant in this case, committed an act during the

 5   limitation period and that's November 10, 2013, to four

 6   years forward, November 2017, no evidence that IDSA

 7   committed an act during that period and harmed any

 8   Plaintiffs' business or property.

 9          Your Honor, in response to our summary judgment

10   motion on this point, all the Plaintiffs do is submit

11   evidence that IDSA has been engaged in lobbying activities

12   during that time period.  Lobbied Congress, might have

13   lobbied a state legislature on matters related to Lyme

14   disease.

15          Your Honor, the Supreme Court held 60 years ago

16   and it's well-settled law that petitioning the government

17   cannot support an antitrust claim.  That's what the

18   Noerr-Pennington doctrine says and well-settled law all

19   across the country and, of course, within the Fifth

20   Circuit.

21          Your Honor, the third independent reason the

22   Plaintiffs have no evidence to support their antitrust

23   claims is that they submitted no evidence of a relevant

24   antitrust market.

25          First they argued that the relevant antitrust

1  market is the Lyme disease treatment market, but,

2  Your Honor, there's no evidence and there can't be any

3  evidence that IDSA competes in that market.  IDSA is a

4  professional medical society.  It does not provide Lyme

5  disease treatment.  It doesn't compete in that market.

6      Your Honor, the second market they allege is what

7  they call a market for Lyme disease guidelines.

8  Your Honor, IDSA does provide Lyme disease guidelines but

9  that cannot be an antitrust market.  An antitrust market is

10  a market in which companies or persons compete with each

11  other to provide products or services at a profit.  (Audio

12  disruption) -- gives away the guidelines for free.  That is

13  not antitrust market.

14      Your Honor, it's important to remember, only IDSA

15  remains in the case.  There's no allegation that IDSA has

16  paid anything.  There's no allegation or evidence that IDSA

17  profited in any way from producing these guidelines.

18      Your Honor, the fourth reason the antitrust claims

19  on summary judgment should be dismissed -- (audio

20  disruption) -- on those claims on competition by IDSA.

21  Plaintiffs present no evidence that IDSA restricted

22  competition in any way, and just because they say so is not

23  evidence that is sufficient at the summary judgment stage.

24      Your Honor, the fifth reason is there's no

25  evidence submitted by Plaintiffs that IDSA holds a

1  monopoly, power or market power in the defined market.

2  They must produce evidence on summary judgment that IDSA

3  has market power to support their Section 1 claims which

4  require an agreement or to support their Section 2 claims

5  that IDSA has monopoly power.  There is no evidence of

6  either submitted.

7       Finally, Your Honor, the sixth reason.  Plaintiffs

8  no evidence that they have been injured in their business

9  or property.  Your Honor, Plaintiffs' damages with

10  derivative of their personal injury and therefore are not

11  recoverable under the Sherman Act which permits recovery to

12  business or property.

13       Your Honor, The Court did look at this issue in

14  connection with the first motion to dismiss filed by the

15  Insurance Defendants and that was joined by IDSA and the

16  doctors -- it wasn't prepared by us -- and Your Honor ruled

17  at that stage that Plaintiffs had properly pled injury to

18  business or property.  That was then and this is now and we

19  ask the Court to consider the ruling of the appellate court

20  that has looked into this issue in the greatest depth, the

21  Sixth Circuit opinion in the Jackson case, which we

22  acknowledge was not included in the Insurance Defendants

23  original motion to dismiss at the beginning of the case.

24  We ask the Court to consider that which is the case that

25  goes into the issue clearly in the most depth.

1          And at summary judgment, now Plaintiffs need

2     evidence of their injuries to business or property which

3     they do not submit and the Plaintiffs just recently amended

4     their complaint, Your Honor, to allege personal injuries

5     showing you what they're really seeking in this case.

6          Your Honor, there's multiple independent reasons

7     to grant summary judgment on the antitrust claims and at

8     this stage, Plaintiffs cannot rely on allegations or

9     suggestions.  They must set forth the evidence and they

10    have no evidence.  Your Honor, I would like to reserve my

11    remaining time on this issue for rebuttal.

12          THE COURT:  Thank you, Mr. Dunn.

13          MR. DUTKO:  May I respond, Your Honor?

14          THE COURT:  Yes.

15          MR. DUTKO:  Your Honor, Daniel Dutko on behalf of

16    the Plaintiffs.  Before I get into the argument, I want to

17    address some of the accusations made by Mr. Dunn.  I'm not

18    sure why he used this forum to make those accusations but

19    we disagree with them.  The fact we ignored court orders,

20    I'm not quite sure where that comes from.  I believe we've

21    tried everything we could to comply with the court orders

22    and to do everything with respect to what the Court wanted

23    in this case.

24          I'm not sure why Mr. Dunn referred to our filings,

25    our petitions, our complaints as late filings because these

1    were not filed late.  These were filed months before the

2    pleadings deadline that Mr. Dunn proposed and agreed to.

3         I'm not sure why Mr. Dunn said that our Second

4    Amended Complaint alleged no new facts.  When you look at

5    paragraphs 193 and 198, you can see new facts in the Second

6    Amended Complaint that specifically are not laid out in the

7    other complaint, and I'll give the Court an opportunity to

8    turn to that.  I'm looking at paragraph 193, Your Honor.

9         You can specifically see there are new facts set

10   forth with respect to our fraudulent misrepresentation

11   claims, and they're all bullet-pointed there.  And there

12   also new facts with respect to the negligent

13   misrepresentation claim in 198 that are bullet-pointed.

14        So I'm not quite sure why Mr. Dunn has made these

15   representations to the Court, especially in light of the

16   fact that it has been difficult at best to get documents

17   and information from Mr. Dunn regarding his clients.  I

18   know this is not a discovery dispute and our discovery

19   issues are set forth in our motion and we'll rest on those

20   papers with respect to that issue.

21        But I do want to point out that Mr. Dunn seems to

22   have taken the position that his interpretation of the

23   Court's order and his interpretation of the letter of the

24   law is what governs the discovery in this case and has

25   either withheld documents, not produced documents or

1    destroyed documents.  And so that is all set forth in our

2    motion but I would like to now address the allegations of

3    our antitrust claim.

4          The first issue that needs to be raised,

5    Your Honor, is that Plaintiffs in all of their complaints

6    have alleged Section 2 violations of the antitrust claim.

7    Mr. Dunn's motion for summary judgment, the IDSA's motion

8    for summary judgment, does not even address Section 2.

9    There is no issue with respect to Section 2.

10         And I'm going to make sure I'm careful with that

11   because on page 25 of the IDSA's motion, they begin with

12   listing a couple of the elements of Section 2, but then the

13   very next sentence goes back specifically into Section 1

14   and that is the last reference to Section 2 anywhere in the

15   summary judgment papers.

16         I searched through the reply to see if maybe they

17   tried to address the Section 2 arguments and there is no

18   reference -- there's three references to Section 2 but

19   nothing with respect to proving or disproving Section 2

20   antitrust claims.  Therefore, it's Plaintiff's position

21   that even if the Court were inclined to grant the Section 1

22   summary judgment, the Section 2 has not even been addressed

23   and cannot be granted at this time.

24         Turning now to Section 1 of to Sherman antitrust

25   claim, the Court has lived with this case for a long time

1  and knows the facts but just briefly if the Court will

2  indulge me, as the Court is aware, Lyme disease as it

3  exists today is a very big issue.  In fact, Congress has

4  enacted the working group, Stanford recently enacted their

5  own working group -- Stanford University.  Lyme disease and

6  chronic Lyme disease is so prevalent and such a big deal

7  that legislatures around the country are passing laws for

8  the treatment and diagnosis of Lyme disease.

9       And this all began, Your Honor, in the mid-'90s.

10 And the reason that is important is because before the

11 mid-'90s, there was no issue of Lyme disease and there was

12 no epidemic around the country and that is because

13 insurance companies paid for the long-term treatment of

14 Lyme disease.

15      Around the mid-'90s, insurance companies decided

16 they didn't want to pay for long-term treatment of Lyme

17 disease because it was too expensive and they wanted to

18 save on their bottom line.  That is set forth in the

19 evidence before this Court in the deposition of

20 Dr. Sanchez, who was a vice president of Empire Blue Cross

21 Blue Shield.  Dr. Sanchez testified that because they

22 didn't want to pay for Lyme disease, they enacted arbitrary

23 guidelines and claimed that short-term treatment was all

24 that was necessary for the treatment of Lyme disease.

25      This is the very first time that a claim could be

1   made by the insurance companies that treatment failure did

2   not exist.  Coincidentally -- not coincidentally.  At the

3   exact same time, insurance companies began to pay large

4   sums of money to IDSA panelists and specialists working on

5   guidelines.  Now Mr. Dunn claims there's no evidence of

6   payment, but we have set forth in our response detailed

7   explanation of payment, even though we could not get any

8   documents from the Defendants about these payments.

9         Dr. Sigal was hired by the IDSA to review the

10  guidelines.  He reviewed them for the IDSA.  He testified

11  he was hired by insurance companies to review hundreds or

12  thousands of Lyme disease files, earned hundreds of

13  thousands of dollars.  When I questioned Dr. Sigal, do you

14  think you made more than a million dollars from insurance

15  companies at this time, he paused, thought about it, and

16  said doubtful.  Not no, not I didn't make a million dollars

17  from insurance companies.  That's doubtful.  All the money

18  he received was the exact same time these guidelines were

19  coming out.

20        Dr. Shapiro testified he provided expert testimony

21  in 75 to 80 cases, admitting to being a witness in

22  malpractice cases involving Lyme.  And when Dr. Shapiro was

23  to be put on the Congress' tick-borne working group, more

24  than 40,000 people protested that because of his payments

25  to insurance companies.

1          Dr. Dattwyler testified he was hired numerous

2    times by insurance companies, hired as a consulting expert

3    in Lyme cases, charged 500 to $600 an hour in Lyme disease

4    cases.  That is the evidence we have had to create without

5    discovery because we haven't received any documents related

6    to these payments from the Defendants but that's not all,

7    Your Honor.

8          The Attorney General of the State of Connecticut

9    in November of 2006 conducted its own investigation.  It

10   determined -- sent CIDs to the IDSA panelists, to the

11   insurance companies and it reviewed all of these documents

12   and it concluded, quote, several of the most powerful IDSA

13   panelists have undisclosed financial interest in insurance

14   companies, including consulting arrangements with insurance

15   companies.

16         So these documents, which we still have not been

17   able to see, that were not produced by the Defendant, were

18   not produced by the Attorney General because all of them

19   were returned to the Defendants, these documents were read

20   with the eyes of the Attorney General's office and they

21   determined there were antitrust violations and they talked

22   about the payments to the IDSA panelists.

23         So it is -- we are allowed to prove our case with

24   circumstantial evidence.  There are very rarely cases in

25   which we can find a document that sets forth that the two

1    parties came to an agreement.  There are very rarely cases

2    involving a conspiracy in which we can prove it with a

3    smoking gun.

4         So what we do is we present it with circumstantial

5    evidence.  It is absolutely no coincidence that at the

6    exact same time that the IDSA is putting out guidelines,

7    the IDSA panelists are receiving payments and the -- the

8    insurance companies are paying these IDSA doctors at the

9    exact same time.  It's no coincidence, Your Honor.

10        THE COURT:  Let me ask you, Mr. Dutko.  I'm well

11   familiar with the history of the case and the Plaintiff's

12   allegations, so I don't know that there's a lot of need to

13   go over this in great detail, but given your preliminary

14   comments, if the insurance companies started denying these

15   long-term treatment claims as you said in as early as the

16   mid 1990s, but the guidelines themselves weren't actually

17   written until 2000 and 2006, how did this alleged

18   conspiracy change any -- any of the insurance company's

19   behavior?

20        MR. DUTKO:  It changed the behavior in a couple of

21   ways but most importantly, as the Court is aware, when --

22   if you were to have treatment and you get denied by your

23   insurance company, you can then appeal it.  And when you

24   appeal it, you have the opportunity to present your

25   argument and your doctors will say, this patient needs

1    long-term treatment.

