**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION**

LISA TORREY, *et al.*,

                Plaintiffs,

v.

INFECTIOUS DISEASES SOCIETY OF AMERICA, *et al.*,

                Defendants.

§
§
§
§
§
§
§
§
§
§
§
§
§

CIVIL ACTION NO.  5:17-CV-00190-RWS

## <u>ORDER</u>

Before the Court is Defendant Infectious Diseases Society of America's ("IDSA") Motion for Summary Judgment on Plaintiffs' RICO and Antitrust Claims.[1,2]  Docket No. 357.  The Court heard argument on the motion on April 23, 2021.  Docket No. 397.  For the reasons set forth below, Defendant's motion is **GRANTED**.

## BACKGROUND

Plaintiffs sued Defendant in November 2017, alleging that the Defendant, Doctors and Insurance Defendants have engaged in a decades-long conspiracy to deny the existence of and to prevent treatment of chronic Lyme disease.  Docket No. 1.  Plaintiffs alleged that doctors have known for a long time that while many patients who contract Lyme disease may be cured with

---

[1] At the time the motion was filed, several individual doctors were also defendants in the case and signed onto the motion, including Dr. Gary P. Wormser, Dr. Allen Steere, Dr. Raymond J. Dattwyler, Dr. John J. Halperin, Dr. Eugene Shapiro and Dr. Leonard Sigal (collectively, the "Doctors").  They have since been dismissed from the case.  Docket No. 396.

[2] Plaintiffs also sued the insurance providers Anthem, Inc., Blue Cross and Blue Shield of Texas, Aetna, Inc., Cigna Health and Life Insurance Company (sued as Cigna Corporation), Kaiser Foundation Health Plan, Inc. (sued as Kaiser Permanente, Inc.), United Healthcare Services, Inc., Unitedhealth Group Inc. and Blue Cross and Blue Shield Association (collectively, the "Insurance Defendants").  At this time, the suit against these parties has either been stayed for notice of settlement or dismissed.

short-term antibiotics, up to 40 percent of patients do not respond to short-term antibiotic treatment. *Id.* ¶ 45. These patients require long-term antibiotic treatment until the symptoms are resolved. *Id.* Though the Insurance Defendants initially provided coverage for long-term antibiotic treatment of Lyme disease, the health insurance industry made a concerted effort in the 1990's to deny coverage because long-term treatment was too expensive. *Id.* ¶¶ 47–48. The Insurance Defendants enlisted the help of doctors who were researching Lyme disease—the IDSA panelists—and paid them large fees to develop arbitrary guidelines for testing Lyme disease. *Id.* ¶ 48. Once these guidelines were established, the Insurance Defendants denied coverage for patients who did not meet the new stringent Lyme disease testing protocols and prevented Plaintiffs from obtaining the antibiotics needed to treat their disease. *Id.* ¶ 49.

Plaintiffs' Third Amended Complaint alleges four counts of Racketeer Influenced and Corrupt Organization ("RICO") violations (Docket No. 361 at 45–49), one count of antitrust violations (*id.* at 49–52) and two counts of misrepresentation (*id.* at 52–60). Plaintiffs have since filed a stipulation dismissing their RICO allegations. Docket No. 396. Defendant now moves for summary judgment on Plaintiffs' antitrust claim.

## LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) ("The Federal Rules of Civil Procedure have for almost 50 years authorized motions for summary judgment upon proper showings of the lack of a genuine, triable issue of material fact."). Summary judgment is proper if the pleadings, the discovery and disclosure materials on file and any affidavits "[show] that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute about a material fact is genuine "if the evidence is such

that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The trial court must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment.  *Casey Enters. Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981).  The substantive law identifies which facts are material. *Anderson*, 477 U.S. at 248.

The party moving for summary judgment has the burden to show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *Id.* at 256.  Where the nonmovant bears the burden of proof, the movant may discharge its burden by showing that there is an absence of evidence to support the nonmovant's case.  *Celotex*, 477 U.S. at 325; *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000).  Once the movant has carried its burden, the nonmovant must "respond to the motion for summary judgment by setting forth particular facts indicating there is a genuine issue for trial."  *Byers*, 209 F.3d at 424 (citing *Anderson*, 477 U.S. at 248–49).  The nonmovant must adduce affirmative evidence.  *Anderson*, 477 U.S. at 256–57.  No "mere denial of material facts nor . . . unsworn allegations [nor] arguments and assertions in briefs or legal memoranda" will suffice to carry this burden.  *Moayedi v. Compaq Computer Corp.*, 98 F. App'x 335, 338 (5th Cir. 2004).  The Court must consider all the evidence, but must refrain from making any credibility determinations or weighing the evidence.  *See Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

## DISCUSSION

Defendant contends that (1) Plaintiffs cannot present significant probative evidence of payments or communications linking it to the Insurance Defendants' alleged antitrust conspiracy; (2) Plaintiffs lack significant probative evidence to support their antitrust claims against it; (3) Plaintiffs' damages are derivative of their personal injuries and are not recoverable under antitrust

law; and (4) Plaintiffs' claim is barred by the statute of limitations.  Because the Court finds that there is no genuine issue of material fact on Defendant's first and second contentions regarding probative evidence, it does not reach the issue of whether Plaintiffs' damages are proper or Plaintiff's claims are barred by the statute of limitations.

