# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

November 16, 2023

Lyle W. Cayce
Clerk

---

No. 22-40728

---

Lisa Torrey; Kathryn Kocurek, *Individually and on behalf of* the Estate of J. David Kocurek, Ph.D.; Amy Hanneken; Jane Powell; Carol Fisch; John Valerio, *Individually and as Next Friend of* Christopher Valerio; Randy Sykes; Brienna Reed; Rosetta Fuller; Adriana Monteiro Moreira; Jessica McKinnie; Kristine Woodard; Gayle Clarke; Allison Lynn Caruana; Chloe Lohmeyer; Tawnya Dawn Smith, *Individually and as Next Friend of* Monet Pitre; Mike Peacher, *Individually and as Next Friend of* Ashleigh Peacher; Alarie Bowerman, *Individually and as Next Friend of* Elisa Bowerman, Emory Bowerman and Anais Bowerman,

*Plaintiffs—Appellants*,

*versus*

Infectious Diseases Society of America,

*Defendant—Appellee*.

---

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 5:17-CV-190

---

Before Jones, Stewart, and Duncan, *Circuit Judges*.

Stuart Kyle Duncan, *Circuit Judge*:

A professional society specializing in the study and treatment of infectious diseases published guidelines in a peer-reviewed medical journal for treating Lyme disease. Individuals who claim to suffer from persistent Lyme disease symptoms sued the society, alleging the guidelines harmed them by casting doubt on how chronic Lyme disease should be treated and even whether the condition exists. The district court dismissed the claims because it concluded that the statements at issue were non-actionable medical opinions, not factual assertions that could support a claim for fraudulent or negligent misrepresentation. We AFFIRM.

I.

A.

Plaintiffs are people who claim to suffer from chronic Lyme disease. A person contracts Lyme disease from ticks carrying the bacterium *Borrelia burgdorferi*. *See generally* Robert L. Bratton et al., *Diagnosis and Treatment of Lyme Disease*, 83 MAYO CLINIC PROC. 566 (2008). Typical symptoms are fever, headache, swollen joints, fatigue, and rashes. Many patients respond to short-term antibiotics, but some do not. This latter group is said by some to experience "post-Lyme disease syndrome," "posttreatment chronic Lyme disease," or "chronic Lyme disease."

The nature of chronic Lyme disease, and how to properly treat the condition, are matters of scientific dispute. Plaintiffs allege that some doctors, accepting the phenomenon's existence, recommend a holistic approach that may include long-term antibiotics. Others take a different view—like the Defendant here, the Infectious Diseases Society of America ("IDSA"), a professional society of doctors, scientists, and other healthcare professionals.

In 2006, IDSA published *The Clinical Assessment, Treatment, and Prevention of Lyme Disease, Human Granulocytic Anaplasmosis, and Babesiosis:*

*Clinical Practice Guidelines by the Infectious Diseases Society of America* ("the Guidelines"). The Guidelines appeared in the peer-reviewed medical journal *Clinical Infectious Diseases*, one of IDSA's publications. The Guidelines extensively discuss how to diagnose and treat Lyme disease.[1] Throughout, they express doubt about the causes, frequency, and even the existence of chronic Lyme disease. Moreover, the Guidelines do not recommend long-term antibiotic therapy for persons with persistent Lyme symptoms who have already received recommended treatments.

B.

In November 2017, Plaintiffs sued IDSA, six health insurance companies and a health insurance trade association (collectively, the "Insurance Defendants"), and seven doctors ("the Doctors") who were among the fourteen authors of IDSA's 2006 Guidelines. Plaintiffs alleged that the Insurance Defendants paid the Doctors "large consulting fees" to include baseless treatment recommendations in the Guidelines, which, in turn, would allow the Insurance Defendants to deny coverage for chronic Lyme disease. Plaintiffs asserted claims under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(a)–(d), as well the Sherman Act.

From 2019 to 2021, Plaintiffs settled with all Insurance Defendants. They also conducted full discovery on their RICO and antitrust claims. In January 2021, on the last day of fact discovery, Plaintiffs filed a Second Amended Complaint, adding for the first time fraudulent and negligent misrepresentation claims against IDSA. IDSA and the Doctors moved to

[1] We discuss specific statements from the Guidelines below, as necessary to address Plaintiffs' arguments.

dismiss Plaintiffs' Second Amended Complaint and also moved for summary judgment on the RICO and antitrust claims.