2           That became impossible after the guidelines were

3    created because then the insurance companies could deny the

4    appeal with the argument that all of the experts in the

5    IDSA have now said this is the only treatment you need and

6    there's absolutely no treatment failure.

7           So when you have another disease, when you have

8    any other disease, you have a very good opportunity to get

9    alternate treatments.  But with Lyme disease, because they

10   conspired with these IDSA doctors, they created, in

11   essence, a monopoly on the treatment of guidelines -- of

12   Lyme disease and so now the insurance companies could not

13   only deny it, but they could use it to deny any sort of

14   appeals and any sort of issues in paying for it.

15          THE COURT:  So are you saying there were no

16   appeals denied before 2000?

17          MR. DUTKO:  I'm saying that before 2000 it was

18   much easier to receive long-term treatment on Lyme disease

19   and, in fact, Dr. Sanchez's testimony, you will see, which

20   is attached as an exhibit to our response, Dr. Sanchez

21   talks about the appeals process in-depth and talks about

22   how you can appeal it, but -- and you can get treatment,

23   but basically after 2000, in 2006 when the guidelines were

24   created, the appeals process became almost impossible.

25          And we know that, Your Honor, because of the

1    testimony of the Plaintiffs in which Plaintiffs cannot get

2    treatment through insurance so they have to pay out of

3    pocket.

4             So yes, Your Honor, before 2000 when the

5    guidelines were created the appeals process and the ability

6    to receive coverage was out there but after 2000 it became

7    almost impossible to overcome that heavy burden.

8             So what we have, Your Honor, is we have

9    circumstantial evidence establishing that the insurance

10   companies conspired with the IDSA doctors to create

11   guidelines that restricted trade.

12            So we move on to one of the other arguments made

13   by the Defendants, and that is whether or not -- let me

14   make sure you I wrote that down -- whether or not the IDSA

15   restrained trade.  And briefly, Your Honor, before I move

16   on to that, if I'm allowed to share my screen, I would like

17   to show the Court a document if the Court doesn't mind.

18            THE COURT:  Not at all.  Go ahead.

19            MR. DUTKO:  Your Honor, can the Court see this

20   document?

21            THE COURT:  Yes.

22            MR. DUTKO:  Your Honor, this is a document created

23   by the IDSA and sent to state policy -- sent to state

24   legislators when state legislators were trying to pass laws

25   to help Lyme disease treatment.  The IDSA went out of its

1    way to protect the insurance companies and if you look down

2    here on the second page of this document, Your Honor, the

3    IDSA specifically addresses the issue of requiring health

4    insurers to cover Lyme disease treatment that are not

5    supported by scientific evidence including long-term

6    antibiotic use and experimental drugs.

7            So the issue before this Court is why -- if the

8    IDSA does not have an agreement with the insurance

9    companies to create guidelines that are untrue, then why do

10   they go out of their way to push this idea on state

11   legislatures.  If they're so independent, as counsel for

12   IDSA points out, why are they sending letters to state

13   legislatures saying insurance companies should not have to

14   pay.  What does it matter to them?  What does it even

15   matter?

16           And I want to point out, Your Honor, that counsel

17   raised the Noerr-Pennington doctrine with respect to these

18   documents that we produced.  And first of all,

19   Noerr-Pennington doctrine is an affirmative defense that

20   has to first be proved by the Defendants.  All they did was

21   mention it and talk about how it restricted it.  They

22   presented no evidence to create a presumption that we have

23   to overcome that -- they didn't meet that burden.

24           But more importantly, Your Honor, in the

25   AlliedTube case, AlliedTube looked at the Noerr-Pennington

1  doctrine with respect to standard-setting organizations

2  like this case and said:  When, however -- and I'm quoting

3  AlliedTube, United States Supreme Court.

4        (As read):  When, however, private associations

5  promulgate safety standards based on the merits of

6  objective expert judgments and through procedures that

7  prevent the standard setting process from being biased by

8  members with economic interest in stifling product

9  competition, these private standards have signature

10  procompetitive advantages.  Given this context, petitioner

11  does not enjoy the immunity accorded those who merely urge

12  the government to restrain trade.

13        AlliedTube and then later the Fifth Circuit in RRR

14  Farms versus American Horse Protections in which the Fifth

15  Circuit said, therefore, as the summary judgment movement

16  -- this is -- sorry.  This case is Amphastar

17  Pharmaceuticals in the Fifth Circuit.

18        (As read):  Indeed, the Supreme Court has held the

19  petitioning of a private SSO like the USP generally does

20  not trigger Noerr-Pennington protection.

21        And so all of the documents we have established

22  with respect to their lobbying efforts, those are all

23  admissible and do not fall under Noerr-Pennington.  If they

24  did, they didn't meet their burden of their affirmative

25  defense, so we would rely on those documents.

1          The next issue is whether they control -- restrain

2     trade and control the Lyme disease market.  And I will

3     briefly -- there's a lot of evidence of this, Your Honor,

4     but I just want to read the HHS 2020 subcommittee report on

5     the Tick-Borne Working Group and I'm going to read from

6     this.

7          (As read):  The IDSA is the largest infectious

8     disease specialty society in the world, publishes the two

9     largest medical journals in the field, dominates peer

10    review and often functions as a gatekeeper for hospital

11    staff privileges.  Its restrictive Lyme disease guidelines,

12    which make it difficult for patients to achieve diagnosis

13    and receive care, have been adopted by many insurers and

14    often referred to as an authoritative source by many

15    physicians who do not specialize in the decease.  In

16    addition, members of the IDSA provide expert testimony to

17    enforce its views to enforce disciplinary actions against

18    practitioners who do not comply with the guidelines.

19         The Tick-Borne Working Group went on to hold

20    ultimately in their final report to Congress:  Although the

21    IDSA is aware that there are two standards of diagnosis for

22    care for patients with Lyme disease, their treatment

23    guidelines do not disclose this fact and many patients and

24    clinicians may not be aware that another diagnosis or

25    treatment approach exists.

1          There is tremendous amount of evidence that they

2     restrain trade in the market.  There's a tremendous amount

3     of evidence that they dominate the market and that they're

4     the only organization that is looked to by doctors all over

5     the country.  In fact --

6          THE COURT:  What exactly is the market?  What's

7     the market?

8          MR. DUTKO:  That's -- and that's a good question,

9     Your Honor, because that was one of the issues.  And to

10    answer that question -- just give me one second,

11    Your Honor.  I'm going to find it.

12         To answer that question let's just rely on what

13    the IDSA says.  The market is the United States in the Lyme

14    treatment market, Your Honor.  That's the answer to the

15    question.  That's not me saying that.  That's the IDSA

16    saying that.

17         This is in the IDSA guidelines, Your Honor:  The

18    objective of these practice guidelines are to provide

19    clinicians and other health care practitioners with

20    recommendations for treatment of patients in the United

21    States with suspected or established Lyme disease.

22         That's the IDSA.  They have defined their own

23    market.  The market is Lyme disease treatment and treatment

24    and diagnosis in the United States.  And that has been

25    upheld by other courts.  The treatment in the United States

1   has been upheld by numerous courts and we cite to those,

2   Your Honor, in our response on page 18 and page 19.

3          THE COURT:  Aren't those cases -- and correct me

4   if I'm wrong, I thought those cases primarily, at least,

5   relate to practitioners in the field and that's not at

6   issue here, is it?

7          MR. DUTKO:  Well, Your Honor, they -- they relate

8   to treatment and care of patients within a certain field.

9   For example in the Weiss case, they upheld a nationwide

10  inpatient hospital health care market as a relevant market

11  in an antitrust cast.  In the labor case, they upheld

12  hospital based osteopathic anesthesiology as a relevant

13  market, nationwide, in an antitrust case.

14         So it is true, Your Honor, that -- I mean, I'll

15  say to the Court that Lyme disease obviously is a -- this

16  is a unique set of circumstances.  You're not allowed a

17  case involving antitrust with standard setting

18  organizations with respect to treatment guidelines.  But if

19  you look to these cases, it's clear that a relevant market

20  can be the diagnosis and treatment of Lyme disease in the

21  United States.

22         Another case, Your Honor, the Wilke case out of

23  the Seventh Circuit holding and I quote:  The relevant

24  market was the provision of health care services to the

25  American public on a nationwide basis, particularly for the

1   treatment of musculoskeletal problems.

2        So it's clear, Your Honor, when you look to the

3   other cases that have addressed this issue that the

4   relevant market, Your Honor, is the treatment and diagnosis

5   of Lyme disease in the United States.

6        This is further established, Your Honor, by the

7   testimony of the IDSA corporate representative when asked:

8   If you were a small town doctor in the city of Texarkana

9   and you're going to treat Lyme disease, you would likely

10  rely on the guidelines of the leading medical authority of

11  the diagnosis and treatment of Lyme disease?

12       Correct.  That would be my understanding.  When

13  the IDSA puts these guidelines out, they anticipate that

14  doctors all around the country are going to rely on the

15  guidelines in the treatment and diagnosis of Lyme disease.

16  That is correct.

17       The IDSA, through it's IDSA guidelines and through

18  its corporate representative have set forth the market and

19  the market is clearly the treatment and diagnosis of Lyme

20  disease in the United States.

21       So, Your Honor, I'll try to give some time back to

22  the Court, but --

23       THE COURT:  Mr. Dutko, I have a couple of other

24  questions.

25       MR. DUTKO:  Yes.

1        THE COURT:  So there's this allegation out there

2   that documents were either destroyed or not produced.  What

3   evidence do you have that documents were destroyed?

4        MR. DUTKO:  Your Honor, I just want to point out

5   that when we use the term "destruction of documents," we're

6   not using that in the term of they knew about this lawsuit

7   and they then destroyed the documents.  But we're using it

8   in the term of these documents existed and we know they

9   existed and they don't exist anymore or they haven't been

10  produced.  And the evidence we have of that is clearly set

11  forth in our response, Your Honor.  And you can see in

12  Plaintiff's response, we go through in detail how people

13  testified that there were documents that were destroyed.

14  And I will find that testimony here.

15        We went through each one of the -- Dr. Sigal

16  testified that the documents he had regarding his -- his

17  payments from insurance companies no longer exist.

18  Dr. Sigal testified when asked about documents related to

19  work he did for insurance companies, quote, those have been

20  shredded.

21        THE COURT:  So to be clear, there's no allegation

22  that any evidence was spoliated?

23        MR. DUTKO:  Your Honor, we have not made a

24  spoliation argument and when we use the term "destruction

25  of documents," I don't think we're trying to argue that

1  somebody intentionally destroyed documents, but when we

2  questioned the IDSA representative, when we questioned

3  doctors, when we questioned anyone in this case about where

4  those documents are, they testified I had those documents

5  but when I moved, I got rid of them, I shredded all those

6  documents.

7          And one of the key documents that we're looking

8  for and have been looking for as the Court is aware is the

9  documents from the Attorney General's office.  So all those

10  documents were sent back to the Defendants, none of them

11  have been produced to us.  So they're either destroyed or

12  they're in the possession of the Defendants and not

13  produced.  And so we know those documents all existed but

14  we don't have them, Your Honor.

15          THE COURT:  And I think the Defendant points out

16  in its papers that no motion to compel on this issue was

17  filed.  Is that correct?

18          MR. DUTKO:  Well, I'll -- I'll tell the Court that

19  the reason why motion to compel hasn't been filed is

20  because this issue was not brought to our attention until

21  emails from Mr. Dunn were recently sent and the reply in

22  which there's some indication that some of these documents

23  might exist.  I'll give the Court an example.

24          When we sought payments from insurance companies

25  to the IDSA doctors, we were under the impression as I'm

1  assuming the Court was, that Mr. Dunn would either identify

2  or produce documents from any insurance company to the

3  doctors.

4       Now, in their reply, they have taken the position,

5  there may be payments documents out there, but those were

6  not the letter of the law with respect to the Court's

7  order, with respect to the joint agreement, so we didn't

8  have to produce them.