## I.      Lack of Evidence Linking Defendant to the Insurance Defendants

Defendant asserts that Plaintiffs brought this case against the Insurance Defendants, alleging that one aspect of their longstanding and open business activities is a fraudulent criminal conspiracy in violation of antitrust law designed to save themselves millions of dollars by denying coverage for chronic Lyme disease; Plaintiffs joined Defendant to the case by asserting that the Insurance Defendants brought it into their criminal conspiracy through long-term, ongoing payments related to Lyme disease.  Docket No. 357 at 13.  Defendant argues that Plaintiffs must produce significant probative evidence showing it participated in the alleged conspiracy by receiving payments from the Insurance Defendants—otherwise, it cannot be liable for a criminal conspiracy that it did not conceive, that it never even discussed with any Insurance Defendant and that was not designed to benefit it.  *Id.* at 14.  Defendant argues that Plaintiffs cannot reach this burden because there is no evidence that it ever received any payments from any Insurance Defendant related to Lyme disease.

Defendant also preemptively argues that Plaintiffs may not rely on a press release from the Connecticut Attorney General or testimony before Congress from Dr. Joseph Burrascano.  *Id.* Defendant asserts that these statements do not identify a single doctor, Insurance Defendant or consulting arrangement or payment, and thus do not create a genuine factual dispute.  *Id.*  And, Defendant argues, the press release and Congressional testimony are both inadmissible hearsay that cannot be considered in ruling on summary judgment.  *Id.* at 14–15 (citing FED. R. CIV. P.

56(c)(2); *Cruz v. Aramark Servs.*, 213 Fed. App'x 329, 332 (5th Cir. 2007); *In re Oil Spill by the Oil Rig Deepwater Horizon*, MDL No. 2179, 2012 WL 425164, at *2 (E.D. La. Feb. 9, 2012); *Fat Butter, Ltd. v. BBVA USA Bancshares, Inc.*, No. 4:09-cv-3053, 2010 WL 11646900, at *8 (S.D. Tex. Apr. 13, 2010)).

Plaintiffs first respond that, due to the destruction of evidence in this case (*see* Docket No. 373 at 5–9), Plaintiffs are relying on circumstantial evidence to support the conspiracy between Defendant and health insurance companies. *Id.* at 12. As part of its circumstantial case, Plaintiffs assert that health insurance companies paid for long term antibiotics for Lyme disease until they determined it cut into profits in the mid-1990's. *Id.* at 13 (citing Docket No. 373-1 at 90:8–93:14). Plaintiffs assert that Empire Blue Cross/Blue Shield created an arbitrary policy of only covering short-term antibiotic treatment that had no medical or scientific justification, and other medical companies shortly followed suit. *Id.* (citing Docket No. 373-1 at 114:3–9; PAMELA WEINTRAUB, CURE UNKNOWN, INSIDE THE LYME EPIDEMIC 306–31 (2008)). Plaintiffs also assert that from the mid-1990's until enactment of the 2000 IDSA Guidelines, health insurance companies began denying insurance coverage for antibiotics after short-term treatment. *Id.* Plaintiffs further assert that at the same time health insurance companies created arbitrary guidelines for Lyme disease, they began paying large consulting fees to some of the most influential Lyme disease experts. *Id.*

Plaintiffs then allege that three doctors involved in the IDSA Guidelines received payments from insurance companies. One, Plaintiffs allege that Dr. Sigal—who was hired by Defendant to review the Lyme disease guidelines before they were published—was an "active expert witness for insurance companies." *Id.* (citing Docket No. 373-2 at 44:7–19, 59:9–24). Two, Plaintiffs allege that Dr. Shapiro—who was hired by Defendant to author the 2000 and 2006 IDSA Guidelines—testified that he provided expert testimony in around 75 to 80 cases, offered testimony

in court more than a "dozen" times and twice testified in front of medical boards.  *Id.* at 13–14 (citing Docket No. 373-4 at 6:3–24).  Three, Plaintiffs allege that Dr. Dattwyler—who was also one of the guideline authors retained by Defendant—testified that he was hired by insurance companies to testify as an expert witness in Lyme cases, to consult and to review medical records for Lyme patients.  *Id.* at 14 (citing Docket No. 373-5 at 13:1–4, 13:7–16, 189:19–190:6).