In March 2021, Plaintiffs filed a Third Amended Complaint, adding allegations supporting their misrepresentation claims. IDSA and the Doctors again moved to dismiss. Plaintiffs later voluntarily dismissed with prejudice their RICO claims against IDSA and the Doctors and likewise dismissed their antitrust claim against the Doctors (but not against IDSA). In September 2021, the district court granted IDSA's motion for summary judgment on the antitrust claims.

All that remained were Plaintiffs' misrepresentation claims against IDSA, which the district court dismissed shortly thereafter. The court reasoned that "the statements in the IDSA Guidelines are not the type of statements that Plaintiffs can recover for based on misrepresentation, as they are medical opinions, not factual representations." At best, the court observed, "Plaintiffs cite other studies or statements that have reached different conclusions or formed different opinions than those expressed in the IDSA Guidelines."

Subsequently, IDSA moved to recover $43,940.06 in costs for defending against Plaintiffs' RICO and antitrust claims. Plaintiffs filed a notice stating they agreed with IDSA's proposed bill of costs. Accordingly, the district court granted IDSA $43,940.06 in costs and entered final judgment against Plaintiffs.

Plaintiffs timely appealed.

II.

We review *de novo* a Rule 12(b)(6) dismissal for failure to state a claim. *See Norsworthy v. Hous. Indep. Sch. Dist.*, 70 F.4th 332, 336 (5th Cir. 2023). A complaint that fails to state a facially plausible claim must be dismissed. *Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "[F]acial plausibility" means "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). We accept well-pled facts as true and view them in the light most favorable to the plaintiff. *PHI Grp., Inc. v. Zurich Am. Ins. Co.*, 58 F.4th 838, 841 (5th Cir. 2023). But we disregard "conclusory allegations, unwarranted factual inferences, or legal conclusions." *Heinze v. Tesco Corp.*, 971 F.3d 475, 479 (5th Cir. 2020) (citation omitted).

## III.

Plaintiffs argue the district court erred in dismissing their misrepresentation claims against IDSA. They contend that the Guidelines, properly read, do not merely report medical opinions but instead make factual representations about the proper treatment for, and indeed the very existence of, chronic Lyme disease. We disagree. Instead, as explained below, we agree with the district court that the Guidelines "are medical opinions, not factual representations," and cannot form the basis for a claim of fraudulent or negligent misrepresentation.

Before beginning our analysis, we say a brief word about the applicable law. Plaintiffs' misrepresentation claims might be governed by the laws of three different States—Texas, New York, or Virginia. *See generally* Restatement (Second) of Conflict of Laws §§ 6, 145 (Am. L. Inst. 1971). The parties spar over this choice-of-law question, but their disagreement does not touch the key issue on which we resolve this appeal—*i.e.*, whether the Guidelines constitute non-actionable medical opinions or actionable factual representations.[2] As to that issue, the parties appear to

[2] The parties' disagreement about applicable state law instead centers on the issue of "derivative" reliance—specifically, whether Plaintiffs may maintain a claim based on the allegation that their *doctors* relied on IDSA's alleged misrepresentations. Because we

agree that those States' laws do not meaningfully differ.[3] Accordingly, we need not resolve the choice-of-law question. *See LHC Nashua P'ship, Ltd. v. PDNED Sagamore Nashua, L.L.C.*, 659 F.3d 450, 456–57 (5th Cir. 2011) (explaining we need not decide governing State law "if our conclusions would be the same"). We therefore turn to Plaintiffs' arguments.

Plaintiffs appear to agree that merely publishing a medical opinion—even a hotly debated one—in a peer-reviewed journal cannot give rise to a misrepresentation claim. Some of our sister circuits have adopted that proposition in analogous contexts, relying on both the First Amendment and commonsense observations about the nature of scientific debate. *See Pacira Biosci., Inc. v. Am. Soc'y of Anesthesiologists, Inc.*, 63 F.4th 240, 249 (3d Cir. 2023) (holding that "content, verifiability, and context" all support conclusion that statements in peer-reviewed medical journal are "nonactionable opinions" for trade libel claims); *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 498 (2d Cir. 2013) (holding that contents of article published in peer-reviewed medical journal are "non-actionable scientific conclusions" for false advertising claim under Lanham Act). Our circuit has discussed one of those precedents favorably, albeit in dicta. *See Eastman Chem. Co. v. Plastipure, Inc.*, 775 F.3d 230, 235 (5th Cir. 2014) ("After a thorough analysis, the Second Circuit concluded that the First Amendment places scientific debates unfolding within the scientific community beyond the reach of the Lanham Act." (citing *ONY*, 720 F.3d at 496–97)). We discuss those cases in greater detail below. For their part,

---

do not address this issue, we need not address the antecedent choice-of-law question posed by the parties.