9       With respect to the documents related to the

10  Attorney General's investigation, the Court has said in its

11  own order that the scope of discovery should include those

12  documents.  Now we believe -- recently we're under the

13  impression that maybe Mr. Dunn has those documents but he

14  is reading the Court's order and reading the joint

15  discovery to somehow weave his way through and say he

16  doesn't have to produce those.

17       THE COURT:  So this is the first time that you've

18  become aware that that position has been taken?

19       MR. DUTKO:  It's the first time we've -- we've

20  become aware that he may have documents.  We were always

21  under the impression that if he had them, he would produce

22  them.  We went through everything, nothing was produced, so

23  we have to operate under the assumption that those

24  documents don't exist.  We can't file a motion to compel if

25  we don't believe the documents exist.  It's not until

1    Mr. Dunn in his reply, recently filed, and in his emails,

2    sort of inferred that these documents may be out there.

3           We have been operating under the Court's rules,

4    which is wide-open discovery and the production of

5    documents.  If they don't produce them, we can't just

6    assume they're out there and file a motion to compel.  We

7    have no problem filing a motion to compel, we have done it

8    in the past as the Court is aware.  If we thought the

9    documents existed, we would certainly file a motion to

10   compel but Mr. Dunn has been less than candid with respect

11   to documents in his possession and we still have no idea

12   what his position is.  On the one hand --

13          THE COURT:  Mr. Dutko, I think you're well

14   familiar with the Court's practice, Mr. Dutko.  You call

15   Mr. Dunn up on the phone and you have a conversation with

16   him or you send him an email or a letter and if you don't

17   get a satisfactory response, you file a motion to compel.

18   So this is the first I'm hearing about this.

19          MR. DUTKO:  Yes, Your Honor, that is true.  But I

20   will point out this is all very recent with respect to

21   Mr. Dunn's position.  And we did send emails, Your Honor,

22   we sent numerous emails.  At one point I said -- when he

23   pointed out we didn't destroy documents, I said, Mr. Dunn,

24   you either have them or they have been destroyed, tell us

25   which it is, and we didn't get an answer.

1          So I'll admit our focus has been on all of these

2    motions and responding to all of these motions.  As you can

3    see there's numerous motions, so if I didn't act as quickly

4    as I should, I apologize to the Court.

5          THE COURT:  I guess, Mr. Dutko, my concern is this

6    case has been pending for more than three years and the

7    Court has given you every opportunity to conduct whatever

8    efforts at discovery, within reason, you believed were

9    appropriate.  And so it seems strange to me that we are

10   here after multiple amended complaints and now a motion for

11   summary judgment and now I'm hearing for the first time

12   that you don't think Mr. Dunn has complied with his

13   discovery obligations and yet you have never bothered,

14   recently at least, to bring that to our attention.

15         MR. DUTKO:  Respectfully, Your Honor, we have

16   conducted thorough discovery.  We have subpoenaed third

17   parties.  We subpoenaed the Attorney General.  We have not

18   been sitting around not conducting discovery.  We sent

19   discovery, we deposed all the doctors, we deposed the IDSA

20   corporate representative.  We asked about these documents.

21   We asked whether they had them.  We have gone through, in

22   detail, to try to find these documents.  These documents

23   are key to our case.

24         It was not until very, very recently in which

25   Mr. Dunn exchanged emails with us that we had any

1    understanding that maybe these documents existed.  And

2    Your Honor, that is at the end of the discovery period.

3           And so I find it difficult to -- I mean, we do

4    have some responsibility to act diligently, I understand

5    that, but Mr. Dunn has an obligation to make sure that he

6    conducts discovery in the way this Court intended, which is

7    to say the documents exist and I'm not producing them, not

8    produce them, but we have to operate under the assumption

9    that what we has produced is what he has.

10          And his interpretation of the discovery order now

11   seems to be the issue in this case, not whether the

12   documents exist or don't exist.  So I know that we have an

13   obligation to seek these documents and we have worked hard

14   to try to do so.

15          MR. LEE:  Your Honor, Lance Lee.  I -- may I

16   interject at this point on this issue because it does

17   relate to what my argument is going to be on the Rule 11

18   issue.

19          I was floored when I read Mr. Dunn's reply on the

20   Rule 11 motion and at page 6, they state:  IDSA was not

21   obligated to produce documents it provided to the

22   Connecticut Attorney General's investigation unless they

23   fell within the scope of discovery in this case.

24          That is the first time that any of us on the

25   Plaintiffs' side were ever aware that there may be

1    documents that are being withheld.  There is no question

2    that the entirety of the CID responses are relevant to this

3    case.

4            Your Honor indicated as such in your order of

5    April 9, 2019, when you said at page 7:  Thus, discovery

6    should be broad enough to include the information collected

7    and considered by the Attorney General.  The 2008

8    investigation sought discovery back to 1998.  Accordingly,

9    non-email discovery should include materials created in

10   1998 and any time thereafter.

11           Every time that we -- my recollection is every

12   time that we made an inquiry during discovery related to

13   the CID responses and the Connecticut Attorney General

14   information, we were told "we have no responsive

15   documents."  That's what we were told on more than one

16   occasion.

17           And for this to now appear in the reply brief for

18   the first time, I hope that that illustrates what your --

19   answers what your question was.  You know, why didn't we

20   file a motion to compel?  Maybe we should have tried to

21   file a motion to compel before this hearing, but the issue

22   is and the question is, I guess, do the files still exist

23   and, if so, why were they not produced?  Because the CID

24   and the investigation by the Attorney General is at the

25   heart of our antitrust claims.  I hope that --

 1          THE COURT:  It does.  Thank you, Mr. Lee.

 2          Back to you, Mr. Dutko.  Mr. Dutko, you're

 3    actually out of time but I do have a question, just a

 4    general question for you if I may before you close.

 5          And of course, there was the stipulation of

 6    dismissal with respect to the individual doctors and the

 7    RICO claims and, you know, I certainly am not trying to put

 8    words in your mouth or make educated guesses about what the

 9    Plaintiffs' view about this, but at least in part reading

10    between the lines in -- in the Plaintiffs' response to the

11    motion for summary judgment, it could lead one, reading it

12    fairly, to conclude that the Plaintiffs are taking the

13    position that they have, rightly or wrongly, have been

14    unable to discover evidence to support the RICO claims.

15          So my question for you -- assuming that's correct,

16    my question for you is this:  If there is no evidence to

17    support the RICO claims, why is there evidence to support

18    the antitrust claims?

19          MR. DUTKO:  Your Honor, I will answer that.  So

20    the issue with RICO as the Court is aware is the standard

21    is a little bit different than the antitrust.  In order to

22    establish a RICO claim we have to establish exactly the

23    newspaper questions:  the who, what, when, where and how.

24    In order to do that, we have to identify wire fraud or mail

25    fraud and what that means is as the Court knows, you have

1  to identify the date it was mailed, how much was mailed,

2  who it was mailed to, where it was mailed.

3       Your Honor, that is vastly different than

4  establishing a conspiracy with respect to circumstantial

5  evidence because the RICO predicate is much more stringent.

6  Your Honor, we were operating under the impression that we

7  would receive certain documents with respect to payments,

8  the same documents that the Attorney General received,

9  which would establish the who, what, when, where and how.

10  When we did not get the documents that we anticipated

11  getting, we agreed to not bring suit or dismiss the RICO

12  claim because we cannot establish that very stringent

13  predicate.

14       So the answer to the question is circumstantial

15  evidence doesn't work in RICO.  I can't say that I believe

16  payments were made on these days.  I have to establish --

17  the Court knows the criminal standard and it's very

18  stringent and we felt like we couldn't meet that in good

19  faith in light of the evidence we did not have, so we

20  didn't want to waste the Court's time with that.

21       We thought we could bring a couple of the doctors

22  in, but without RICO jurisdiction, we didn't want to have

23  that fight, so we agreed to dismiss them all.  But as you

24  recall from the jurisdictional arguments, we believe

25  there's jurisdiction over some of them, but we just didn't

1   want to waste the Court's time with those issues, so we

2   simply dropped them because we couldn't establish that

3   predicate.

4           THE COURT:  That's a helpful response.  Thank you,

5   Mr. Dutko.

6           MR. DUTKO:  With that, Your Honor, I will pass my

7   time.

8           THE COURT:  Thank you very much.

9           Mr. Dunn, you have 13 minutes.

10          MR. DUNN:  Okay.  Thank you.  And I don't know

11  whether somebody else has volume on, but when Mr. Dutko was

12  speaking I was hearing echoing and I hope this is clear and

13  people can hear me.

14          Your Honor, to address first what Mr. Lee was

15  saying and the whole assertion that we have held documents

16  that have been -- that we have been obligated to produce.

17  Your Honor, we have held nothing back that we were

18  obligated to produce.  We were very clear that we, yes,

19  have the materials submitted to the Connecticut Attorney

20  General, but no, we were not obligated at any point to

21  turn 100 percent of those materials over because, as the

22  discovery order makes clear, Your Honor, we agreed with

23  Plaintiffs that we would search materials that we have,

24  including the Connecticut Attorney General materials for

25  certain information prior to 2010.  And there was a very

1    contentious dispute about how extensive discovery prior to

2    2010 would be for all parties.

3         And, Your Honor, we reached an agreement and we

4    specifically addressed what would be searched within the

5    Connecticut Attorney General materials.  It specifically

6    says:  Payments from the Insurance Defendants to the

7    doctors, communications from the Insurance Defendants with

8    the doctors about the guidelines.  It was very specific.

9    It does not address -- it does not obligate IDSA to turn

10   over any information if information exists regarding

11   payments from disability insurance companies, from medical

12   malpractice from insurance companies.  Your Honor, that is

13   very clearly laid out in the discovery order, so that's

14   number one.  Nothing was withheld that was ordered to be

15   produced.  Nothing.

16        THE COURT:  So let me follow up, Mr. Dunn.  I may

17   have misunderstand what Mr. Dutko said it, but as I

18   understood it, he said he did not know until very recently

19   that, in fact, the Connecticut Attorney General

20   investigatory documents might actually exist and that he

21   had previously been led to believe that the documents had

22   been returned by the AG's office to whoever submitted them

23   and that they were not kept.  So can you enlighten me at

24   all about this?

25        MR. DUNN:  He has no basis to claim such an

1   understanding, Your Honor.  We agreed in 2019 that we would

2   search the materials produced to the Connecticut Attorney

3   General.  We agreed exactly on the scope of that search.

4   That's in the filed discovery order, Your Honor, it

5   specifically mentions the Connecticut Attorney General

6   materials.

7         We would never have put that in there if we did

8   not have them any longer.  We would have -- it's

9   Docket 181.  Your Honor, we would not have agreed to do

10  that if we didn't have the materials.  We would have told

11  them that.  So that's number one, Your Honor.

12        Number two, if they thought they were going to get

13  documents from the Connecticut Attorney General, they would

14  have had those documents by June 1, 2020.  That's the

15  document discovery deadline in the most recent docket

16  control order.  At that moment, if they thought they were

17  getting documents and if they thought they were entitled to

18  everything, that's the moment, no later than that, they

19  should have raised this issue.  We heard nothing about it,

20  Your Honor.

21        Number three:  They took IDSA's corporate

22  deposition in November, 2020, six or so months ago.  The

23  corporate representative was very clear.  We have the

24  materials from the Connecticut Attorney General's

25  investigation that we provided.  We've turned them over to

1   counsel for counsel to search according to the rules of

2   discovery in this case.

3        If they thought that we had failed to give them

4   those documents, that was their third opportunity,

5   Your Honor, to come to us and claim that they needed those

6   documents.  They never did that, Your Honor, and for them

7   to say now, even at the end we sent an email that we didn't

8   respond to, that's false, Your Honor.  We responded timely

9   to every single email, so there is nothing that was failed

10  to be produced according to the rules of this court and

11  they are way late to argue that oh, all of a sudden

12  everything had to be turned over.

13       Not even close, Your Honor.  It's very clear in

14  these orders and this was done for a reason because going

15  back and searching before 2010, all these materials and

16  emails, et cetera, was something that all the Defendants

17  objected to and we reached an agreement.  Plaintiffs agreed

18  to it, we brought it to the Court and the Court entered it.