Plaintiffs then rely on a 2006 Investigation by then Connecticut Attorney General Richard Blumenthal.  *Id.*  Plaintiffs assert that Blumenthal investigated the IDSA Guidelines and served Civil Investigative Demands ("CIDs") on many of the IDSA panelists and health insurance companies.  *Id.* (citing Docket No. 373-6).  Plaintiffs then point to a press release from Blumenthal that concluded several of the most powerful IDSA panelists had undisclosed financial interests in insurance companies including consulting arrangements with insurance companies.  *Id.* (citing http://www.empirestatelymediseaseassociation.org/Archives/CTAGPressReleaseIDSAResponse. htm).

Plaintiffs assert that after receiving the large consulting fees from insurance companies, the IDSA panelists put the same arbitrary guidelines into the IDSA Guidelines that the insurance companies created in the 1990's.  *Id.*  Plaintiffs argue that insurance companies have since used the IDSA Guidelines to justify restricting coverage of long-term antibiotic treatment of Lyme disease.  *Id.* at 15 (citing https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2435453/).

Plaintiffs then rely on the fact that several states passed or proposed legislation that requires insurers to pay for long-term antibiotic treatment for Lyme disease patients who experience treatment failure.  *Id.*  Plaintiffs assert that Defendant criticized legislation "[r]equiring health insurers to cover Lyme disease treatments that are not supported by scientific evidence, including long-term antibiotic use."  *Id.* (citing  https://www.idsociety.org/globalassets/idsa/topics-of-

interest/lyme/lyme-state-policy-primer-update-2016-final.pdf).       Plaintiffs   posit   that   an
independent organization with no connection to insurance companies would not publish such a
statement.  *Id.*

Plaintiffs conclude that this circumstantial evidence supports an inference of conspiracy
between Defendant and health insurance companies and establishes that the only reason the IDSA
panelists created guidelines claiming there is no treatment failure in Lyme disease is because they
engaged in a conspiracy with health insurance companies.  *Id.* at 16 (citing *Abraham & Veneklasen
Joint Venture v. Am. Quarter Horse Ass'n*, 776 F.3d 321, 331–32 (5th Cir. 2015); *Viazis v. Am.
Ass'n of Orthodontists*, 314 F.3d 758, 763 (5th Cir. 2002)).

Plaintiffs next respond that the circumstantial evidence tends to exclude independent
conduct.  *Id.*  Plaintiffs assert that the IDSA panelists involved with the IDSA Guidelines agree
that there is treatment failure in Lyme disease but allowed the IDSA Guidelines to publish with
the statement: "[t]here is no convincing biologic evidence for the existence of symptomatic chronic
*B. burgdorferi* infection among patients after receipt of recommended treatment regimens for
Lyme disease."  *Id.* (citing Docket No. 373-8 at 36:11–13; Docket No. 373-2 at 42:4–19, 58:12–
59:24; Docket No. 357-2).  Plaintiffs posit that the only reason the IDSA panelists would allow
this to occur is due to large payments made by the health insurance companies in their conspiracy
to restrain competition.  *Id.*

Defendant first replies that no evidence was destroyed or not produced in this matter.
Docket No. 386 at 3.  Defendant asserts that Plaintiffs have always contended that this case is
about alleged large consulting fees the Insurance Defendants paid to the Doctors to write false
Lyme disease guidelines.  *Id.* at 4 (citing Docket No. 1 ¶¶ 54, 76; Docket No. 377 ¶¶ 38–49; Docket
No. 373 at 1).  Defendant asserts that discovery in this matter has at all times been limited to

finding consulting payments from the Insurance Defendants to the Doctors or Defendant related to Lyme disease: Plaintiffs' written discovery requests focused on payments from the Insurance Defendants to the Doctors; Plaintiffs never challenged Defendant's objections regarding payments by "insurance companies" that were not limited to the Insurance Defendants; and Plaintiffs never asked Defendant or the Doctors to produce documents regarding payments to the Doctors from disability or medical malpractice insurance companies. *Id.* Defendant further argues that the scope of discovery has already been litigated in this Court and that the scope of the subject matter searched for would be limited to Defendant and the Doctors searching and producing documents sufficient to show any consulting payments by the Insurance Defendants. *Id.* at 5 (citing Docket No. 181 ¶ I.2).