[3] Indeed, Plaintiffs' brief concedes there is no substantive difference on this issue among the laws of Texas, New York, or Virginia and that, consequently, "the Court need not resolve the choice-of-law question with regards to this issue."

Plaintiffs do not contest the principle and, in any event, cite no decision casting any doubt on it.[4]

What Plaintiffs do argue, however, is that the district court failed to read the Guidelines' statements about chronic Lyme disease "in context." Had it done so, they contend, the court would have seen that the Guidelines do not merely report opinions but, rather, make factual assertions intended to influence doctors and insurance companies. These arguments miss the mark.

Plaintiffs contend the district court "literally" read the Guidelines without considering "the perception of them as applied by medical practitioners, other researchers, and influential players within the medical community." We disagree. Plaintiffs cite no authority instructing courts to read the Guidelines in that way. Instead, Plaintiffs cite cases merely saying courts must consider "a reasonable person's perception of the entirety of a publication," *In re Lipsky*, 460 S.W.3d 579, 594 (Tex. 2015), and must avoid "literalism." *Immuno AG. v. Moor-Jankowski*, 567 N.E.2d 1270, 1273 (N.Y. 1991). These are everyday interpretive rules, but Plaintiffs fail to show how the district court violated them. To the contrary, the district court explicitly recognized the Guidelines' context: it noted that the Guidelines "set forth explanations of medical research, experiments and knowledge based on citations to other published studies and clinical trials, not naked assertions of fact." Indeed, if anyone has taken the Guidelines out of context, it is Plaintiffs. As the district court observed, the statements targeted by Plaintiffs

---

[4] Accordingly, we need not determine when, if ever, the mere publication of a medical or other scientific opinion might form the basis for a cause of action for misrepresentation or any other tort.

"are isolated portions of complex documents and reading the IDSA Guidelines in their entirety undermines Plaintiffs' pleadings."

Plaintiffs also contend the Guidelines show that IDSA tried to "bury" or "explain away" treatment failures, which Plaintiffs interpret as the organization's "skepticism and overall disapproval of the studies relating to instances of chronic Lyme disease." This argument is unavailing. Contrary to Plaintiffs' view, the Guidelines do not become actionable factual representations merely because they disapprove of studies Plaintiffs prefer. As the district court concluded, "[a]t best, Plaintiffs cite other studies or statements that have reached different conclusions or formed different opinions than those expressed in the IDSA Guidelines." *See Am. Sch. Of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 106 (1902)) ("[D]ifferent schools of medicine have their followers, and many who believe in the one will pronounce the other wholly devoid of merit. But there is no precise standard by which to measure the claims of either . . . .").

Plaintiffs next argue that the district court erred by relying on a Guidelines disclaimer which "contradicts" the Guidelines' opening sentence. We again disagree. The disclaimer states that the "[G]uidelines cannot always account for individual variation among patients," and that "the ultimate determination" to apply them should "be made by the physician in the light of each patient's individual circumstances." The Guidelines' introductory sentence states that they "are intended for use by health care providers who care for patients who either have these infections or may be at risk for them." We see no contradiction between the two statements. It is perfectly consistent (1) to offer general guidance to physicians about treating Lyme disease, while (2) recognizing the final decision should be left up to the treating physician given inevitable variation in individual cases. In any event, even if Plaintiffs were correct that some

tension existed between the two statements (although we see none), they cite no authority that this amounts to an actionable misrepresentation.

As to specific statements in the Guidelines, Plaintiffs emphasize two. They take issue with IDSA's positions that (1) "[t]here is no convincing biological evidence for the existence of symptomatic chronic *B. burgdorferi* infection among patients after receipt of recommended treatment regimens for Lyme disease," and (2) "[a]ntibiotic therapy has not proven to be useful and is not recommended for patients with chronic (>6 months) subjective symptoms after recommended treatment regimens for Lyme disease."[5] On their face, however, these statements are medical opinions. In this context (a scientific debate over treatment options for persistent Lyme symptoms), to say that evidence is not "convincing" or that some treatment is "not recommended" is plainly to express a medical opinion. Just because Plaintiffs disagree with those opinions does not mean that IDSA is somehow liable because their doctors or insurance providers found the opinions persuasive.