19  Your Honor, that is the answer to that.

20       And it's not only way too late for them to raise

21  this, it's just completely wrong.  There's nothing in the

22  -- and we searched high and low, those documents for

23  payments from the Insurance Defendants, what they agreed

24  was relevant, to the doctors.  That's what they wanted us

25  to do and we looked through it and it's not there,

1   Your Honor.  And it's not a surprise it's not there.

2          So that's -- IDSA actually kept everything so

3   there's no -- nothing was destroyed.  And they cannot claim

4   that they get to take their antitrust claims against IDSA

5   only to trial because of -- because of that.

6          Your Honor, very quickly, I want to try and get

7   through many of the things that Mr. Dutko said.  Look, they

8   did ignore court orders.  Two examples, they delayed filing

9   an amended complaint as ordered by the Court within

10  30 days, so months and months and months.  Another clear

11  example, the Court order said you're limited to five

12  experts and they designated seven when they started this

13  and there's many other examples, Your Honor.

14         Your Honor, the Second Amended Complaint does not

15  allege new facts.  It only alleges --

16         THE COURT:  Mr. Dunn, you've got six minutes left.

17  I'm happy to hear this but I really would prefer you to

18  focus on the antitrust part of the case.

19         MR. DUNN:  Okay.  So, Your Honor, I think they

20  have pretty much admitted that they don't have evidence of

21  an agreement and they focused on their alleged Section 2

22  monopoly allegations.  And with respect to that, they have

23  no evidence of a monopoly.  They present zero evidence.

24         And the only evidence that they have is they claim

25  it's things that IDSA had said.  And the only things that

1    they point out -- first of all, they have no response to

2    our statute of limitations argument, Your Honor.  They have

3    not tried to show that IDSA did anything with the new

4    limitations period to harm any Plaintiff within the

5    limitations period.  They totally dropped that.

6            Your Honor, with respect to arguments that IDSA

7    has made to state legislatures that they put in front of

8    you on the screen, arguing that IDSA's statements in a

9    standard document on the website defending the science and

10   telling state legislatures please follow the science, that

11   cannot support the inference of a conspiracy.

12           There is a legitimate basis for a professional

13   society to say to state legislatures that you should follow

14   the science, even if, in this case, it might lead to

15   limited treatment that they can claim helps health

16   insurance companies.  You can't infer an agreement because

17   of that, because there's another basis.  They are just

18   trying to follow the science.

19           Noerr-Pennington says when you're talking to a

20   state legislature or Congress, you cannot use that to

21   support an antitrust claim.  And their effort to say, oh,

22   look at these cases, and if you are petitioning a private

23   standard setting organization, that does not give

24   Noerr-Pennington protection.  That's not what they're

25   arguing about here.  It's petitioning the government is

1   what they're citing and those cases in no way hold that

2   somehow petitioning the government can give rise to an

3   antitrust violation.

4          Your Honor, they cite this Tick-Borne Diseases

5   Working Group report to HHS.  It's all hearsay and it

6   doesn't show a monopoly in a defined market.  Nothing at

7   all.  They define the market now as the market for

8   treatment of Lyme disease and as I think Your Honor

9   appreciates, they never argue and they have no evidence to

10  support an argument that IDSA competes in that market.

11  IDSA is not a health provider.  There's no evidence that

12  IDSA provides treatment in that market.  They need evidence

13  which they have none of, that IDSA restricts competition in

14  that market.

15         All of their cases, as you pointed out,

16  Your Honor, are ones where they concern providers of the

17  services in the market.  No allegation that IDSA actually

18  provides these services.

19         Let me just check my notes, Your Honor.

20         And finally, Your Honor, Mr. Dutko is still trying

21  to confuse the Court, if you don't mind.  When he talks

22  about evidence of payments, he is not precise and he needs

23  to be.  (Audio distortion) -- precise he has no evidence

24  because he talks about Dr. Sigal, who is the only doctor

25  who actually -- actually, there's evidence that he did any

1   work for an actual health insurance company, but he never

2   had anything to do with the 2000 guidelines, was never an

3   author of either guideline, and actually only reviewed a

4   late draft of the 2000 guidelines and testified he made no

5   substantive changes at all.

6          And the allegation that he no longer has documents

7   and destroyed them, Your Honor, there's no assertion at all

8   that Dr. Sigal or any other doctor had an obligation to

9   preserve documents from consulting arrangements 10, 15,

10  20 years ago, and they failed to point out that the reason

11  they were shredded is that he moved a few years ago, well

12  before the case was filed, and had every right to not take

13  all those old documents with him.

14         All the other evidence that Mr. Dutko cites with

15  respect to alleged payments, Dr. Shapiro, Dr. Dattwyler,

16  zero evidence of payments by health insurance companies.

17  It's all disability insurance companies, medical

18  malpractice insurance companies, irrelevant.  Your Honor,

19  summary judgment is appropriate on the antitrust claims

20  remaining against IDSA.

21         THE COURT:  All right.  Thank you, Mr. Dunn.

22         Before we move on to the argument on the motion to

23  dismiss, let's take a short recess of probably about ten

24  minutes.

25         (Recess taken.)

1          THE COURT:  Okay.  We are back.  Do we have

2   everybody else back?

3          MR. DUNN:  Your Honor, you have everyone you need

4   for the Defendants.  I see at least one screen that doesn't

5   have a person in it on the Plaintiffs' side.

6          THE COURT:  Did we lose Mr. Egdorf?

7          MR. EGDORF:  I'm here, Your Honor.  I was trying

8   to be nondistracting and I turned the microphone and the

9   camera off.  I promise I'm listening attentively and biting

10  my tongue as you might imagine, Your Honor.  If you need

11  me, call me.

12         THE COURT:  No, I don't.  Want to make sure you

13  didn't drop off completely.

14         Okay.  Argument on the motion to dismiss.

15         MR. DUNN:  Thank you, Your Honor.

16         Just before we get started because it was an issue

17  at the very end, just wanted to point out to the Court that

18  on March 16, 2001, in Docket 386, which is our reply in

19  support of our summary judgment motion, we cite and attach

20  the IDSA corporate representative testimony from November

21  of 2020 that IDSA preserved and searched the materials that

22  it submitted to the Connecticut Attorney General.  So

23  that's Docket 386, page 9, Exhibit 17, and then we

24  discussed it in a later filing as well in connection with

25  the Rule 11 motion.  We just wanted to give that cite to

 1   the Court.

 2          THE COURT:  Thank you.

 3          MR. DUNN:  Your Honor, we're now arguing

 4   Defendant's motions to dismiss the new misrepresentation

 5   claims and it's motions because they have set forth,

 6   Plaintiffs, these claims in two separate amended complaints

 7   filed in 2021.

 8          Your Honor, there are seven, now, independent

 9   reasons that the new misrepresentation claims should not go

10   forward.  Your Honor, the first, the most clearcut in our

11   view.  The Court should strike the amended complaints.

12          Your Honor, the Fifth Circuit gives this Court the

13   discretion to strike the complaints.  And, Your Honor,

14   absolutely, the docket control order says parties can amend

15   their pleadings up to April 16, 2021, without filing a

16   motion to amend.

17          Now, Mr. Dutko said that we wrote that, I think he

18   said.  He might have said they wrote that prior times

19   they've argued we agreed to it.  As Your Honor is well

20   aware, that's a standard provision in the Court's docket

21   control order to put that deadline at the very end of

22   discovery.

23          Your Honor, the right to amend a pleading at the

24   end of discovery cannot give Plaintiffs the right to add

25   new claims that require extensive additional liability,

1   damages and expert discovery particularly when those new

2   claims, as here, could have been brought at the very

3   beginning of the case.

4          How do we know that they could have brought these

5   new misrepresentation claims at the beginning of the case?

6   We don't have to go any further than their Second Amended

7   Complaint.  The first time they brought the claims they

8   filed them without adding a single new factual allegation.

9          Mr. Dutko points to some new paragraphs in the

10   Second Amended Complaint.  Every new paragraph is a

11   paragraph that comes under Count VI or under Count VII.

12   There are no new factual claims.  Each one says this count

13   incorporates all the prior paragraphs before it.  Each

14   count when it alleges a misrepresentation, cites back to a

15   prior paragraph in the complaint, a paragraph that was in

16   the complaint long ago, before the Second Amended Complaint

17   was filed.

18          Your Honor, these are brand-new claims trying to

19   bring a brand-new case after Plaintiffs's determined that

20   their original case had no factual support and would be

21   dismissed on summary judgment.  It's a complete abuse of

22   the docket control order provision that says you can amend

23   your pleading at the very end of discovery.  That can't be

24   what it allows.  This Court has ever right to exercise its

25   discretion under Fifth Circuit precedent to say no, we're

1    not going to allow that, the case is over, and if you want

2    to bring a new case, to bring it as a new case.  This case

3    is over.

4           Your Honor, the second reason that the new

5    misrepresentation claims should be dismissed.  Plaintiffs

6    failed to plead them with particularity under Rule 9(b).

7    Your Honor, we discussed a bit in the last motion what that

8    means and Mr. Dutko actually confused, in our view, his

9    obligation to plead with particularity with his obligation

10   to come forward with evidence in support of his claims at

11   the summary judgment stage because you rightly asked why

12   are there antitrust claims still viable if the RICO claims

13   fail because there's no evidence to support those claims.

14          Mr. Dutko cited the pleading standard and the

15   pleading standard is you plead fraud with particularity.

16   You plead fraud by showing who, where, what, when, why and

17   how, the newspaper questions.  He somehow believes that to

18   show an antitrust claim at summary judgment he doesn't have

19   to come up with specific evidence in support of the alleged

20   agreement and the alleged payments.  But he does because if

21   you're going to base an antitrust claim on payments, you

22   have to prove the payments by showing who made them, when

23   they were made, the amount, how they were made.

24          So now we're at the pleading stage again,

25   Your Honor, and these are misrepresentation claims, both

1  negligent and fraud claims that according to Fifth Circuit

2  law, well-settled federal law, that need to be pled with

3  particularity.  But there's a difference between

4  Plaintiffs' original RICO fraud claims and now their new

5  common law fraud and negligent misrepresentation claims

6  when it comes to pleading with particularity.

7        The RICO fraud claims, Plaintiffs alleged and you

8  held, Your Honor, that all of the evidence to support those

9  claims was uniquely in possession of the Defendants because

10 the core part of the fraud there, that was alleged, were

11 the payments from the Insurance Defendants to the doctors.

12       And, Your Honor, you gave them a -- I'm sorry, a

13 relaxed pleading standard and you provided them full

14 discovery.  The new misrepresentation claims, fraud claims,

15 critical discussion.  Here, Plaintiffs are in possession of

16 the evidence because the new claims allege that the

17 Plaintiffs's doctors were misled by the guidelines.  They

18 allege that doctors that they sought and failed to diagnose

19 their Lyme disease somehow relied on the guidelines and

20 missed the diagnosis.  They didn't give them their

21 long-term antibiotics.

22       Your Honor, that's not evidence we have.  That's

23 evidence they have.  And to bring these new

24 misrepresentation claims under Rule 9(b), they have to tell

25 us in the pleading who relied, when did they rely, what did

1  they read or hear that was an alleged misrepresentation,

2  how and when did it injure the Plaintiff.

3       Your Honor, that's not evidence we can ever have

4  and they haven't got it, so they must plead these claims

5  with particularity and they don't allege any of those

6  details or try and this time they cannot argue for a

7  relaxed pleading standard.  It's completely different.

8       And Your Honor, they have now had two tries and

9  they're not entitled to another one and the new claim

10  should be dismissed just on that basis alone.

11       Third independent reason and this one is very

12  substantial, but it can get complicated, Your Honor.

13  Plaintiffs do not allege detrimental reliance by the

14  Plaintiffs themselves.  They allege only detrimental

15  reliance by third-party doctors.  That's not enough,

16  Your Honor, and no court has gone this far, to try to hold

17  a professional medical society liable to patients, not for

18  misrepresentations that the Plaintiffs relied on, the

19  patients, for alleged misrepresentations that their

20  third-party doctors relied on.