Defendant argues that Plaintiffs cannot complain now, well after the close of fact discovery and in response to Defendant's summary judgment motion, that it and the Doctors "destroyed or failed to produce relevant documents." *Id.* at 5. Defendant asserts that there is no evidence of such alleged destruction or failure to produce, and Plaintiffs never raised these allegations with Defendant or the Doctors; never asked for a meet-and-confer; and never filed a motion to compel.[3]

---

[3] Discovery closed in this matter on January 15, 2021. Docket No. 376. The instant motion for summary judgment motion was filed on February 3, 2021. Docket No. 357. In response to summary judgment, for the first time, Plaintiffs allege that evidence was destroyed; they did not, however, file a motion to compel at that point. Defendant raised this in its reply on March 16, and at oral argument on April 23, the Court questioned Plaintiffs about their failure to move on the alleged discovery dispute. Docket No. 405 at 34:5–14. Only after that, on May 3, did Plaintiffs file a motion to compel. Docket No. 402. That is too late. *See Lectec Corp. v. Chattem, Inc.*, No. 5:08-CV-130, 2011 WL 13085199, at *2 (E.D. Tex. Feb. 1, 2011) (Folsom, J.) ("Plaintiff has not shown that it moved to compel production from [Defendant], however, so Plaintiff cannot now rely on any purported discovery misconduct to compensate for a deficiency in Plaintiff's evidence.").

Moreover, Plaintiffs provide no evidence to support their allegation that Defendant has not met its discovery obligations in this case. The parties *agreed* on the scope of the subject matter that would be searched for—and relevant to this issue—and that scope was limited to evidence of payments from the Insurance Defendants. *See* Docket No. 181 ¶ I.2 ("For all Defendants, copies of payments, checks, wire transfers, or other documents sufficient to show any consulting payments by the insurance defendants to the doctor defendants and/or Infectious Diseases Society of America (IDSA[]) related to Lyme disease. These documents would not include payments made for claims for the provision of medical services to patients by the doctor defendants."). Work that a doctor has done with other disability or medical malpractice insurance companies is irrelevant to the Plaintiffs' allegations in this suit and does not support Plaintiffs' speculation that documents were not produced.

*Id.*  Concerning Dr. Sigal, Defendant asserts that he served as an expert for Standard Insurance Company, a disability carrier, and he testified that he and his wife destroyed hard-copy documents that had been stored in their garage just before they moved in 2014 or 2015—well before Plaintiffs filed this case.  *Id.* at 6 (citing *Schwob v. Standard Insurance Co.*, 248 Fed. App'x 22, 23, 26 (10th Cir. 2007); *Dutkewych v. Standard Insurance Co.*, 781 F.3d 623, 625, 629 (1st Cir. 2015); Docket No. 386-1 at 20:18–21:16).  Concerning Dr. Shapiro, Defendant asserts that he testified that he never served as an expert witness for an Insurance Defendant or any health insurance company— which Plaintiffs themselves recognize, referring to Dr. Shapiro's work "related to the disability claims he worked on for insurance companies" and "in malpractice cases involving Lyme disease." *Id.* at 7 (citing Docket No. 373 at 6).  Concerning Dr. Dattwyler, Defendant asserts that he did not work for any Insurance Defendant or any other health insurance company, only having engagements with medical malpractice carriers and disability carriers.  *Id.* at 8 (citing Docket No. 386-5 at 13:1–16).  Concerning Defendant, it asserts that it preserved documents at the beginning of this case, including the materials submitted to the Connecticut Attorney General from more than ten years before Plaintiffs filed this case.  *Id.* at 9 (citing Docket No. 386-6 at 77:23–78:16, 82:3– 83:7).  Defendant asserts that it searched its records and provided to Plaintiffs all relevant documents in accordance with limits on discovery agreed to by the parties or as ordered by the Court.  *Id.* (citing Docket No. 357-5 ¶ 9).

Defendant next replies that its lobbying efforts cannot support Plaintiffs' antitrust claims. *Id.* at 11.  Defendant asserts that the *Noerr-Pennington* doctrine, which holds that petitioning the government in an effort to influence public policy cannot constitute evidence in support of an antitrust claim, is well established.  *Id.* (citing *E. R. R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 135 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670–

71 (1965); *see also Gibbes v. Ameristar Casino Vicksburg Inc.*, 137 F. App'x 673, 674 (5th Cir. 2005); *Bayou Fleet, Inc. v. Alexander*, 234 F.3d 852, 854 (5th Cir. 2000)).

## II.    Lack Evidence to Support Antitrust Claims

Defendant contends that Plaintiffs bear a heavy burden that they cannot meet in pursuing an antitrust claim.  Docket No. 357 at 22 (citing *Matsushita Elec. Indus. Co, Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986)).  Defendant argues that the entirety of the evidence produced in this matter supports that it and the Doctors acted independently from the Insurance Defendants to write the IDSA Guidelines—which dooms Plaintiffs' antitrust claims.  *Id.* at 22–23 (citing *Stewart Glass & Mirror, Inc. v. USA Glas, Inc.*, 17 F.Supp.2d 649, 657 (5th Cir. 1998)).  Defendant contends that Plaintiffs cannot meet their burden to produce probative evidence that it agreed with the Insurance Defendants to restrain trade, as there is no evidence of an agreement, much less one to restrain trade.  *Id.* at 23 (citing *Marucci Sports LLC v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 374 (5th Cir. 2014); *Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.3d 266, 272 (5th Cir. 2008); *Spectators' Commun. Network, Inc. v. Colonial Country Club*, 253 F.3d 215, 222 (5th Cir. 2001)).