Not only do Plaintiffs misread the Guidelines, but accepting their arguments would risk putting us at odds with other circuits. For instance, in the Second Circuit's *ONY* case, the plaintiff claimed an article in a peer-reviewed medical journal made false statements about the effectiveness of treatments to help lung function in premature infants. 720 F.3d at 492–95. The Second Circuit recognized that scientific discourse "poses several problems for the fact-opinion paradigm of First Amendment jurisprudence." *Id.* at 496. On the one hand, "[m]ost conclusions contained in a scientific journal article are, in principle, capable of verification or refutation by means of objective proof." *Ibid.* (internal quotation marks and citation omitted). On

---

[5] Plaintiffs raise similar objections to IDSA's not recommending long-term antibiotic therapy "[b]ecause of a lack of biological plausibility, lack of efficacy, absence of supporting data, or the potential for harm to the patient."

the other hand, "it is the essence of the scientific method that the conclusions of empirical research are tentative and subject to revision, because they represent inferences about the nature of reality based on the results of experimentation and observation." *Ibid.* Accordingly, the court concluded that the statements at issue were "more closely akin to matters of opinion, and [were] so understood by the relevant scientific communities." *Id.* at 497. It therefore held that "the contents of the article [were] non-actionable scientific conclusions." *Id.* at 498.

Similarly, the Third Circuit's *Pacira* case involved a dispute over the efficacy of an anesthetic to control post-surgical pain. 63 F.4th at 243. The manufacturer plaintiff sued defendants for trade libel for publishing statements in a medical journal criticizing the anesthetic. *Ibid.* Citing *ONY*, the Third Circuit examined the content of the publication, the verifiability of the assertions, and the context in which they were written. *Id.* at 245–49. The court concluded that a "fair and natural reading of these statements shows that these are nonactionable subjective expressions." *Id.* at 246 (internal quotation marks and citation omitted).

Plaintiffs rely on our opinion in *Eastman Chemical Co. v. Plastipure, Inc.*, but it does not help them. That case involved a plaintiff who manufactured a plastic resin used in drinking containers. 775 F.3d at 233. Defendants, who were plaintiff's competitors, published an article in a peer-reviewed journal "summarizing the results of its testing of more than 500 commercially available plastic products." *Ibid.* They also distributed a three-page brochure depicting plaintiff's resin as containing harmful chemicals. *Id.* at 233–34. We allowed plaintiff's Lanham Act suit to go forward, but only after emphasizing that "[plaintiff] did not sue [defendants] for publishing an article in a scientific journal." *Id.* at 236. Rather, we stated, "[plaintiff] sought to enjoin statements made in commercial advertisements and directed at customers." *Ibid.* Accordingly, we affirmed the injunction, which applied

only to defendants' statements "in connection with any advertising, promotion, offering for sale, or sale of goods or services," but *not* to the journal article. *Id.* at 237. As this description of *Eastman* confirms, the case helps IDSA, not Plaintiffs.

In sum, the district court did not err in holding that IDSA's Guidelines statements about chronic Lyme disease constitute nonactionable medical opinions.[6]

## IV.

The district court's judgment is AFFIRMED.

---

[6] Alternatively, Plaintiffs argue that—even if the Guidelines are nonactionable medical opinions—they can still sue for misrepresentation because IDSA knew the opinions were false. We need not address this argument because, as IDSA points out, Plaintiffs did not raise it in the district court. Plaintiffs' reply brief does not even attempt to argue to the contrary. Accordingly, the argument is forfeited. *See Moore v. LaSalle Mgmt. Co., L.L.C.*, 41 F.4th 493, 509 (5th Cir. 2022) ("We do not consider arguments raised for the first time on appeal." (internal quotation marks and citation omitted)).

Finally, Plaintiffs argue the district court erred by granting IDSA's bill of costs as the prevailing party. But the only basis on which Plaintiffs argue for reversal is that the district court erred in dismissing their misrepresentation claims. Because we affirm the dismissal of those claims, we necessarily affirm the bill of costs.