21       Your Honor, this Court should not extend the law

22  where no Court has ever gone and this is another pleading

23  deficiency that cannot be cured in yet another complaint.

24       Your Honor, the fourth reason, independent reason,

25  that these misrepresentation claims should not go forward.

1    Fifth Circuit law makes clear when you're bringing

2    adversity jurisdiction common law claims, you, the

3    Plaintiff, have the obligation to allege facts in the

4    complaint that will show the governing law, which state's

5    law applies.

6          That's your burden as a Plaintiff, to help the

7    Court, because when the Court gets a common law claim, the

8    Court needs to know which law applies and it's not

9    necessarily the law of the state where the Court is sitting

10   because the claim might be otherwise.  Parties in a

11   contract can agree that Delaware law will apply when

12   bringing their claims in Texarkana, if they have a

13   connection to the jurisdiction.

14         The Fifth Circuit holds that if the Plaintiff does

15   not do that, dismissal is appropriate.

16         Your Honor, nothing in the Plaintiffs' two

17   complaints sets forth the facts that would permit the Court

18   the determine the governing law.  Now, Plaintiffs argue in

19   their opposition brief that you can tell where -- which

20   state's law will apply but they're all over the map,

21   Your Honor, and they're not referring to the allegations in

22   their complaints.  They argued Texas and then they argued

23   New York and then next, who knows what they will argue.

24         So we're confused as to what law they say should

25   apply.  We have told the Court that the only law that would

1    make sense would be Virginia, but we don't even need to get

2    there because what is clear is that the Plaintiffs have

3    failed to set forth in the complaint the facts that would

4    permit Your Honor to determine which state's law applies to

5    these new claims.

6         Your Honor, the fifth reason, independent reason

7    the misrepresentation claims should be dismissed.  The

8    misrepresentation they allege are not actually in the IDSA

9    Lyme disease guidelines, which is the only place they point

10   to where alleged misrepresentations were made and we set

11   forth this in detail in our filings.  I'll give one

12   example.

13        Your Honor, they allege that one of the

14   misrepresentations is the following quote:  Quote, all Lyme

15   patients are cured by a short course, 14 to 28 days, of

16   antibiotic treatment, end quote.

17        Your Honor, that statement is nowhere in the

18   guidelines.  They can't show it to you there and that's

19   just one example that alleged misrepresentations are just

20   their own characterizations of the guidelines.  They never

21   actually give you the alleged misrepresentation from the

22   guidelines and when they try to, it's clear that it's not

23   -- it's actually not false.

24        The sixth reason, Your Honor, independent reason,

25   the misrepresentation claim should not go forward is that

1    the law says that for misrepresentation you have to allege

2    facts that can be adjudged true or false.  You can't allege

3    to support a misrepresentation claim opinions.  But in this

4    case, the misrepresentation claims they allege are merely

5    opinions.

6           On the key point, which is their assertion that

7    the IDSA Lyme disease guidelines denied the existence of

8    chronic Lyme disease, that is just the opinion of these

9    doctors and scientists who looked at in 2006 all the

10   available studies and explained them and gave their

11   opinion.

12          And here is how the complaint reads.  The

13   complaint says:  That the 2006 guidelines specifically

14   state there is absolutely no treatment failure for Lyme

15   disease.  And then their support is the following actual

16   filing they quote from the guidelines.  Here is their

17   support from the guidelines:  There is no convincing

18   biologic evidence for the existence of essentially chronic

19   Lyme disease.

20          So the key is where it is and what it says.  That

21   statement comes after a long discussion of many studies

22   regarding so-called chronic Lyme disease and the statement

23   is there's no convincing biologic evidence for the

24   existence of symptomatic Lyme disease among patients who

25   received the recommended treatment course for Lyme disease.

1          Convincing biologic evidence, that's an opinion,

2    Your Honor, that gives these doctor's opinions.  They don't

3    say there's absolutely nothing out there about it.  They

4    say there's no convincing biologic evidence and they are

5    trying to build a misrepresentation claim on that

6    statement.  Not allowed under the law.  The law says you

7    need a statement that can be proven, as a matter of fact,

8    true or false.

9          Your Honor, the last reason, the seventh reason

10   these claims should not go forward is that judicial

11   estoppel.  Your Honor, you should apply judicial estoppel

12   to block these brand-new personal injury claims.

13   Your Honor, Plaintiffs agree that judicial estoppel

14   applies, that the Court has the ability to do this, but

15   they just agree that it doesn't apply here because they

16   just made a mistake.

17          But, Your Honor, here is what they did.

18   Throughout the case until we got to their Second Amended

19   Complaint, they argued repeatedly that they're not seeking

20   damages for personal injuries.

21          They argued it to keep their RICO and antitrust

22   claims alive because it was argued at the beginning of the

23   case that you can recover only for injuries to business or

24   property.  They argued it in response to the motion to

25   impose independent medical exams on them and particularly

1   with respect to keeping the RICO and antitrust claims

2   alive, they succeeded, Your Honor, held in part because

3   they are alleging -- not seeking personal injury damages,

4   they're seeking business or property damages and the RICO

5   and antitrust claims will survive.

6          Your Honor, they then turn around and seek damages

7   in these new claims for personal injuries that abuses their

8   position, prior position taken before the Court and

9   judicial estoppel is appropriate to block their new

10  personal injury claims.

11         Your Honor, finally, allowing these new

12  misrepresentation claims to go forward would damage the

13  beneficial development of medical practice guidelines.

14  Medical professional societies cannot be exposed to these

15  misrepresentation claims brought by patients who do not and

16  cannot assert that they relied on the guidelines.

17         The chilling effect would set back the development

18  of these clinical practice guidelines at a time when we

19  need them.  We need professional societies to be studying

20  diseases and recommending diagnostics and treatments and in

21  this case, if these claims are allowed to go forward, it

22  would expose them to all sorts of troubling liability

23  claims.

24         And the practicality of this where the key people

25  involved are the doctors who Plaintiffs alleged relied on

1    the guidelines and failed to treat each Plaintiff, many of

2    these Plaintiffs allege they went to dozens of doctors who

3    didn't diagnosis their Lyme disease.  Each one of those

4    doctors they could be alleging relied on the guidelines in

5    doing so.

6            That's what they say.  They don't identify them

7    all but that would involve hundreds of these doctors who

8    are alleged to have relied on the guidelines, failed to

9    diagnosis Lyme disease and we would have to take discovery

10   of them and understand is that why they missed the Lyme

11   disease or was there some other reason.  Would IDSA need to

12   consider whether to join to the lawsuit because maybe it

13   was something else that happened that caused the damage.

14   It's impractical, it's terrible policy and it's not been

15   adhered to by any court, state in this country and it

16   should not go forward.

17           Your Honor, I reserve the rest of my time for

18   rebuttal unless you have questions, of course.

19           THE COURT:  Thank you, Mr. Dunn.

20           MR. DUTKO:  May I proceed, Your Honor.

21           THE COURT:  Yes, please.

22           MR. DUTKO:  Your Honor, again, Daniel Dutko on

23   behalf of the Plaintiffs.  To start with, Your Honor, there

24   is a scheduling order put in place signed by this Court,

25   circulated by the Defendants that allows the pleadings

1   amendment deadline without leave of Court in April.  Many

2   months before that deadline we amended our pleadings.

3        Counsel for the IDSA claims that, well -- so

4   counsel for the IDSA claims that they're somehow prejudiced

5   by these new claims because they came out of nowhere, yet

6   on the other hand they're claiming that they have known

7   about the claims all along because they were in the

8   original complaint.  They can't have it both ways.  It's

9   either they're sandbagged and it came out of nowhere or we

10  have known about them since the original complaint was

11  filed.

12       The truth is, Your Honor, the Plaintiffs in this

13  case -- as the Court will recall, the Plaintiffs in this

14  case have spent a lot of time spending to 12(b)(6) motions.

15  We have four separate 12(b)(6) motions, two filed by the

16  insurance companies and two filed by IDSA and the doctors.

17       We had two very long hearings in which we went

18  over and had to prove our case in-depth.  In fact, we had

19  to -- unusually, we had to present evidence with our

20  complaints so that we could overcome the burden.

21       And so, while we had a general understanding that

22  these misrepresentations were going on, it was not until

23  the depositions that we were able to get evidence to

24  establish that misrepresentation was clearly happening in

25  this case.

1              And just so the Court knows, Mr. Buskey

2    (phonetic), the corporate representative, was deposed on

3    November 24, 2020.  Dr. Shapiro was deposed on December 21,

4    2020.  Dr. Wormser was deposed on January 7, 2020, and in

5    January, after these depositions, is when we amended our

6    complaint to add these causes of action well before the

7    pleadings deadline.

8              So the issue before this Court is whether we met

9    the pleadings requirement.  There is no dispute and we have

10   cited the case law that our negligent misrepresentation

11   claims have opinion requirement of 8(a).  We clearly meet

12   that.  That was just the notice pleadings.  So the question

13   is does our fraudulent misrepresentation claims, do they

14   meet the Rule 9(b) pleading requirements.

15             Counsel for the IDSA continues to claim that we

16   need to meet the RICO standard for pleading under negligent

17   misrepresentation -- fraudulent misrepresentation and that

18   is not correct.  In fact, we cited two cases from the Fifth

19   Circuit, Herman Holdings and Williams v. WMX Tex, and I

20   will quote:  A Plaintiff pleading fraud to specify the

21   statements contended to be -- a Plaintiff pleading fraud to

22   specify the statements contended to be fraudulent, identify

23   the speaker, state when and where the statements were made

24   and explain why the statements were fraudulent.

25             Your Honor, our Third Amended Complaint, filed

1    well before the pleadings deadline, sets forth in great

2    detail what the statements were, who made them, when they

3    were made, and why the statements were fraudulent.

4    Mr. Dunn seems to -- counsel for the IDSA seems to indicate

5    or say that we never quoted to the guidelines.  Well, I'll

6    read the guidelines.  They say:  There is no convincing

7    biologic evidence for the existence of symptomatic chronic

8    B burgdorferi infection among patients after receipt of

9    recommended treatment regimens for Lyme disease.

10          The IDSA takes a clear position in that statement

11   and many more that chronic Lyme disease does not exist,

12   that once you receive the recommended treatment of

13   short-term antibiotic there is no active infection, you do

14   not have Lyme disease.  Well, when we took the depositions

15   of Mr. Buskey, Dr. Wormser, Dr. Shapiro, at the end of 2020

16   and beginning of 2021 they clearly establish that treatment

17   failure exists.

18          So we know, Your Honor, that there is treatment

19   failure.  We know, Your Honor, that the IDSA takes the

20   position that treatment failure does not exist.  This is a

21   misrepresentation.  We set forth in detail when those

22   statements were made.  We set forth how they were

23   fraudulent.  We set forth how they were false and set forth

24   how they were relied on.  So we know, Your Honor, that

25   there's more than enough in the pleadings requirement of

1    Rule 9(b) for fraud to meet our requirements to establish

2    fraudulent misrepresentation.

3         Your Honor, counsel for the IDSA goes into great

4    detail to say we can't have a chilling effect on the IDSA.

5    They're just simply creating guidelines.  Your Honor, the

6    IDSA is not just some sort of organization that puts its

7    guidelines out and then sits around hoping people will rely

8    on them.

9         As you saw from the letters to Congress, from the

10   letters to state representatives, lobbying efforts to

11   convince people that these are the only guidelines.  You

12   saw the Tick-Borne Working Group says the IDSA pushes these

13   guidelines as the only guidelines.  You saw the Tick-Borne

14   Working Group say the IDSA won't even reference other

15   ideas, other treatments.

16        Not only that, but how many treatment

17   organizations have been investigated by the Attorney

18   General's office for antitrust abuse.  The IDSA lost their

19   right a long time ago to say they're an independent group

20   and they have no culpability in this.  They put out false

21   guidelines that they know are false.  They put out false

22   guidelines that say for example -- and this is detailed in

23   the complaint -- that say the way that you test for Lyme

24   disease is the two-tier test and that's how you determine

25   whether someone has Lyme disease.