Defendant further contends that Plaintiffs have no evidence to show that the alleged markets are relevant antitrust product markets, which are defined based on the interchangeability of products and competition amongst brands.  *Id.* at 22–23 (citing *Apani Southwest, Inc. v. Coca-Cola Enterprises, Inc.*, 300 F.3d 620, 626 (5th Cir. 2002)).  Defendant states that Plaintiffs asserted relevant antitrust markets are the market for the "treatment of chronic Lyme disease" and the market for insurers to provide "coverage for such treatment."  *Id.* at 23.  But, Defendant contends, the IDSA Guidelines are not a product because they are available for free, and the proliferation of other guidelines for the treatment of Lyme disease illustrates that the existence of the IDSA

Guidelines does not prevent any other organization from issuing its own guidelines. *Id.* at 24 (citing *Kinderstart.com LLC v. Google, Inc.*, No. C 06-2057, 2007 WL 831806, *5 (N.D. Cal. Mar. 16, 2007); Docket No. 357-3 at 2).  And although Plaintiffs allege that Defendant conspired to monopolize the markets for "treatment of chronic Lyme disease" and for the insurance coverage for Lyme disease, Defendant points out that it is not an insurance company and does not compete in the insurance coverage market. *Id.*

Moreover, to the extent the IDSA Guidelines recommend to doctors certain treatments for Lyme disease, Defendant argues that Plaintiffs cannot present evidence that the IDSA Guidelines function as a "monopoly" as required under the Sherman Act. *Id.*  Defendant asserts that a monopolization claim fails at summary judgment if Plaintiffs cannot allege a market share of "at least fifty percent," and "it is doubtful whether 60 or 64 percent would be enough." *Id.* (citing *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 489 (5th Cir. 1984)).  Defendant contends Plaintiffs cannot meet that threshold here. *Id.* at 25 (citing Docket No. 357-3 at 2).

Finally, Defendant contends that for Plaintiffs' Section 2 monopolization claims, they must prove that it engaged in "predatory" or "exclusionary" conduct, and for their Section 1 conspiracy claims, they prove that it engaged in an "unreasonable restraint" on competition. *Id.* Defendant argues that it is well settled that setting forth professional guidance that is voluntary on its face is not an unreasonable restraint of trade. *Id.* (citing *Consol. Metal Prod., Inc. v. Am. Petrol. Inst.*, 846 F.2d 284, 296 (5th Cir. 1988)).  Defendant asserts that the Fifth Circuit discourages treble damages actions that are nothing more than disagreements with the recommendations set forth in voluntary guidelines, regardless whether most doctors rely on the IDSA Guidelines. *Id.* at 25–26 (citing *Golden Bridge*, 547 F.3d at 273; *DM Research, Inc. v. Coll. of Am. Pathologists*,

170 F.3d 53, 57 (1st Cir. 1999); *Schachar v. Am. Acad. Of Ophthalmology, Inc.*, 870 F.2d 397, 398 (7th Cir. 1989)).

Plaintiffs respond that the relevant antitrust market is the Lyme disease treatment market in the United States, which is relevant and proper for an antitrust case.   Docket No. 373 at 18 (citing *Wilk v. Am. Med. Ass'n*, 671 F. Supp. 1465, 1478 (N.D. Ill. 1987), *aff'd*, 895 F.2d 352 (7th Cir. 1990); *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1447 (9th Cir. 1988); *Weiss v. York Hosp.*, 745 F.2d 786, 827 (3d Cir. 1984); *Bio-Med. Applications Mgmt. Co., Inc v. Dallas Nephrology Assoc.*, No. 4:94CV37, 1995 WL 215302, at *2 (E.D. Tex. Feb. 6, 1995); *Leyba v. Renger*, 874 F. Supp. 1229, 1238 (D.N.M. 1994)).