 1            The doctors deposed at the end of 2020 and

 2    beginning of 2021 testified, Your Honor, those tests are

 3    not only inaccurate, but they do not show an active

 4    infection.  So the representation that the IDSA makes to

 5    doctors around the country is if you want to determine

 6    whether your patient has Lyme disease use a test that they

 7    say that IDSA doctors admit is inaccurate and doesn't show

 8    infection.

 9            Your Honor, as to judicial estoppel, we claimed

10    that we couldn't seek personal injury damages in a RICO

11    case.  We never claimed that we couldn't seek personal

12    injury damages in a misrepresentation case.  There is no --

13    I'm not sure how judicial estoppel stops us from making

14    these new claims.

15            And -- give me one second, Your Honor.

16            And on the issue of choice of law, Your Honor,

17    finally, we did answer the question what law -- what law

18    applies.  In fact, we cited numerous cases out of the Fifth

19    Circuit and they all say that when a Court is resting in

20    federal question jurisdiction and not diversity

21    jurisdiction, the choice of law does not apply and the

22    Court applies the choice of law rules of the forum state.

23            Your Honor, this case was filed under federal

24    question jurisdiction.  We have been sitting under federal

25    question jurisdiction.  The only law that applies is the

1   law of the forum state Texas.  We have cited numerous cases

2   to that effect.

3          Counsel, very early on, the IDSA very early on

4   tried to get this Court to dismiss this case by claiming

5   all the doctors were in New York, all the people in New

6   York, everyone worked in New York, it should be in New

7   York.  When we pointed out that we will apply New York law

8   based on their representations, they ran away from that and

9   now are claiming that New York law should not apply.

10         So if Texas law doesn't apply and New York law

11  applies, both states recognize all these causes of action

12  that we have asserted and, Your Honor, based on that we ask

13  the Court to deny their motion to dismiss because we have

14  clearly admit the pleading requirements and we met the

15  Court's deadlines.

16         THE COURT:  Thank you Mr. Dutko.

17         Mr. Dunn, brief response.

18         MR. DUNN:  Sure.  So look, Your Honor -- (audio

19  disruption) -- argue that the claims in the original

20  complaint, then we would have known about them, not true.

21  The facts were all there but the claims never were there

22  and to defend ourselves, we needed to know about the claims

23  at the beginning of the case.  It's absolutely prejudicial

24  to bring these brand-new -- they're completely new.  It's a

25  complete new case.

1          Case 1 concerned all the actions of the doctors

2     working with the Insurance Defendants to get payments and

3     write false guidelines.

4          Case 2 now concerns all the reliance of these

5     unrelated third-party doctors they allege relied on the

6     allegedly false guidelines.

7          Your Honor, we have shown this in our response

8     briefs but there's nothing new from the depositions which

9     did occur in the fall, and the last one in January, more

10    recently.  No testimony was new.  There's nothing in there.

11    We have demonstrated that in our responsive papers.

12         Your Honor, the pleading requirements.  First of

13    all, the law is clear that the negligent misrepresentation

14    claims do have to meet the Rule 9(b) requirement and even

15    if not, even if only the 8(a) requirements, they still

16    don't meet that.  They never tell us which doctors relied

17    on the alleged false statements.  That is the core of any

18    misrepresentation claim, Your Honor.  It starts with

19    reasonable reliance, whether its fraud or negligent

20    misrepresentation and that is what you have to plead.

21         Your Honor, he cites a case that says you have to

22    plead and identify the speaker and identify the statements.

23    In that case the Plaintiff alleged that he or she relied on

24    the statements.  In those cases, it's very clear who is

25    relying on the statements and when they heard them.

1          That's not the case that they want to bring here.

2    They want to bring a case in which for each Plaintiff

3    there's potentially dozens of doctors who relied on the

4    allegedly false statement.  They don't plead it.  They have

5    to plead it and now they're not even asking for the chance

6    to do it again.  They're standing on their pleading.  It's

7    not there.  It's nowhere there.

8          Your Honor, they say that IDSA takes the position

9    that treatment failure does not exist.  That's what

10   Mr. Dutko said.  The guidelines don't say that.  The

11   guidelines speak of retreatment when it's necessary.  The

12   guidelines speak of Lyme arthritis that can go on for

13   months and require new treatment and need treatment.

14   There's no statement in the guidelines that treatment

15   failure does not exist and it's not there.

16         Your Honor, they referenced the Connecticut

17   Attorney General investigation for antitrust.  The

18   Connecticut Attorney General never found an antitrust

19   violation, nothing close, there's nothing like that in the

20   one document they have, which is a press release.  They

21   just settled and had a do-over, a new look at the

22   guidelines, they had a new panel that was cleared for

23   conflicts and what did that panel do?  That panel looked at

24   all the science and said everything is valid.  We recommend

25   no changes to these guidelines.  We looked at the same

1    studies they looked at, they're valid.

2         Your Honor, Mr. Dutko argues that the two-tier

3    test is the only way you can test for Lyme disease and

4    that's false.  The guidelines don't say that.  They make

5    clear that the test was an antibody test that, number one,

6    should be given at the beginning of the belief that you

7    might have Lyme disease because it's not effective, and

8    number two, it could -- it doesn't show active infection.

9    It's clear that it's an antibody test that shows

10   antibodies.

11        That's the best test that is available now and

12   that is -- it's a test that has its uses and the guidelines

13   don't say it and they can't point to a place where the

14   guidelines say it, that that's the only way you can show

15   Lyme disease.  They make clear in the early stages, don't

16   test, look for a rash and then you can find Lyme disease.

17   That's not what the guidelines say.  You have to test.

18        Your Honor, judicial estoppel we have gone over.

19   I don't think we need to discuss it again.

20        Choice of law.  Your Honor, common law claims are

21   not federal question jurisdiction claims.  And so when you

22   bring a RICO and antitrust claim, the substantive law that

23   applies is federal law.  When you bring a common law claim,

24   you have to find a state law and here they haven't pled in

25   their new amended complaint which law should apply.  Like

1   Mr. Dutko says, New York law now should apply.  There's no

2   fact in the complaint that you could find that will take

3   you to New York law.  It's not there.  It's just not there.

4   So, Your Honor, the new misrepresentation claim should not

5   go forward.

6             THE COURT:  Thank you, Mr. Dunn.

7             MR. DUNN:  Thank you, Your Honor.

8             THE COURT:  Okay.  I think that leaves us with the

9   motion to stay and the motion for sanctions.  I don't know

10  if the parties are actually going to need the amount of

11  time we have set aside for those motions.  And I guess I

12  have a question about the motion to stay, honestly, whether

13  that is in light of where we are, whether the parties even

14  need to present argument on that, but I'm happy to break

15  now and we can come back if we think it'll truly take an

16  hour to argue these motions but if they can be handled

17  relatively quickly, we can go forward and hear them now.  I

18  think we've heard arguments related to both of these

19  motions spread throughout the morning's arguments already.

20            MR. DUTKO:  Your Honor, in light of the recent --

21  may I speak?

22            THE COURT:  Yes, Mr. Dutko.

23            MR. DUTKO:  In light of -- in light of the recent

24  -- we have in essence stated everything.  So, you know, we

25  entered a joint order kind of staying all the deadlines

1  anyway, so as reluctant as we were to stay the case, we

2  basically agreed to stay, so I don't know if we need to

3  address it.

4       MR. DUNN:  Your Honor, Alvin Dunn.  I agree.  I

5  just think that -- and I hope the Court agrees, that

6  additional pretrial activity should not resume until the

7  Court determines whether any of Plaintiffs' claims have

8  survived Defendant's motions.

9       THE COURT:  Well, you know, maybe we do need to

10  hear argument on it because I think potentially what the --

11  what you're asking for, Mr. Dunn, is really, you know, in

12  conflict with our Local Rules and the Court's practice.  I

13  think what Mr. Dutko has said is that the parties have

14  effectively stayed the case by agreeing to get these

15  motions briefed up and argued and presented.  I guess it's

16  just a question about whether either side at this point

17  thinks a new DCO is necessary.

18       But, you know, Mr. Dunn, you're, I'm sure, well

19  familiar that our Local Rules do say that we expect parties

20  to continue with their case even when dispositive motions

21  pending.

22       MR. DUNN:  I appreciate that, Your Honor.  I guess

23  we don't think that we should proceed to expert discovery

24  on the antitrust claims or to full discovery on the

25  misrepresentation claims unless we have additional guidance

1  from the Court.  I think Plaintiffs have effectively agreed

2  by submitting and agreeing to stay the prior deadlines.

3  That's our position and we'll of course abide by the

4  Court's rules.

5          THE COURT:  Let me hear from Mr. Dutko about it.

6  I'm inclined to completely agree with you, Mr. Dunn.  It

7  seems to me, given the parties's agreement, I think this

8  motion is moot, but if we need to hear argument on it, I'm

9  glad to hear it.

10          MR. DUTKO:  Your Honor, I think we're kind of

11  saying the same thing, but I don't want the Court to

12  believe that we kind of want to stop the whole case.  We

13  still need to get ready for trial and we still need -- I'm

14  happy to put off expert deadlines with Mr. Dunn if that is

15  the primary concern for an extended period of time until

16  the Court can rule on the motions but we have -- we have

17  made representations, Your Honor, to Mr. Dunn that in light

18  of the new claims, he wants to take brief depositions of

19  the Plaintiffs.  Those things should move forward so that

20  we can prepare for trial.

21          I mean, what I don't want to do, Your Honor, is I

22  don't want the get to the eve of trial and then Mr. Dunn

23  say well, I wasn't able to take all these depositions

24  because we basically stayed the case.

25          So I do agree that we can put off some deadlines

1   to appease Mr. Dunn, but I agree with the Court that we I

2   don't want to stop the case cold.

3          THE COURT:  Let me say if this if it's helpful and

4   I agree with you, Mr. Dutko.  We're all sort of saying the

5   same thing.

6          I'll tell you our trial schedule over the next

7   several months.  Regardless of what I end up doing on these

8   dispositive motions, we are backed up with trials from now

9   over the next several months.  So I tried a case last week.

10  I am trying a case next week, I'm trying a case the week

11  after that, we have three cases to try in May.  Given the

12  world we have lived in over the past year, we're just now,

13  I guess, realizing the effect it's going to have on our

14  trial schedule over the next year.

15         So, you know, I can assure you the odds are, you

16  know, relatively good that we could not get this case

17  scheduled -- I think we do have a setting in September, but

18  I don't know candidly whether that's realistic at this

19  point, given our calendar and the backlog we've got and

20  where the parties are in terms of discovery.

21         So to the extent that helps in any way, I would

22  suggest the parties visit about this some more.  But again,

23  Mr. Dunn, you did file a motion to stay, it's been fully

24  briefed and it's set for argument, so if you want to go

25  forward today presenting that motion, I'll be glad to hear

1   it.

2          MR. DUNN:  Your Honor, I'm happy to try -- take

3   your guidance that we should discuss with Plaintiffs what

4   additional activities should take place and when.

5          THE COURT:  Is that fair enough?

6          MR. LEE:  I'm sorry.  I didn't mean to interrupt,

7   Your Honor, I was going to add a comment if I may.  If

8   not --

9          THE COURT:  Yeah, that's fine.  I was going to ask

10  Mr. Dutko his thoughts but I would like the hear from you

11  as well.

12         MR. LEE:  Sure.  And Mr. Dutko has been more in

13  the line of fire, if you will, on these things, but with my

14  name on there I figure I should make a comment.

15         In all my experience over these many years in

16  court, I do think for what it's worth and I think this is

17  what I'm hearing from Your Honor, we need to figure out

18  what we can do without issues because whether we go the

19  trial in September or you tell us we have to go next year

20  assuming we prevail these motions today, your first inquiry

21  is going to be where are we and what do we have left to do.

22         And it makes no sense to me to not try to do

23  everything we can to move forward so when Your Honor says

24  we're ready for you, Mr. Egdorf and Mr. Dunn, that we are

25  ready to jump, rather than us saying we have a lot of stuff

1  we have to get done.