Plaintiffs next responds that Defendant dominates and controls a monopoly share of the Lyme disease treatment market, as it represents to the country that it is the leading authority in the treatment of Lyme disease and continually pushes for its guidelines to be the only thing doctors need to follow when treating Lyme disease.   *Id.* at 20 (citing Docket No. 373-10).   Plaintiffs contend that to protect its monopoly in the Lyme treatment market, Defendant tries to influence state legislators and Congress.   *Id.* at 20–21.   Plaintiffs also argue that it is impossible for doctors to rely on other guidelines because of Defendant's dominance in the Lyme disease treatment market.   *Id.* at 22  (citing https://www.hhs.gov/sites/default/files/tbdwg-2020-reportto-ongress-final.pdf).   Plaintiffs argue that Defendant works to perpetuate its dominance.   *Id.*

Plaintiffs also respond that voluntary guidelines can be an unreasonable restraint on competition.   *Id.* at 23 (citing *Am. Soc. of Mech. Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 558 (1982)).   Plaintiffs argue that a standard-setting organization can obtain monopoly power by allowing members with an economic interest in restraining competition to bias its standard-

setting process.  *Id.* at 17 (citing *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 501 (1988)).[4]

Defendant replies that all of Plaintiffs' antitrust claims allege that it conspired with the Insurance Defendants and the Doctors to restrain competition, yet Plaintiffs have no evidence of an actual agreement and no evidence of the large consulting fees.  Docket No. 386 at 12.  Defendant asserts that in the absence of proof, Plaintiffs instead recycle 2008 statements from the Connecticut Attorney General and Burrascano's 1993 Congressional testimony.  *Id.* at (citing Docket No. 373 at 8–10).  But, Defendant argues, it demonstrated in its motion—and Plaintiffs did not refute— that these statements do not identify a single communication between an Insurance Defendant and a Doctor or Defendant regarding Lyme disease and do not identify a single payment from an Insurance Defendant to a Doctor or Defendant for a consulting arrangement related to Lyme disease.  *Id.*  Defendant argues that these statements are thus irrelevant, as well as inadmissible.  *Id.*  With no evidence of large consulting fees paid by the Insurance Defendants to the Doctors, Defendant asserts that Plaintiffs stretch to assert that its lobbying efforts regarding Lyme disease and alleged false statements in the Lyme disease guidelines make sense only if the Insurance Defendants have paid substantial sums to it and the Doctors.  *Id.* at 14.  But not only can lobbying efforts not be used to support a conspiracy per the *Noerr-Pennington* doctrine, Defendant argues that there "is a persuasive, rational and non-conspiratorial explanation for its lobbying efforts": it believes that Lyme disease diagnosis and treatment should be based on scientific evidence.  *Id.* (citing Docket No. 373-10 at 1 ("IDSA must oppose H.R. 4701, as we believe it will inappropriately bias federal activities that must remain science-based in order to ensure optimal patient care and protect the public's health and safety.")).

---

[4] Plaintiffs further assert that Defendant said nothing about Plaintiffs' Section 2 antitrust claim.  *Id.* at 24.

Defendant argues that Plaintiffs have also not contested the sworn declarations from it and the Doctors that they did not communicate with or interact with the Insurance Defendants in developing the IDSA Guidelines.  *Id.* at 15.  Defendant argues that there can be no "meeting of the minds" without any "meeting."  *Id.* (citing *H & B Equip. Co. v. Int'l Harvester Co.*, 577 F.2d 239, 245 (5th Cir. 1978); *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 654 (7th Cir. 2002)).

Defendant then replies that Plaintiffs present no evidence to support their alleged antitrust market.  *Id.* at 16.  Defendant asserts that the Fifth Circuit recently held that an antitrust plaintiff must "meet his burden of presenting evidence" to establish an antitrust market, such as setting forth the potential competitors in the alleged market or presenting evidence of "all interchangeable substitute products."  *Id.* (citing *Shah v. VHS San Antonio Partners LLC*, 985 F.3d 450, 455, 452 (5th Cir. 2021)).  But Plaintiffs only cite the Center for Disease Control's statement regarding the scope of Lyme disease in the United States and the fact that the IDSA Guidelines state that they seek to assist clinicians who diagnose and treat Lyme disease.  *Id.* (citing Docket No. 373 at 19).

Defendant further replies that Plaintiffs do not provide any evidence that it competes in the alleged market for the treatment of Lyme disease—or evidence of how it would benefit economically if it limited competition in that market.  *Id.* at 17 (citing *United Farmers Agents Ass'n v. Farmers Ins. Exch.*, 89 F.3d 233, 236 (5th Cir. 1996); *Kinderstart.com*, 2007 WL 831806, at *5).  And, Defendant argues, the case law Plaintiffs rely on is inapposite, as the cases cited address medical services markets involving actual medical professionals who were competitors in the proposed market.  *Id.* (citing *Oltz*, 861 F.2d at 1447 (finding medical doctor anesthesiologists and nurse anesthesiologists competed in the market for anesthesia care); *Weiss*, 745 F.2d at 826 (finding medical doctors and osteopathic doctors competed in market for inpatient hospital care)).