2      My suspicion from what I thought I was gathering

3  from Your Honor is that you see it the same way, but I

4  didn't want to put words in your mouth.  But assuming that

5  is somewhat correct, that might be helpful in guiding our

6  discussions with Mr. Dunn.

7      THE COURT:  Let me say this.  I'll endeavor to

8  have an order out on these motions as quickly as possible,

9  but I am not going to promise you to have them out by a

10 certain date.  I have learned my lesson the hard way about

11 that.  This is -- this is a hard-fought case, and you know,

12 the -- the motions have been well briefed and presented

13 here today, and I -- I will look forward to getting an

14 order out as quickly as possible.  I don't know whether

15 that's two or three weeks or maybe a little bit longer.

16     Here is what I would suggest you all do.  You all

17 meet and confer about what remains to be done in the case

18 and discuss whether, given the status of the case

19 currently, recognizing that motions to dismiss have been

20 filed, the case could be gotten ready by September or

21 whether more time is going to be necessary.

22     Let me ask you all to do that within say 14 days

23 and provide us with a status update about that.  My sense

24 is, as the case stands right now, you-all would not be

25 prepared to go forward on September, but I could be wrong

 1   about that and I -- just like I'm not -- Mr. Egdorf doesn't

 2   want to put words in my mouth, I don't want to put words in

 3   your mouth.  So I don't know whether you could or you

 4   couldn't.

 5         You-all visit about it and see if you can reach

 6   some sort of an agreement and if you can, let us know that

 7   and if you can't, let us know that.  How does that sound?

 8         MR. LEE:  Yes, Your Honor, and if I may add a

 9   thought.  If by chance and I don't know the answer, I'll

10   have to confer with my colleagues, but if the answer is no

11   we don't think we'll be ready by September, I would suspect

12   you would like us in this report to tell you when that date

13   would be.

14         THE COURT:  Yes, I would.

15         MR. LEE:  Thank you, Your Honor.

16         THE COURT:  Okay.

17         Is that okay with you, Mr. Dunn?

18         MR. DUNN:  Yes, Your Honor.  I'll be candid.  I

19   think our position is going to be that we absolutely could

20   not be ready to have this case ready to try in September,

21   even if the only claims that remain are antitrust claims

22   against IDSA and the brand-new case that will go good

23   forward because as we have briefed and argued, even

24   antitrust claims, the expert deadlines were long ago and we

25   need additional discovery there and also as we briefed and

1    argued if the misrepresentation claims survive, there's so

2    much that would need to be done.

3          So you have our position in the motion to stay and

4    I'm happy to take two weeks and discuss with Plaintiffs

5    what should happen while we wait for the Court's rulings

6    but I wanted to respond honestly to the arguments I'm

7    hearing.

8          THE COURT:  That's fine.  I understand that.  Let

9    me suggest this, Mr. Dunn, you all have the meet and confer

10   within two weeks, and then immediately thereafter, file a

11   status update and let me know what you-all have discussed

12   and the resolution of it and we'll at least know a little

13   bit more once that's occurred.

14         MR. EGDORF:  Absolutely.  Thank you, Your Honor,

15   we'll do that.

16         THE COURT:  Okay.  And then the final motion for

17   argument is the motion for sanctions, Mr. Dunn.  You may

18   proceed.

19         MR. DUNN:  Yes, Your Honor.  Thank you very much.

20   This is the final motion.

21         Your Honor, we -- (audio disruption) --

22   stipulation -- I don't know if anybody has a mic on that

23   could be muted because I'm getting feedback.

24         THE COURT:  Yeah, anyone not speaking, which means

25   everybody except Mr. Dunn, if you would mute your

1   microphones, please.  All right.

2          MR. DUNN:  Thank you, Your Honor.

3          THE COURT:  That's better.

4          MR. DUNN:  I think so, yes.  I'm not hearing the

5   feedback any longer.

6          Your Honor, we're now facing a situation that is

7   precisely covered by Rule 11 itself and the notes to

8   Rule 11.  As the Court knows, Rule 11 provides that when an

9   attorney or a party provides a pleading to the Court, the

10  attorneys who sign the pleading -- and that's the case

11  here, it's the attorneys -- certify to the best of their

12  knowledge the factual contentions of evidentiary support or

13  if specifically so identified will likely have evidentiary

14  support after a reasonable opportunity for further

15  investigation or discovery.

16         Your Honor, I'm not seeking sanctions against

17  Plaintiffs for filing their original complaint, which

18  alleged large consulting payments from the Insurance

19  Defendants to the doctors based on information and belief.

20  This Court ruled that Plaintiffs were entitled to full

21  discovery, which under Rule 11 is the reasonable

22  opportunity to develop evidentiary support.

23         Your Honor, it's just common sense that Plaintiffs

24  after completing discovery and finding no evidence to

25  support their claims, should not be permitted to continue

1    to press those claims.  It's common sense.  Not only is it

2    common sense, it's also addressed specifically in the notes

3    to Rule 11.

4           Your Honor, those notes say that tolerance of

5    factual contentions in initial pleadings by Plaintiffs

6    where those contentions are specifically identified as made

7    on information and belief.  That's what the rules allow,

8    what the notes say that tolerance does not relieve

9    litigants from the obligation to conduct an appropriate

10   investigation into the facts that's reasonable under the

11   circumstances.  They go on.

12          The tolerance of the ability to file original

13   claims on information and belief is not a license to make

14   claims out any factual basis or justification and here is

15   the key part, Your Honor.  The notes to Rule 11 say if --

16   moreover, if evidentiary support is not obtained after a

17   reasonable opportunity for further investigation or

18   discovery, the Plaintiffs have a duty under Rule 11 not to

19   persist with those factual contentions.  The notes say the

20   rule doesn't require a formal amendment to the pleadings

21   for which evidentiary support is not found but rather calls

22   upon the Plaintiffs not thereafter to advocate such claims

23   or defenses.  Those are the notes to Rule 11, Your Honor.

24   Common sense.

25          Your Honor, Plaintiffs here have done precisely

 1   what these notes to Rule 11 prohibit.  They had a
 2   reasonable opportunity for further investigation or
 3   discovery.  They persisted with their factual allegations
 4   they yet again made without evidentiary support.  After
 5   full discovery they refiled their RICO and antitrust claims
 6   in their Second Amended Complaint.  They again alleged
 7   large consulting payments from the Insurance Defendants to
 8   the doctors, but in that same pleading they said we still
 9   need meaningful discovery to find the evidence to support
10   these claims.
11        But this was January 7, 2021, Your Honor.
12   Discovery was over.  So they filed their Second Amended
13   Complaint in violation of Rule 11, claims refiled without
14   evidentiary support but they didn't stop there, Your Honor.
15        They filed a Third Amended Complaint.  The same
16   allegations that lacked evidentiary support.  They doubled
17   down on their Rule 11 violation.  And they kept going,
18   Your Honor.  They filed motions to dismiss the Second
19   Amended Complaint and the Third Amended Complaint.
20        And then they alleged in response to those motions
21   that they learned for the first time that the guidelines
22   provide false information about treatment failure.  False
23   as we showed in our pleadings.  They made those allegations
24   in their original complaint.
25        They claimed they learned for the first in the

1   recent depositions that IDSA provides false information

2   regarding testing.  False, they put that in their original

3   complaint.

4        They allege they learned that the IDSA 30(b)(6)

5   deposition that IDSA takes the position it's the leading

6   authority on the diagnosis and treatment of Lyme disease.

7   Again, Your Honor, false.  That very statement was in a

8   letter from 2015 that the Plaintiffs themselves brought to

9   the deposition.  They didn't learn it at the deposition.

10  They learned it from the letter, six years old.

11       And, Your Honor, they opposed our summary judgment

12  motion and acknowledged that finally when they are

13  obligated to come forward with the facts that they don't

14  have the facts and they said they will dismiss their RICO

15  claims.  But then they said as an excuse, the reason they

16  have to do this is because IDSA and the doctors destroyed

17  or failed to produce relevant documents.

18       Again, false, Your Honor.  IDSA and the doctors

19  produced everything they were obligated to produce, nothing

20  was destroyed and the Plaintiffs never moved to compel

21  production.

22       And then, Your Honor, their most egregious was

23  their actual response to our Rule 11 motion and they

24  specifically claim that IDSA destroyed specifically the

25  evidence that it submitted to the Connecticut Attorney

1  General and we have been over this, Your Honor.  That's the

2  most egregious lie.  IDSA preserved the evidence, it told

3  the Plaintiffs that it preserved the evidence, it searched

4  the evidence and found nothing responsive according to the

5  scope of discovery this Court entered.

6        Your Honor, it's a very clear Rule 11 violation.

7  Its a violation of the Rule 11 text itself and in this

8  exact situation is specifically addressed in the notes to

9  Rule 11.  Your Honor, it's an abuse of the Court, what the

10 Plaintiffs did.  Rule 11 sanctions, if they're ever

11 appropriate, they're appropriate here.

12        Thank you, Your Honor.

13        THE COURT:  Thank you, Mr. Dunn.

14        Mr. Lee.

15        MR. LEE:  Yes, Your Honor.  May it please the

16 Court, Lance Lee on behalf of the Plaintiffs.

17        Let me start by saying, Your Honor, that we take

18 this motion very seriously.  Suffice it to say that we're

19 more than disappointed that we're having to defend

20 ourselves against this motion and these accusations, but

21 with all due respect to counsel, I don't believe that this

22 motion should have ever been filed.  And there are

23 basically three reasons why.

24        First of all, and I think the easiest for the

25 Court to decide, but what apparently Mr. Dunn is not

1   recognizing is with respect to the RICO allegations, we

2   made the decision to withdraw those allegations, dismiss

3   those allegations, if you will, during the "safe harbor"

4   period related to Rule 11.  We did it before that time

5   expired.  Therefore, Your Honor, we should not be -- we

6   shouldn't even be discussing this as far as the RICO

7   allegations are concerned.

8          Second, Your Honor, with respect to the new

9   allegations or the allegation regarding our

10  misrepresentation claims, counsel includes four sentences

11  in their motion for sanctions about these misrepresentation

12  claims.

13         As Mr. Dutko stated during his presentation on the

14  motions to dismiss and I won't reiterate all of those

15  things, we did receive new evidence and we did follow the

16  Court's instructions as outlined in the docket control

17  order.  We did properly amend, and there was nothing

18  nefarious or inappropriate about the addition of those

19  misrepresentation claims.  So I think that that's a fairly

20  easy decision for the Court to make as well in the context

21  of Rule 11.

22         Now, the antitrust issue is -- is troubling to me

23  on a number of levels.  First of all, this Court told us

24  not once, but twice that our pleadings with respect to

25  antitrust were appropriate.  There was no heightened

1    pleading standard.  We all understand that the law

2    indicates that there's no heightened pleading standard, and

3    we have met that standard.  We're now at the summary

4    judgment phase.  We have obviously significant disputes as

5    to whether summary judgment is appropriate.

6              So I don't understand how Mr. Dunn can look at

7    what we have done and that the Court has previously blessed

8    in our pleadings and tell us that we have now violated

9    Rule 11.  And in his cover note of February 4, 2021, the

10   Defendants states that we filed our Third Amended

11   Complaint, which did not amend Plaintiffs' RICO or

12   antitrust claims.

13             The question I have, Your Honor, is why would we

14   amend our antitrust claims?  We didn't have to amend our

15   antitrust claims.  You have already told all the parties

16   twice that those claims are sufficiently pled.  We have

17   already satisfied that standard.

18             And now we can't be subject to this type of

19   motion, much less even violating this motion, given that --

20   that we weren't even required to say another thing at the

21   pleading stage with an amended complaint relating to

22   antitrust claims.

23             Our complaint doesn't have to be a trial brief

24   that outlines every factual issue, our final complaint in

25   the case.  It doesn't have to be like that.  So this aspect

1  of the motion, in my opinion, respectfully, is clearly

2  inappropriate.

3          Now, what I suggest is even more inappropriate and

4  disturbing to us is what we have now definitely found out

5  from the IDSA and Mr. Dunn through this briefing process

6  and we have talked about it already, but I think we have to

7  talk about it some more.