Defendant also replies that there is no evidence it possesses a monopoly market share. *Id.* First, Defendant argues that Plaintiffs are attempting to revise their original, joint monopolization claim to allege that Defendant alone monopolizes the market for Lyme disease treatment. *Id.* at 17–18. But even with recasting the monopolization claims as Plaintiffs do, there is no support for the proposition that Defendant's claim to be a premier authority is evidence that it participates in the actual market for the treatment and diagnosis of Lyme disease. *Id.* at 19 (citing *Retractable Tech., Inc. v. Becton Dickinson & Co.*, 842 F.3d 883, 894–95 (5th Cir. 2016)). Defendant asserts that there is still no evidence that it treats Lyme disease patients. *Id.* Defendant further argues that Plaintiffs passing mention of an antitrust market for "Lyme treatment guidelines" has no more viability, as Defendant publishes Lyme disease guidelines for free, as do numerous other organizations—at least six other sets of guidelines are in the record here. *Id.* at 18 (citing Docket No. 373 at 22), 19 n.6. Defendant argues that monopoly power would be nonsensical in this context, as a monopolist has the "power to control prices or exclude competition." *Id.* at 19 (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966)). But there are no prices for treatment guidelines and no barriers to others issuing guidelines. *Id.* As to the one document Plaintiffs cite, Defendant argues that it does nothing to support Plaintiffs' claims, as the report states that "for patients with persistent symptoms associated with Lyme disease, almost all . . . select practitioners who follow the guidelines of ILADS. Very few (6%) of these same patients report being treated by infectious disease physicians who follow only the IDSA guidelines." *Id.* (citing Docket No. 386-8 at 70).

Defendant finally replies that Plaintiffs have no evidence that the IDSA Guidelines actually are unreasonable restraints. *Id.* (citing Docket No. 373 at 23). Defendant further contends that Plaintiffs rely on inapposite cases where actual market participants orchestrated conspiracies to

secretly infiltrate the standard-setting organization in order to draft guidelines designed to prevent new competitors from entering the market. *Id.* (citing *Am. Soc. of Mech. Eng'rs*, 456 U.S. at 560–61 (finding a company's VP secretly ghostwrote the document and got an unaffiliated ASME official to sign it); *Allied Tube*, 486 U.S. at 496 (finding a company recruited hundreds of new members to rig the vote on a new guideline)).   In fact, Defendant argues, Plaintiffs admit that the Insurance Defendants began denying long-term treatment in the mid-1990's, yet present no evidence that the publication of the IDSA Guidelines actually had any effect on this pre-existing practice. *Id.* at 21 (citing *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)).  Indeed, the only evidence Plaintiffs proffer of the IDSA Guidelines impact is a letter to the editor making the uncorroborated statement that "[unnamed] insurance companies have used these guidelines to justify their restrictive coverage of long-term antibiotic treatment."   *Id.* (citing Docket No. 373 at 15).  Defendant contends that this is inadmissible.  *Id.*

## III.   Analysis

To survive summary judgment after a movant "identif[ies] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact," *Celotex*, 477 U.S. at 323, the nonmovant must bear the burden of establishing otherwise by supporting its contentions with some evidence.  *Geiserman*, 893 F.2d at 793 (citing *id.* at 324); *Anderson*, 477 U.S. at 248 (holding that the non-moving party cannot "rest upon mere allegations or denials of [the] pleading but must set forth specific facts showing there is a genuine issue for trial").  But Plaintiffs fail to produce any summary judgment evidence to support their antitrust claims.

After almost three years of discovery, Plaintiffs do not point to a single communication between Defendant and the Insurance Defendants—let alone any large fees—to support Plaintiffs'

allegations of a conspiracy.  Even assuming that the two pieces of evidence Plaintiffs have relied

on from the start of this case are admissible summary judgment evidence—Burrascano's testimony

from 1993, seven years prior to the first set of IDSA Guidelines issuing, and the Connecticut

Attorney General's press release—neither identifies a single agreement or payment between the

Insurance Defendants, the Doctors and Defendant.  Thus, viewing the evidence in the light most

favorable to them as the nonmovant, Plaintiffs have not adduced any affirmative evidence in

response to Defendant's motion for summary judgment to support their allegations of a conspiracy

to deny the existence of chronic Lyme disease in exchange for payment.

Further, to survive summary judgment in an antitrust case[5] when relying on circumstantial

evidence, Plaintiffs bear the burden of "present[ing] evidence 'that tends to exclude the possibility'

that the alleged conspirators acted independently . . . [and] must show that the inference of

conspiracy is reasonable in light of the competing inferences of independent action or collusive

action that could not have harmed respondents."  *Matsushita*, 475 U.S. at 588; *see also Golden

Bridge Tech.*, 547 F.3d at 273 ("It is not sufficient under *Matsushita* for [Plaintiff] to simply

propose conceivable motives for conspiratorial conduct; [Plaintiff's] evidence must tend to show

that the possibility of independent conduct is excluded.").  An antitrust claim must also show "a

conscious commitment to a common scheme designed to achieve an unlawful objective."