8          If they withheld relevant discoverable information

9  that goes to the very heart of our antitrust claims, then

10  we need to see that and we need to see that now.  And the

11  discovery obligations, the Court knows better than I in the

12  Eastern District, require that documents be produced

13  through additional disclosures, that parties do not have to

14  go through the request for production process like we have

15  to in so many other jurisdictions.

16          On July 13, 2018, the IDSA certified to the Court

17  that they had provided those initial disclosures.  Now, I

18  understand that the first motion to dismiss was pending.

19  And that we had basically agreed to a standstill or at

20  least very limited discovery during that standstill period.

21  There's been a lot of water under the bridge.

22          But, Your Honor, once you denied those motions,

23  once you allowed our antitrust claims to proceed, there

24  should have been an immediate or at least soon thereafter

25  supplementation of those disclosures to include the CID

1   responses that were provided to the Connecticut AG.  We

2   didn't get anything.  This idea, Your Honor, that we would

3   have somehow agreed to one narrow category of documents to

4   support our claims against the IDSA, it -- to me is

5   ludicrous.  And I didn't understand any agreement in that

6   regard.

7           When we came before the Court in the winter of

8   2019, we were discussing time frames.  We were discussing

9   issues related to time and then ancillary to that, what the

10  parties would have to look for in relation to those time

11  frames.  That was our discussion.

12          This complaint and these antitrust claims have

13  never, ever been just about payments.  We can look at our

14  Third Amended Complaint and go back.  If you look at -- I'm

15  just looking at, for example, paragraph 117 and I believe

16  this is a similar paragraph that was in our previous

17  complaints.

18          We talk about things like refusing to meaningfully

19  consider information regarding the existence of Lyme

20  disease, excluding scientists and physicians with divergent

21  opinions, failing to conduct conflicts of interest reviews

22  with the panelists.  All of those things, Your Honor,

23  constitute the basis for our antitrust allegations.  Those

24  and much more.  It's not just about payments.  So it defies

25  logic that Plaintiffs would have ever agreed to forgo any

1    discovery on anything other than payments.

2         Now, Your Honor, Mr. Dunn talks about then AG

3    Blumenthal not issuing any type of finding of antitrust

4    violation.  He found something and that something had to be

5    in those responses that we have yet to see.  We have never

6    soon.  So we asked the Connecticut AG office for those

7    documents.  We subpoenaed the Connecticut AG.  We provided

8    Mr. Dunn with notice of that subpoena.

9         Did he file any objections as to the scope of that

10   subpoena, which he should have done?  No, he didn't.  So it

11   belies -- that belies the fact that this is all just about

12   a narrow provision in that joint report.

13        And, Your Honor, I think that we're now in the

14   position, given the timing and I do need to address this.

15   Mr. Dunn accuses us of saying that the IDSA destroyed

16   documents.  I think that Mr. Dutko adequately addressed

17   that, but I would like to make one more point about it.

18        Either the documents were there at some point in

19   time or they're not now or they're being withheld and it's

20   clear from the reply briefs filed by Mr. Dunn on behalf of

21   IDSA that they're still there.  So, Your Honor, I --

22   believe now we're in the position of having to ask this

23   Court for leave to file a motion to compel these documents.

24   I don't believe that we can proceed without doing so, but

25   that is an issue for -- for another day and hopefully a

```
 1   quick day.

 2        But circling back to the actual motion for Rule 11

 3   sanctions, I don't believe there is anything with relation

 4   to any of these three areas that would allow this Court to

 5   impose sanctions on Plaintiffs in this case and I would

 6   respectfully request that the motion be denied.

 7        THE COURT:  Thank you, Mr. Lee.

 8        Mr. Dunn, a short response?

 9        MR. DUNN:  Thank you, Your Honor.

10        His first point was that the Plaintiffs agreed to

11   withdraw their RICO claims.  They did say they would

12   dismiss them.  Number one, they did not dismiss them unless

13   seven weeks later.  They promised to and it took me

14   multiple emails to get them to do that.  That's one.

15        Two is the antitrust claims are based on the same

16   allegations.  They haven't dismissed those and its the same

17   allegations without any evidentiary support that they

18   replead in their Second Amended Complaint.

19        Your Honor, the misrepresentation claims.

20   Plaintiffs claim they have new evidence that they properly

21   amended.  No, there was no evidence.  We have set that

22   forth.  There is nothing new in the depositions.

23        Your Honor, the allegations of payments are the

24   same allegations supporting the RICO claims that support

25   the antitrust claims, that's what it's all about.
```

1          Your Honor, they say why would we amend our

2    antitrust claims.  The notes to Rule 11 say Plaintiffs, you

3    don't have to amend your antitrust claims, but you cannot

4    continue to press them.  When you have no evidence, when

5    discovery is over, the notes say you can't press them any

6    longer and what they did, though, was they filed a new

7    pleading in which they continued to press them and that

8    violates Rule 11.  It's right there in the notes.

9          Your Honor, they say that we should have turned

10   over these Connecticut AG materials in our initial

11   disclosures.  No.  At that point, discovery by agreement

12   with Plaintiffs was limited to the prior four years.  We

13   then later had a the dispute as to how far back discovery

14   should go and that dispute was resolved and it's very

15   clear, Your Honor.  It's in the filed Docket 181.

16         We agreed, Plaintiffs agreed, that we would go

17   back prior to 2010 in very limited ways and we promised and

18   we did review everything including the Connecticut Attorney

19   General materials for what was really important to them and

20   this is what the agreement says:  Communications with the

21   Insurance Defendants regarding the Lyme disease guidelines,

22   payments from the Insurance Defendants related to Lyme

23   disease consulting arrangements.

24         That's what we scoured those materials for.

25   That's what we promised to do.  That's what they agreed we

1   would do.  If they wanted and thought they were entitled to

2   100 percent of everything prior to 2010, we would have had

3   a different discussion, put a dispute before the Court, the

4   Court would have decided what to do.

5           THE COURT:  My recollection, Mr. Dunn, is that we

6   had a hearing and I asked the parties to engage in some

7   further meet and confer and that was the resolution, but I

8   could be misremembering all that.

9           MR. DUNN:  You're exactly right and we resolved it

10  and actually, we, IDSA and the doctors agreed with the

11  Plaintiffs on the exact scope because we were willing to go

12  back to 1995 for the limited areas they wanted us to look

13  for prior to 2010.  It's very detailed, when will we search

14  emails, when will we search non-email documents, et cetera

15  and then the Insurance Defendants and the Plaintiffs were

16  not able to agree.  They put that dispute to Your Honor and

17  Your Honor ruled on that dispute and Your Honor needed to

18  actually determine the scope of the discovery that applied

19  to the Insurance Defendants.

20          Your Honor, just of course, entered the agreement

21  of the parties with respect to the scope of discovery

22  before 2010 related to IDSA's and the doctor's obligations.

23  That's what happened, Your Honor.  You remember that

24  absolutely correctly.

25          Your Honor, the AG must have found something, it

 1   has to be in the response that Plaintiffs have never seen.

 2   Your Honor, still, we searched everything as the Court

 3   ordered and to say that they need to move to compel now for

 4   production of documents with respect to an effort to save

 5   their antitrust claims after discovery has closed is highly

 6   prejudicial, improper and they're a only saying this in

 7   response to the Rule 11 motion where they say, no, you must

 8   have destroyed documents.  You destroyed documents and we

 9   have to come back to them and prove a negative.

10        We didn't destroy documents, Your Honor.  I cited

11   it at the beginning of the second session.  The IDSA

12   corporate deposition is very clear.  It says that they

13   preserved the Connecticut AG materials and searched them

14   according to the Court's order.  This is November of 2020.

15   There's no confusion.  There's no effort to hide anything.

16   I don't know why Plaintiffs' attorneys might be somehow

17   surprised at this point.

18        Again, full document discovery was completed as of

19   June 1, 2020.  If they thought they were missing something

20   then, they would have asked.  This is way too late and it's

21   in response to a very valid and compelling Rule 11 motion,

22   Your Honor, Rule 11 sanctions are appropriate and we

23   appreciate the Court's consideration of our Rule 11 motion.

24        THE COURT:  Thank you, Mr. Dunn.

25        I think that completes argument on the motions

1    that we believe need argument on.  As I said, I can't make

2    you promises on when the summary judgment order and order

3    on the motions to dismiss will be out, but hopefully it'll

4    be relatively soon given what our trial schedule is over

5    the next several weeks but we'll do our best.  Other

6    comments or concerns, questions by anyone?

7         MR. LEE:  If I may, Your Honor, can I do a little

8    housekeeping with you or at least a little update for you?

9         THE COURT:  Yes.

10        MR. EGDORF:  As the Court I'm sure has seen

11   repeatedly and that might be why some of the insurance

12   folks were on the call.  As Your Honor knows, we have

13   settled the case with everyone except for Mr. Dunn's

14   clients.  We have been, you know -- I think I see Mr. Holt

15   and he and I have talked too many times trying to round up

16   all of the Defendants on seeing if we can get some sort of

17   agreement on release documents and things like that and

18   that has taken a significant amount of time, as you might

19   suspect with this many lawyers who all think their

20   wordsmithing is the best way to do it.

21        So that is why, Your Honor, you have seen so many

22   "can we have 30 more days," those kinds of things because

23   we're trying to get all that paperwork done and why it then

24   becomes significant, and Mr. Dutko can correct me if I'm

25   wrong, I think we have four minor Plaintiffs that are still

1    in the case that we're going to have to do ad litem

2    approval hearings.

3          We do have an ad litem.  Your Honor has signed an

4    order for an ad litem.  That ad litem we have talked to at

5    length.  He has been given significant materials and done a

6    great deal of work, but as I understand it, he is just

7    waiting for us to finally get all the documents, so all the

8    clients can sign them.

9          So, you know, we're all kind of, I think,

10   disagreeing a little bit about the documents but I don't

11   want the Court to think we're all doing the mess around.

12   Our clients want to get paid and I'm sure Mr. Holt and the

13   other Defendants -- maybe not in a hurry to pay us, but

14   probably tired of attending court hearings or reading

15   paperwork.

16         Anyway, I'm sure Your Honor wants to get to lunch,

17   I didn't want to belabor it but I wanted to make sure since

18   we had an opportunity to visit with each other that was 100

19   percent clear that you understood the status of this.  It's

20   my hope we clear up this paperwork situation soon.

21   Obviously with this many clients and their health

22   situations, getting them to sign all the documents, may

23   take a little bit of work but that's where we are and I

24   hope we can get this settlement hearing before you sooner

25   rather than later.

1              THE COURT:  That's fine, Mr. Egdorf.  Appreciate

2    those comments.  Very helpful.

3              MR. EGDORF:  That's all I had, Your Honor, and

4    Mr. Holt or someone might want to say something different

5    about that, but I think from the rest of us on our side, we

6    are done for today and we appreciate all this time you gave

7    for today.  We're glad to be back with you and we'll await

8    your rulings.

9              THE COURT:  Thank you, Mr. Egdorf.  Any other

10   comments by anyone?

11             Mr. Holt, do you have anything you wish to say?

12             MR. HOLT:  Nothing to add, Your Honor.  I

13   appreciate the update from Mr. Egdorf.  I think I can speak

14   for the other the Defendants, although they're not all

15   here, but we have had the greatest conversations -- (audio

16   disruption).

17             THE COURT:  Okay.  Good.

18             MR. ROESER:  Same for Aetna.

19             THE COURT:  Thank you, Mr. Roeser.  Anything else?

20             All right.  The parties's presentations were very

21   helpful today.  I appreciate those.  Thanks for everyone's

22   participation and we'll be in recess.  Thanks to all of

23   you.

24             (Time noted 12:47 p.m.)

25

1                    COURT REPORTER'S CERTIFICATION

2              I HEREBY CERTIFY that the foregoing is a true and

3    correct transcript from the stenographic notes of the

4    proceedings in the above-entitled matter to the best of my

5    ability.

6

7                         /s KATHRYN McALPINE/
                         KATHRYN McALPINE, RPR, CSR, CCR
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25