*Marucci*, 751 F.3d at 374 (quoting *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764

(1984)); *see also H & B Equip.*, 577 F.2d at 245 ("To establish [a party's] complicity, the evidence

must warrant a finding that [the conspiring parties] had a 'meeting of minds in an unlawful

arrangement.' ").  And "if there is not sufficient evidence of a conspiracy to support a Section 1

---

[5] The Fifth Circuit has held that in antitrust cases "[w]e no longer maintain that summary judgment is especially disfavored in categories of cases.  Stearns' attempt to invoke earlier cases in which we suggested that summary judgment should be shunned when complex antitrust claims are involved thus fails."  *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 521 (5th Cir. 1999) (citation omitted).

claim, then there is not sufficient evidence of a conspiracy to support a Section 2 claim [under a theory of joint monopolization]." *Stewart Glass*, 17 F.Supp.2d at 657.

An antitrust plaintiff must also present evidence to establish an antitrust market. *See Shah*, 985 F.3d at 454 ("Whether a relevant market has been identified is usually a question of fact; however, in some circumstances, the issue may be determined as a matter of law.  If [Plaintiff] fails to define his proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in [his] favor, the relevant market is legally insufficient.  That is, in order for [Plaintiff's] definition to be legally sufficient, it must include all commodities reasonably interchangeable by consumers for the same purposes." (citation omitted)).  In a relevant market, a monopolist has "the power to control prices or exclude competition." *Grinnell*, 384 U.S. at 571. And "[t]he offense of monopolization requires that the defendant dominate the relevant market," meaning that—absent special circumstances—"a defendant must have a market share of at least fifty percent before he can be guilty of monopolization." *Domed Stadium Hotel*, 732 F.2d at 489.

Assuming *arguendo* that Plaintiffs here have properly identified and supported the market for the treatment of Lyme disease as an antitrust market, they cannot meet their burden to survive summary judgment on their antitrust claims.  As discussed above, Plaintiffs do not present evidence that gives rise to a genuine issue of fact of an agreement between the alleged conspirators. *See Marucci*, 751 F.3d at 374.  Nor do they present evidence that tends to exclude the possibility of independent conduct on the part of Defendant; instead, they offer merely speculation, conclusory assertions and attorney argument. *See Golden Bridge Tech.*, 547 F.3d at 273; s*ee also Sojitz Energy Venture, Inc. v. Union Oil Co. of California*, 394 F. Supp. 3d 687, 714 (S.D. Tex.

2019) (citing *Velasco v. Cameron Cty.*, 721 F. App'x 387, 388–89 (5th Cir. 2018); *Blue Spike, LLC v. Audible Magic Corp.*, No. 6:15-CV-584, 2016 WL 3653516, at *4 (E.D. Tex. May 31, 2016) ("Conclusory assertions and attorney argument are insufficient to defeat summary judgment.")). Further, there is no evidence that Defendant actually participates in the market for the treatment of Lyme disease as a monopolist—let alone controls fifty percent of that market. *See United Farmers Agents*, 89 F.3d at 236 (finding that a proposed market fails because defendant did not sell services in that market but provided a free product); *Domed Stadium Hotel*, 732 F.2d at 489. Defendant promulgates free guidelines for doctors about treating Lyme diseases and is one of many groups to do so. *See* Docket No. 357-3 at 2. Defendant does not treat patients for Lyme disease and is not an insurance company that pays for those treatments. Under these circumstances, it is implausible that Defendant controls fifty percent of the Lyme disease treatment market. Plaintiffs' antitrust claims thus fail. *See Stewart Glass*, 17 F.Supp.2d at 657.

The time for speculation on what may have occurred has passed. Because Plaintiffs cannot provide evidence that Defendant formed an agreement with the Doctors and the Insurance Defendants to create and enforce arbitrary guidelines for the treatment of Lyme disease, that Defendant received money from the Insurance Defendants in furtherance on the alleged conspiracy, or that Defendant participates in or controls fifty percent of the proposed antitrust market, there is no genuine issue of fact remaining for trial on Plaintiffs' antitrust violations allegation. Defendant IDSA's Motion for Summary Judgment on Plaintiffs' RICO and Antitrust Claims (Docket No. 357) is thus **GRANTED**. It is

**ORDERED** that Plaintiffs' antitrust claims (Docket No. 361 at 49–52) are **DISMISSED WITH PREJUDICE**.

**So ORDERED and SIGNED this 1st day of September, 2021.**

ROBERT W. SCHROEDER III
UNITED STATES DISTRICT JUDGE